1              UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF CALIFORNIA

3

4     UNITED STATES OF AMERICA,    )
                                   )
5              PLAINTIFF,          )    CASE NO. 13CR3781-JLS
                                   )             13CR3782-JLS
6     VS.                          )
                                   )    SAN DIEGO, CALIFORNIA
7     LEONARD GLENN FRANCIS,       )    THURSDAY,
                                   )    NOVEMBER 21, 2013
8              DEFENDANT.          )    4:11 P.M.
      _____)

9

10

11              TRANSCRIPT OF BOND HEARING
             BEFORE THE HONORABLE JAN M. ADLER
12             UNITED STATES MAGISTRATE JUDGE

13

14    APPEARANCES:

15    FOR THE GOVERNMENT:      ROBERT HUIE
                               BRIAN YOUNG
16                             ASSISTANT U.S. ATTORNEYS
                               880 FRONT STREET
17                             SAN DIEGO, CALIFORNIA  92101

18

19    FOR THE DEFENDANT:       JONES DAY
                               BY:  EDWARD SWAN, ESQ.
20                                  KATIE SHEPPARD, ESQ.
                               12265 EL CAMINO REAL
20                             SUITE 300
21                             SAN DIEGO, CALIFORNIA  92130

22

      TRANSCRIPT ORDERED BY:   ROBERT HUIE, AUSA
23

      TRANSCRIBER:             CAMERON P. KIRCHER
24

      PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
25    TRANSCRIPT PRODUCED BY TRANSCRIPTION.

1    SAN DIEGO, CALIFORNIA - THURSDAY, NOVEMBER 21, 2013

2                        4:11 P.M.

3            THE CLERK:  CALLING MATTERS 14 AND 15 FROM THE

4    CALENDAR, 13CR3781 AND 13CR3782, THE UNITED STATES OF AMERICA

5    VERSUS LEONARD GLENN FRANCIS, ON CALENDAR FOR A BOND

6    HEARING.

7            MR. HUIE:  GOOD AFTERNOON, YOUR HONOR.  ROBERT HUIE

8    AND BRIAN YOUNG FOR THE UNITED STATES.

9            THE COURT:  GOOD AFTERNOON.

10           MR. SWAN:  GOOD AFTERNOON.  PAT SWAN -- AND MY

11   ASSOCIATE KATIE SHEPPARD IS OUT IN THE HALL -- OF JONES DAY,

12   FOR THE DEFENDANT, LEONARD FRANCIS, WHO IS IN CUSTODY --

13           THE COURT:  GOOD AFTERNOON.

14           MR. SWAN:  -- AND NOT YET PRESENT IN COURT.

15           YOUR HONOR, BEFORE HE COMES OUT, I WOULD LIKE TO --

16   I EXPECT THIS HEARING WILL BE SOMEWHAT LENGTHY.  I REALIZE

17   IT'S LATE IN THE DAY, BUT I WOULD LIKE TO MAKE A MOTION THAT

18   MR. FRANCIS BE PERMITTED TO PARTICIPATE WITHOUT AT LEAST THE

19   WAIST AND HANDCUFFS, SHACKLES.

20           THE COURT:  WHAT IS THE GOVERNMENT'S POSITION?

21           MR. HUIE:  YOUR HONOR, WE DEFER TO THE COURT'S

22   JUDGMENT.

23           THE COURT:  ALL RIGHT.  I WILL GRANT THE MOTION.  IF

24   THE MARSHALS WOULD PLEASE JUST LEAVE THE LEG SHACKLES ON.

25           MR. SWAN, YOU'RE GOING TO RESIST TALKING ABOUT

1    DUKE'S RECRUITING CLASS?

2              MR. SWAN:  I AM.

3              THE COURT:  IT'S VERY HARD TO DO THAT, I'M SURE.

4              MR. SWAN:  I WAS TRYING TO FIGURE OUT A WAY TO WORK

5    THAT INTO THE BOND ARGUMENT.

6              THE COURT:  I DON'T KNOW IF YOU KNOW, BUT THEY GOT

7    ANOTHER COMMITMENT TODAY.

8              MR. SWAN:  OH, THEY GOT THE THIRD, OKAY.

9              THE COURT:  WINSLOW.

10             MR. SWAN:  THERE'S HOPE.  IT'S BETTER THAN

11   NORTH CAROLINA WITH BELMONT.

12             MR. FRANCIS IS NOW PRESENT IN COURT.  THANK YOU VERY

13   MUCH.

14             THE COURT:  THANK YOU.

15             ALL RIGHT.  THIS MATTER IS ON FOR A BOND HEARING.

16             MR. SWAN:  THANK YOU, YOUR HONOR.

17             WE'RE HERE TODAY SEEKING A BOND FOR MR. FRANCIS, WHO

18   HAS BEEN IN CUSTODY FOR TWO MONTHS, SINCE HIS ARREST ON

19   SEPTEMBER 16TH, 2013.  HIS PRETRIAL DETENTION HAS BEEN VERY

20   HARD ON HIM.  HE'S HAD VIRTUALLY NO CONTACT WITH HIS THREE

21   YOUNGEST CHILDREN, WHO ARE AGES FIVE, SIX AND SEVEN.  THEY

22   JUST STARTED SCHOOL EARLIER THIS MONTH IN MALAYSIA, AND HE

23   MISSED THEIR RECENT BIRTHDAYS.  HE IS DIVORCED AND HAS BEEN A

24   SINGLE PARENT.  HE'S A LOVING AND DOTING PARENT FOR ALL THREE

25   OF HIS YOUNG CHILDREN.

1     THEY ARE PRESENTLY BEING TAKEN CARE OF BY HIS

2 70-YEAR-OLD MOTHER, WHO IS IN POOR HEALTH.  AND I HAVE SOME

3 DOCUMENTS IF THE COURT WOULD LIKE ATTESTING TO HER MEDICAL

4 PROBLEMS.

5     HE REALIZES HE'S GOING TO HAVE TO STAY HERE FOR THE

6 PENDENCY OF THIS CASE, AND HE'S DETERMINED TO DO THAT.  BUT

7 PRESENTLY, GIVEN THE LACK OF PHONE AND TIME, HE HASN'T REALLY

8 HAD A CHANCE TO TALK TO HIS KIDS.  IF HE WAS RELEASED, HE

9 OBVIOUSLY WOULD HAVE THAT ABILITY.  HE WOULD ALSO HAVE THE

10 ABILITY TO WORK WITH HIS BUSINESS.

11     THERE IS NO ALLEGATION THAT HIS EXTENSIVE MARITIME

12 BUSINESS IN SOUTHEAST ASIA IS FRAUDULENT.  THE CHARGE HERE IS

13 THAT HE BRIBED SOME NAVY OFFICERS, AND THERE IS ADDITIONAL

14 ALLEGATIONS THAT HE OVERCHARGED ON CERTAIN CHARGES.  BUT HE

15 HAS HAD A LEGITIMATE BUSINESS FOR THE LAST 30 YEARS, WHICH

16 I'LL TALK ABOUT IN A FEW MINUTES.  AND THE BUSINESS NEEDS HIS

17 GUIDANCE; OTHERWISE, IT'S THREATENED BY CREDITORS.

18     AND BEING IN CUSTODY, HE CANNOT HANDLE THOSE

19 PROBLEMS.  ALL THESE CONCERNS HAVE CHALLENGES THEMSELVES.  HE

20 WANTS TO BE RELEASED SO HE CAN HANDLE THESE PROBLEMS.  AND I

21 BELIEVE WE CAN PROVIDE THE COURT WITH A SUFFICIENT

22 COMBINATION OF CONDITIONS THAT WILL ENSURE THE COURT THAT HE

23 WILL MAKE HIS FUTURE COURT APPEARANCES.

24     BUT BEFORE I GO ANY FURTHER, I WOULD LIKE TO

25 INTRODUCE MR. FRANCIS' AUNT, FRANCISCA WHITE, WHO IS SEATED

1    TO THE LEFT.

2                CAN YOU RAISE YOUR HAND.  THANK YOU.

3                THE COURT:  GOOD AFTERNOON.

4                MR. SWAN:  AND HER SON, JOSEPH, WHO IS ALSO

5    MR. FRANCIS' GODSON.  THEY CAME HERE YESTERDAY IN SUPPORT OF

6    MR. FRANCIS' BOND.  THEY LIVE IN THE BALTIMORE, MARYLAND

7    SUBURB, AND THEY FLEW ACROSS THE COUNTRY TO BE HERE WITH

8    MR. FRANCIS TO SHOW THEIR SUPPORT.  AND AS I WILL DETAIL,

9    MS. WHITE, MRS. WHITE, IS PREPARED TO COSIGN HIS BOND.

10               WHEN WE INITIALLY APPEARED ON THIS CASE, THE

11   GOVERNMENT MOVED FOR MR. FRANCIS' PRETRIAL DETENTION BASED ON

12   ITS CLAIM THAT HE WAS A FLIGHT RISK.  HE'S A 49-YEAR-OLD

13   MALAYSIAN CITIZEN, WHO WAS INVITED TO SAN DIEGO BY THE

14   U.S. NAVY.  HE'S BEEN A U.S. NAVY CONTRACTOR FOR DOZENS OF

15   YEARS, AND HE WAS INVITED HERE TO MEET WITH HIS CUSTOMER, THE

16   U.S. NAVY, AND MAKE A PRESENTATION.

17               HE CAME HERE LEGALLY ON A TEN-YEAR VISA THAT EXPIRES

18   IN THE YEAR 2019, SIX YEARS FROM NOW.  AND HE'S LEGALLY HERE

19   NOW.  HE WAS ADMITTED INTO THE UNITED STATES FOR SIX MONTHS

20   ON THAT VISA.  AT THE U.S. NAVY'S REQUEST, HE MADE A FORMAL

21   PRESENTATION TO THE U.S. NAVY, AND AFTERWARD, HE WAS ARRESTED

22   IN HIS HOTEL ROOM AT THE MARRIOTT HOTEL DOWNTOWN -- ON THE

23   HARBOR SIDE.

24               MR. FRANCIS CAME TO SAN DIEGO KNOWING HE WAS UNDER

25   INVESTIGATION AND THAT HE COULD BE ARRESTED.  HE DID NOT SEEK

1    TO FLEE, BUT INSTEAD CAME WITH A FULL KNOWLEDGE THAT HE COULD

2    END UP WHERE HE IS NOW.  HE WANTS TO HAVE HIS DAY IN COURT

3    AND HE IS NOT A FLIGHT RISK.

4            AT HIS INITIAL ARRAIGNMENT, WE STIPULATED TO

5    DETENTION WITHOUT PREJUDICE SO WE COULD HAVE TIME TO PUT

6    TOGETHER A BOND PACKAGE THAT WOULD REASONABLY ASSURE THIS

7    COURT THAT MR. FRANCIS WOULD MAKE ALL OF HIS COURT

8    APPEARANCES AS REQUIRED.  WE BELIEVE WE HAVE THAT BOND

9    PACKAGE NOW.

10           WHILE THE ALLEGATIONS AGAINST MR. FRANCIS ARE

11   SERIOUS, THE CHARGES ARE BASICALLY FINANCIAL CRIMES.  THEY

12   ARE NOT CRIMES OF VIOLENCE.  THEY ARE NOT DRUG CRIMES OR

13   OTHER CRIMES JUSTIFYING DETENTION WITHOUT BAIL.  WE

14   UNDERSTAND THAT THE GOVERNMENT BELIEVES MR. FRANCIS IS A

15   SERIOUS RISK OF FLIGHT.  WE APPRECIATE THE GOVERNMENT'S

16   CONCERN, BUT WE BELIEVE THAT THERE IS A COMBINATION OF

17   CONDITIONS THAT WILL REASONABLY ASSURE HIS APPEARANCE AS

18   REQUIRED.

19           I'D LIKE TO ADDRESS THE 3142 FACTORS.  I BELIEVE,

20   FIRST, IT'S IMPORTANT TO NOTE THAT UNDER TITLE 18, USC

21   SECTION 3142(E)(2), THAT THERE IS NO REBUTTABLE PRESUMPTION

22   THAT MR. FRANCIS SHOULD BE DETAINED.  IN THE MAJORITY OF

23   CASES IN THIS DISTRICT, INVOLVING -- EXCEPT FOR CASES

24   INVOLVING ILLEGAL ALIENS ENTERING THE COUNTRY, THERE USUALLY

25   IS A REBUTTABLE PRESUMPTION THAT THERE IS NO COMBINATION OF

1      CONDITIONS THAT WILL REASONABLY ENSURE THE DEFENDANT'S

2      APPEARANCE.

3            THIS IS NOT ONE OF THOSE CASES.  HE'S NOT CHARGED

4      WITH A CRIME OF VIOLENCE.  HE'S NOT CHARGED WITH AN OFFENSE

5      FOR WHICH THE MAXIMUM PENALTY IS LIFE IMPRISONMENT OR DEATH.

6      HE'S NOT CHARGED WITH A CONTROLLED SUBSTANCE VIOLATION, WHICH

7      HAS A MAXIMUM PENALTY OF TEN YEARS OR MORE.  HE'S NOT CHARGED

8      WITH A FELONY AFTER BEING CONVICTED OF TWO OR MORE PRIOR

9      OFFENSES.  AND HE'S NOT CONVICTED -- EXCUSE ME, HE'S NOT

10     CHARGED WITH A FELONY THAT IS OTHERWISE NOT A CRIME OF

11     VIOLENCE THAT INVOLVES A MINOR VICTIM.  THERE IS NO

12     REBUTTABLE PRESUMPTION THAT HE SHOULD BE DETAINED.

13           TURNING TO THE FACTORS UNDER SECTION 3142(G), THE

14     FIRST FACTOR THAT THE COURT SHOULD CONSIDER IN SETTING A BOND

15     IS NATURE AND CIRCUMSTANCES OF THE OFFENSE CHARGED.  HERE IN

16     TWO INFORMATIONS CURRENTLY PENDING BEFORE THIS COURT,

17     MR. FRANCIS IS CHARGED WITH CONSPIRACY TO COMMIT BRIBERY.

18     EACH OF WHICH CARRIES A MAXIMUM FIVE YEARS IN CUSTODY.

19           I SHOULD NOTE TO THE COURT THAT MR. FRANCIS HAS BEEN

20     CHARGED IN A THIRD CASE, IT'S ONLY BY COMPLAINT RIGHT NOW,

21     AND HE WAS ARRAIGNED IN THAT CASE BEFORE JUDGE BARTICK THIS

22     MORNING WITH THE SAME CHARGE, CONSPIRACY TO COMMIT BRIBERY.

23     I THINK THERE IS SOME ISSUE WHETHER IT'S ONE, TWO OR THREE

24     SEPARATE CONSPIRACIES.  BUT BECAUSE OF THAT CASE, HE FACES

25     NOW A MAXIMUM 15 YEARS IN CUSTODY.

1       WE ASKED JUDGE BARTICK THIS MORNING TO TRANSFER THAT

2  CASE TO THIS COURT SO WE COULD DO ALL THIS AT ONE TIME.  HE

3  FELT SINCE IT WAS ASSIGNED TO HIM, HE WOULD KEEP IT FOR THE

4  TIME BEING AND SEE WHAT HAPPENS.  AND WE HAVE A DATE NEXT

5  MONDAY TO REAPPEAR IN FRONT OF HIM.

6       MR. FRANCIS HAS PLED NOT GUILTY TO ALL THE CHARGES.

7  AND AS I SAID EARLIER, THIS IS A FINANCIAL CRIME WHERE

8  VIRTUALLY ALL DEFENDANTS ARE RELEASED ON BOND PENDING APPEAL.

9       ALONG THOSE LINES, IT SHOULD BE NOTED THAT ALL THREE

10  OF HIS ALLEGED CO-CONSPIRATORS IN EACH OF THE THREE CASES ARE

11  PRESENTLY ON BOND.  U.S. NAVY CAPTAIN SANCHEZ, WHO WAS

12  ARRESTED IN THE LAST THREE WEEKS IN TAMPA, FLORIDA WAS

13  RELEASED ON $100,000 SECURED PROPERTY BOND WITH HOME

14  DETENTION AND GPS MONITORING.  HE IS ALLEGED TO HAVE VIOLATED

15  THE TRUST AND ALLEGIANCE HE SWORE TO AS A U.S. NAVY OFFICER

16  BY PROVIDING CLASSIFIED AND SENSITIVE INFORMATION TO

17  MR. FRANCIS, ALLEGEDLY IN EXCHANGE FOR BRIBES.

18       THE SECOND DEFENDANT, CO-DEFENDANT, U.S. NAVY

19  COMMANDER MICHAEL MISIEWICZ WAS ARRESTED IN COLORADO, AND HE

20  WAS RELEASED ON THE SAME CONDITIONS AS MR. SANCHEZ, A

21  $100,000 SECURED PROPERTY BOND, WITH HOME DETENTION AND GPS

22  MONITORING.  AND LIKE MR. SANCHEZ, HE'S ALLEGED TO HAVE

23  VIOLATED THE TRUST AND ALLEGIANCE HE SWORE TO AS A U.S. NAVY

24  OFFICER.

25       THE THIRD DEFENDANT, WHO IS ONE OF THE TWO CASES YOU

1    HAVE, THE CASE WITH MR. MISIEWICZ AND MR. BELIVEAU.  THE

2    THIRD DEFENDANT IS NCIS SUPERVISORY SPECIAL AGENT JOHN

3    BELIVEAU.  HE WAS ARRESTED IN THE VIRGINIA AREA, WHERE HE WAS

4    A SUPERVISORY AGENT IN CHARGE OF THE NCIS OFFICE IN QUANTICO,

5    VIRGINIA.

6          IT APPEARS HE WAS RELEASED ON HIS OWN RECOGNIZANCE.

7    THE GOVERNMENT MAY CORRECT ME.  I TRIED TO DETERMINE THAT THE

8    LAST COUPLE OF DAYS FROM PACER, AND I WAS UNABLE TO DO SO.

9    BUT I SAW SOME NEWS ARTICLES INDICATING HE WAS RELEASED O.R.,

10   DESPITE ALLEGEDLY VIOLATING HIS SWORN OATH AS A NAVAL

11   INVESTIGATIVE AGENT.

12         THE BOND WE'RE REQUESTING HERE TODAY FOR

13   MR. FRANCIS, WHO DID NOT VIOLATE ANY SWORN OATH TO THE UNITED

14   STATES, IS MUCH MORE ONEROUS AND STRINGENT THAN ANY OF THOSE

15   THREE GENTLEMEN.

16         THE SECOND FACTOR TO CONSIDER UNDER 3142 IS WHETHER

17   IT'S A CRIME OF VIOLENCE.  AND AS I MENTIONED EARLIER, THIS

18   DOES NOT INVOLVE A CRIME OF VIOLENCE.  IT DOES NOT INVOLVE A

19   NARCOTIC, DRUG OR ANY OTHER VIOLATION SPECIFIED IN SECTION

20   3142(G)(1).

21         TURNING TO THE WEIGHT OF THE EVIDENCE.  I KNOW THAT

22   THE COURT HAS OR WILL BE GIVEN A COPY OF THE COMPLAINTS AND

23   THE AFFIDAVITS OF THE SPECIAL AGENT INVESTIGATING THIS CASE,

24   AND I KNOW THE GOVERNMENT WILL ARGUE THAT THE WEIGHT OF THE

25   EVIDENCE AGAINST MR. FRANCIS IS HIGH.  WE'RE NOT GOING TO

1  DISCUSS THE MERITS OF THE CASE TODAY.  BUT AS THE COURT

2  KNOWS, THAT'S THE LEAST SIGNIFICANT FACTOR IN THE

3  DETERMINATION OF BAIL.

4       TURNING TO THE HISTORY AND CHARACTERISTICS OF

5  MR. FRANCIS.  AS I MENTIONED, HE'S A 49-YEAR-OLD GENTLEMAN

6  WHO IS A CITIZEN OF MALAYSIA.  HE DOESN'T HAVE A MENTAL

7  CONDITION THAT WOULD AFFECT WHETHER HE WOULD APPEAR.  HE HAS

8  FAMILY TIES IN THE UNITED STATES.  HE HAS HIS AUNT, FRANCISCA

9  WHITE, AND HIS GODSON, JOSEPH WHITE, WHO LIVE IN MARYLAND.

10  HE HAS AN ADULT SON WHO HAS RETURNED TO MALAYSIA, BUT IS A

11  COLLEGE STUDENT ATTENDING A PROMINENT COLLEGE IN THE

12  NORTHEAST UNITED STATES AND EXPECTS TO RETURN TO SCHOOL IN

13  MAY OF THIS COMING YEAR.

14       MR. FRANCIS HAS HAD STEADY EMPLOYMENT IN SINGAPORE

15  AND WILL WORK REMOTELY IF HE'S RELEASED ON BOND.  HE IS THE

16  PRESIDENT AND CEO OF GLENN DEFENSE AND FOR THE LAST 30 YEARS

17  HAS PROVIDED SERVICES TO OUR U.S. NAVY.  HE'S PROVIDED THOSE

18  SERVICES, WHERE HE PROVIDED SERVICES FOR SIX TO SEVEN HUNDRED

19  PORT VISITS A YEAR OF U.S. NAVY SHIPS THROUGHOUT SOUTHEAST

20  ASIA, COVERING A 54 MILLION SQUARE MILE AREA.

21       WE UNDERSTAND THAT THE GOVERNMENT IS GOING TO ARGUE

22  THAT MR. FRANCIS OVERCHARGED THE U.S. NAVY FOR SERVICES, BUT

23  THERE IS NO ALLEGATION THAT THE SERVICES WERE NOT PERFORMED;

24  AND TO THE CONTRARY, ALL THE SERVICES WERE PERFORMED AND WERE

25  ALWAYS TOP NOTCH.  HIS SERVICES AND EFFORTS AND HIS COMPANY'S

1    PERFORMANCE GREATLY ASSISTED OUR NAVY IN THE PERFORMANCE OF

2    ITS MISSION.

3            I HAVE HERE TODAY LETTERS, NOT FROM THE NAVY BECAUSE

4    OF THE CHARGES, SUGGESTING THAT CERTAIN PEOPLE IN THE NAVY

5    WERE INFLUENCED BY HIM, BUT I HAVE 11 LETTERS HERE THAT I'D

6    LIKE TO SUBMIT -- AND I'VE GIVEN MR. HUIE COPIES -- FROM

7    EMBASSIES THROUGHOUT SOUTHEAST ASIA.  EMBASSIES OF THE UNITED

8    STATES OF AMERICA AND MOST OF THE COUNTRIES IN SOUTHEAST ASIA

9    DATING BETWEEN NOVEMBER 2003 AND NOVEMBER 2012, A NINE-YEAR

10   PERIOD.

11           AND THIS IS JUST A SAMPLING OF THE TYPE OF

12   COMMENDATIONS HE RECEIVED FROM THE UNITED STATES FOR THE

13   PERFORMANCE, THE WORK THAT WAS PERFORMED FOR THE U.S. NAVY

14   AND FOR THE UNITED STATES.

15           CAN I APPROACH?

16           THE COURT:  YOU MAY APPROACH.  THANK YOU.

17           MR. SWAN:  WE HAVE DOZENS OF LETTERS SIMILAR TO THAT

18   FROM THE U.S. NAVY, BUT BECAUSE OF THE ALLEGATIONS, I DON'T

19   WANT TO SUBMIT THOSE AND SUGGEST THAT ANY ONE OF THOSE PEOPLE

20   MIGHT HAVE BEEN INFLUENCED IN ANY WAY.  BUT THEY ARE

21   AVAILABLE FOR THE COURT IF THE COURT WOULD LIKE TO SEE THEM.

22           THOSE LETTERS -- I KNOW THE COURT HAS AN OPPORTUNITY

23   TO READ THEM -- WILL SHOW THAT FOR DECADES MR. FRANCIS AND

24   HIS COMPANY HAVE PROVIDED OUTSTANDING SERVICES.  THIS IS A

25   GENTLEMAN WHO HAS HAD STEADY EMPLOYMENT.  HE'S HAD BASICALLY

THE SAME JOB FOR DECADES.  HE'S BUILT IT UP AND IT INDICATES

THAT HE IS SOMEONE RESPONSIBLE, SOMEONE ABLE TO PERFORM IF HE

MAKES A PROMISE.

MR. FRANCIS OBVIOUSLY IS NOT A LONG-TIME RESIDENT OF

THIS COMMUNITY.  HE WAS INVITED HERE BY OUR GOVERNMENT SO HE

COULD MAKE A PRESENTATION AND BE ARRESTED.  BEFORE THAT, HE

HAS MAINTAINED STEADY RESIDENCE IN SINGAPORE, AND HE LIVES IN

A HOUSE THAT HAS BEEN OWNED BY THE FAMILY FOR 40 YEARS.  HE

HAS A STEADY JOB, STEADY RESIDENCE.  THE DEFENDANT DOES NOT

HAVE ANY SIGNIFICANT COMMUNITY TIES OTHER THAN HIS AUNT AND

GODSON WHO WERE GOOD ENOUGH TO COME HERE.

TURNING TO PAST CONDUCT.  HE HAS NO HISTORY RELATING

TO DRUG ABUSE.  HE HAS NO HISTORY RELATING TO ALCOHOL ABUSE.

HE HAS NO SIGNIFICANT PRIOR CRIMINAL RECORD.  TWENTY-FIVE

YEARS AGO, WHEN HE WAS -- MORE THAN 25 YEARS, BUT WHEN HE WAS

21 YEARS OLD, WHICH WOULD HAVE BEEN 28 YEARS AGO, HE WAS

ARRESTED IN MALAYSIA FOR POSSESSING TWO GUNS AND SOME

AMMUNITION.

UNLIKE THE UNITED STATES, MALAYSIA TREATS POSSESSION

OF FIREARMS WHEN YOU'RE NOT LICENSED TO POSSESS THEM VERY

STRICTLY.  HE WAS RELEASED ON BOND.  AND THE CASE WENT ON FOR

A NUMBER OF YEARS, AND WHEN HE WAS AGE 24, WHICH WOULD HAVE

BEEN 25 YEARS AGO, HE WAS CONVICTED.  HE WAS SENTENCED TO

18 MONTHS IN CUSTODY, BUT HE SERVED LESS THAN A YEAR.  AND

SINCE THEN, HAS HAD NO ARRESTS, CONVICTIONS OR ANYTHING

1    SIMILAR TO THAT.  AND HE WAS CONVICTED, LIKE I SAID, FOR A

2    CRIME THAT WOULD NOT BE A CRIME HERE IN SAN DIEGO OR THE

3    UNITED STATES.

4         HE HAS NO PRIOR RECORD OF FAILURE TO APPEAR AT COURT

5    PROCEEDINGS.  HE MADE ALL HIS COURT APPEARANCES 25 YEARS AGO

6    BEFORE HE WAS SENTENCED.  HE HAS NO PRIOR RECORD OF

7    PROBATION, PAROLE OR SUPERVISED RELEASE VIOLATIONS AND/OR

8    REVOCATIONS.  AT THE TIME OF HIS ARREST IN THIS CASE, CASES,

9    HE WAS NOT ON PROBATION.  HE WAS NOT ON PAROLE.  HE WAS NOT

10   ON RELEASE PENDING TRIAL, SENTENCE, APPEAL OR COMPLETION OF

11   SENTENCE.

12        TURNING TO THE OTHER FACTORS UNDER 3142.  THE

13   DEFENDANT, IN ADDITION TO RUNNING A SUCCESSFUL COMPANY, HAS

14   BEEN A VERY CHARITABLE AND GIVING PERSON.  HE, HIS FAMILY AND

15   HIS COMPANIES HAVE GIVEN TO NUMEROUS CHARITIES OVER THE YEAR.

16   AND I HAVE SOME LETTERS, JUST A SAMPLING BECAUSE I DIDN'T

17   WANT TO BURDEN THE COURT WITH A LOT OF DOCUMENTS OF SOME OF

18   THE LETTERS THANKING HIM AND HIS COMPANY FOR THEIR GOOD WORK

19   AND THE SPONSORSHIP OF WORTHY CAUSES IN THEIR COMMUNITY.  AND

20   I'VE GIVEN A COPY OF THESE TO MR. HUIE.

21        MAY I APPROACH?

22        THE COURT:  YES.

23        MR. SWAN:  AS I MENTIONED EARLIER, MR. FRANCIS IS

24   LEGALLY HERE IN THE UNITED STATES ON A TEN-YEAR VISA, AND I

25   HAVE A COPY OF THE VISA, WHICH I WOULD ALSO LIKE TO SUBMIT TO

1  THE COURT.  AND I'VE GIVEN A COPY TO MR. HUIE.  AND IT SHOWS
2  THAT IT EXPIRES MARCH 5, 2019.
3      YOUR HONOR, WE BELIEVE BASED ON THESE FACTORS, THAT
4  THERE IS A COMBINATION OF CONDITIONS THAT WILL ASSURE
5  MR. FRANCIS' APPEARANCE AT FUTURE COURT PROCEEDINGS.  AND WE
6  PROPOSE FIVE CATEGORIES OF CONDITIONS, AND I'VE SAVED THE
7  COURT TIME IN WRITING THEM DOWN.  I'VE PASTED THEM INTO A
8  DOCUMENT.  I WONDER IF I CAN DISTRIBUTE THAT.
9      THE COURT:  YES, PLEASE.
10     MR. SWAN:  AND I'D LIKE TO WALK THROUGH EACH OF THE
11  CONDITIONS AND EXPLAIN OUR THINKING BEHIND THEM.
12     FIRST, MR. FRANCIS WILL POST A CASH OR CORPORATE
13  SURETY BAIL BOND IN THE AMOUNT OF ONE MILLION DOLLARS.  WE
14  HAVE A BONDSMAN IN COURT TODAY.  THAT'S THE ROUTE WE PLAN TO
15  TAKE, SO HE'LL HAVE A BONDSMAN AND A LICENSED BOND COMPANY
16  THAT WILL BE LOOKING OUT AFTER HIM AND MAKING SURE THAT HE
17  MAKES HIS APPEARANCES, AND IF HE FLEES, WILL DO EVERYTHING IN
18  THEIR POWER TO GET HIM BACK.
19     SECOND, THE DEFENDANT'S AUNT, FRANCISCA WHITE, WHO
20  IS A UNITED STATES CITIZEN, WILL COSIGN A PERSONAL SURETY
21  BOND FOR THE DEFENDANT IN THE ADDITIONAL AMOUNT OF $100,000;
22  SO THE TOTAL AMOUNT OF THE BOND WILL BE ONE MILLION, ONE
23  HUNDRED THOUSAND DOLLARS.
24     I'D LIKE TO BRIEFLY GIVE YOU SOME INFORMATION AS TO
25  MS. WHITE RIGHT NOW IF I COULD.  SHE WAS BORN IN SINGAPORE

1    AND CAME TO THE UNITED STATES AND IS NOW A NATURALIZED U.S.

2    CITIZEN.  SHE WAS NATURALIZED IN THE YEAR 2000.  SHE'S LIVED

3    IN THE UNITED STATES SINCE 1994.  HER HUSBAND, WHO WAS IN THE

4    MERCHANT MARINES, PASSED AWAY ABOUT TEN YEARS AGO, AND AS A

5    SINGLE MOM, SHE RAISED HER SON, JOSEPH, WHO IS HERE.  HE'S 18

6    YEARS OLD AND JUST GRADUATED FROM HIGH SCHOOL.

7         SHE IS A COORDINATOR AT THE UNION MEMORIAL HOSPITAL

8    IN BALTIMORE, MARYLAND, WHERE SHE HAS WORKED SINCE MARCH

9    2005, OVER THE LAST EIGHT YEARS.  SHE OWNS THE HOME SHE LIVES

10   IN IN PARKVILLE, MARYLAND, WHICH IS A SUBURB OF BALTIMORE;

11   AND SHE PURCHASED THAT HOUSE IN JULY 2004.  UNFORTUNATELY,

12   BECAUSE OF THE ECONOMIC DOWNTURN, IT HAS NO EQUITY IN IT, SO

13   WE'RE NOT ASKING THE COURT TO ACCEPT THAT AS COLLATERAL FOR

14   THE BOND.  BUT SHE IS CURRENT ON HER PAYMENTS AND OBVIOUSLY

15   WANTS TO KEEP THE HOUSE AND WOULD NOT WANT TO HAVE A JUDGMENT

16   BY THE UNITED STATES AGAINST HER THAT WOULD THREATEN THE

17   OWNERSHIP OF HER HOUSE.

18        A THIRD CONDITION THAT WE PROPOSE IS THAT THE

19   DEFENDANT WEAR A GPS ANKLE TRANSMITTER AND BE PLACED IN THE

20   HOME CONFINEMENT PROGRAM WITH ACTIVE GPS MONITORING

21   SUPERVISED BY THE PRETRIAL SERVICES OFFICE, AND THAT HE WILL

22   PAY FOR THE DAILY COST OF HIS MONITORING.

23        BECAUSE HE DOESN'T HAVE A HOME HERE IN SAN DIEGO,

24   THE FOURTH CONDITION IS THAT HE WILL LIVE IN A RENTED

25   APARTMENT OR CONDOMINIUM.  WE'VE MADE INQUIRIES DURING THIS

1     TIME PERIOD, AND PROBABLY BE IN THE DOWNTOWN SAN DIEGO AREA,

2     SINCE HE WON'T BE DRIVING, SO HE CAN COME TO COURT AND GO TO

3     PRETRIAL SERVICES AS NEEDED.

4          AND IT WOULD BE AN APARTMENT OR CONDOMINIUM APPROVED

5     IN ADVANCE BY PRETRIAL SERVICES.  WE REALIZE IT'S GOING TO

6     TAKE SOME TIME IF THE COURT ALLOWS HIM TO POST A BOND TO MEET

7     THE CONDITIONS OF THE BOND.  THE RESIDENCE WILL BE IN AN

8     UPPER FLOOR OF A MULTI-STORY BUILDING AND WILL NOT BE ON THE

9     GROUND FLOOR OR NEAR STREET LEVEL, FURTHER ENSURING THAT IT

10    WOULD BE DIFFICULT FOR HIM TO LEAVE OTHER THAN THROUGH THE

11    FRONT DOOR OF THE APARTMENT OR CONDO.

12         AS AN EXTRA LAYER OF SECURITY, MR. FRANCIS WILL PAY

13    FOR HIS RESIDENCE TO BE MONITORED BY AN INDEPENDENT SECURITY

14    COMPANY THAT WILL INSTALL SURVEILLANCE CAMERAS,

15    CLOSED-CIRCUIT TV CAMERAS ON THE EXTERNAL DOORS AND INSTALL

16    ALARMS ON ALL WINDOWS AND EXTERNAL DOORS.  AND THAT

17    MONITORING BE 24 HOURS A DAY, AND THEY WILL ALERT PRETRIAL

18    SERVICES AND ANY OTHER REQUESTED AUTHORITIES IF MR. FRANCIS

19    LEAVES HIS RESIDENCE WITHOUT PERMISSION OF PRETRIAL SERVICES.

20         THE SIXTH CONDITION -- AND, FRANKLY, WE DON'T THINK

21    THIS IS NECESSARY, BUT WE DON'T WANT TO LEAVE ANYTHING TO

22    CHANCE.  IF THE COURT BELIEVES IT IS NECESSARY, MR. FRANCIS

23    WILL PAY FOR A THIRD LEVEL OF SECURITY, A 24-HOUR GUARD

24    SERVICE THAT WILL BE PRESENT AT HIS APARTMENT AT ALL TIMES,

25    AND THAT WILL IMMEDIATELY ALERT PRETRIAL SERVICES AND AGAIN

ANY OTHER REQUESTED AUTHORITIES IF MR. FRANCIS ATTEMPTS TO

LEAVE HIS APARTMENT WITHOUT PERMISSION OF PRETRIAL SERVICES.

THE LAST THREE CONDITIONS ARE FAIRLY STANDARD.  HE

WILL REPORT TO PRETRIAL SERVICES AS DIRECTED.  HE WILL

SURRENDER ANY TRAVEL DOCUMENTS.  I CAN TELL YOU THAT HIS --

BOTH HIS PASSPORT AND HIS EXPIRED PASSPORT I BELIEVE WERE

SEIZED WHEN HE WAS ARRESTED.  SO HE DOESN'T HAVE ANY

PASSPORT, BUT I KNOW THE TYPICAL CONDITION IS THAT HE WILL

NOT APPLY FOR OR ATTEMPT TO OBTAIN AN ADDITIONAL OR NEW

PASSPORT.

AND LAST, THAT HE WILL COMPLY WITH ALL OTHER

REASONABLE CONDITIONS SET BY THE COURT.

AS I MENTIONED EARLIER, HE IS DETERMINED TO FACE THE

CHARGES, HE WANTS TO FACE THEM.  HE REALIZES THAT IF HE

VIOLATES THE TERMS AND CONDITIONS, IF HE JUMPS BAIL, HE WILL

BE FACING ADDITIONAL TIME IN CUSTODY, WHICH WILL MEAN MORE

TIME THAT HE WON'T BE ABLE TO SPEND WITH HIS THREE YOUNG

CHILDREN.

WE BELIEVE THAT THE PROPOSED BOND CONDITIONS CONTAIN

THE FOLLOWING CONDITIONS THAT WILL ENSURE HIS APPEARANCE AT

FUTURE COURT PROCEEDINGS.  FIRST, A LARGE CORPORATE SURETY,

CASH OR CORPORATE SURETY BOND.  TWO, A BOND COSIGNED BY HIS

AUNT, BASICALLY IN THE AMOUNT OF HER TOTAL NET WORTH.  AND

THEN, THREE, SIGNIFICANT RESTRICTIONS ON HIS ABILITY TO FLEE.

HOME DETENTION, ACTIVE GPS MONITORING, 24-HOUR VIDEO

1  SURVEILLANCE AND WINDOW AND EXTERNAL DOOR ALARMS, AND IF THE

2  COURT DEEMS NECESSARY, 24-HOUR GUARD SERVICE.  AGAIN, ALL

3  THESE WOULD BE APPROVED IN ADVANCE BY PRETRIAL SERVICES AND

4  THEY WOULD BE SUPERVISING HIM WHILE ON RELEASE.

5          MR. FRANCIS WANTS TO FACE THE CHARGES.  HE'S

6  ASSEMBLED A TEAM.  MR. GOULD FROM HOLLAND & KNIGHT IS PRESENT

7  IN COURT.  HE HAS NOT YET MADE AN APPEARANCE, BUT I'M WORKING

8  WITH HOLLAND & KNIGHT, WHO PROVIDED GOVERNMENT CONTRACTING

9  SERVICES FOR GLENN DEFENSE FOR THE LAST FIVE, SIX YEARS.

10 THEY KNOW THE BUSINESS WELL.  AND MR. GOULD, LIKE MYSELF, A

11 FORMER PROSECUTOR, IS PREPARED TO PROVIDE A ZEALOUS DEFENSE.

12          MR. FRANCIS COULD HAVE AVOIDED BEING HERE BY NOT

13 COMING TO SAN DIEGO AT THE INVITATION OF THE U.S. NAVY, BUT

14 KNOWING THE RISK OF THE ARREST, HE CAME.  HE'S WILLING TO

15 FACE WHATEVER CONSEQUENCES AWAIT HIM.

16          FINALLY, HIS ABILITY TO FLEE AND AVOID DETECTION AND

17 ARREST IS RELATIVELY MINIMAL, IF NOT NIL.  AS THE COURT

18 PROBABLY OBSERVED WHEN HE CAME IN, MR. FRANCIS IS A LARGE

19 MAN.  HE'S SIX-THREE.  HE WEIGHS OVER 300 POUNDS.  THE PRESS

20 HAS NOW LABELED HIM "FAT LEONARD."  I'D RATHER REFER TO HIM

21 AS "BIG LEONARD."

22          THE COURT:  THAT'S PROBABLY PRUDENT.

23          MR. SWAN:  YES.  THANK YOU.

24          AND BECAUSE THAT DESCRIBES HIM.  HE IS ALMOST BIGGER

25 THAN LIFE IN CERTAIN RESPECTS.  SINCE HIS ARREST, HIS PHOTO

HAS BEEN SHOWN WORLDWIDE, MAKING HIM A VERY RECOGNIZABLE
PUBLIC FIGURE.  THE AMOUNT OF PRESS HERE TODAY SHOWS HOW MUCH
INTEREST THERE IS AND WILL CONTINUE TO BE IN HIS WHEREABOUTS.
IF HE WERE TO FLEE, FRANKLY, THERE WOULD BE NO PLACE HE COULD
HIDE.

HE WOULD BE RECOGNIZED, REPORTED, ARRESTED AND
RETURNED TO THE UNITED STATES.  EVEN IF HE RETURNED TO
MALAYSIA, THEY HAVE AN EXTRADITION TREATY THAT WOULD ALLOW
HIM TO BE EXTRADITED HERE.  BY FLEEING, AND HE'S WELL AWARE
OF THIS, AND WE'VE HAD LONG TALKS ABOUT IT, HE WOULD ONLY
INCREASE BY MANY YEARS THE TIME HE'D SPEND IN CUSTODY.

WE RESPECTFULLY REQUEST THAT THE COURT GRANT OUR
MOTION FOR BOND IN THE TWO CASES, IMPOSE THE CONDITIONS THAT
WE HAVE PROPOSED AND IMPOSE ANY ADDITIONAL CONDITIONS THAT
THE COURT FEELS ARE NECESSARY TO ENSURE HIS APPEARANCE.  WE
BELIEVE WE'VE MET THE FACTORS AND STANDARDS UNDER 3142 FOR
MR. FRANCIS TO BE ENTITLED TO BOND, AND WE RESPECTFULLY
REQUEST THAT THE COURT RELEASE MR. FRANCIS ON REASONABLE
CONDITIONS PENDING TRIAL.

THANK YOU VERY MUCH.

THE COURT:  THANK YOU.

MR. HUIE.

MR. HUIE:  THANK YOU, YOUR HONOR.

WE HAVE MOVED TO DETAIN MR. FRANCIS AS A RISK OF
FLIGHT, AND IN SO MOVING, WE AGREE WITH PRETRIAL SERVICES,

1    THAT THERE IS NO CONDITION OR COMBINATION OF CONDITIONS THAT

2    WOULD REASONABLY ASSURE HIS APPEARANCE, AND THAT INCLUDES THE

3    CONDITIONS THAT MR. SWAN HAS OFFERED THIS AFTERNOON.

4            AS MR. SWAN SAID, MR. FRANCIS HAS BEEN CHARGED IN

5    THREE SEPARATE CRIMINAL COMPLAINTS, EACH ALLEGING A DIFFERENT

6    BRIBERY CONSPIRACY WITH A DIFFERENT PUBLIC OFFICIAL.  AND

7    WHAT THOSE COMPLAINTS ALLEGE BROADLY IS THAT MR. FRANCIS WAS

8    THE CEO AND OWNER OF A COMPANY CALLED GDMA, GLENN DEFENSE

9    MARINE ASIA, A COMPANY THAT PROVIDES WHAT ARE CALLED SHIP

10   HUSBANDRY SERVICES TO THE U.S. NAVY.  AND SHIP HUSBANDRY

11   SERVICES, YOUR HONOR, ARE THE WIDE RANGE OF SERVICES THAT A

12   SHIP WOULD NEED WHEN IT PULLS INTO PORT, FROM ANYTHING LIKE

13   SECURITY OR FOOD OR WATER OR FUEL TO REMOVAL OF WASTE.  AND

14   OVER THE YEARS, GDMA HAS HELD HUNDREDS OF MILLIONS OF DOLLARS

15   IN CONTRACTS WITH THE UNITED STATES.

16           NOW, IN ADDITION TO THESE THREE CASES, YOUR HONOR,

17   THERE IS ALSO A FOURTH CASE THAT'S PENDING IN THIS DISTRICT

18   AGAINST ANOTHER GDMA EXECUTIVE NAMED ALEX WISIDAGAMA.

19   MR. WISIDAGAMA IS MR. FRANCIS' COUSIN, AND HE'S PART OF THE

20   EXECUTIVE SUITE, SOMEONE WHO REPORTS TO MR. FRANCIS.  HE WAS

21   ARRESTED AT THE SAME TIME AS MR. FRANCIS AT THE MARRIOTT IN

22   SAN DIEGO.

23           MR. WISIDAGAMA IS CHARGED WITH CONSPIRING WITH

24   OTHERS, INCLUDING GDMA AND INCLUDING MR. FRANCIS, TO DEFRAUD

25   THE U.S. NAVY.  AND MR. FRANCIS HASN'T BEEN NAMED AS A

1    DEFENDANT IN THAT COMPLAINT, BUT THAT COMPLAINT DOES

2    EXPRESSLY DESCRIBE HIS PARTICIPATION IN THE FRAUD.  WE EXPECT

3    MR. FRANCIS WILL BE CHARGED IN CONNECTION WITH THE FRAUD IN

4    THE FUTURE.

5           YOUR HONOR, I'VE PRINTED OUT COURTESY COPIES OF THE

6    FOUR COMPLAINTS IN THE THREE BRIBERY CASES AND THE FRAUD

7    CASE.  AND IF THE COURT WOULD LIKE, I CAN HAND THEM UP FOR

8    THE COURT'S REFERENCE.

9           THE COURT:  THANK YOU.

10          MR. HUIE:  WHAT I'D LIKE TO DO, YOUR HONOR, IS TO

11   ADDRESS THE 3142(G) FACTORS.  AND IN OUR VIEW, EACH OF THE

12   STATUTORY FACTORS INDEPENDENTLY FAVOR DETENTION.

13          SO STARTING WITH THE NATURE AND CIRCUMSTANCES OF THE

14   OFFENSE.  EACH OF THE THREE COMPLAINTS IN WHICH MR. FRANCIS

15   HAS BEEN CHARGED INVOLVE THE SAME GENERAL ALLEGATIONS.  AND

16   THOSE ALLEGATIONS ARE VERY SERIOUS.  THEY ARE THAT HE

17   CORRUPTED THREE NAVY OFFICIALS, TWO UNIFORMED COMMANDERS AND

18   ONE SUPERVISORY SPECIAL AGENT WITH NCIS.  AND THOSE ARE

19   COMMANDER MICHAEL MISIEWICZ, COMMANDER JOSE SANCHEZ AND

20   SPECIAL AGENT JOHN BELIVEAU.

21          THE ALLEGATION IS THAT MR. FRANCIS CORRUPTED THEM

22   INTO PROVIDING HIM WITH CLASSIFIED AND CONFIDENTIAL NAVY

23   INFORMATION AND ALSO INTO SERVING AS ADVOCATES FOR GDMA IN

24   MAKING DECISIONS WITHIN THE NAVY TO BENEFIT HIS COMPANY.  IN

25   EXCHANGE, THE COMPLAINTS ALLEGE, HE GAVE THESE THREE MEN

1    CASH, HE PAID FOR LUXURY TRAVEL FOR THEM AND HE PAID FOR

2    PROSTITUTES FOR THEM.

3         AND THE PICTURE THAT EMERGES FROM THESE COMPLAINTS

4    IS NOT A SERIES OF ONE OFF TRANSACTIONS, BUT RATHER A

5    SUSTAINED BRIBERY RELATIONSHIP THAT DEVELOPED OVER THE COURSE

6    OF YEARS.  AND WHAT THAT RELATIONSHIP DEVELOPED INTO WAS THAT

7    MR. FRANCIS HAD THESE INDIVIDUALS, WHO WERE OFFICERS OF THE

8    UNITED STATES NAVY, WHO IN EFFECT WERE ACTING AS SECRET

9    AGENTS FOR THE ECONOMIC INTERESTS OF THE GDMA COMPANY.

10        NOW, IN ADDITION TO THE BRIBERY, WE'VE ALSO HANDED

11   UP A COPY OF MR. WISIDAGAMA'S FRAUD COMPLAINT WHICH MENTIONS

12   MR. FRANCIS AND HIS COMPANY, AND WE WOULD INCLUDE THAT IN OUR

13   PROFFER.  THAT COMPLAINT, LIKE THE OTHERS, IS LONG AND

14   DETAILED, IT'S OVER 20 PAGES; BUT IT JUST PROVIDES VERY

15   CONCRETE EXAMPLES OF THE FRAUD.

16        IF YOU TAKE THE EXAMPLES OF FRAUD IN ONE COUNTRY,

17   THAILAND, DURING AN APPROXIMATELY ONE-YEAR PERIOD, THAT ARE

18   ILLUSTRATED IN THE COMPLAINT AND YOU ADD THEM UP YOU GET

19   ABOUT TEN MILLION DOLLARS IN FRAUD LOSSES JUST FOR ONE

20   COUNTRY FOR ONE YEAR.  AND GDMA IN FACT DEALS WITH THE NAVY

21   IN A DOZEN COUNTRIES AND HAS DEALT WITH THE NAVY FOR DECADES.

22   SO THAT TEN MILLION DOLLARS IS A SUBSTANTIAL UNDERSTATEMENT

23   OF THE HARM CAUSED BY MR. FRANCIS' FRAUD.

24        NOW, MR. SWAN IS CORRECT, THE CRIMES, IF YOU TAKE

25   THE CRIMES CHARGED IN THE COMPLAINTS AND THE INFORMATIONS AND

1    ADD THEM UP, THEY ADD UP TO A 15-YEAR MAXIMUM.  BUT OF COURSE

2    THE CONDUCT THAT'S DESCRIBED IN THESE CHARGES GIVES RISE TO A

3    MUCH GREATER CRIMINAL EXPOSURE.  EVERY COUNT OF WIRE FRAUD

4    WOULD ADD AN ADDITIONAL POTENTIAL 20 YEARS.  EVERY COUNT,

5    EVERY ACT OF BRIBERY WOULD CARRY AN ADDITIONAL 15 YEARS.

6           IN ADDITION, THE GUIDELINES THAT THE DEFENDANT FACES

7    ARE VERY SUBSTANTIAL.  AND I'D LIKE TO WALK THROUGH THE

8    GOVERNMENT'S VIEW OF THOSE GUIDELINES.  IT'S UNDER THE

9    BRIBERY GUIDELINE, 2C1.1.  UNDER THAT GUIDELINE, YOUR HONOR,

10   THE BASE OFFENSE LEVEL IS 12.  THERE IS A PLUS-TWO FOR MORE

11   THAN ONE BRIBE, A PLUS-22 FOR LOSSES FROM 20 TO 50 MILLION,

12   WHICH IS OUR CURRENT ESTIMATE, A PLUS-FOUR FOR BRIBERY OF

13   GOVERNMENT OFFICIALS IN SENSITIVE POSITIONS, A PLUS-FOUR

14   UNDER GUIDELINES 3B1.1 FOR A LEADER OF CRIMINAL ACTIVITY, AND

15   ANOTHER PLUS-TWO UNDER 3C1.1 FOR OBSTRUCTION.

16          AND IF YOU ADD THOSE UP, YOUR HONOR, THE TOTAL IS

17   46.  AND EVEN WITH A THREE-LEVEL REDUCTION FOR ACCEPTANCE OF

18   RESPONSIBILITY, AND EVEN WITH NO CRIMINAL HISTORY, THE RESULT

19   IS A 43.  AND UNDER THOSE GUIDELINES, YOUR HONOR, THE

20   SENTENCING COMMISSION HAS RECOMMENDED THAT THE MINIMUM

21   SENTENCE HE FACE IS LIFE.  AND OF COURSE THAT'S THE MAXIMUM

22   SENTENCE, TOO.  SO IT'S HARD TO CONCEIVE AN OFFENSE FOR WHICH

23   THERE IS A MORE SERIOUS PUNISHMENT.  AND, FOR EXAMPLE, HE

24   FACES NO ADDED EXPOSURE BY JUMPING BAIL, BECAUSE HE'S ALREADY

25   FACING THE ULTIMATE CUSTODIAL PENALTY.

1        NOW, TURNING TO THE WEIGHT OF THE EVIDENCE IN THIS

2   CASE.  THE EVIDENCE IS STRONG, IT'S DESCRIBED IN DETAIL IN

3   THESE 80 TO 90 PAGES OF COMPLAINTS, AND IT'S DESCRIBED IN

4   E-MAILS THAT USE MR. FRANCIS' OWN WORDS AND IN GDMA'S OWN

5   DOCUMENTS.  AND IT'S ALSO DESCRIBED THROUGH A COOPERATOR,

6   SOMEONE WHO WORKED FOR HIM IN THAILAND.

7        WE SUBMIT, YOUR HONOR, THAT THE EVIDENCE IS NOT ONLY

8   STRONG, BUT IT'S CONCLUSIVE.  WE DON'T HEAR THE DEFENSE TO BE

9   DWELLING ON THIS ASPECT THIS AFTERNOON, BUT IF THERE IS A

10  DISPUTE IN THAT REGARD, WE DO HAVE ADDITIONAL EVIDENCE WE

11  COULD PRESENT AT SIDEBAR.

12       NOW, TURNING TO THE HISTORY AND CHARACTERISTICS OF

13  MR. FRANCIS AND STARTING WITH HIS TIES TO THIS COMMUNITY.  HE

14  IS A CITIZEN OF MALAYSIA.  HE HAS LIVED IN SINGAPORE.  HIS

15  CHILDREN LIVE IN MALAYSIA.  HE WORKS IN SINGAPORE.  AND SO

16  ALL HIS TIES TO THE COMMUNITY ARE IN SINGAPORE AND IN

17  MALAYSIA.  IN CONTRAST, HE'S NOT A U.S. CITIZEN.  HE'S NEVER

18  BEEN.  HE'S NEVER HAD A RIGHT TO RESIDE HERE.  HE DOES HAVE A

19  VISA, WHICH IS A NON-IMMIGRANT VISA, ALLOWING HIM TO VISIT,

20  BUT EVEN THAT VISA ONLY ALLOWS HIM TO STAY FOR A MAXIMUM SIX

21  MONTHS.

22       NOW, THE NEXT HEARING IN OUR CASE IS LATE FEBRUARY,

23  WHICH WOULD BE FIVE AND A HALF MONTHS AFTER HE HAS ENTERED

24  THIS COUNTRY.  SO IF RELEASED, THERE IS A POSSIBILITY THAT HE

25  WOULD OUTSTAY EVEN THAT VISA, BE ARRESTED BY IMMIGRATION

1    AUTHORITIES AND DEPORTED.

2         THE COURT:  JUST A QUESTION ABOUT THE VISA.

3         MR. SWAN INDICATED IN HIS PRESENTATION THAT THE VISA

4    DOESN'T EXPIRE UNTIL 2019, BUT YOU'RE SAYING IT'S -- IT ONLY

5    ALLOWS HIM TO STAY HERE IS IT SIX MONTHS AT A TIME?

6         MR. HUIE:  THAT'S RIGHT, YOUR HONOR.  THERE ARE TWO

7    RELEVANT PERIODS, THE VALIDITY OF THE VISA AND THEN THE

8    VALIDITY OF THE STAY WITHIN THE VISA.

9         NOW, MR. FRANCIS DOES NOT AND HAS NEVER LIVED

10   ANYWHERE IN THE UNITED STATES.  HE OWNS NO PROPERTY HERE.  HE

11   HAS NO BANK ACCOUNT HERE.  HE HAS NO EMPLOYMENT HERE.  HE HAS

12   ZERO CONNECTIONS OF ANY KIND TO THIS COMMUNITY HERE IN

13   SOUTHERN CALIFORNIA.  AND EVEN IF YOU WERE TO EXPAND THE

14   CONCEPT OF THE COMMUNITY TO COVER THE ENTIRE UNITED STATES,

15   HIS CONNECTIONS ARE VERY LIMITED.

16        MS. WHITE IS WILLING TO SIGN FOR HIM, THAT'S A

17   GENEROUS ACT ON HER PART, BUT WE WOULD NOTE THAT EVEN WITH A

18   $100,000 BOND, MR. FRANCIS HAS THE ABILITY MANY TIMES OVER TO

19   MAKE GOOD IF THE UNITED STATES WERE TO FORFEIT THAT BOND

20   AMOUNT.

21        YOUR HONOR, WE SUBMIT THAT THE DEFENDANT'S MAIN TIE,

22   HIS PRINCIPAL TIE TO THE UNITED STATES, IS IN FACT THAT HE

23   HAS DEFRAUDED THE UNITED STATES YEAR AFTER YEAR.  AND EVEN

24   THIS FRAUD, HE HAS DONE FROM OUTSIDE THE UNITED STATES.  SO

25   HIS TIE TO OUR COUNTRY STANDS IN THE WAY OF THE RELATIONSHIP

1    BETWEEN A PERPETRATOR AND A VICTIM.

2          THE SIGNIFICANCE OF THE POINTS ABOUT HIS CONNECTIONS

3    WITH THE U.S. AND OTHER COUNTRIES, YOUR HONOR, IS THAT THIS

4    DEFENDANT HAS ABSOLUTELY NO REASON TO REMAIN IN THE UNITED

5    STATES FOR TRIAL.  THE CHOICE HE FACES IS BETWEEN STAYING IN

6    A COUNTRY WHERE HE HAS NO TIES TO FACE TRIAL AND A LIFE

7    SENTENCE OR LEAVE AND GO HOME TO HIS FAMILY.  GIVEN THAT

8    CHOICE, IT WOULD BE STRANGE IF HE WOULD MAKE THE CHOICE TO

9    STAY HERE FOR TRIAL INSTEAD OF, FOR EXAMPLE, TAKING THE

10   16-MILE TRIP DOWN TO TIJUANA, BUYING A PLANE TICKET, BUYING

11   SOME TRAVEL DOCUMENTS AND GOING SOMEWHERE ELSE.

12          AND IF HE WERE TO GO SOMEWHERE ELSE, NOBODY KNOWS

13   WHERE HE WOULD GO.  MR. FRANCIS OWNS A COMPANY WITH OFFICES

14   IN A DOZEN COUNTRIES.  HE KNOWS PEOPLE IN THOSE COUNTRIES.

15   HE HAS FAMILY IN MALAYSIA, SINGAPORE, WE BELIEVE IN EUROPE.

16   HE SPEAKS MORE THAN A FEW LANGUAGES.  HE OWNS A FLEET OF OVER

17   50 VESSELS, INCLUDING MANY VESSELS THAT YOU CAN TAKE ON THE

18   HIGH SEAS.

19          THIS MAN CAN GO WHEREVER HE WANTS IN THE WORLD, AND

20   WE SUBMIT THAT HE HAS THE MEANS AND THE KNOW HOW AND THE

21   MOTIVATION TO SIMPLY SHOP FOR A COUNTRY THAT HAS NO

22   EXTRADITION TREATY WITH THE UNITED STATES.  MALAYSIA DOES

23   TECHNICALLY HAVE A TREATY, BUT IT'S NOT IN OUR VIEW AN

24   EXTRADITION FRIENDLY COUNTRY.  IT'S HARD TO IMAGINE A

25   DEFENDANT WHO IS MORE MOBILE AND WHO PRESENTS A GREATER

1    FLIGHT RISK

2            AS FAR AS MR. FRANCIS' CRIMINAL HISTORY, MR. SWAN

3    HAS MENTIONED THAT.  I WON'T BELABOR IT.  IT WAS A SERIOUS

4    CONVICTION UNDER THE LAWS OF THE COUNTRY OF MALAYSIA, AS

5    EVIDENCED BY THE FACT THAT HE WAS SENTENCED TO 18 MONTHS ON

6    EACH COUNT AND HE WAS ALSO SENTENCED TO CORPORAL PUNISHMENT.

7    SO EVEN THOUGH THAT WAS A LONG TIME AGO, THIS CASE IS NOT HIS

8    FIRST BRUSH WITH THE LAW.

9            FOR THESE REASONS, YOUR HONOR, IT IS OUR VIEW THAT

10   THE DEFENDANT'S PROPOSAL OF BOND, WHILE THOUGHTFUL, IS WHOLLY

11   INADEQUATE TO ENSURE HIS APPEARANCE.  ANY PROPOSAL THAT IN

12   ANY WAY RELIES UPON HIS GOOD FAITH OR HIS TRUST OR HIS

13   COMPLIANCE WE THINK IS INSUFFICIENT.

14           AND WHEN IT COMES TO THE NOTION OF HIM BEING KEPT IN

15   CHECK BY A GPS BRACELET OR A VIDEO CAMERA OR EVEN A SECURITY

16   GUARD, WE WOULD NOTE THAT MR. FRANCIS HAS ALREADY

17   ACCOMPLISHED WHAT SHOULD HAVE BEEN IMPOSSIBLE, AND THAT IS

18   BRIBING AND CORRUPTING SENIOR OFFICERS IN THE MOST POWERFUL

19   NAVY IN THE WORLD, BRIBING AND CORRUPTING SENIOR LAW

20   ENFORCEMENT OFFICIALS INTO WORKING FOR HIM.  WE THINK IT

21   WOULD BE NO DIFFICULT MATTER FOR HIM TO DO THE SAME AND TO

22   ESCAPE CUSTODY OR TO ESCAPE THE PROTECTIVE BOUNDARIES OF

23   THOSE CONDITIONS FOR THE MOMENT NECESSARY TO MAKE IT OUT OF

24   THIS COUNTRY.

25           IN CONCLUSION, YOUR HONOR, MR. FRANCIS IS IN A

1   DIFFERENT SITUATION FROM MANY FOREIGN NATIONALS THAT COME

2   BEFORE THIS COURT AND RAISE THE ISSUE OF BOND.  THE

3   DIFFERENCE, ONE OF THEM IS THAT HE'S HERE IN THE UNITED

4   STATES NOT BECAUSE HE WANTS TO BE HERE OR BECAUSE HE HAS TIES

5   HERE, BUT BECAUSE HE WAS ARRESTED HERE IN HIS HOTEL SUITE ON

6   SEPTEMBER 16TH, 2013.  HE WAS HERE THAT DAY BECAUSE OF A

7   SPECIAL MEETING ARRANGED WITH HIM, OTHER EXECUTIVES OF GDMA

8   AND SOME SENIOR OFFICERS WITH THE NAVY.

9        NOW, I WOULD NOTE THAT IT WAS NO EASY MATTER TO GET

10  MR. FRANCIS TO STEP FOOT INTO THE UNITED STATES.  THAT

11  MEETING ITSELF WAS APPROXIMATELY SIX MONTHS IN THE PLANNING.

12  AND AFTER THAT MEETING WAS SET, THE INVESTIGATIVE TEAM IN

13  THIS CASE COORDINATED A WORLDWIDE OPERATION TO COINCIDE WITH

14  HIS APPEARANCE IN SAN DIEGO.  THAT OPERATION INVOLVED MERE

15  SIMULTANEOUS LAW ENFORCEMENT ACTIVITY ON SEPTEMBER 16TH AND

16  17TH IN APPROXIMATELY EIGHT ASIAN COUNTRIES AND WITHIN THE

17  UNITED STATES IN APPROXIMATELY EIGHT STATES, INVOLVED OVER A

18  HUNDRED FEDERAL LAW ENFORCEMENT OFFICERS.

19       THE RESULT OF THAT OPERATION, YOUR HONOR, IS THAT

20  MR. FRANCIS IS HERE IN THE UNITED STATES, HE'S HERE IN THIS

21  COURTROOM, AND HE'S HERE IN CUSTODY.  AND WE SUBMIT THAT IF

22  HE IS RELEASED ON BOND, HE WILL FLEE AND HE WILL NOT COME

23  BACK.  HE HAS NO REASON TO COME BACK AND EVERY REASON TO

24  LEAVE.

25       WE AGREE IN CONCLUSION, YOUR HONOR, WITH PRETRIAL

1    SERVICES THAT THE DEFENDANT SHOULD BE HELD WITHOUT BAIL.

2          THANK YOU.

3          THE COURT:  THANK YOU.

4          MR. SWAN, I HAVE SOME QUESTIONS.  I'LL ALLOW YOU TO

5    RESPOND TO MR. HUIE'S COMMENTS.  YOU MAY, IN THE PROCESS,

6    ANSWER SOME OR ALL OF MY QUESTIONS, BUT I'LL LET YOU GO

7    FIRST.

8          MR. SWAN:  THANK YOU.

9          MR. HUIE SAID WE CAN'T RELY SOLELY ON MR. FRANCIS'

10   GOOD FAITH AND TRUST.  WE'RE NOT ASKING THE COURT TO DO THAT.

11   WE'VE RECOMMENDED CONDITIONS THAT GO FAR BEYOND ANY

12   CONDITIONS I'VE EVER SEEN IMPOSED IN A CASE IN THIS DISTRICT

13   OR ANYWHERE ELSE; THAT IS, CLOSED-CIRCUIT SURVEILLANCE,

14   ALARMS ON DOORS AND WINDOWS AND 24-HOUR GUARD SERVICE.

15         I SPOKE WITH PRETRIAL SERVICES.  I GAVE THEM

16   ADVANCED NOTICE OF THE CONDITIONS I WAS GOING TO PROPOSE.  I

17   ASKED THEM IF THEY HAD EVER HEARD OF SIMILAR CONDITIONS BEING

18   IMPOSED AND THE ANSWER WAS NO.  I ASKED THEM, LET ME KNOW IF

19   IT'S HAPPENED BEFORE.  NO.

20         AND I REALIZE THAT WHEN THEY PREPARED THEIR

21   RECOMMENDATION BACK IN SEPTEMBER OF THIS YEAR, THE

22   RECOMMENDATION THAT'S HERE TODAY, THEY DIDN'T HAVE THE

23   BENEFIT OF OUR THINKING.  THEY DIDN'T HAVE THE BENEFIT OF

24   THESE ADDITIONAL CONDITIONS.  THEY DIDN'T HAVE THE ABILITY

25   THEN BECAUSE WE DIDN'T -- WE HAD NOT PROPOSED THEM, TO

1    CONSIDER WHETHER THOSE CONDITIONS WOULD BE SUFFICIENT TO

2    ENSURE MR. FRANCIS' APPEARANCE AT ALL FUTURE PROCEEDINGS.

3            GOING QUICKLY THROUGH MR. HUIE'S ARGUMENT.  HE SPENT

4    SOME TIME ON THE CHARGES AND THE WEIGHT OF THE EVIDENCE.  AS

5    I MENTIONED BEFORE, THAT'S THE LEAST SIGNIFICANT AND LEAST

6    IMPORTANT FACTOR THE COURT SHOULD CONSIDER.

7            HE ARGUED THE AMOUNT OF FRAUD.  MR. FRANCIS HAS NOT

8    YET BEEN CHARGED WITH FRAUD AND WHEN MR. HUIE CALCULATED THE

9    SENTENCING GUIDELINES, THE LARGEST COMPONENT OF THOSE

10   GUIDELINES WAS A PLUS-20 FOR THE AMOUNT OF THE FRAUD.  THAT

11   IN ITSELF DROVE AND RESULTED IN THE ANSWER THAT THE

12   GOVERNMENT WANTED, WHICH WAS A LEVEL 43, WHICH EQUATES TO

13   LIFE IMPRISONMENT.

14           THAT AMOUNT IS IN DISPUTE AND IT IS NOT A LEVEL -- A

15   PLUS-20.  MR. FRANCIS IS NOT FACING LIFE IMPRISONMENT.  AND

16   WHEN -- IF THIS CASE GOES TO TRIAL AND HE'S CONVICTED, HE

17   WILL NOT BE SENTENCED TO LIFE IMPRISONMENT.

18           THE COURT:  DO YOU TAKE ISSUE WITH THE GOVERNMENT'S

19   STATEMENTS THAT EVERY COUNT OF FRAUD OR BRIBERY, EVERY

20   ADDITIONAL COUNT WILL CARRY SIGNIFICANT ADDITIONAL PENALTIES?

21   I TRUST YOU CANNOT DISAGREE WITH THAT.

22           MR. SWAN:  IF THEY CAN ALLEGE THOSE COUNTS IN THIS

23   DISTRICT.  THE ACTS OCCURRED OUTSIDE THE UNITED STATES, AND I

24   AM STILL WAITING TO DETERMINE WHETHER THOSE ACTS, THOSE

25   ALLEGED WIRE TRANSFER, WIRE FRAUD, OTHER INCIDENTS CAN BE

1    CHARGED HERE. I UNDERSTAND THEY HAVE BEEN CHARGED WITH

2    CONSPIRACY, BUT EACH OF THE OVERT ACTS, WILL THEY BE ABLE TO

3    BE CHARGED HERE. THAT REMAINS TO BE SEEN. THEY HAVE NOT

4    BEEN CHARGED YET. HE'S JUST BEEN CHARGED WITH CONSPIRACY

5    COUNTS.

6          BUT ANSWERING YOUR QUESTION DIRECTLY, IF THEY ARE

7    ABLE TO BE CHARGED, IT'S -- IT FOLLOWS THAT THOSE ARE THE

8    MAXIMUM SENTENCES THAT COULD BE IMPOSED FOR EACH OF THOSE

9    COUNTS; AND THEY COULD STACK THEM. BUT RIGHT NOW, HE'S JUST

10   CHARGED WITH TWO FIVE-YEAR FELONIES IN THIS COURT AND ONE

11   BEFORE JUDGE BARTICK.

12        THE COURT: THERE IS THE COMPLAINT AGAINST -- LET ME

13   PRONOUNCE HIS NAME CORRECTLY.

14        MR. SWAN: MR. WISIDAGAMA.

15        THE COURT: WISIDAGAMA. IN FACT, I SIGNED THAT

16   COMPLAINT. AND I REMEMBER DOING SO AND I REMEMBER READING

17   THE AGENT'S AFFIDAVIT THAT ACCOMPANIES WHAT HAS BEEN PROVIDED

18   TO ME TODAY.

19        AS I UNDERSTAND IT, MR. LEONARD IS NAMED --

20        MR. SWAN: MR. FRANCIS.

21        THE COURT: MR. FRANCIS, PARDON ME. MR. FRANCIS IS

22   NOT NAMED AS A DEFENDANT, BUT HIS NAME IS PROMINENT IN THAT

23   COMPLAINT. AND IF HE WERE CHARGED WITH BEING A

24   CO-CONSPIRATOR IN THAT CASE, THAT WOULD OF COURSE ADD TO THE

25   POTENTIAL SENTENCE HE FACES; CORRECT?

1        MR. SWAN:  CORRECT.

2        TWO THINGS.  IF HE'S CHARGED AND POTENTIAL.  RIGHT

3   NOW I'M FACING WHAT HE'S CHARGED WITH.

4        TURNING TO A COUPLE OTHER ARGUMENTS THAT MR. HUIE

5   RAISED.  HE IS CORRECT THAT THE VISA THAT WAS GRANTED TO

6   MR. FRANCIS WAS FOR SIX MONTHS WHEN HE ENTERED THE COUNTRY;

7   SO IT'S STILL VALID, IT'S STILL LEGAL.  I'VE HAD OTHER CASES

8   WITH FOREIGN NATIONALS, WHO HAVE COME TO THE UNITED STATES

9   AND BEEN ARRESTED AND THEY HAVE BEEN HERE ON VISITOR VISAS.

10  THEY HAVE MADE BOND, THEIR VISAS HAVE BEEN EXTENDED AND/OR

11  THEY HAVE BEEN PAROLED INTO THE UNITED STATES.

12       THE LAST THING THE GOVERNMENT WANTS IS FOR THEM

13  TO -- THEIR VISA TO EXPIRE AND THEM TO LEAVE.  THEY WANT THEM

14  TO STAY HERE.  AND IMMIGRATION ACTUALLY WORKS WITH US AND THE

15  GOVERNMENT TO PROVIDE THAT THE VISA BE EXTENDED.

16       THE COURT:  AND, AGAIN, AS I UNDERSTAND IT, IT

17  ALLOWS SOMEONE TO VISIT FOR A PERIOD OF SIX MONTHS.  IT MAY

18  BE VALID THROUGH 2019, BUT HE CANNOT STAY HERE UNLESS IT'S

19  EXTENDED BEYOND SIX MONTHS AT ANY ONE TIME; IS THAT CORRECT?

20       MR. SWAN:  YES, THAT'S ABSOLUTELY CORRECT.  AND THAT

21  WOULD BE US WORKING WITH IMMIGRATION TO GET IT EXTENDED.  AND

22  WE'VE HAD -- I'VE HAD AT LEAST THREE OTHER CASES WITH FOREIGN

23  NATIONALS HERE ON VISITOR VISAS THAT HAVE BEEN EXTENDED

24  THROUGHOUT THE ENTIRE CRIMINAL CASE, AND THEY HAVE ALL -- ALL

25  THREE OF THEM WERE PUT ON HOME DETENTION.

1          THE COURT:  ALL RIGHT.  THANK YOU.

2          MR. SWAN:  MR. HUIE SUGGESTED THAT MR. FRANCIS COULD

3    CORRUPT THE SECOND AND THIRD LAYER THAT WE HAVE IMPOSED.  I

4    DOUBT HE'S GOING TO CORRUPT THE FIRST LAYER, OUR PRETRIAL

5    SERVICES, WHICH IS GOING TO BE MONITORING HIM 24/7 ON THE

6    ACTIVE GPS.

7          ON THE CLOSED-CIRCUIT MONITORING, THE REASON WE

8    SUGGESTED THAT IS THAT'S AN OFF-SITE COMPANY THAT ONCE THE

9    ITEMS ARE INSTALLED, THE CAMERAS ARE INSTALLED, THE ALARMS

10   ARE INSTALLED, WILL HAVE NO REASON TO COME IN CONTACT WITH

11   MR. FRANCIS.  THEY WILL BE TOTALLY INDEPENDENT.  THEY WILL

12   ONLY REPORT TO PRETRIAL SERVICES AND ANY OTHER LAW

13   ENFORCEMENT AGENCIES.

14         THAT IS, YOU KNOW, BELTS AND SUSPENDERS IN MY MIND

15   IN TERMS OF ENSURING THAT HE WILL APPEAR, BUT WE WANTED TO

16   MAKE IT BULLETPROOF.  WE WANTED TO HAVE AN EXTRA LAYER THERE

17   TO GIVE THE COURT ASSURANCE THAT HE'S GOING TO MAKE HIS COURT

18   APPEARANCES.  AND THOSE RESTRICTIONS, ALONG WITH MR. FRANCIS'

19   RECOGNIZABILITY, WILL MAKE IT EXTREMELY DIFFICULT FOR HIM TO

20   FLEE.

21         THE COURT:  THE GOVERNMENT MAKES THE POINT THAT IF

22   HE'S ABLE TO FLEE, ALL HE HAS TO DO IS GO A FEW MILES FROM

23   HERE TO TIJUANA.  HE'S, ACCORDING TO THE GOVERNMENT, A VERY

24   RESOURCEFUL FELLOW, AND THE NEXT THING YOU KNOW, HE'LL BE

25   ABLE TO GET ON A PLANE AND GO TO A COUNTRY OF HIS CHOOSING

1    THAT MAY NOT HAVE AN EXTRADITION TREATY WITH THE UNITED

2    STATES.

3           HOW DO YOU RESPOND TO THAT?

4           MR. SWAN:  WELL, I'VE HEARD THAT ARGUMENT MADE OVER

5    THE LAST 30 YEARS.  I WORK 16, 17 MILES FROM THE BORDER.  IF

6    THAT WAS THE CASE, ALMOST EVERYBODY WOULD BE DETAINED,

7    BECAUSE, YES, YOU COULD DRIVE TO MEXICO.

8           THE ABILITY TO FLY OUT OF MEXICO IS A WHOLLY

9    DIFFERENT STORY.  IT IS NOT WHAT THE GOVERNMENT PORTRAYS.  IT

10   IS NOT AN EASY MATTER.  HE WON'T HAVE ACCESS TO TRAVEL

11   DOCUMENTS THAT WOULD ALLOW HIM TO LEAVE MEXICO, MUCH LESS

12   LAND IN A COUNTRY THAT DOESN'T HAVE AN EXTRADITION TREATY.

13          I'M NOT AWARE OF ANY FLIGHTS FROM MEXICO TO A POINT

14   THAT IS ONE OF THOSE FEW COUNTRIES THAT DOESN'T HAVE AN

15   EXTRADITION TREATY.  SO HE WOULD HAVE TO ENTER AIR SPACE,

16   ENTER ANOTHER COUNTRY BEFORE HE COULD MOVE ON TO WHATEVER

17   SITE THE GOVERNMENT HAS IN MIND.  SO THAT SCENARIO IS MUCH

18   MORE DIFFICULT AND MORE FAR-FETCHED THAN THE GOVERNMENT

19   SUGGESTS.

20          THE LAST NOTE I WOULD MAKE, MR. HUIE COMMENTED ON

21   THE CONVICTION.  HE WAS ARRESTED WHEN HE WAS 21 YEARS OLD, 27

22   YEARS AGO.  AND IT WAS INTERESTING, WE WERE HERE BEFORE WHERE

23   SOMEONE WAS TALKING ABOUT A MURDER CONVICTION 17, 18 YEARS

24   AGO.  THIS IS ALMOST ANOTHER DECADE PAST THAT.  HE WAS --

25   CONTRARY TO WHAT THE GOVERNMENT SAID, HE WAS NOT SENTENCED TO

1 18 MONTHS AND 18 MONTHS, FOR A TOTAL OF 36 MONTHS.  HE WAS --

2 HIS TOTAL SENTENCE WAS 18 MONTHS, AND HE SERVED LESS THAN A

3 YEAR.  HE PAID THE PRICE BACK WHEN HE WAS BARELY A YOUNG

4 ADULT, AND FOR THE LAST 27 YEARS, 28 YEARS HAS LIVED CRIME

5 FREE.

6    WE BELIEVE THAT THE CONDITIONS -- I'M SORRY.

7    THE COURT:  I DO HAVE SOME MORE QUESTIONS.

8    MR. SWAN:  YES.  I'M READY.

9    THE COURT:  YOU WERE ABOUT TO WRAP UP.

10    MR. SWAN:  I WON'T.

11    THE COURT:  ALL RIGHT.  THANK YOU.

12    ANOTHER POINT MADE BY MR. HUIE IS THAT, KIND OF AN

13 OVERARCHING POINT, IS THAT YOUR CLIENT HAS NO GOOD REASON TO

14 REMAIN IN THE UNITED STATES, THAT HIS CHILDREN ARE IN

15 MALAYSIA, HE'S LIVED IN SINGAPORE.  HE DOES HAVE THE AUNT

16 HERE AND HER SON, WHO LIVE IN BALTIMORE, BUT THAT HE HAS NO

17 TIES OTHER THAN THEM TO THIS COUNTRY AND NO TIES IN THIS

18 AREA.  AND THAT GIVEN WHAT HE FACES POTENTIALLY IF ADDITIONAL

19 CHARGES ARE FILED, HE SIMPLY HAS NO GOOD REASON TO REMAIN

20 HERE AND EVERY REASON NOT TO REMAIN HERE.

21    HOW DO YOU RESPOND TO THAT?

22    MR. SWAN:  TWO WAYS.  ONE, HE WANTS TO REMAIN HERE

23 AND FACE THESE CHARGES; AND, TWO, THE CONDITIONS THAT WE HAVE

24 PROPOSED MAKE IT VIRTUALLY IMPOSSIBLE FOR HIM TO FLEE.

25    ABSENT -- I MEAN, I WAS THINKING OF WHAT ELSE WE

1  COULD PROPOSE THAT WOULD ENSURE THAT HE COULDN'T FLEE, AND

2  ABSENT A BALL AND CHAIN OR FIVE-POINT RESTRAINTS 24/7, I

3  CAN'T THINK OF ANY OTHER CONDITIONS THAT WE COULD PROPOSE

4  THAT WOULD BE MORE ONEROUS AND STRINGENT THAN THE ONES WE

5  HAVE.

6          I'M GLAD THE COURT ASKED THAT QUESTION, BECAUSE IT

7  REMINDED ME OF ONE OF THE THINGS THAT MR. HUIE COMMENTED ON,

8  THAT IT WAS -- IT TOOK A LONG TIME, ACCORDING TO MR. HUIE, TO

9  COORDINATE MR. FRANCIS' ARREST, A PLAN SIX MONTHS IN ADVANCE.

10          THE COURT:  THAT DOES ANTICIPATE ANOTHER QUESTION.

11  I MIGHT JUST ADD BEFORE YOU ANSWER IT, THAT THEY PORTRAY IT

12  AS NOT HAVING BEEN AN ACT OF HIS VOLITION IN ANY WAY, SHAPE

13  OR FORM, AS I UNDERSTAND IT, AND THAT IT WAS A COORDINATED

14  EFFORT OF MULTIPLE COUNTRIES IN SOUTHEAST ASIA WITH THE

15  UNITED STATES TO GET HIM HERE.  YOU HAVE ARGUED THAT HE CAME

16  HERE KNOWING THAT HE MIGHT BE ARRESTED.

17          HOW DO YOU SQUARE THOSE TWO UP?

18          MR. SWAN:  IN A NUMBER OF RESPECTS.  FIRST, THERE

19  WAS A LOT OF BEHIND THE SCENES COORDINATION TO COORDINATE THE

20  SEARCHES AND ARREST OF OTHER PEOPLE AT THE SAME TIME

21  MR. FRANCIS WAS ARRESTED HERE ON SEPTEMBER 16TH.  BUT HE WAS

22  INVITED BY HIS CUSTOMER, THE U.S. NAVY, TO COME HERE WITH HIS

23  MANAGEMENT AND MAKE A PRESENTATION.  HE CAME WILLINGLY.  THEY

24  KNEW WHEN HE WAS COMING FAR IN ADVANCE SO THEY CAN COORDINATE

25  ALL THOSE OTHER ACTIVITIES.

1        IT WASN'T THE FIRST TIME HE'S BEEN IN THE UNITED

2    STATES.  HE'S BEEN TO HAWAII SEVERAL TIMES.  HE'S GONE THERE

3    AT THE REQUEST AND INVITATION OF THE U.S. NAVY TO BE THERE

4    FOR CHANGE OF COMMAND PRESENTATIONS.  HE'S BEEN SITTING IN

5    THE FRONT ROW OF CHANGE OF COMMAND CELEBRATIONS IN HAWAII ON

6    SEVERAL OCCASIONS.  SO THIS WASN'T A ONE-OFF, BOY, WE BETTER

7    GET HIM TO THE UNITED STATES, IT'S DIFFICULT TO DO.

8        WHEN HE WAS INVITED BY THE U.S. NAVY, HIS CUSTOMER,

9    HE CAME.  THEY KNEW HE'D COME.  BUT HE ALSO KNEW THAT HE WAS

10   UNDER INVESTIGATION AND HE KNEW THAT THERE WAS A RISK THAT

11   HE'D BE ARRESTED.  DID HE COME HERE TO TURN HIMSELF IN?  NO.

12   BUT DID HE COME HERE KNOWING THAT AN ARREST WAS POSSIBLE?

13   ABSOLUTELY.  AND HE CAME NONETHELESS.

14       AND, YOU KNOW, HE DID NOT HAVE TO COME.  HE WASN'T

15   UNDER COERCION FROM HIS CUSTOMER THAT THEY HAD TO BE IN

16   SAN DIEGO.  THEY INVITED HIM HERE, HE CAME HERE.  AND HE WAS

17   ARRESTED.

18       THE COURT:  THE GOVERNMENT SAYS THAT HE IS ONE OF

19   THE MOST MOBILE DEFENDANTS THAT COULD BE IMAGINED, IN THE

20   SENSE THAT HE HAS A FLEET OF SOME 50 SHIPS AND MANY PEOPLE

21   UPON WHOM HE COULD RELY TO SPIRIT HIM FAR AWAY.

22       HOW DO YOU RESPOND TO THAT?

23       MR. SWAN:  THE 50 SHIPS ARE BARGES AND OTHER TUGS

24   AND BOATS USED TO HELP HUSBAND DESTROYERS, AIRCRAFT CARRIERS.

25   THEY ARE NOT VEHICLES THAT I WOULD HAVE IN MIND -- YACHTS,

1    OCEAN-GOING VESSELS -- THAT YOU COULD LIVE ABOARD AND YOU

2    WOULD WANT TO LIVE ABOARD.  AND, UNFORTUNATELY, BECAUSE OF

3    THIS CASE AND THE PUBLICITY, A NUMBER OF THOSE VESSELS ARE

4    SUBJECT TO SEIZURE BY CREDITORS; SO WHETHER THEY ARE STILL

5    AVAILABLE AT ANY POINT IN TIME IS UNKNOWN TO ME.

6         YES, HE HAS CONTACTS THROUGHOUT SOUTHEAST ASIA, BUT

7    THAT WOULD REQUIRE HIM TO FLEE THE SUPERVISION OF PRETRIAL

8    SERVICES, THE SUPERVISION OF AN INDEPENDENT SURVEILLANCE

9    COMPANY, THE SUPERVISION OF A 24-HOUR GUARD.  SO HE DOES HAVE

10   FRIENDS AND FAMILY IN SOUTHEAST ASIA, BUT HE'S HERE.  AND

11   LIKE I SAID BEFORE, HE WANTS TO FACE THESE CHARGES.

12        THE COURT:  THE GOVERNMENT SAYS, AND OF COURSE THIS

13   DOES DEPEND ON WHAT HE IS CHARGED WITH AND WHETHER THOSE

14   CHARGES AS YOU PUT IT CAN BE BROUGHT HERE.  BUT IF THEY CAN,

15   THE GOVERNMENT ARGUES THAT THERE IS NO ADDED EXPOSURE TO HIM

16   IF HE JUMPS, AGAIN, CREATING A DISINCENTIVE FOR HIM TO

17   STAY.

18        MR. SWAN:  OKAY.  WELL, I LISTENED TO THE COURT'S

19   SENTENCING UNDER 3553 EARLIER.  THE SENTENCING GUIDELINES ARE

20   ADVISORY.  THE -- AND THAT'S A STARTING POINT.  BUT THE COURT

21   IS GIVEN A LOT OF FLEXIBILITY IN HOW IT FASHIONS AN

22   APPROPRIATE SENTENCE FOR ALL THE FACTORS UNDER 3553.

23        AND I CAN TELL YOU, IF YOU WANT TO MAKE SURE THAT

24   THE COURT GOES WITH THE GUIDELINES OR EXCEEDS THE GUIDELINES,

25   YOU AGGRAVATE IT BY VIOLATING THE TERMS OF PRETRIAL RELEASE

1    OR WORSE, YOU JUMP BOND.  AND THEN YOU COME BACK AND ANY

2    EQUITIES YOU MIGHT HAVE HAD ARE GONE.  SO THERE IS A REAL

3    PENALTY IF HE FLEES.

4          I HAVE BEEN PRACTICING IN THIS DISTRICT A LONG TIME

5    AND I PROSECUTED, WHEN I WAS IN THE U.S. ATTORNEY'S OFFICE,

6    ALL THE BAIL-JUMP CASES; AND THERE WERE ONLY A FEW, AND WE

7    GOT EVERY SINGLE ONE OF THEM.  THE RESOURCES OF THE U.S.

8    GOVERNMENT, PARTICULARLY IN THIS CASE, WHERE THEY HAVE THE

9    ASSISTANCE OF THE SINGAPORE POLICE THAT EXECUTED SEARCH

10   WARRANTS SIMULTANEOUSLY AND OTHER COUNTRIES THAT WORKED

11   HAND-IN-HAND WITH THE U.S. GOVERNMENT TO EXECUTE SEARCH

12   WARRANTS, DETAIN PEOPLE, INTERVIEW PEOPLE, ARREST PEOPLE, WAS

13   STAGGERING.

14         SO THEY ARE CAPABLE.  THEY ARE ABLE.  AND IF

15   MR. FRANCIS WAS TO VIOLATE THIS COURT'S ORDER ON PRETRIAL

16   RELEASE, I AM QUITE CONFIDENT THEY WOULD FIND HIM, ARREST

17   HIM, RETURN HIM AND HE WOULD FACE SIGNIFICANTLY MORE EXPOSURE

18   BECAUSE OF THAT VIOLATION, THAT VIOLATION OF THIS COURT'S

19   ORDER.

20         THE COURT:  MR. SWAN, YOU ALSO MENTIONED WHEN YOU

21   BEGAN YOUR ARGUMENT THAT THE OTHER THREE DEFENDANTS HAVE BEEN

22   RELEASED ON BOND.

23         AREN'T THEIR CIRCUMSTANCES QUITE DIFFERENT FROM YOUR

24   CLIENT'S?

25         MR. SWAN:  EVERY DEFENDANT IS DIFFERENT, YES.

1          THE COURT:  CERTAINLY.

2          MR. SWAN:  AND I BELIEVE TWO OF THEM, AND MAYBE THE

3     THIRD, ARE U.S. CITIZENS WITH MORE TIES TO THE UNITED STATES.

4     AND THAT'S WHY WE SUGGESTED TWO THINGS, A MUCH HIGHER

5     FINANCIAL CONDITION AND ALSO THE EXTRA SECURITY TO PREVENT

6     ANY EFFORT TO FLEE.

7          SO WE'RE NOT ASKING FOR AN APPLES TO APPLES

8     COMPARISON.  WE'RE JUST POINTING OUT THAT HIS CO-CONSPIRATORS

9     WHO WERE -- WHO, FRANKLY, VIOLATED THE TRUST OF THEIR

10    COUNTRY, IF THE GOVERNMENT'S ALLEGATIONS ARE TRUE, STAND IN A

11    MUCH DIFFERENT POSITION THAN MR. FRANCIS.

12         THE COURT:  OKAY.  THANK YOU.  I KNOW I DIDN'T LET

13    YOU DO YOUR SUMMATION SO NOW --

14         MR. SWAN:  IT WAS REALLY GOOD.

15         THE COURT:  I'M HAPPY TO HEAR YOU.

16         MR. SWAN:  NO.  ALL I WAS GOING TO ASK THE COURT

17    AGAIN IS TO CONSIDER THE FACTORS UNDER -- AS I KNOW THE COURT

18    WILL, UNDER 3142, AND ALSO CONSIDER THE CONDITIONS THAT WE

19    PROPOSE, WHICH ARE EXTRAORDINARY, MORE THAN I'VE SEEN

20    PROPOSED IN ANY OTHER CASE, AND I THINK WILL GIVE THE COURT

21    THE ASSURANCE THAT MR. FRANCIS WILL MAKE HIS COURT

22    APPEARANCES AS REQUIRED.

23         AND I THANK YOU FOR YOUR ATTENTION THIS LATE IN THE

24    DAY.

25         THE COURT:  THANK YOU.

1    MR. HUIE.

2    MR. HUIE:  YOUR HONOR, THANK YOU.  I'D LIKE TO

3    RESPOND BRIEFLY WITHOUT REPEATING ANY OF MY EARLIER

4    PRESENTATION.

5    THE COURT:  THANK YOU.

6    MR. HUIE:  IT IS TRUE THAT MR. FRANCIS KNEW ABOUT

7    THE INVESTIGATION BEFORE HE CAME HERE.  AND THE REASON HE

8    KNEW IS THAT HE BOUGHT OFF AN NCIS AGENT TO FIND OUT ABOUT

9    IT.  BUT WHAT HE DIDN'T KNOW WAS THAT LAW ENFORCEMENT HAD PUT

10   A FALSE REPORT IN THE FILE THAT REPORTED THAT THE

11   INVESTIGATION HAD BEEN DECLINED BY THE PROSECUTORS.

12   AND PRESUMABLY IN RELIANCE ON THAT FALSE REPORT, HE

13   CAME TO THIS COUNTRY.  HE CAME TO THIS COUNTRY, YOUR HONOR,

14   FOR THE SIMPLE REASON OF MAKING MONEY, THE SAME REASON THAT

15   MOTIVATED HIM THROUGHOUT THE FRAUD AND THE BRIBERY SCHEME.

16   NOW THAT HE FINDS HIMSELF HERE AND CHARGED, HIS FLIGHT TO

17   MEXICO IS A VERY CONCRETE PROBABILITY.

18   AS THE COURT KNOWS, IT'S NOT UNCOMMON FOR

19   INDIVIDUALS IN TIJUANA TO BUY AMERICAN TRAVEL DOCUMENTS FOR

20   AS LITTLE AS A FEW HUNDRED DOLLARS.  MR. FRANCIS HAS

21   TREMENDOUS RESOURCES AND HE HAS THE ABILITY TO BUY WHATEVER

22   TRAVEL DOCUMENTS HE NEEDS SOUTH OF THE BORDER TO GO ANYWHERE.

23   WHEN I MENTIONED HIS FLEET, IT'S TRUE THAT HE'S NOT

24   GOING TO TAKE A BARGE OUT ON THE HIGH SEAS, BUT HE'S GOT

25   PATROL BOATS, HE'S GOT SUPPLY BOATS, HE HAS A FLEET THAT

1    MOVES AROUND TO DIFFERENT COUNTRIES IN SOUTHEAST ASIA.  AND

2    ALL HE NEEDS IS ONE VESSEL TO GET AWAY.  HE DOESN'T NEED TO

3    RIDE OR HE DOESN'T NEED A CONVOY OF ALL 50 OF THEM.

4          NOW, I'D LIKE TO ADDRESS A COUPLE VERY TECHNICAL

5    POINTS, AND THAT IS ABOUT THE VENUE, THE POSSIBILITY OF

6    ADDITIONAL SUBSTANTIVE COUNTS AND ALSO LOSSES.  IN MENTIONING

7    THE FRAUD COMPLAINT, YOUR HONOR, I PROVIDE THAT BY WAY OF

8    BACKGROUND.  ALTHOUGH WE DO INTEND TO CHARGE HIM WITH FRAUD,

9    HE DOESN'T NEED TO BE CHARGED WITH FRAUD FOR THE FRAUD LOSSES

10   TO COME INTO PLAY.  UNDER THE BRIBERY GUIDELINES, 2C1.1,

11   THOSE GUIDELINES ARE ENHANCED BY LOSSES THAT ARE CAUSED BY

12   THE FRAUD.

13         AND THE BRIBERY SCHEMES AS THEY HAVE BEEN ALLEGED

14   ARE INTERCONNECTED WITH FRAUD.  WE ALLEGED THAT HE BRIBED

15   NAVY OFFICIALS TO GET INFORMATION THAT ALLOWED HIM TO EXPLOIT

16   HIS FRAUDULENT SCHEME.  WE ALLEGE THAT HE BRIBED AN NCIS

17   AGENT IN ORDER TO EVADE DETECTION OF HIS FRAUDULENT SCHEME.

18   SO WHETHER OR NOT HE'S ADDITIONALLY CHARGED WITH FRAUD, THOSE

19   FIGURES WILL COME INTO PLAY OR WOULD COME INTO PLAY AT

20   SENTENCING ON THE BRIBERY COUNTS.

21         WHEN IT COMES TO THE POSSIBILITY OF ADDING

22   SUBSTANTIVE COUNTS OF BRIBERY FOR EXAMPLE, EACH ONE CARRYING

23   AN ADDITIONAL 15-YEAR MAXIMUM, THE VENUE PROVISION THAT WE

24   WOULD RELY ON IS THE SAME VENUE PROVISION WE'VE RELIED ON FOR

25   THE CONSPIRACY.  THAT'S 18 U.S. CODE 3248.  AND IT CONFERS

1    VENUE OVER ACTS THAT TAKE PLACE ON THE HIGH SEAS ON A

2    DISTRICT IN WHICH AN INDIVIDUAL WAS ARRESTED.

3          SO THE COMPLAINTS THEMSELVES, THEY ARE ALREADY ON

4    FILE, THEMSELVES RECITE SUBSTANTIVE ACTS OF BRIBERY IN WHICH

5    MR. FRANCIS PARTICIPATED AS A PRINCIPAL OR AS AN AIDER OR

6    ABETTOR THAT COULD THEMSELVES BE USED EASILY TO CHARGE

7    ADDITIONAL SUBSTANTIVE COUNTS OVER WHICH WE WOULD HAVE VENUE

8    AND WHICH WOULD EXPAND THE STATUTORY MAXIMUM.

9          WHEN IT COMES TO THE GUIDELINES, YOUR HONOR, THEY

10    ARE, OF COURSE, ADVISORY, BUT THE GUIDELINES ANALYSIS I WENT

11    THROUGH WOULD BE APPLICABLE TO ONLY ONE OF THE CRIMINAL

12    CASES; AND OF COURSE HE BRIBED MORE THAN ONE PERSON.  AND SO

13    THIS WOULD BE THE TYPE OF SITUATION WHERE IF THERE WERE TO BE

14    SOME SORT OF DEPARTURE OR VARIANCE, THERE WOULD BE A VERY

15    GOOD ARGUMENT, IN MY VIEW ON THE GOVERNMENT'S SIDE, FOR AN

16    UPWARD VARIANCE TO NEGATE THAT BECAUSE OF THE NUMBER OF TIMES

17    HE PERFORMED THIS SCHEME.

18          YOUR HONOR, WE'VE DISCUSSED THE BOND SITUATIONS OF

19    THE THREE NAVY OFFICIALS, EACH OF WHOM HAVE SIGNIFICANT TIES

20    TO THEIR RESPECTIVE COMMUNITIES.  MR. FRANCIS' SITUATION IS

21    MORE ANALOGOUS TO THAT OF MR. WISIDAGAMA, HIS LIEUTENANT, HIS

22    UNDERLING, WHO IS A SINGAPORIAN NATIONAL, AND WHO IS DETAINED

23    RIGHT NOW.

24          FINALLY, YOUR HONOR, WE WOULD OPPOSE ANY SORT OF

25    BERNIE MADOFF-TYPE HOME CONFINEMENT CONDITIONS, IN CONDITIONS

1  OF LUXURY AND EASE.  WE THINK THE ONLY SORT OF ARRANGEMENT

2  THAT WOULD BE ADEQUATE WOULD BE IN EFFECT ONE THAT RECREATES

3  THE MCC OUTSIDE OF THE MCC.  AND THAT'S NEITHER FEASIBLE, NOR

4  WE THINK DESIRABLE.

5  SO FOR THOSE REASONS, YOUR HONOR, UNLESS THE COURT

6  HAS QUESTIONS, WE WOULD SUBMIT ON OUR PRESENTATION.

7  THE COURT:  WITH REGARD TO MR. WISIDAGAMA, WAS THERE

8  ANY DETENTION HEARING HELD IN HIS CASE?

9  MR. HUIE:  THERE HAS NOT BEEN.

10  MR. SWAN:  HE HAS WAIVED.

11  THE COURT:  AND MR. SWAN POINTS OUT THAT IT COULD BE

12  SAID THAT AS CLOSE AS WE ARE TO THE BORDER, JUST ABOUT

13  ANYBODY RELEASED COULD GO TO MEXICO.  OF COURSE, WE ALWAYS

14  INDICATE THAT THEY ARE NOT ALLOWED TO GO TO MEXICO, BUT AS HE

15  POINTS OUT, PEOPLE CAN AND DO AT TIMES.  BUT HIS POINT IS

16  THAT YOUR ARGUMENT IS OVERBROAD IN THAT WE'D NEVER ALLOW

17  ANYONE TO BE ON PRETRIAL RELEASE IF THAT WERE THE CASE.

18  WILL YOU RESPOND TO THAT, PLEASE.

19  MR. HUIE:  YES, YOUR HONOR.  MR. FRANCIS IS

20  DIFFERENTLY SITUATED IN PART BECAUSE OF HIS RESOURCES.  HE'S

21  WORTH TENS OF MILLIONS OF DOLLARS, WE ESTIMATE.  THAT MAKES

22  HIM VERY DIFFERENT THAN 99.5 PERCENT OF THE DEFENDANTS IN

23  THIS DISTRICT.

24  HE'S ALSO DIFFERENT BECAUSE HE IS TRULY A MAN OF THE

25  WORLD.  HE CAN GO WHEREVER HE LIKES.  HE'S GOT THE

1    SOPHISTICATION, THE EDUCATION, THE WORLDLY WISDOM TO GO

2    WHEREVER HE WANTS TO GO, GO WHEREVER WE CAN'T FIND HIM.  AND

3    SO IN HIS CASE, I THINK THE PROXIMITY TO MEXICO IS A VERY

4    COMPELLING PROBABILITY.

5            THE COURT:  ALL RIGHT.  THANK YOU.

6            MR. HUIE:  THANK YOU.

7            THE COURT:  MR. SWAN, I HAVE A QUESTION OR TWO, BUT

8    IF YOU WANT TO MAKE A VERY BRIEF PRESENTATION, YOU'RE

9    WELCOME.

10           MR. SWAN:  I'LL LET YOU ASK YOUR QUESTIONS FIRST.

11           THE COURT:  THANK YOU.

12           MR. HUIE SAYS THAT THE KINDS OF CONDITIONS YOU HAVE

13    PROPOSED WOULD ALLOW YOUR CLIENT ESSENTIALLY TO LIVE LIKE

14    BERNIE MADOFF.

15           MR. SWAN:  AND THAT WAS GOING TO BE MY FIRST

16    COMMENT.

17           THE COURT:  THAT IS TO SAY, WE CERTAINLY HAVE HEARD

18    A LOT ABOUT OVER RECENT YEARS, BUT NOT VERY RECENTLY.

19           WILL YOU RESPOND TO THAT.

20           MR. SWAN:  WELL, MY FIRST THOUGHT WAS THIS HEARING

21    IS CONCERNING FLIGHT RISK; NOT ABOUT LUXURY.  BUT MY SECOND

22    THOUGHT WAS, WE HAVE BEEN LOOKING AT APARTMENTS THROUGHOUT

23    THE DOWNTOWN AREA AND THE NORTH PARK AREA THAT ARE TWO

24    BEDROOM, 2000-SQUARE-FOOT APARTMENTS.  SO I DON'T KNOW HOW

25    BIG MR. MADOFF'S LUXURY PENTHOUSE SUITE WAS, BUT I HAVE AN

1    IMPRESSION IT WAS MANY MULTIPLES OF THAT SIZE AND WAS WORTH

2    TENS OF MILLIONS OF DOLLARS BEING IN MANHATTAN.

3          SO HE'S NOT GOING TO BE LIVING THE LIFE OF LUXURY.

4    HE'S GOING TO BE LIVING IN A VERY SMALL APARTMENT WHERE HE

5    WILL AT LEAST HAVE ACCESS TO A TELEPHONE, A COMPUTER AND

6    THAT'S IT.  I MEAN -- SO I DON'T -- I SORT OF BRISTLED AT

7    THAT COMMENT BECAUSE I DIDN'T THINK IT WAS A FAIR COMMENT BY

8    MR. HUIE.

9          YOU SAID YOU HAD ANOTHER QUESTION.

10          THE COURT:  I DO.  I THINK THIS IS ONE OF THE MOST

11    DIFFICULT ISSUES, AND THAT IS THAT YOUR CLIENT HAS NO

12    COMMUNITY TIES HERE IN THIS DISTRICT.  HIS ONLY FAMILY IN THE

13    UNITED STATES LIVES ACROSS THE COUNTRY.

14          IT IS TRUE PEOPLE HAVE BEEN RELEASED BEFORE WHO HAVE

15    COMMUNITY TIES IN OTHER DISTRICTS.  IT DOESN'T NECESSARILY

16    HAVE TO BE IN SAN DIEGO, THAT'S TRUE.  I HAVE RELEASED PEOPLE

17    IN THE PAST WHO HAVE TIES IN OTHER DISTRICTS.

18          BUT HE HAS NO ONE HERE IN SAN DIEGO MOTIVATING HIM

19    TO STAY HERE, DOES HE?

20          MR. SWAN:  HE DOES NOT.  HE HAS HIS AUNT MOTIVATING

21    HIM TO STAY HERE.  WE THOUGHT AND CONSIDERED HIM GOING TO

22    PARKVILLE, MARYLAND AND LIVING IN MRS. WHITE'S MODEST HOME.

23    THAT WOULD POSE TREMENDOUS DIFFICULTIES.

24          I'VE HAD AT LEAST ONE CLIENT WHO WAS RELEASED TO

25    MICHIGAN, PUT ON HOME DETENTION, AND JUST NAVIGATING THROUGH

1  TSA AND FLIGHTS TO AND FROM WITH ANKLE BRACELETS IS ALMOST

2  BEYOND DESCRIPTION.  PLUS, IT MAKES IT TREMENDOUSLY DIFFICULT

3  TO CONSULT WITH YOUR CLIENT, AND IT DIDN'T SEEM WORKABLE.

4         BUT IF THAT'S THE COURT'S CONCERN, THAT IS SOMETHING

5  TO BE CONSIDERED.  I KNOW IF SHE WAS LIVING HERE, HE WOULD

6  FEEL THE SAME RESPONSIBILITY TO HER TO MAKE HIS COURT

7  APPEARANCE AS IF SHE'S LIVING IN MARYLAND.  AND I DON'T THINK

8  THE FACT THAT SHE WOULD BE LIVING HERE WOULD CHANGE HIS

9  THOUGHT PROCESS WHETHER HE WOULD NOT MAKE HIS COURT

10  APPEARANCES OR NOT.

11         SO LIKE YOU SAID, WE'VE HAD A NUMBER OF DEFENDANTS

12  WHO ARE RELEASED WHO HAVE NO COMMUNITY TIES TO  SAN DIEGO

13  AND THEIR COMMUNITY TIES ARE ELSEWHERE, BECAUSE THEY WERE

14  ARRESTED HERE LIKE MR. FRANCIS.

15         THE COURT:  ALL RIGHT.  THANK YOU.

16         MR. SWAN:  THANK YOU.

17         THE COURT:  THE ONE PLAYER HERE WHO HASN'T HAD A

18  CHANCE TO SPEAK IS PRETRIAL.

19         MS. KOUHI, DO YOU HAVE ANYTHING YOU'D LIKE TO ADD?

20         MS. KOUHI:  I HAVE NOTHING TO ADD, YOUR HONOR,

21  OUTSIDE OUR RECOMMENDATION FOR DETENTION STANDS.

22         THE COURT:  ALL RIGHT.  THANK YOU.

23         I'M GOING TO TAKE A BREAK WHILE I CONSIDER WHAT HAS

24  BEEN PRESENTED AND THEN I'LL RENDER MY RULING.  THANK YOU.

25         (RECESS, 5:26 P.M. TO 5:43 P.M.)

1    THE COURT:  ALL RIGHT.  MR. SWAN, I HAVE ONE LAST

2    QUESTION FOR YOU --

3         MR. SWAN:  YES, SIR.

4         THE COURT:  -- BEFORE I ISSUE MY RULING.  AND I

5    MEANT TO ASK YOU THIS EARLIER AND I FORGOT.

6         MR. HUIE SAID THAT, AGAIN NOT ONLY DID YOUR CLIENT

7    NOT COME HERE OF HIS OWN VOLITION, BUT HE CAME HERE BECAUSE

8    HE THOUGHT, BASED ON SOME INSIDE INFORMATION THAT PROVED TO

9    BE FALSE, THAT HE WAS NOT GOING TO BE ARRESTED, IF I

10   UNDERSTAND YOUR ARGUMENT CORRECTLY.

11        IS THAT A FAIR SUMMARY?

12        MR. HUIE:  YES, YOUR HONOR.  AND I'M NOT PURPORTING

13   TO SPEAK FOR WHAT MR. FRANCIS BELIEVED, BUT WE DID IN FACT

14   PUT A FALSE REPORT INTO THE NCIS SYSTEM THAT SAID THAT THE

15   CASE HAD BEEN DECLINED.

16        THE COURT:  I DON'T KNOW IF YOU'VE HAD A CHANCE TO

17   SPEAK TO YOUR CLIENT ABOUT THAT BUT --

18        MR. SWAN:  NO, I HAVE NOT.  AND I DON'T KNOW WHETHER

19   HE EVER RECEIVED THAT REPORT, KNEW THAT REPORT.  I DO KNOW

20   WITHOUT WAIVING PRIVILEGE THAT HE BELIEVED WHEN HE CAME HERE

21   THAT HE WAS STILL UNDER INVESTIGATION AND HE KNEW THERE WAS A

22   POSSIBILITY OF ARREST.

23        CAN I ADD TWO OTHER QUICK THOUGHTS --

24        THE COURT:  SURE.

25        MR. SWAN:  -- THAT I NEGLECTED?

1    I KNOW, AT LEAST I THOUGHT FROM THE COURT'S

2 QUESTIONING, CONCERN THAT THERE WAS NOBODY HERE IN SAN DIEGO

3 FOR MR. FRANCIS TO LIVE WITH.  JOSEPH WHITE, WHO IS SEATED IN

4 THE BACK OF THE COURT, WHO RECENTLY GRADUATED FROM HIGH

5 SCHOOL, IS WILLING TO COME AND LIVE WITH HIS UNCLE HERE IN

6 SAN DIEGO AND LIVE WITH HIM FULL TIME THROUGH THE PENDENCY OF

7 THE CASE.

8    THE OTHER THING I NEGLECTED TO MENTION WAS THAT IN

9 ADDITION TO THE TRIPS TO HAWAII THAT I MENTIONED EARLIER,

10 MR. FRANCIS CAME TO THE UNITED STATES IN APRIL OF THIS YEAR

11 AFTER THE BOSTON MARATHON BOMBINGS TO PICK UP HIS SON AND

12 BRING HIM HOME.  SO HE TRAVELED TO BOSTON, WAS THERE.  SO IT

13 WASN'T THAT HE DIDN'T COME TO THE UNITED STATES FROM TIME TO

14 TIME AND THAT HE HAD TO BE LURED ON THIS ONE SPECIAL

15 OCCASION.

16    SO I WANTED THE COURT TO KNOW THAT HE'S COME TO THE

17 UNITED STATES, AND HE CAME TO THE UNITED STATES AT THAT POINT

18 CLEARLY BEFORE THIS FALSE REPORT WAS PUT IN HIS FILE AND

19 BEFORE HE MIGHT HAVE SEEN IT, WHICH I DON'T KNOW HE DID.

20    THE COURT:  AND IS IT YOUR ARGUMENT THAT AT THE TIME

21 HE CAME ON THAT OCCASION, THAT HE KNEW HE WAS UNDER

22 INVESTIGATION AND COULD BE ARRESTED?

23    MR. SWAN:  YES.

24    THE COURT:  MR. HUIE.

25    MR. SWAN:  THE INVESTIGATIONS HAVE BEEN GOING ON FOR

1  QUITE SOME TIME.

2         THE COURT:  ALL RIGHT.  MR. HUIE, DID YOU HAVE

3  SOMETHING YOU WANTED TO SAY?

4         MR. HUIE:  NO, YOUR HONOR.  I THOUGHT YOU WERE

5  ASKING ME A QUESTION.

6         THE COURT:  OKAY.

7         MR. SWAN:  THANK YOU VERY MUCH.

8         THE COURT:  ALL RIGHT.  THANK YOU.

9         ALL RIGHT.  I WANT TO THANK COUNSEL FOR YOUR

10  EXCELLENT ARGUMENTS ON BOTH SIDES.  I WANT TO THANK PRETRIAL

11  SERVICES FOR YOUR INPUT, WHICH IS ALWAYS MOST APPRECIATED.

12  AND I'M NOW GOING TO ISSUE MY RULING.

13         MAY WE HAVE THE DEFENDANT STAND, PLEASE.  THANK YOU.

14         THIS IS A CASE IN WHICH WE HAVE VERY SERIOUS

15  ALLEGATIONS, EXTREMELY SERIOUS ALLEGATIONS AGAINST THE

16  DEFENDANT AND IN WHICH THE GOVERNMENT SAYS THAT THE WEIGHT OF

17  THE EVIDENCE IS VERY STRONG.

18         BASED ON WHAT I HAVE SEEN AND HEARD TO DATE, I HAVE

19  TO AGREE THAT NOT ONLY ARE THE ALLEGATIONS SERIOUS, BUT THE

20  WEIGHT OF THE EVIDENCE, TAKING WHAT THE GOVERNMENT SAYS AS

21  TRUE, AND OF COURSE BEFORE THE DEFENSE HAS HAD A CHANCE TO

22  REBUT THOSE ALLEGATIONS, THAT THE WEIGHT OF THE EVIDENCE DOES

23  INDEED APPEAR TO BE STRONG.  THAT IS, HOWEVER, THE LEAST

24  IMPORTANT FACTOR UNDER THE BAIL REFORM ACT.  AND THE ANALYSIS

25  CANNOT AND MUST NOT END WITH THAT SINGLE FACTOR.

1    LOOKING AT THE OTHER FACTORS THAT I MUST CONSIDER,

2  THE DEFENDANT DOES HAVE SOME CRIMINAL HISTORY, BUT IT IS

3  ATTENUATED AND IT IS NOT OF SUCH A SIGNIFICANT NATURE,

4  ALTHOUGH I'M NOT MINIMIZING IT, THAT I BELIEVE IT WEIGHS IN

5  FAVOR OF DETENTION.

6    THE DEFENDANT IS NOT A CITIZEN OF THIS COUNTRY.

7  HE'S A CITIZEN OF MALAYSIA.  HE'S BEEN LIVING IN SINGAPORE.

8  HE DOES NOT HAVE TIES TO THIS PARTICULAR JUDICIAL DISTRICT.

9  HE DOES, HOWEVER, HAVE TIES IN THE UNITED STATES.  HIS AUNT

10  AND NEPHEW, WHO ARE HERE TODAY, WHO LIVE IN BALTIMORE,

11  MARYLAND, OR THE BALTIMORE AREA.  AND THEY ARE HERE TO SHOW

12  THEIR SUPPORT AND HIS AUNT IS PREPARED TO SIGN ON TO A BOND

13  IF THE COURT WERE TO ISSUE CONDITIONS OF PRETRIAL RELEASE.

14    THE PENALTIES FOR THESE ALLEGED OFFENSES ARE VERY

15  SERIOUS.  I DON'T THINK ANYBODY CAN SAY OTHERWISE.  MR. SWAN

16  ARGUES THAT AT THIS POINT THEY AMOUNT TO A TOTAL OF 15 YEARS.

17  THE GOVERNMENT ARGUES THAT WITH ADDITIONAL CHARGES THE

18  PENALTIES WILL BE VERY SEVERE.  I DON'T THINK ANYONE CAN SAY

19  THAT ULTIMATELY THOSE PENALTIES MAY NOT BE MUCH MORE SEVERE

20  THAN THE PICTURE WE HAVE HERE TODAY.

21    MR. SWAN ARGUES THAT MR. FRANCIS WANTS HIS DAY IN

22  COURT, THAT HE CAME HERE KNOWING HE COULD BE ARRESTED.  THERE

23  IS A DISPUTE BETWEEN THE PARTIES AS TO WHETHER HE REALLY DID

24  COME HERE OF HIS OWN VOLITION, BUT MR. SWAN POINTS OUT THAT

25  HE DID COME HERE TO VISIT HIS SON IN BOSTON AND THE

1    INVESTIGATION IS A VERY LONG-RUNNING INVESTIGATION AND THAT

2    HE HAD TO HAVE KNOWN AS OF THAT TIME THAT HE COULD BE

3    ARRESTED IF HE CAME HERE.

4         THE DEFENDANT IS HERE IN THE UNITED STATES LEGALLY.

5    HE'S HERE ON A VISA THAT ALLOWS HIM TO BE HERE FOR A

6    SIX-MONTH PERIOD.  IF HE WERE TO BE RELEASED ON BAIL, THAT

7    VISA WOULD OBVIOUSLY HAVE TO BE EXTENDED.  I CANNOT AND WILL

8    NOT MINIMIZE THE SERIOUSNESS OF THE CASE, OF THESE

9    ALLEGATIONS.  THEY ARE VERY, VERY SERIOUS, THE PENALTIES ARE

10   POTENTIALLY VERY SEVERE.  HOWEVER, IT IS THE LAW THAT IF I

11   CAN FASHION CONDITIONS OF PRETRIAL RELEASE THAT WILL

12   REASONABLY ASSURE THE APPEARANCE OF THE DEFENDANT IN COURT, I

13   MUST DO SO.  THAT IS CLEARLY MY CHARGE UNDER THE BAIL REFORM

14   ACT.

15        HERE, I BELIEVE I CAN FASHION VERY STRINGENT

16   CONDITIONS OF PRETRIAL RELEASE THAT WILL REASONABLY ASSURE

17   THE APPEARANCE OF THE DEFENDANT IN COURT, AND, THEREFORE, I

18   AM GOING TO DO SO.

19        THOSE CONDITIONS WILL BE AS FOLLOWS:  I AM GOING TO

20   IMPOSE A CASH OR CORPORATE SURETY BOND IN THE AMOUNT OF ONE

21   MILLION DOLLARS.  AND I WANT TO MAKE CLEAR, BECAUSE NOT EVERY

22   CORPORATE SURETY BOND WE SEE COMPLIES WITH THE CONDITIONS AS

23   REQUIRED BY THE COURT, BUT A CORPORATE SURETY BOND MUST COVER

24   ALL CONDITIONS OF RELEASE; NOT JUST THE DEFENDANT'S

25   APPEARANCE.  IF THE CORPORATE SURETY BOND ONLY APPLIES TO THE

1 DEFENDANT'S APPEARANCE IN COURT, IT WILL BE REJECTED. THAT

2 HAS BEEN THE COURT'S CONSISTENT POLICY AND WILL REMAIN SO.

3 MR. SWAN HAS SUGGESTED THAT AN ADDITIONAL ASPECT OF

4 PRETRIAL RELEASE BE THAT THE DEFENDANT'S AUNT, FRANCISCA

5 WHITE, COSIGN A PERSONAL SURETY BOND FOR THE DEFENDANT IN AN

6 ADDITIONAL AMOUNT OF $100,000; AND I AM GOING TO IMPOSE THAT

7 CONDITION AS WELL. SO THE PERSONAL APPEARANCE BOND IN THE

8 AMOUNT OF $100,000 SECURED BY THE CO-SIGNATURES OF THE

9 DEFENDANT AND HIS AUNT, FRANCISCA WHITE.

10 WE'VE TALKED A LOT THIS AFTERNOON AND NOW THIS

11 EVENING ABOUT THE VISA AND HOW LONG IT ALLOWS THE DEFENDANT

12 TO BE HERE. BECAUSE HE IS NOT A U.S. CITIZEN AND BECAUSE HE

13 WILL HAVE TO BE HERE LEGALLY AND WILL HAVE TO HAVE SATISFIED

14 ALL GOVERNMENT AGENCY CONDITIONS TO BE ABLE TO LEGALLY REMAIN

15 IN THE UNITED STATES DURING THE PENDENCY OF THE PROCEEDINGS,

16 I AM ADDING THAT CONDITION. SO HE WILL HAVE TO COMPLY WITH

17 ALL GOVERNMENT AGENCY CONDITIONS TO BE ABLE TO LEGALLY REMAIN

18 IN THE UNITED STATES DURING THE PENDENCY OF THIS CASE.

19 NOW, TRAVEL RESTRICTION. THIS HAS TO BE EXTREMELY

20 STRINGENT, AND I DON'T THINK THE DEFENSE IS SUGGESTING

21 ANYTHING OTHER THAN THAT. I'M INCLINED TO RESTRICT TRAVEL

22 RIGHT HERE TO SAN DIEGO. NO FURTHER THAN SAN DIEGO COUNTY.

23 DOES ANYONE WANT TO BE HEARD ON THAT ISSUE?

24 MR. SWAN: NO, YOUR HONOR. THAT'S FINE.

25 MR. HUIE: NO, YOUR HONOR.

1      THE COURT:  ALL RIGHT.  THE DEFENDANT'S TRAVEL IS

2 RESTRICTED TO SAN DIEGO COUNTY.

3      AND, MR. FRANCIS, I WANT TO MAKE IT VERY CLEAR,

4 YOU'VE HEARD THIS DISCUSSED, BUT YOU MUST NOT ENTER MEXICO,

5 YOU MUST NOT LEAVE THIS COUNTY.

6      THE DEFENDANT:  YES, YOUR HONOR.

7      THE COURT:  I AM GOING TO REQUIRE THE DEFENDANT TO

8 PARTICIPATE IN THE COURT'S LOCATION-MONITORING PROGRAM AND

9 ABIDE BY ALL TECHNOLOGY REQUIREMENTS.  THE DEFENDANT WILL PAY

10 FOR THE COST OF HIS MONITORING AS DIRECTED BY THE COURT

11 AND/OR THE ASSIGNED PRETRIAL SERVICES OFFICER.

12      THE DEFENDANT WILL BE PLACED ON GPS MONITORING WITH

13 HOME DETENTION.  ACTUALLY, I DO WANT TO ASK MS. KOUHI THIS.

14 THERE IS HOME INCARCERATION OR HOME DETENTION.

15      HOME INCARCERATION IS THE MOST STRINGENT; CORRECT?

16      MS. KOUHI:  YES, YOUR HONOR.

17      THE COURT:  AND COULD YOU FOR MY BENEFIT -- I'M SURE

18 YOU'VE TOLD ME THIS MORE THAN A FEW TIMES -- REMIND US OF

19 WHAT HOME INCARCERATION INVOLVES.

20      MS. KOUHI:  YES, YOUR HONOR.  HOME INCARCERATION

21 INVOLVES THE DEFENDANT BEING ALLOWED TO LEAVE FOR MEDICAL

22 PURPOSES, RELIGIOUS PURPOSES AND COURT APPEARANCES.

23      THE COURT:  AND THAT'S IT?

24      MS. KOUHI:  AND THAT'S IT.  AND ANYTHING THAT THE

25 COURT ORDERS.

1          MR. SWAN:  DOES IT PERMIT ATTORNEY VISITS?

2          MS. KOUHI:  AND ATTORNEY VISITS.  IF THE COURT IS

3 MORE INCLINED TO SET HOME DETENTION, PRETRIAL HAS DISCRETION

4 WITH THINGS LIKE ATTORNEY VISITS, GOING TO THE MARKET,

5 EVERYTHING ELSE THAT HOME INCARCERATION DOESN'T ALLOW, A

6 HAIRCUT, A GROCERY STORE RUN AND THINGS OF THAT NATURE.

7          THE COURT:  OKAY.  I APPRECIATE YOU DESCRIBING THAT.

8          I'D LIKE TO HEAR FROM THE PARTIES.  WHAT ARE YOUR

9 THOUGHTS ON THAT ISSUE.  MR. HUIE?

10         THE COURT:  YOUR HONOR, WE WOULD FAVOR THE MOST

11 STRINGENT CONDITIONS AVAILABLE.

12         THE COURT:  SO DOES THAT MEAN, MS. KOUHI, THAT IF

13 MR. FRANCIS WANTS TO GO TO THE MARKET OR WANTS TO GO GET A

14 HAIRCUT, OR DO JUST ABOUT ANYTHING OTHER THAN MEDICAL

15 TREATMENTS OR SEE HIS ATTORNEY, THAT HE MUST GET YOUR

16 PERMISSION ON EACH SUCH OCCASION?

17         MS. KOUHI:  THAT IS TRUE.  I'M SORRY.  WITH -- UNDER

18 HOME DETENTION?

19         THE COURT:  UNDER HOME INCARCERATION.

20         MS. KOUHI:  UNDER HOME INCARCERATION, WE DON'T HAVE

21 THE AUTHORITY TO ALLOW HIM ANYTHING OUTSIDE MEDICAL,

22 RELIGIOUS OR LEGAL THINGS, UNLESS THE COURT ORDERS AN

23 APPOINTMENT IN WHICH CASE --

24         THE COURT:  AND UNDER HOME DETENTION, IT'S THE SAME

25 EXCEPT THAT YOU HAVE THE DISCRETION --

1          MS. KOUHI:  THAT IS CORRECT.

2          THE COURT:  -- TO ALLOW HIM TO GO TO THE MARKET, GO

3     SHOPPING, SEE HIS ATTORNEY.

4          MS. KOUHI:  AS WELL AS ANYTHING THAT PRETRIAL

5     SERVICES DEEMS TO BE APPROPRIATE.

6          THE COURT:  OKAY.  MR. SWAN, DO YOU WANT TO BE HEARD

7     ON THAT ISSUE?

8          MR. SWAN:  I WOULD LIKE PRETRIAL SERVICES TO HAVE

9     SOME DISCRETION.  I WOULD THINK THEY ARE GOING TO BE VERY

10    STRINGENT IN THEIR DISCRETIONARY CALLS.  I FOUND THAT THEY

11    HAVE -- THEY ARE REASONABLE, BUT THEY ARE STRICT, AND I THINK

12    SOME LATITUDE AND DISCRETION TO THEM IS APPROPRIATE.

13         THE COURT:  ALL RIGHT.  I'M GOING TO MAKE IT HOME

14    DETENTION.  AND IT IS UNDERSTOOD THAT IT IS UP TO PRETRIAL

15    SERVICES TO EXERCISE VARIOUS STRINGENT -- DISCRETION BUT IN A

16    STRINGENT MANNER AS TO WHAT SORTS OF TRAVEL OUTSIDE OF THE

17    RESIDENCE WILL BE ALLOWED.

18         MS. KOUHI:  YES.

19         THE COURT:  THANK YOU.

20         NOW, THE DEFENDANT DOES NOT HAVE A PLACE TO LIVE IN

21    THIS COUNTY, DOES NOT HAVE ANY FAMILY HERE.  WE'VE TALKED

22    ABOUT THAT AT LENGTH.  AND HE WILL HAVE TO FIND A PLACE TO

23    LIVE.

24         MR. SWAN HAS SUGGESTED THAT HE LIVE IN A RENTED

25    APARTMENT OR CONDOMINIUM IN THIS COUNTY, APPROVED BY PRETRIAL

1   SERVICES, AND THAT THE RESIDENCE BE AN UPPER FLOOR OF A

2   MULTI-STORY BUILDING AND THE RESIDENCE NOT BE NEAR STREET

3   LEVEL.  IT APPEARS TO THE COURT THAT THAT IS AN APPROPRIATE

4   SUGGESTION.  IF PRETRIAL HAS ANY OTHER THOUGHTS ABOUT THAT,

5   I'M CERTAINLY WILLING TO CONSIDER THEM.

6           MS. KOUHI:  WE DON'T HAVE ANY.  I WOULD JUST NOTE

7   FOR THE COURT'S INFORMATION, WE DO CONTRACT WITH PLACES LIKE

8   C.A.I. AND A SOBER LIVING ENVIRONMENT, IF THAT WOULD BE

9   APPROPRIATE IN THIS CASE.  THOSE ARE THE ONLY HOUSING OPTIONS

10  WE HAVE.

11          MR. SWAN:  THEY WOULDN'T BE APPROPRIATE HERE WHERE

12  THERE IS NO SUBSTANCE ABUSE.

13          THE COURT:  THAT IS GENERALLY FOR SUBSTANCE ABUSE

14  SITUATIONS; CORRECT?

15          MS. KOUHI:  SOBER LIVING WITH C.A.I. IS SOMEWHERE

16  THAT WE UTILIZE FOR PURPOSES OF INDIVIDUALS WHO DON'T HAVE

17  ACCESS TO HOUSING EITHER IMMEDIATELY OR DURING THEIR STAY IN

18  THIS DISTRICT.

19          THE COURT:  AND, YET, IF HE IS GOING TO LIVE IN A

20  RENTED APARTMENT AND THESE EXTRA CONDITIONS ARE IMPOSED, THAT

21  WOULD BE MORE STRINGENT, WOULD IT NOT, THAN BEING AT C.A.I.?

22          MS. KOUHI:  I BELIEVE THAT BEING AT C.A.I. WOULD BE

23  MORE STRICT.

24          THE COURT:  YOU DO.  CAN YOU EXPLAIN WHY.

25          MS. KOUHI:  C.A.I. HAS THE ABILITY TO ALLOW THE

1     DEFENDANT TO WEAR THE GPS TRANSMITTER.  THERE IS ALSO

2     IN-AND-OUT CHECK-IN, IN-AND-OUT PROCEDURES FOR THAT FACILITY.

3     IT'S AN ADDED LAYER OF PROTECTION POSSIBLY IF THE COURT

4     WANTED THAT.

5              THE COURT:  OKAY.  MR. SWAN, DO YOU WANT TO RESPOND

6     TO THAT?

7              MR. SWAN:  I'M NOT FAMILIAR WITH C.I.A.  AND WHAT I

8     JUST HEARD THE PRETRIAL SERVICES OFFICER SAY A FEW MINUTES

9     AGO, IT'S FOR PEOPLE WHO DON'T HAVE THE MEANS TO RENT THEIR

10    OWN APARTMENT BUT WHO OTHERWISE ARE ENTITLED TO BOND.

11             THAT'S NOT THE CASE HERE.  AND I THINK WITH THE

12    EXTRA SECURITY SUGGESTIONS, A RECOMMENDATION COULD BE MADE

13    THAT IT'S SUFFICIENT.

14             THE COURT:  ALL RIGHT.  I AM GOING TO IMPOSE THE

15    CONDITION SUGGESTED BY THE DEFENSE, THAT THE DEFENDANT WILL

16    BE PERMITTED TO LIVE IN A RENTED APARTMENT OR CONDOMINIUM IN

17    THIS COUNTY TO BE APPROVED BY PRETRIAL.  THE RESIDENCE WILL

18    BE ON AN UPPER FLOOR OF A MULTI-STORY BUILDING AND THE

19    RESIDENCE WILL NOT BE NEAR STREET LEVEL.

20             IT HAS BEEN SUGGESTED BY THE DEFENSE THAT AS AN

21    EXTRA LAYER OF SECURITY, THE DEFENDANT PAY FOR HIS RESIDENCE

22    TO BE MONITORED BY AN INDEPENDENT SECURITY COMPANY THAT WILL

23    INSTALL SURVEILLANCE CAMERAS ON THE EXTERNAL DOORS AND

24    INSTALL ALARMS ON ALL WINDOWS AND EXTERNAL DOORS AND ALERT

25    PRETRIAL AND ANY OTHER REQUESTED AUTHORITIES IF MR. FRANCIS

1    WERE TO LEAVE HIS RESIDENCE WITHOUT PERMISSION OF PRETRIAL

2    SERVICES.  I'M GOING TO IMPOSE THAT CONDITION.  I THINK UNDER

3    THE CIRCUMSTANCES WE'VE DISCUSSED AT GREAT LENGTH TODAY, THAT

4    THAT IS A NECESSARY CONDITION, AND I'M GOING TO IMPOSE IT.

5           NOW, ANOTHER SUGGESTION MADE BY THE DEFENSE WAS IF

6    THE COURT BELIEVED IT NECESSARY, THE DEFENDANT PAY FOR A

7    THIRD LAYER OF SECURITY; NAMELY, A 24-HOUR GUARD SERVICE TO

8    BE PRESENT AT THE APARTMENT AT ALL TIMES AND TO IMMEDIATELY

9    ALERT PRETRIAL SERVICES AND ANY OTHER REQUESTED AUTHORITIES

10   AGAIN IF MR. FRANCIS WERE TO LEAVE THE APARTMENT WITHOUT

11   PERMISSION OF PRETRIAL SERVICES.

12          I'D LIKE TO HEAR FROM THE GOVERNMENT ON THAT

13   CONDITION.  DO YOU BELIEVE THAT'S NECESSARY?

14          MR. HUIE:  WE DO, YOUR HONOR.

15          THE COURT:  ALL RIGHT.  I WILL IMPOSE THAT CONDITION

16   AS WELL.

17          IT IS MY UNDERSTANDING THAT THE DEFENDANT HAS -- HIS

18   PASSPORT HAS BEEN SEIZED; IS THAT CORRECT?

19          MR. HUIE:  YES, YOUR HONOR, THAT'S CORRECT.

20          THE COURT:  I DON'T KNOW IF HE POSSESSES ANY OTHER

21   TRAVEL DOCUMENTS, BUT JUST OUT OF AN ABUNDANCE OF CAUTION, I

22   WILL INDICATE THAT HE IS TO SURRENDER ALL TRAVEL DOCUMENTS.

23   AND HE CANNOT APPLY FOR A NEW PASSPORT DURING THE PENDENCY OF

24   THE CASE.

25          MR. FRANCIS, THERE ARE CERTAIN STANDARD CONDITIONS

1   WITH WHICH ANY DEFENDANT RELEASED ON PRETRIAL RELEASE MUST

2   COMPLY, AND I'M GOING TO ADVISE YOU OF THOSE NOW.

3           YOU CANNOT, OF COURSE, COMMIT ANY FEDERAL, STATE OR

4   LOCAL CRIME DURING THE PERIOD OF YOUR RELEASE.  OF COURSE YOU

5   MUST MAKE ALL OF YOUR COURT APPEARANCES WITHOUT FAIL.  AS WE

6   DISCUSSED, YOU'LL REPORT FOR SUPERVISION TO PRETRIAL SERVICES

7   AS DIRECTED BY THE ASSIGNED PRETRIAL SERVICES OFFICER AND PAY

8   FOR THE REASONABLE COSTS OF SUPERVISION IN AN AMOUNT

9   DETERMINED BY PRETRIAL SERVICES.

10          YOU CANNOT POSSESS OR USE ANY NARCOTIC, DRUG OR

11  CONTROLLED SUBSTANCE WITHOUT A LAWFUL MEDICAL PRESCRIPTION.

12  YOU CANNOT POSSESS ANY FIREARM, DANGEROUS WEAPON OR

13  DESTRUCTIVE DEVICE DURING THE PENDENCY OF THE CASE.  YOU MUST

14  HAVE READ OR HAVE EXPLAINED AND ACKNOWLEDGE YOUR

15  UNDERSTANDING OF THE ADVICE OF PENALTIES AND SANCTIONS FORM.

16  AND, OF COURSE, AS WE DISCUSSED, YOU'LL BE PROVIDING A

17  CURRENT RESIDENCE ADDRESS AND PHONE NUMBER PRIOR TO YOUR

18  RELEASE THAT WILL BE APPROVED BY PRETRIAL SERVICES.

19          NOW, ANOTHER THING WE NEED TO DISCUSS IS EMPLOYMENT.

20  I NORMALLY IMPOSE A CONDITION THAT THE DEFENDANT MAINTAIN

21  FULL-TIME EMPLOYMENT.  I THINK I NEED TO HEAR FROM THE

22  PARTIES ON THAT.  I KNOW MR. SWAN HAS SAID THAT MR. FRANCIS

23  WANTS TO SOMEHOW BE ABLE TO CONTINUE HIS BUSINESS WHILE HE'S

24  ON RELEASE.

25          WHAT IS THE GOVERNMENT'S POSITION ON THAT?

1    MR. HUIE:  YOUR HONOR, WE WOULD NOT URGE THAT

2  CONDITION IN THIS PARTICULAR CASE.

3    THE COURT:  YOU WOULD -- I'M SORRY.

4    MR. HUIE:  WE WOULD NOT URGE AN ADDED CONDITION THAT

5  HE MAINTAIN AND SEEK FULL-TIME EMPLOYMENT OUTSIDE OF THE GDMA

6  BUSINESS.  WE THINK HIS TIME WILL PROBABLY BE SPENT MOST

7  PROFITABLY IN THE CONDUCT OF THAT BUSINESS.

8    THE COURT:  IN THE WHICH BUSINESS?

9    MR. HUIE:  IN THE CONDUCT OF THE GDMA BUSINESS.

10   THE COURT:  OKAY.  MR. SWAN.

11   MR. SWAN:  I AGREE.  HE WILL HAVE HIS HANDS FULL

12  TRYING TO RUN HIS BUSINESS FROM THIS FAR AWAY.  AND, FRANKLY,

13  GIVEN HIS IMMIGRATION STATUS, HE CAN'T REALLY GO OUT AND GET

14  A JOB OUTSIDE THE DEPARTMENT.  IF THAT CHANGES, WE'LL COME

15  BACK AND ASK FOR A MODIFICATION.

16   THE COURT:  ALL RIGHT.  SO CONDITION NO. 10, YOU'RE

17  SUGGESTING I NOT INCLUDE?

18   MR. HUIE:  THAT'S OUR POSITION, YOUR HONOR.

19   THE COURT:  ALL RIGHT.  I WILL NOT INCLUDE THAT

20  REQUIREMENT UNDER THE CIRCUMSTANCES.

21   I'D LIKE TO HEAR FROM THE PARTIES AND PRETRIAL IF

22  YOU BELIEVE ANY OTHER CONDITIONS SHOULD BE IMPOSED.

23   MR. HUIE.

24   MR. HUIE:  NO, YOUR HONOR.

25   MS. KOUHI:  YES, YOUR HONOR.

1    WITH REGARD TO THE GUARD OUTSIDE MR. FRANCIS' HOME,

2  IS THE COURT AUTHORIZING COMMUNICATION?  I'M A LITTLE BIT

3  CONFUSED BECAUSE THIS HAS NEVER HAPPENED IN THE PAST.  SO

4  JUST FOR CLARIFICATION PURPOSES, IS THE COURT ALLOWING

5  PRETRIAL SERVICES TO COMMUNICATE THE DEFENDANT'S PROPOSED

6  SCHEDULE WITH THAT INDIVIDUAL AND RELEASE INFORMATION ABOUT

7  THE DEFENDANT'S SCHEDULE TO THAT INDIVIDUAL?

8    THE COURT:  I THINK THAT WOULD HAVE TO BE DONE SO

9  THAT THE GUARD WOULD KNOW WHEN HE CAN LEAVE AND WHEN HE

10  CANNOT LEAVE.

11    ANY OBJECTION TO THAT, MR. HUIE?

12    MR. HUIE:  NO, YOUR HONOR.

13    MR. SWAN:  YOUR HONOR, THE GUARD ACTUALLY MAY,

14  BECAUSE OF THE FACILITY, BE SITTING JUST INSIDE THE DOOR AS

15  OPPOSED TO JUST OUTSIDE THE DOOR.  THAT'S THE ONLY

16  CLARIFICATION I WANTED TO MAKE.

17    BUT I THINK MY ENVISION, THE GUARD WOULD REGULARLY

18  COMMUNICATE WITH PRETRIAL SERVICES ALL ASPECTS OF

19  MR. FRANCIS' WHEREABOUTS.

20    THE COURT:  SO MS. KOUHI, YOU'RE SUGGESTING THAT I

21  ADD THAT PRETRIAL BE ABLE TO COMMUNICATE WITH THE --

22    MS. KOUHI:  FOR VERIFICATION PURPOSES OF THE

23  DEFENDANT'S SCHEDULE.

24    THE COURT:  ALL RIGHT.  AND DEFENSE COUNSEL ARE TO

25  NOTIFY PRETRIAL SERVICES UPON THE SUBMISSION OF BOND

1    PAPERWORK.

2          MS. KOUHI, YOU WILL WANT, I ASSUME, THE DEFENDANT TO

3    BE RELEASED FROM CUSTODY DIRECTLY TO YOU THE FOLLOWING

4    BUSINESS DAY SO HE CAN BE FITTED WITH THE GPS DEVICE?

5          MS. KOUHI:  YES, YOUR HONOR.

6          THE COURT:  OKAY.  SO THE DEFENDANT WILL BE RELEASED

7    FROM CUSTODY DIRECTLY TO PRETRIAL SERVICES THE FOLLOWING

8    BUSINESS DAY BY 10:00 A.M., WITH PRETRIAL SERVICES TO PROVIDE

9    TRANSPORTATION TO THE RESIDENCE IF NEEDED.

10         MS. KOUHI:  IF NEEDED, YES.

11         THE COURT:  ALL RIGHT.  IS THERE ANYTHING ELSE THAT

12   ANYONE WANTS TO ADD?

13         MR. HUIE:  YES, YOUR HONOR.  WE, OF COURSE, HAVE

14   TREMENDOUS RESPECT FOR THE COURT'S RULING, BUT GIVEN WHAT'S

15   AT STAKE FOR THE UNITED STATES, WE WOULD RESPECTFULLY ASK FOR

16   A BRIEF STAY OF THE COURT'S RULING.  IN OUR VIEW, THAT STAY

17   WOULD BE OF LITTLE OR NO PREJUDICE POTENTIALLY TO MR. FRANCIS

18   FOR A COUPLE OF REASONS.

19         ONE, WE ALREADY HAVE A DETENTION HEARING ON CALENDAR

20   BEFORE JUDGE BARTICK FOR MONDAY, AND I BELIEVE HE WILL BE

21   DETAINED PENDING THAT HEARING ANYWAY.  AND, SECOND, SOME OF

22   THESE CONDITIONS OF RELEASE MAY TAKE SOME TIME TO SET UP.  WE

23   OF COURSE WILL SEEK THAT REVIEW IN THE DISTRICT COURT AT THE

24   EARLIEST POSSIBLE OPPORTUNITY.

25         THE COURT:  UNDERSTOOD.

1      MR. SWAN.

2           MR. SWAN:  WE OPPOSE THE STAY.  BUT I DO AGREE WITH

3      MR. HUIE THAT IT'S GOING TO TAKE A FEW DAYS TO COMPLY WITH

4      ALL THE CONDITIONS, SO IT'S NOT NECESSARY AT THIS MOMENT IN

5      TIME.

6           THE COURT:  ALL RIGHT.  WELL, I THINK CLEARLY THE

7      GOVERNMENT, WE KNOW THE GOVERNMENT HAS EVERY RIGHT TO SEEK

8      REVIEW BY THE DISTRICT JUDGE.  IT IS GOING TO TAKE SOME TIME

9      FOR ALL OF THESE MANY MOVING PARTS TO BE PUT INTO PLACE IN

10     ANY EVENT.  I'M GOING TO GRANT THE GOVERNMENT'S MOTION FOR A

11     STAY.

12          HOW MUCH TIME DO YOU SEEK?

13          MR. HUIE:  YOUR HONOR, I EXPECT TO FILE OUR PAPERS

14     TOMORROW OR MONDAY.  I'M GOING TO TRY TO CALENDAR IT FIRST

15     THING TOMORROW MORNING AT JUDGE SAMMARTINO'S EARLIEST

16     AVAILABLE TIME SLOT.  AND WE'LL NEED TO GET A TRANSCRIPTION

17     OF THE RECORDING, OF COURSE.

18          THE COURT:  SO ARE YOU SEEKING A STAY OF 24 HOURS,

19     48 HOURS?

20          MR. HUIE:  WELL, YOUR HONOR, WE'D SEEK A STAY

21     PENDING THE DISTRICT COURT'S RULING.

22          THE COURT:  PENDING HER DECISION.

23          MR. SWAN:  YOUR HONOR, MY POSITION WOULD BE THAT THE

24     COURT CAN GIVE THEM A STAY TO GET THE PAPERWORK TO JUDGE

25     SAMMARTINO, BUT IT WOULD BE THEN INCUMBENT UPON THEM TO ASK

1  HER FOR A STAY OF YOUR ORDER ONCE SHE HAS THE PAPERWORK IN

2  FRONT OF HER.

3      THE COURT:  MR. HUIE, DO YOU WANT TO RESPOND TO

4  THAT?

5      MR. HUIE:  WELL, WE COULD SEEK A STAY BEFORE JUDGE

6  SAMMARTINO AS WELL.  THE PROBLEM IS WE HAVE TO GET A HEARING

7  DATE IN ORDER TO ARGUE FOR A STAY.  SO WHAT WE'RE PROPOSING

8  IS THAT WE GET A STAY UNTIL THE FIRST AVAILABLE HEARING THAT

9  JUDGE SAMMARTINO GIVES THE PARTIES.

10     MR. SWAN:  AND MY PROBLEM IS I HAVE NO IDEA WHEN

11 THAT'S GOING TO BE.

12     THE COURT:  I THINK JUDGE SAMMARTINO IS LIKELY TO

13 SCHEDULE THIS ON A PRETTY PROMPT BASIS.  I'M GOING TO STAY MY

14 ORDER TO ALLOW THE GOVERNMENT TO FILE THE APPEAL WITH THE

15 DISTRICT JUDGE AND PENDING THE HEARING DATE ON THAT APPEAL.

16     ALL RIGHT.  ANY OTHER THING THAT ANYONE WISHES TO

17 RAISE?

18     MR. SWAN:  NOT AS TO CONDITIONS OF THE BOND.

19     I WAS GOING TO RAISE THE ISSUE OF A NEBBIA HEARING

20 AS TO MS. WHITE, BUT GIVEN THE GOVERNMENT'S PLANNED APPEAL, I

21 WILL SET THAT UP TELEPHONICALLY IF THAT'S OKAY WITH THE COURT

22 IF THE CONDITIONS ARE AFFIRMED.  YOU'VE HAD A CHANCE TO SEE

23 HER NOW AND WE CAN SET HER UP WITH A NOTARY TO MAKE SURE

24 SHE'S THE PERSON ON THE PHONE.

25     THE COURT:  YES, THAT CAN BE DONE TELEPHONICALLY.

1    AND WHAT YOU CAN DO ALSO, IF THIS ORDER IS AFFIRMED

2  BY THE DISTRICT JUDGE, IS SUBMIT THE PROPOSED BOND PAPERWORK

3  TO MR. HUIE.  AND IF THE GOVERNMENT DOES NOT FEEL A NEBBIA

4  HEARING IS NECESSARY, I WILL NOT CONDUCT ONE.  BUT IF THERE

5  ARE ANY QUESTIONS RAISED, AND YOU FEEL THE COURT SHOULD

6  EXAMINE HER OR YOU WISH TO EXAMINE HER UNDER OATH, WE CAN

7  MAKE ARRANGEMENTS TO DO THAT.

8    MR. HUIE:  THANK YOU, YOUR HONOR.

9    THE COURT:  ALL RIGHT.  THANK YOU, EVERYONE.

10    MR. SWAN:  THANK YOU.

11    THE COURT:  HAVE A NICE EVENING.

12    THE CLERK:  COURT IS NOW IN RECESS.

13    (PROCEEDINGS CONCLUDED AT 6:15 P.M.)

14    -- OO0OO --

15    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

16  FROM THE ELECTRONIC SOUND RECORDING OF THE PROCEEDINGS IN THE

17  ABOVE-ENTITLED MATTER.

18

19  /S/CAMERON P. KIRCHER          11-24-13
    TRANSCRIBER                    DATE
20

21

22

23

24

25