THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA


HONORABLE JANIS L. SAMMARTINO
UNITED STATES DISTRICT JUDGE PRESIDING

_____


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. 13-CR-3781-JLS |
| | ) | NO. 13-CR-3782-JLS |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | NOVEMBER 25, 2013 |
| | ) | |
| LEONARD GLENN FRANCIS, ET AL., | ) | |
| | ) | BOND HEARING |
| DEFENDANTS. | ) | |

_____


APPEARANCES:


FOR THE PLAINTIFF:       ROBERT S. HUIE
                         U.S. ATTORNEY'S OFFICE
                         SOUTHERN DIST. OF CALIFORNIA
                         CRIMINAL DIVISION
                         880 FRONT STREET, SUITE 6293
                         SAN DIEGO, CA  92101


FOR THE DEFENDANT:       EDWARD P. SWAN
                         KATIE SHEPPARD
                         JONES DAY
                         12265 EL CAMINO REAL, SUITE 200
                         SAN DIEGO, CA  92130-4096


PRETRIAL SERVICES:       DIANA KOUHI AND BORIS ILIC


COURT REPORTER:          GAYLE WAKEFIELD, RPR, CRR

```
1    NOVEMBER 25, 201

2                         AFTERNOON SESSION

3              THE CLERK:  NUMBER TWO AND THREE ON THE CALENDAR,

4    13-CR-3781 AND 13-CR-3782, UNITED STATES OF AMERICA VS. LEONARD

5    GLENN FRANCIS, FOR BOND HEARING.

6              MR. HUIE:  GOOD AFTERNOON, YOUR HONOR, ROBERT HUIE FOR

7    THE UNITED STATES.

8              THE COURT:  THANK YOU.  GOOD AFTERNOON.

9              MR. SWAN:  GOOD AFTERNOON, YOUR HONOR, PAT SWAN AND

10   KATIE SHEPPARD, JONES DAY, FOR THE DEFENDANT LEONARD FRANCIS,

11   WHO IS IN CUSTODY AND NOT YET IN COURT.

12             I DON'T KNOW WHAT THE COURT'S PROCEDURE IS ON LONG

13   HEARINGS, BUT I WOULD ASK THAT HIS RESTRAINTS BE REMOVED FROM

14   HIS WAIST AND HIS HANDS AT THE VERY LEAST.

15             THE COURT:  THAT MAY BE THE CASE.  LET ME ASK THE

16   MARSHALS, HIS ARMS AND HAND RESTRAINTS COULD BE REMOVED FOR

17   THIS HEARING?  IF YOU WOULD DO THAT.  THANK YOU.

18             THE MARSHAL:  YOU'RE WELCOME, YOUR HONOR.

19             THE COURT:  I ALSO HAVE, FOR THE RECORD,

20   REPRESENTATIVES FROM PRETRIAL SERVICES THIS AFTERNOON, IF YOU

21   WOULD LIKE TO STATE YOUR NAMES FOR THE RECORD.

22             PRETRIAL SERVICES OFFICER KOUHI:  GOOD AFTERNOON, YOUR

23   HONOR, DIANA KOUHI FOR PRETRIAL SERVICES.

24             THE COURT:  THANK YOU VERY MUCH.

25             PRETRIAL SERVICES OFFICER ILIC:  AND BORIS ILIC WITH
```

PRETRIAL SERVICES.

THE COURT:  THIS MATTER WAS SET AT THE REQUEST OF THE UNITED STATES GOVERNMENT AS AN APPEAL FROM THE MAGISTRATE JUDGE'S ORDER, AND WHAT'S BEEN FILED WITH THIS COURT IS THE NOTICE OF MOTION AND MOTION TO REVOKE THE RELEASE ORDER AND DETAIN DEFENDANT AS A FLIGHT RISK.

THE COURT HAS -- THE MAGISTRATE JUDGE STAYED THE ORDER THAT WAS ENTERED FOR THIS COURT TO CONSIDER THE MATTER AND PRESENT THINGS TODAY.  WHAT I HAVE READ AND CONSIDERED ARE THE FOLLOWING FOR PURPOSES OF TODAY'S HEARING:  I'VE READ AND CONSIDERED THE UNITED STATES' NOTICE OF MOTION AND MOTION TO REVOKE THE RELEASE ORDER AND TO DETAIN DEFENDANT AS A FLIGHT RISK.

I'VE READ THE TRANSCRIPT OF THE BOND HEARING IN FRONT OF MAGISTRATE JUDGE JAN ADLER, DATED NOVEMBER THE 21ST, 2013. I'VE READ THE ORDER AND CONDITIONS OF PRETRIAL RELEASE RE BAIL, AND I'VE READ FOUR COMPLAINTS AND AFFIDAVITS IN SUPPORT IN THE FOLLOWING FOUR CASES:  UNITED STATES VS. LEONARD GLENN FRANCIS AND JOHN BERTRAND BELIVEAU, II, 13-MJ-3456.  UNITED STATES VS. LEONARD GLENN FRANCIS AND MICHAEL MISIEWICZ, 13-MJ-3457. UNITED STATES VS. LEONARD GLENN FRANCIS AND JOSE SANCHEZ, NUMBER 13-MJ-4027.  AND UNITED STATES VS. ALEX WISIDAGAMA, 13-MJ-3783.  AS I SAID, THE COMPLAINTS AND THE SUPPORTING AFFIDAVITS ON THOSE MATTERS.  SO ALL THOSE HAVE BEEN READ AND CONSIDERED.

1    THE GOVERNMENT IS -- HAS REQUESTED THIS, SO, MR. HUIE,

2    YOU MAY PROCEED, SIR.

3    MR. HUIE:  THANK YOU, YOUR HONOR, AND THANK YOU FOR

4    HEARING THIS MATTER ON SUCH SHORT NOTICE.

5    YOUR HONOR, THE UNITED STATES IS GRAVELY CONCERNED

6    ABOUT THE PROBABILITY THAT MR. FRANCIS, IF RELEASED ON BOND,

7    WILL FLEE THE COUNTRY AND NOT BE AVAILABLE FOR TRIAL.  WE AGREE

8    WITH PRETRIAL SERVICES THAT HE IS A FLIGHT RISK AND SHOULD BE

9    DETAINED.

10   IN MY PRESENTATION THIS AFTERNOON, YOUR HONOR, I WOULD

11   LIKE TO ADDRESS TWO POINTS; ONE IS WHY THE BAIL AND DETENTION

12   STATUTE, IN OUR VIEW, REQUIRES HIS DETENTION, AND, SECOND, WHY

13   THE BOND CONDITIONS THAT HAVE BEEN SET IN THIS CASE, AT THE

14   REQUEST OF THE DEFENSE, ARE INADEQUATE.

15   SO FIRST THE BAIL STATUTE.  AS THE COURT KNOWS, THAT

16   STATUTE IDENTIFIES CERTAIN FACTORS THAT SHOULD BE CONSIDERED IN

17   DETERMINING WHETHER SOMEBODY SHOULD BE DETAINED, THE 3142(G)

18   FACTORS.  IN OUR BRIEF WE'VE GONE THROUGH THOSE FACTORS ONE BY

19   ONE.

20   WHAT I WOULD LIKE TO TALK ABOUT THIS AFTERNOON IS NOT

21   JUST THE FACT THAT EACH OF THESE FACTORS FAVORS DETENTION, BUT

22   THE FACT THAT CONSIDERING THE THOUSANDS OF OTHER CRIMINAL CASES

23   FILED IN THIS DISTRICT EVERY YEAR, THAT THESE FACTORS IN THIS

24   CASE TO AN EXCEPTIONAL DEGREE FAVOR DETENTION.

25   SO STARTING WITH 3141(G)(1), THE NATURE AND

CIRCUMSTANCES OF THE OFFENSE.  THE OFFENSES ALLEGED HERE ARE
EXCEPTIONAL IN THE DEGREE TO WHICH THEY FAVOR DETENTION, AND
THEY'RE EXCEPTIONAL BOTH QUALITATIVELY AND QUANTITATIVELY AND
I'LL EXPLAIN WHAT I MEAN BY THAT.  QUANTITATIVELY, AS JUDGE
ADLER ACKNOWLEDGED, AT PAGE 50 OF THE TRANSCRIPT, THESE ARE
"EXTREMELY SERIOUS OFFENSES."  HE ALSO REFERRED TO THEM AS
"VERY SERIOUS," PAGE 52.  THE ALLEGATIONS ARE THAT MR. FRANCIS
CORRUPTED SENIOR OFFICERS IN THE U.S. NAVY TO TURN OVER
CLASSIFIED INFORMATION IN VIOLATION OF THEIR SWORN DUTY TO
PROTECT THE UNITED STATES, AND THAT HE CORRUPTED A SENIOR LAW
ENFORCEMENT OFFICER TO ACT AS A DOUBLE AGENT ON BEHALF OF A
CRIMINAL ENTERPRISE.

        NOW, QUANTITATIVELY SPEAKING, AS I'VE MADE THIS POINT
IN OUR BRIEF, THE GUIDELINES RECOMMEND THE MOST SEVERE
PUNISHMENT FOR THE DEFENDANT FOR THE CONDUCT DESCRIBED IN THE
CHARGES, AND WE COMPUTED AN OFFENSE LEVEL OF 46.  EVEN GIVING
THE DEFENSE THE BENEFIT OF THE DOUBT AS TO THE LOSS AMOUNT, OUR
NUMBERS COME OUT TO 44, A RANGE FOR WHICH THE GUIDELINES
RECOMMEND A MINIMUM AND A MAXIMUM SENTENCE OF LIFE.

        OF COURSE, YOUR HONOR, I DON'T WANT TO OVERSELL THAT.
NO ONE HERE CAN SEE THE FUTURE AND KNOW WHAT DEFENDANT, IF HE
WERE CONVICTED, WOULD BE SENTENCED TO.  THERE ARE POSSIBILITIES
FOR PLEA AGREEMENTS, CHARGE BARGAINS, COOPERATION, AND I CAN
HANDICAP THOSE POSSIBILITIES IF THE COURT WOULD LIKE, AND THE
GUIDELINES ARE ADVISORY.  A SENTENCE BELOW THEM OR ABOVE THEM

IS POSSIBLE.

BUT NONE OF THIS CHANGES THE FACT THAT WHEN IT COMES TO LOOKING AT BAIL AND DETENTION IN THIS FACTOR THAT THE GUIDELINES SENTENCE COULD NOT BE MORE SERIOUS, AND THIS IS EXCEPTIONAL FOR OUR DISTRICT. THE COURT OFTEN SEES CASES INVOLVING TRAFFICKING IN HARD NARCOTICS. SOMEBODY WHO WAS CONVICTED OF TRAFFICKING IN A KILO OF METH OR 10 KILOS OR A HUNDRED KILOS OR EVEN A THOUSAND KILOS OF METH OR HEROIN OR COCAINE WOULD NOT FACE A GUIDELINE SENTENCE AS SEVERE AS MR. FRANCIS FACES.

SECOND, TURNING TO THE WEIGHT OF THE EVIDENCE, 3142(G)(2), AS JUDGE ADLER FOUND AT PAGE 50 OF THE TRANSCRIPT, THE WEIGHT OF THE EVIDENCE HERE IS STRONG AND IT FAVORS DETENTION, AND IT DOES SO IN THIS CASE TO AN EXCEPTIONAL DEGREE. WE'VE PROFFERED THE CONTENTS OF FOUR COMPLAINTS, OVER 80 PAGES OF DETAILED EVIDENCE, THAT INCLUDE DEFENDANT'S OWN WORDS AS SET OUT IN EMAILS. WE SUBMIT THAT A PROFFER OF THIS VOLUME OF EVIDENCE AT THIS STAGE OF THE PROCEEDINGS IS ALSO EXCEPTIONAL FOR OUR DISTRICT.

FINALLY, TURNING TO THE HISTORY AND CIRCUMSTANCES -- THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT, 3142(G)(3), TO AN EXCEPTIONAL DEGREE THIS FACTOR ALSO FAVORS DETENTION. SO HERE DEFENDANT HAS NO TIES TO THIS COMMUNITY. HE HAS ZERO TIES, EXCEPT FOR THE FACT THAT HE HAS VERY SKILLED LAWYERS IN THIS DISTRICT. HE COULDN'T HAVE FEWER TIES TO THIS AREA.

1    NOW, ON THE OTHER SIDE OF THE COIN, HE HAS EVERYTHING

2  WAITING FOR HIM OVERSEAS.  HE HAS HIS WEALTH.  HE HAS HIS

3  FREEDOM.  HE HAS HIS FAMILY.  IT WOULD BE HARD TO FIND ANY

4  DEFENDANT IN THIS DISTRICT THAT HAS LESS TO ANCHOR HIM HERE.

5    IT WOULD ALSO BE HARD TO FIND ANY DEFENDANT IN THIS

6  DISTRICT WHO HAS THE GREATER MEANS TO FLEE.  THE DEFENDANT IS

7  WORTH TENS OF MILLIONS OF DOLLARS.  HE RUNS A MULTINATIONAL

8  CORPORATION.  HE COMMANDS A FLEET OF VESSELS.  WE SUBMIT THAT

9  NO DEFENDANT IN THIS DISTRICT HAS AS MANY OPTIONS FOR FLIGHT.

10 BY "OPTIONS" I DON'T MEAN HYPOTHETICAL ONES, I MEAN REALISTIC,

11 FINANCIALLY FEASIBLE OPTIONS.

12   NOW, IN TALKING ABOUT THE 3142(G) FACTORS, AND

13 COMPARING DEFENDANT TO OTHER INDIVIDUALS IN THIS DISTRICT, MY

14 POINT IS THIS, THAT NOT ONLY DO THESE STATUTORY FACTORS FAVOR

15 DETENTION, OVERWHELMINGLY, BUT IF DEFENDANT SHOULD NOT BE

16 DETAINED IN THIS CASE, WE SUBMIT, YOUR HONOR, THAT NO DEFENDANT

17 HERE SHOULD BE DETAINED AS A RISK OF FLIGHT AND THAT THAT

18 STATUTE IS AN EFFECTIVE DEAD LETTER.

19   SO ALL THAT BEING THE CASE, WHY ARE THERE CONDITIONS OF

20 RELEASE SET IN THIS CASE?  NOW, AS I MENTIONED, THE DEFENDANT

21 HAS SUBSTANTIAL FINANCIAL RESOURCES, AND HE CREATIVELY HAS

22 PROPOSED TO DEVOTE A TINY FRACTION OF THOSE RESOURCES TO PAY

23 FOR WHAT I REFER TO IN THE BRIEF AS A HOME JAIL, WHAT AMOUNTS

24 TO A DO-IT-YOURSELF, A SELF-DESIGNED JAIL.  AND THE CONDITIONS,

25 THE CONTOURS OF THAT JAIL ARE SET OUT IN JUDGE ADLER'S ORDER,

1    AND ON THE ONE PAGE ATTACHMENT THAT WAS PREPARED BY THE

2    DEFENSE, THAT IS, SELECT AN APARTMENT OR CONDO IN SAN DIEGO.

3    IT HAS TO BE ON THE UPPER FLOOR OF A MULTI-STORY BUILDING WITH

4    THE ENTRANCE NOT NEAR STREET LEVEL.  THIS IS TO PREVENT HIM

5    FROM ESCAPING OUT THE WINDOW.  HE'LL PAY FOR GPS MONITORING,

6    SURVEILLANCE CAMERAS AND ALARMS TO BE MONITORED BY A SECURITY

7    COMPANY, PAID FOR BY DEFENDANT.  AND WHAT THAT MEANS IS THAT

8    SOMEBODY WILL BE PAID TO SIT AT A TELEVISION SET 24 HOURS A DAY

9    TO WATCH HIS FRONT DOOR.  HE'LL ALSO PAY FOR A GUARD TO BE

10   PRESENT IN HIS APARTMENT AT ALL TIMES.

11         WE SUBMIT, YOUR HONOR, THAT THE FACT THAT DEFENDANT HAS

12   OFFERED TO PAY FOR ALL THESE THINGS IS SUFFICIENTLY NOVEL AND

13   UNUSUAL THAT IT HAS OBSCURED AND DISTRACTED FROM THE FACT THAT

14   THE OLD FASHIONED 3142(G) FACTORS IN THIS CASE WARRANT

15   DETENTION.

16         THERE ARE SEVERAL REASONS WHY THIS HOME JAIL PROPOSAL

17   SPECIFICALLY SHOULD BE REJECTED; FIRST, THE IDEA OF A HOME

18   JAIL, AS OUTLINED HERE, MAKES NO SENSE.  WE SUBMIT THAT THE

19   QUESTION IS, DOES DEFENDANT NEED TO BE PHYSICALLY PREVENTED

20   FROM FLEEING?  AND THE ANSWER TO THAT IS YES, BECAUSE HE'S A

21   FLIGHT RISK, AND THE 3142(G) FACTORS SHOW THAT HE IS A FLIGHT

22   RISK.  IF HE IS A FLIGHT RISK, AS HE IS, THEN WE SHOULD NOT BE

23   RELYING ON HIS GOODWILL OR HIS VOLUNTARY COMPLIANCE TO PREVENT

24   HIM FROM FLEEING.  WE SHOULD BE RELYING ON PHYSICAL BARRIERS,

25   ON THE ARCHITECTURE OF DETENTION.

1    DEFENDANT'S BOND PACKAGE IMPLICITLY CONCEDES THIS.  HE

2    HAS TO BE ON THE UPPER FLOOR OF A MULTI-STORY BUILDING.  HE HAS

3    TO HAVE CAMERAS AND ALARMS.  HE HAS TO A GUARD IN HIS APARTMENT

4    24 HOURS A DAY TO KEEP HIM FROM LEAVING.  THIS IS DIFFERENT,

5    YOUR HONOR, FROM SOMEBODY WHO IS WHAT PRETRIAL REFERS TO AS

6    HOME DETENTION, OR UNDER THE SUPERVISION OF A RELATIVE, OR IN A

7    HALFWAY HOUSE.  THOSE ARE SITUATIONS FOR WHERE SOMEBODY NEEDS

8    TO HAVE STRUCTURE IN THEIR LIVES.  THEY NEED TO HAVE SOBER

9    LIVING TO KEEP THEM AWAY FROM DRUGS AND BAD INFLUENCES SO THAT

10   THEY CAN MAKE THEIR COURT APPEARANCES.  THAT'S A DIFFERENT SET

11   OF CIRCUMSTANCES THAN WHAT'S PRESENTED HERE.

12        IF THE ANSWER TO THE QUESTION IS YES, THAT DEFENDANT

13   HAS TO BE PHYSICALLY PREVENTED FROM JUMPING OUT THE WINDOW OR

14   FROM MAKING A BREAK FOR IT, THEN WE SUBMIT THAT HE MUST BE

15   PLACED IN CUSTODY, AND BY THAT, YOUR HONOR, I MEAN REAL CUSTODY

16   INSTEAD OF DO-IT-YOURSELF CUSTODY.  TO PUT IT ANOTHER WAY, ONCE

17   THE COURT DETERMINES THAT DEFENDANT IS A FLIGHT RISK, AND THAT

18   NO CONDITIONS WILL ASSURE HIS APPEARANCE AT TRIAL, HE SHOULD BE

19   DETAINED, AND AT THAT POINT THE CONDITIONS OF THAT DETENTION

20   SHOULD BE DETERMINED BY THE EXPERTS IN THE FIELD OF PRETRIAL

21   DETENTION, NAMELY, THE U.S. MARSHAL SERVICE AND THE BUREAU OF

22   PRISONS.

23        SO IN OUR VIEW, THE BAIL REFORM ACT IS NOT AN

24   INVITATION FOR A DEFENDANT TO RE-ENGINEER WHAT JAIL SHOULD LOOK

25   LIKE.  IT'S NOT, FOR EXAMPLE, AN INVITATION TO SAY, WELL, THE

MCC HAS THREE LAYERS OF GUARDS BETWEEN THE CELL AND THE STREET, BUT DO WE REALLY NEED THREE LAYERS? WHAT IF WE WERE TO JUST HAVE ONE LAYER? WHAT IF WE WERE TO HAVE JUST ONE GUARD IN DEFENDANT'S CONDO? NOR IS IT AN INVITATION TO ASK THE SORT OF QUESTION, LET'S SAY YOU HAVE A 20-FOOT FENCE AROUND AN EXERCISE YARD IN A FACILITY, DOES THE DEFENDANT REALLY NEED A 20-FOOT FENCE OR COULD HE MAKE DUE WITH AN 8-FOOT FENCE? THESE ARE NOT THE KINDS OF CUSTODIAL DECISIONS THAT THE BAIL REFORM ACT ASKS US TO SECOND-GUESS.

MY POINT IS, IF A DEFENDANT IS A FLIGHT RISK THEN THAT PERSON SHOULD BE DETAINED AND THE TERMS OF THAT DETENTION SHOULD BE SET BY THE BUREAU OF PRISONS, AND THAT THE IDEA OF A SELF-DESIGNED JAIL, LIKE THE ONE IN THIS CASE, DOES NOT MAKE SENSE.

SECONDLY, YOUR HONOR, IN ADDITION TO MAKING THOSE SENTENCES A LEGAL MATTER, THE HOME JAIL DESIGNED BY DEFENDANT IN THIS CASE IS SIMPLY NOT EFFECTIVE. IT'S NOT GOING TO BE EFFECTIVE AS A PRACTICAL MATTER. WE'VE ARGUED IN OUR BRIEF THAT EVEN DRIVING THE SPEED LIMIT IT WOULD TAKE ABOUT 15 MINUTES IN NO TRAFFIC TO GET FROM DOWNTOWN SAN DIEGO TO TIJUANA. IF YOU'RE WILLING TO BREAK THAT SPEED LIMIT AND DRIVE IN THE DEAD OF NIGHT, IT MIGHT TAKE AS FEW AS 10 MINUTES. THE SYSTEM THAT THE DEFENDANT HAS DESIGNED HERE, THE HOME JAIL SYSTEM, WILL GIVE HIM THOSE 10 TO 15 MINUTES HE NEEDS. ONCE HE MAKES IT TO MEXICO, HE HAS THE MEANS TO PAY FOR TRAVEL. HE HAS

THE MEANS TO PURCHASE TRAVEL DOCUMENTS, AND HE CAN GET TO WHEREVER IN THE WORLD HE WANTS TO, AND THAT INCLUDES HE CAN SHOP FOR A COUNTRY THAT HAS NO EXTRADITION TREATY, LIKE RUSSIA. HE CAN GO TO A COUNTRY WHERE HE CAN BRIBE OFFICIALS TO NOT ENFORCE THE EXTRADITION TREATY. HE CAN GO BACK TO MALAYSIA WHERE HIS MOTHER AND CHILDREN LIVE. ALTHOUGH WE HAVE TECHNICALLY AN EXTRADITION TREATY WITH MALAYSIA, THE ACTUAL USE OF THAT TREATY TO EXTRADITE SOMEBODY EFFECTIVELY IS VERY, VERY RARE. OR HE CAN JUST FIND ANOTHER PLACE TO HIDE OUT, INCLUDING ONE OF HIS VESSELS IN THE HIGH SEAS.

LET'S LOOK AT THE LAYERS OF SECURITY THAT HIS HOME JAIL HAVE IN PLACE TO PREVENT HIM FROM DOING THAT. ONE OF THEM IS GPS, AND I'D DEFER TO PRETRIAL ON HOW THE MECHANICS OF THIS PROCESS WORKS, BUT JUST BROADLY SPEAKING, LET'S SAY DEFENDANT WAS TO CUT OFF THE GPS DEVICE AND PRETRIAL WERE TO GET SOME NOTIFICATION, THESE STEPS TAKE TIME.

IF THE PRETRIAL OFFICER GETS A NOTIFICATION ON HER PHONE, LET'S SAY THIS IS THE MIDDLE OF THE NIGHT, HOPEFULLY THAT PHONE IS BY HER BED. HOPEFULLY SHE CAN HEAR IT. HOPEFULLY SHE WAKES UP. LET'S SAY SHE GETS THE NOTIFICATION. LETS SAY SHE CALLS THE MARSHAL SERVICE. SHE HAS TO GET A HOLD OF SOMEBODY, EXPLAIN THE SITUATION TO THAT PERSON. THAT PERSON CAN HEAR HER OUT AND DECIDE WHAT TO DO NEXT, AND SO ON AND SO FORTH.

I'M NOT GOING TO HYPOTHESIZE EVERY STEP, BUT THE POINT

1   IS EVEN IF ALL THE TECHNOLOGY WORKS PERFECTLY, EVEN IF

2   EVERYBODY ON EVERY STEP OF THE WAY IS READY, ALERT, STEELY

3   EYED, EVEN IF EVERYBODY MAKES THE DECISION AS TO WHAT TO DO

4   NEXT, AND IN HINDSIGHT IT WAS THE PERFECT DECISION, THERE'S

5   STILL A VERY LOW PROBABILITY THAT HE WOULD BE PHYSICALLY CAUGHT

6   IN 10 MINUTES OF CUTTING OFF THAT DEVICE.

7          WHEN YOU ADD HUMAN ERROR AND TECHNOLOGICAL ERROR, THE

8   ODDS OF THAT HAPPENING ARE EVEN LOWER.  THE SAME GOES, YOUR

9   HONOR, FOR VIDEO CAMERAS, FOR ALARMS THAT IN FACT ADD AN EXTRA

10  LAYER BECAUSE THEY PUT A PRIVATE COMPANY AS THE FIRST

11  RESPONDER, WHO THEN HAS TO CALL PRETRIAL, AND THEN SO ON AND SO

12  FORTH.

13         OKAY, WELL THERE'S ALSO THE GUARD THAT DEFENDANT WOULD

14  BE PAYING TO BE IN HIS APARTMENT, BUT THE GUARD DOESN'T HAVE TO

15  BE IN THE SAME ROOM AS DEFENDANT AT ALL TIMES.  HE'S NOT GOING

16  TO KNOW WHAT DEFENDANT IS UP TO.  AND THERE ARE TIMES WHEN

17  DEFENDANT IS ALLOWED TO COME AND GO UNDER THE ORDERS OF

18  RELEASE, SO FOR WORSHIP, FOR ATTORNEY VISITS, FOR COURT

19  APPEARANCES.  THE ODDS ARE PRETTY GOOD, WE SUBMIT, THAT MR.

20  FRANCIS COULD GIVE ONE SECURITY GUARD THE SLIP ON ONE OCCASION

21  AND GET THE 10 MINUTES HE NEEDS.

22         OF COURSE, IT'S NOT UNTHINKABLE THAT HE COULD BRIBE THE

23  GUARD, THAT HE COULD PHYSICALLY SUBDUE THE GUARD, OR THAT HE

24  COULD PAY SOMEBODY ELSE TO DO THESE THINGS FOR HIM OR WITH HIM.

25         WE SUBMIT, YOUR HONOR, THAT THIS IS A VERY, VERY

1    INEFFECTIVE JAIL.  WHILE IT'S A THREE-LAYER SECURITY SYSTEM,

2    IT'S LIKE CARRYING WATER IN THREE NESTED BUCKETS, EACH OF WHICH

3    HAS A VERY BIG HOLE IN THE BOTTOM.

4        NOW, THIS JUST -- THE DEFENSE MAY DISAGREE AND MAY SAY,

5    "WELL, THE WAY THIS ACTUALLY WILL WORK OUT WILL BE AN EFFECTIVE

6    SYSTEM," BUT IF THEY WERE TO ARGUE THIS, YOUR HONOR, WE WOULD

7    POINT OUT THAT ALL WE HAVE RIGHT NOW FOR THIS JAIL ARE THESE

8    VERY CURSORY PLANS THAT WE'VE DISCUSSED, THAT ON THEIR FACE

9    HAVE PROBLEMS.  WE SUBMIT THAT ONCE THOSE PLANS GET TRANSLATED

10   INTO ACTUAL OPERATIONAL CIRCUMSTANCES, THOSE PROBLEMS ARE GOING

11   TO GROW.

12       HOW THEY'RE GOING TO BE IMPLEMENTED AT THIS POINT IS

13   ANYONE'S GUESS.  MAYBE PRETRIAL WILL BE ALLOWED SOME INPUT ON

14   IT.  MAYBE THE U.S. ATTORNEY'S OFFICE MAY BE ALLOWED SOME

15   INPUT.  I MYSELF AM NOT AN ENGINEER OF DETENTION CIRCUMSTANCES.

16   I DON'T KNOW HOW TO WEIGH IN EFFECTIVELY TO KEEP SOMEBODY IN

17   JAIL.  PRETRIAL HAS INDICATED THAT THIS TYPE OF ARRANGEMENT IS

18   UNPRECEDENTED IN THIS DISTRICT.

19       SO THERE ARE GOING TO BE NUMEROUS DETAILS, DETAILS IN

20   BOTH THE DESIGN AND THE EXECUTION OF THIS HOME JAIL PROPOSAL,

21   THAT WILL OF NECESSITY BE LEFT TO DEFENDANT, WHO IS PAYING FOR

22   AND IMPLEMENTING THIS PROCEDURE, AND IT APPEARS THAT WE ALL

23   WILL BE LEARNING IN THIS CASE BY TRIAL AND ERROR.  FOR SOMEONE

24   WHO IS A FLIGHT RISK, THESE CONDITIONS ARE INEFFECTIVE.

25       NOW, I WOULD ALSO LIKE TO NOTE AS AN ASIDE, YOUR HONOR,

THAT IN ADDITION TO THE HOME JAIL CONDITIONS, THERE'S A
MONETARY COMPONENT, THE $1 MILLION CORPORATE SURETY BOND, AND
THEN ANOTHER $100,000 BOND SIGNED BY DEFENDANT'S AUNT.
DEFENDANT HAS NOT ONLY WHAT I'LL CALL A LIBERTY INCENTIVE TO
FLEE, THAT IS, TO FLEE TO STAY OUT OF JAIL, HE HAS A SEPARATE
FINANCIAL INCENTIVE TO FLEE.  THAT $1.1 MILLION BOND IS SO LOW,
WE SUBMIT, THAT IT IS ACTUALLY PAYING HIM TO FLEE.  IT IS
PUSHING HIM OUT OF THE COUNTRY, AND I'LL EXPLAIN WHAT I MEAN BY
THAT.

DEFENDANT'S CHOICE IS EITHER TO RUN AND TO FORFEIT THAT
$1.1 MILLION OR TO STAY AND FACE TENS OF MILLIONS OF DOLLARS IN
CRIMINAL FORFEITURE, AND ON TOP OF THAT TENS OF MILLIONS OF
DOLLARS IN CRIMINAL RESTITUTION.  THESE ARE THINGS THAT ONLY
ATTACH IF AND WHEN DEFENDANT IS ACTUALLY SENTENCED.  SO FROM A
DOLLAR PERSPECTIVE, EVEN IF DEFENDANT WERE NOT FACING ANY TIME
IN PRISON, FROM LOOKING AT THE DOLLARS ALONE HE FACES A
TREMENDOUS FINANCIAL INCENTIVE TO SAVE MONEY, TO MAKE MONEY BY
FLEEING THIS JURISDICTION.

WE SUBMIT THAT IF HE IS RELEASED, THAT HE SHOULD BE
REQUIRED TO POST AT LEAST $10 MILLION INTO THE REGISTRY OF THE
COURT, AND THAT'S TO MAKE THE VICTIM WHOLE IN THE EVENT THAT HE
FLEES.  EVEN THIS WOULD STILL LEAVE HIM WITH A FINANCIAL
INCENTIVE TO FLEE AND WOULDN'T EVEN BEGIN TO TOUCH THE
INCENTIVE FOR HIM TO REMAIN AND APPEAR FOR TRIAL.

SO WE SUBMIT THAT RIGHT NOW, EVEN WITH THE HOME JAIL

CONDITIONS, THE 1.1 BOND CONDITION CREATES PERVERSE INCENTIVE
AND PRACTICALLY BEGS HIM TO SAVE MONEY BY LEAVING THIS
DISTRICT.

GOING BACK TO THE HOME JAIL ARRANGEMENT, YOUR HONOR, MY
THIRD AND FINAL POINT ABOUT THESE CONDITIONS IS THAT THERE'S
SOMETHING INEQUITABLE ABOUT THEM.  IF DEFENDANT DID NOT HAVE
THE MONEY TO PAY FOR THESE SPECIAL ARRANGEMENTS, A HIGH-RISE
CONDO, VIDEO CAMERAS, ALARMS, A 24-OFFSITE SECURITY COMPANY, A
24-HOUR ONSITE GUARD DETAIL, HE WOULD ALMOST CERTAINLY BE
HOUSED AT THE MCC OR SOMEWHERE ELSE LOCAL.

DEFENDANT'S BOND PROPOSAL RAISES THE TROUBLING
QUESTION, AND THAT IS, IS EVERYONE THAT CAN AFFORD IT ENTITLED
TO A HOME JAIL TYPE ARRANGEMENT?

NOW, IN OUR VIEW THE ANSWER IS NO.  NOWHERE IN THE BAIL
REFORM ACT DOES IT SAY THAT A DEFENDANT WITH RESOURCES IS
ENTITLED TO DIFFERENT AND MORE ADVANTAGEOUS CONDITIONS OF
RELEASE.  THE BAIL REFORM ACT DOES NOT SAY IF YOU CAN AFFORD
YOUR OWN JAIL, YOU CAN DESIGN YOUR OWN JAIL.

IT'S ALSO TROUBLING, YOUR HONOR, THAT THE MONEY THAT'S
GOING TO BE SPENT BY DEFENDANT ON THIS VERY EXPENSIVE, VERY
INEFFICIENT JAIL, IS MONEY THAT IS ALLEGED TO HAVE BEEN STOLEN
FROM THE UNITED STATES IN THE FIRST PLACE.  IT'S MONEY THAT
SHOULD BE GOING TO THE VICTIM AT THE CONCLUSION OF THIS CASE.

AT THE LAST HEARING I REFERRED TO THIS HOME JAIL
ARRANGEMENT ONCE AS A BERNIE MAYDOFF-TYPE ARRANGEMENT, AND OF

COURSE REFERRING TO BERNARD MAYDOFF'S CRIMINAL CASE IN NEW YORK IN WHICH HE WAS CONFINED TO HIS HOME WITH A PAID SECURITY COMPANY TO MONITOR HIM.  NOW, THESE ARE TWO DIFFERENT CASES, ABSOLUTELY THEY'RE DIFFERENT CASES, BUT THERE ARE VERY FEW PRECEDENTS FOR THE TYPE OF HOME JAIL ARRANGEMENT THAT THE DEFENDANT IS REQUESTING AND THIS IS ONE OF THEM.  THAT ARRANGEMENT WAS TROUBLESOME IN MR. MADOFF'S CASE AND IT'S TROUBLESOME HERE.

EVEN IN THAT CASE, THERE WAS NO QUESTION THAT MR. MADOFF WAS BEING HELD IN HIS HOME, IN HIS COMMUNITY, IN THE PLACE WHERE HIS FRIENDS AND FAMILY AND HIS WORK CONTACTS ALL LIVED AND WERE FOUND.  THAT WAS THE PLACE WHERE MR. MADOFF WAS ANCHORED.  THAT IS NOT THE CASE HERE WITH MR. FRANCIS.  SO I SUBMIT THAT THE COURT DOES NOT NEED TO ANSWER THE TROUBLING QUESTION OF WHETHER EVERY MULTIMILLIONAIRE IS ENTITLED TO HOME JAIL IN ORDER TO DECIDE THIS MOTION ON DETENTION.

IN THIS CASE WHAT DEFENDANT IS ASKING FOR, AS FAR AS I CAN TELL, IS UNPRECEDENTED IN ANY DISTRICT, AND THAT IS SOMEONE WITH NO RESIDENT STATUS HERE, WITH NO TIES TO THE COMMUNITY, WITH TREMENDOUS RESOURCES TO FLEE, WITH UNLIMITED OPTIONS ONCE HE GETS OUT OF THIS COUNTRY, WHO FACES AN OVERWHELMING SENTENCE, AND WHO FACES OVERWHELMING EVIDENCE, BEING RELEASED TO THE CARE OF HIS OWN SECURITY GUARD.

NOW, IN CLOSING, YOUR HONOR, I MENTIONED IN MY BRIEF THAT DEFENDANT'S ARREST IN SAN DIEGO IN SEPTEMBER WAS A LONG

1    TIME COMING, THAT THAT MEETING WAS PLANNED MONTHS IN ADVANCE,

2    AND AFTER IT WAS SET, A CAREFULLY COORDINATED LAW ENFORCEMENT

3    OPERATION WAS PUT TOGETHER INVOLVING ACTIVITY IN EIGHT ASIAN

4    COUNTRIES, EIGHT STATES, OVER A HUNDRED LAW ENFORCEMENT

5    OFFICERS.  IF DEFENDANT IS RELEASED, WE SUBMIT THAT HE WILL

6    FLEE AND HE WILL NOT COME BACK.  HE WILL NOT FALL FOR A TRICK

7    LIKE THAT AGAIN, AND ALL THOSE EFFORTS BY LAW ENFORCEMENT TO

8    INVESTIGATE HIM AND TO GET HIM HERE WILL HAVE BEEN IN VAIN.

9        WE AGREE WITH PRETRIAL SERVICES THAT DEFENDANT SHOULD

10   BE DETAINED PENDING TRIAL AND THAT NO RELEASE CONDITIONS,

11   INCLUDING THE RELEASE CONDITIONS HERE, ARE ADEQUATE.  THANK

12   YOU.

13       THE COURT:  THANK YOU, MR. HUIE.

14       MR. SWAN.

15       MR. SWAN:  THANK YOU, YOUR HONOR.  FIRST, LIKE MR.

16   HUIE, I THANK THE COURT FOR PUTTING THIS MATTER ON SO PROMPTLY,

17   AND I'M GLAD WE WERE ABLE TO GET ON YOUR CALENDAR TODAY BEFORE

18   THE HOLIDAYS.

19       AS THE GOVERNMENT NOTED IN ITS BRIEF, YOUR REVIEW TODAY

20   IS DE NOVO, BUT THAT DOES NOT MEAN YOU CANNOT TAKE INTO

21   CONSIDERATION THE HEARING HELD ON NOVEMBER 21ST BEFORE JUDGE

22   ADLER, THE EXTENSIVE ARGUMENTS AND QUESTIONING THAT OCCURRED

23   THERE, AND THE BOND CONDITIONS SET BY JUDGE ADLER.

24       THE *KONEIG* CASE, *UNITED STATES VS. KONEIG*, K-O-E-N-I-G,

25   912 F.2D 1190, NINTH CIRCUIT, 1990, DESCRIBES WHAT -- THAT DE

NOVO REVIEW. IT'S NOT WHAT WE NORMALLY THINK THAT A DE NOVO

REVIEW IS, IT ALLOWS THE COURT OF ORIGINAL JURISDICTION, THIS

COURT, TO TAKE INTO CONSIDERATION EVERYTHING THAT HAPPENED.

YOU CAN RELY ON THE TRANSCRIPTS. YOU CAN RELY ON THE

ARGUMENTS. YOU CAN RELY ON THE PROFFERS SUBMITTED BELOW, AND I

BELIEVE YOU CAN ALSO TAKE INTO CONSIDERATION JUDGE ADLER'S

10-PLUS YEARS EXPERIENCE IN HOLDING DETENTION HEARINGS AND BOND

HEARINGS, WHICH UNDOUBTEDLY NUMBER IN THE THOUSANDS. I BELIEVE

HE BROUGHT THAT EXPERIENCE TO BEAR IN FASHIONING CONDITIONS OF

RELEASE FOR MR. FRANCIS. AND AS THE *KOENIG* CASE SAID, YOU CAN

ADOPT HIS FINDINGS.

THE LAW ALSO IS THAT THE GOVERNMENT BEARS THE BURDEN OF

PROVING BY A PREPONDERANCE OF THE EVIDENCE THAT THERE ARE NO

CONDITIONS OF RELEASE THAT WILL REASONABLY ASSURE MR. FRANCIS'S

APPEARANCE, SO THEY BEAR THE BURDEN TO SHOW THERE'S NO

CONDITIONS THAT WILL REASONABLY ASSURE HIS APPEARANCE. IT

ISN'T -- THE STANDARD ISN'T "ABSOLUTELY" ENSURE HIS APPEARANCE.

IT'S "REASONABLY" ASSURE. IT'S A BALANCING, AND THAT'S WHAT WE

TRIED TO DO HERE IS PROVIDE IN BALANCE TO THE FACTORS UNDER

3142(G) CONDITIONS THAT WILL REASONABLY ASSURE MR. FRANCIS'S

APPEARANCE AT FUTURE COURT APPEARANCES.

FRANKLY, IF THE GOVERNMENT HAD ITS WAY, IT SOUNDS LIKE

ANYTHING BUT A FULL-SCALE PRISON WOULD NEVER SUFFICE, THAT THEY

WANT TO BE ABSOLUTELY ASSURED HE'S GOING TO MAKE HIS COURT

APPEARANCES. THE TEST IS REASONABLY ASSURE.

1          FURTHER, AS JUDGE ADLER NOTED, IT'S THE LAW THAT IF THE

 2     COURT CAN FASHION CONDITIONS OF PRETRIAL RELEASE THAT WILL

 3     REASONABLY ASSURE HIS APPEARANCE IN COURT, THE COURT MUST DO

 4     SO, AND WE HAVE THOSE CONDITIONS HERE.

 5          I KNOW THE COURT'S READ THE TRANSCRIPT, BUT THERE ARE

 6     CERTAIN ARGUMENTS I MADE IN THE TRANSCRIPT THAT I NEED TO

 7     ADDRESS, AND I'LL TRY NOT TO REPEAT MYSELF TOO MUCH.  THANK

 8     YOU.

 9          YOU NOW KNOW FROM READING THE TRANSCRIPT WHY MR.

10     FRANCIS WANTS TO GET OUT ON BOND; IT'S FOR HIS CHILDREN, FOR

11     HIS MOTHER, FOR HIS BUSINESS.  THE VERY ARGUMENT THAT MR. HUIE

12     MADE THAT HE FACES POTENTIAL FINES AND PENALTIES AND

13     RESTITUTION, IF CONVICTED, IF HE'S KEPT IN CUSTODY, HIS

14     BUSINESSES WILL FAIL.  HIS CREDITORS WILL TAKE THEM OVER, AND

15     THERE WILL BE NO MONIES AVAILABLE TO PAY THE RESTITUTION, THE

16     FINES IN THE AMOUNT THAT THE GOVERNMENT CLAIMS ARE OWED.

17          BEFORE I GO ANY FARTHER, I WOULD LIKE TO INTRODUCE MR.

18     FRANCIS'S AUNT, HER NAME IS FRANCISCA, F-R-A-N-C-I-S-C-A,

19     WHITE, AND HER 18-YEAR OLD SON JOSEPH.  YOU MAY HAVE NOTICED

20     THAT THEY CAME IN LATE THIS AFTERNOON, AND THAT'S BECAUSE THEY

21     WERE HERE IN FRONT OF JUDGE ADLER ON THURSDAY AND AFTER THE

22     HEARING THEY FLEW BACK FRIDAY MORNING TO BALTIMORE, MARYLAND,

23     BEFORE MR. HUIE AND I FOUND OUT FROM YOUR CLERK THAT YOU COULD

24     HOLD THE HEARING THIS MORNING, SO WE CONTACTED HER AND SHE

25     AGREED TO FLY BACK OUT.  SHE FLEW BACK OUT THIS MORNING, BUT

THERE WAS A PROBLEM AT LINDBERG FIELD SO THEIR PLANE WAS
REDIRECTED TO LAX.  THEY SAT THERE FOR AWHILE, AND THEY MADE IT
HERE.  AND SHE TOLD ME SHE WOULD BE ABOUT 15 MINUTES LATE, AND
SHE ARRIVED RIGHT AT 2:15.  SO SHE APOLOGIZED FOR BEING LATE,
BUT THERE WERE EXTENUATING CIRCUMSTANCES.  THEY FLEW BACK
ACROSS THIS COUNTRY THIS MORNING SO THAT THEY COULD BE HERE IN
PERSON TO SUPPORT MR. FRANCIS.  THEY HAVE FLOWN I GUESS
APPROXIMATELY 9,000 MILES IN THE LAST FEW DAYS FOR THE SOLE
PURPOSE OF DEMONSTRATING THEIR LOVE AND SUPPORT FOR MR.
FRANCIS.  HE'S VERY APPRECIATIVE, AND THANKS TO THEM FOR
COMING.  THANK YOU.

THE COURT -- EXCUSE ME, THE GOVERNMENT MOVED FOR
PRETRIAL DETENTION BASED ON FLIGHT RISK NOT BECAUSE HE'S A
DANGER TO SOCIETY.

THE COURT:  RIGHT.

MR. SWAN:  AS THE COURT KNOWS FROM READING THE
TRANSCRIPT, MR. FRANCIS WAS INVITED HERE BY HIS CUSTOMER THE
U.S. NAVY.  HE ACTUALLY MADE A PRESENTATION TO THE U.S. NAVY, A
PREPARED PRESENTATION, AND THEN LATER THAT EVENING, WHEN HE WAS
AT HIS MARRIOTT HOTEL ROOM OVER ON HARBORSIDE, HE WAS ARRESTED.
HE WAS LEGALLY HERE ON A 10-YEAR VISA THAT EXPIRES IN 2019, AND
HE'S LEGALLY HERE NOW.  HE CAME, AS THE TRANSCRIPT SAYS,
KNOWING HE WAS UNDER INVESTIGATION AND COULD BE ARRESTED.

THE GOVERNMENT ARGUED BEFORE JUDGE ADLER, "WELL, THEY
CAUGHT ON THAT HE WAS ALLEGEDLY GETTING REPORTS AND THEY PUT A

FALSE REPORT IN." THERE'S NO EVIDENCE THAT MR. FRANCIS SAW
THAT FALSE REPORT. AND HE HAD COME HERE BEFORE. HE CAME HERE
IN MARCH OF THIS YEAR -- OR APRIL, EXCUSE ME, TO GET HIS SON,
WHO IS GOING TO SCHOOL IN BOSTON, AND BRING HIM HOME AFTER THE
BOSTON MARATHON BOMBING.

HE'S COME TO THE UNITED STATES SEVERAL TIMES, TO HAWAII
FOR CHANGE OF COMMANDS. HE'S A FREQUENT TRAVELER TO THE UNITED
STATES. HE KNEW THAT THERE WAS A RISK THAT HE COULD BE
ARRESTED AND HE CAME HERE ANYWAYS. HE WANTS TO HAVE HIS DAY IN
COURT, AND HE'S NOT A FLIGHT RISK.

I WENT THROUGH WITH JUDGE ADLER THE 3142(G) CONDITIONS,
BUT I POINTED OUT BEFORE JUDGE ADLER, AND JUDGE ADLER
UNDERSTOOD, THAT THIS IS NOT A CASE WHERE THERE'S A REBUTTABLE
PRESUMPTION THAT MR. FRANCIS SHOULD BE DETAINED. IN THE GREAT
MAJORITY OF THE CASES HERE IN THIS DISTRICT THAT REBUTTAL OF
PRESUMPTION APPLIES, AND WE HAVE THE BURDEN OF REBUTTING.
THOSE KIND OF CASES INVOLVE A CRIME OF VIOLENCE OFFENSE FOR
WHICH THE MAXIMUM PENALTY IS LIFE IMPRISONMENT. THE MAXIMUM
PENALTY HERE IS NOT LIFE IMPRISONMENT. A CONTROLLED SUBSTANCE
VIOLATION WHICH HAS A MAXIMUM PENALTY OF 10 YEARS OR MORE OR
CERTAIN OTHER FELONIES. THERE IS NO REBUTTAL OF PRESUMPTION
THAT WE HAVE TO REBUT.

TURNING TO THE 3142(G) FACTORS, THE NATURE AND
CIRCUMSTANCES OF THE CRIMES CHARGED, AND I KNOW THE COURT'S
READ THE THREE COMPLAINTS, AS WELL AS THE COMPLAINT AGAINST MR.

WISIDAGAMA IN WHICH MR. FRANCIS IS NOT CHARGED.  EACH OF THOSE
CONSPIRACIES TO COMMIT BRIBERY CARRY A MAXIMUM OF FIVE YEARS IN
CUSTODY.  THERE'S A GOOD ARGUMENT THAT IT'S ONE CONSPIRACY.  I
ALSO UNDERSTAND THE GOVERNMENT'S ARGUMENT THEY COULD AND MAY
CHARGE ADDITIONAL CRIMES, DEPENDING ON VENUE AND JURISDICTION
ISSUES.

ULTIMATELY, THIS IS A FINANCIAL CRIME WHERE VIRTUALLY
ALL DEFENDANTS ARE RELEASED ON BOND PENDING TRIAL, AND HE'S
PLED NOT GUILTY TO THE OFFENSES.  I WENT THROUGH, AND I KNOW
THE COURT READ ABOUT HIS THREE CO-DEFENDANTS, U.S. NAVY
COMMANDER SANCHEZ, U.S. NAVY COMMANDER MICHAEL MISIEWICZ, AND,
EVEN HARDER, NCIS SUPERVISORY AGENT JOHN BELIVEAU, WHICH I
THINK YOU PRONOUNCED CORRECTLY.  ALL THREE GENTLEMEN ARE ON
BOND, ON CONDITIONS FAR LESS STRINGENT THAN WE PROPOSE, AND I
APPRECIATE --

THE COURT:  THE CIRCUMSTANCES ARE DIFFERENT.

MR. SWAN:  THEY ARE DEFINITELY DIFFERENT.  BUT THE ONE
THING THAT I THINK IS IMPORTANT TO STILL KEEP IN MIND IS, IF
THE GOVERNMENT'S TO BE BELIEVED, THEY SOLD THEIR POSITIONS,
THEY SOLD THEIR TRUST, AND THEY SWORE AN ALLEGIANCE TO THE
UNITED STATES WHEN THEY GET SWORN IN AS U.S. NAVAL OFFICERS OR,
EVEN WORSE, AS A SUPERVISORY NCIS AGENT.

THE GOVERNMENT ARGUES THAT THE SENTENCING GUIDELINES
FOR THESE ALLEGED BRIBERY OFFENSES RESULTS IN A MINIMUM TERM OF
LIFE IN PRISON.  WE DISAGREE WITH THAT POSITION ON SEVERAL

GROUNDS; FIRST, IT ASSUMES THE WORST CASE SCENARIO THAT MY
CLIENT WILL BE FOUND GUILTY.  HE STILL ENJOYS THE PRESUMPTION
OF INNOCENCE.

SECOND, IT ALSO INCLUDES THE WORST CASE SCENARIO IN
TERMS OF GUIDELINE CALCULATIONS.  IT ASSUMES THAT THE PROVABLE
LOSS IS OVER $20 MILLION.  WE BELIEVE ANY PROVABLE ALLEGED LOSS
WOULD BE LESS, EVEN IF YOU AGREE WITH THE FACTUAL UNDERPINNING
THAT'S SET FORTH IN THE COMPLAINT, WHICH WOULD REDUCE OBVIOUSLY
THE GUIDELINES.  FOR EXAMPLE, IF THE LOSS IS BETWEEN
2.5 MILLION AND 7 MILLION, WHICH IS STILL VERY HIGH, THE
CALCULATION WOULD BE FOUR POINTS LESS THAN A $20 MILLION LOSS.

THE CALCULATIONS ALSO DON'T INCLUDE A MINUS 3 FOR
ACCEPTANCE OF RESPONSIBILITY, SHOULD HE BE FOUND GUILTY OR
PLEAD GUILTY.  IF THAT MINUS 3 IS ADDED INTO THE FOUR LEVEL
REDUCTION FOR LOSS, THE GOVERNMENT'S GUIDELINE CALCULATION
WOULD RESULT IN A TOTAL OFFENSE LEVEL OF 39 RATHER THAN 46, AND
IF YOU TURN TO THE GUIDELINES THAT'S OUR MINIMUM SENTENCING
RANGE OF 262 MONTHS, WHICH IS STILL A LOT.  IT'S LESS THAN
22 YEARS, BUT IT'S NOT LIFE IN PRISON.  IT'S NOT THE SPECTER OF
NOTHING LEFT TO LIVE FOR EXCEPT TO FLEE, WHICH IS WHAT THE
GOVERNMENT HAS PAINTED THE PICTURE.

THIRD, AND AS EVEN THE GOVERNMENT CONCEDED, THE
SENTENCING GUIDELINES ARE ADVISORY.  IF MR. FRANCIS IS FOUND
GUILTY, THIS COURT WILL SENTENCE HIM UNDER THE FACTORS IN
SECTION 3553.  WE WOULD HAVE THE OPPORTUNITY TO SHOW THE

COURT'S SENTENCES IN OTHER BRIBERY CASES, INCLUDING BRIBERY CASES IN THIS DISTRICT, WHICH HAVE RESULTED IN SENTENCES FAR LESS THAN 22 YEARS. WE ALSO HAVE THE OPPORTUNITY TO ARGUE FOR A MUCH LOWER SENTENCE BASED ON ALL THE FACTS AND CIRCUMSTANCES WHICH WILL THEN BE BROUGHT TO THE COURT'S ATTENTION.

MR. FRANCIS HAS AN INCENTIVE TO STAY AND FIGHT THE ALLEGATIONS. HE HAS RETAINED US TO DEFEND HIM. HE ALSO RETAINED HOLLAND & KNIGHT, WHICH HAS DONE HIS GOVERNMENT CONTRACTING WORK FOR THE LAST FIVE YEARS. MR. WILLIAM GOULD, WHO IS SEATED NEXT TO MS. WHITE, IS A PARTNER AND A FORMER U.S. ATTORNEY, BRINGS WITH HIM A LOT OF EXPERIENCE, AND HIS PARTNER IS A GOVERNMENT CONTRACTING EXPERT. WE'VE SPENT A CONSIDERABLE AMOUNT OF TIME MEETING WITH MR. FRANCIS TO DATE AND WORKING ON OUR DEFENSE. SO HE HAS MADE THE COMMITMENT TO ADDRESS THESE CHARGES THROUGH EITHER AN ACQUITTAL OR CONVICTION.

ANOTHER FACTOR, THE CRIME MR. FRANCIS IS ALLEGED TO COMMIT IS NOT A CRIME OF VIOLENCE, AS I MENTIONED. IT DOESN'T INVOLVE A NARCOTIC DRUG OR ANY OTHER VIOLATION SPECIFIED IN 3142(G)(1).

THE WEIGHT OF THE EVIDENCE, WHICH WE HAVEN'T SPOKEN VERY MUCH ABOUT, MAY BE HIGH, BUT AS THE COURT KNOWS THAT'S THE LEAST SIGNIFICANT FACTOR.

WE TALKED IN FRONT OF JUDGE ADLER, AND I THINK THE COURT SHOULD APPRECIATE FROM READING THE TRANSCRIPT, THAT WE HAD A VERY EXTENSIVE HEARING WITH LOTS OF QUESTIONS, POINTED

QUESTIONS FOR BOTH SIDES THAT I THINK BOTH SIDES ADDRESSED AND
RESPONDED TO.

HE HAS FAMILY TIES IN THE UNITED STATES, NOT AS ROBUST
AS THE GOVERNMENT WOULD LIKE, BUT HE HAS HIS AUNT, AND HIS
GODSON WHO LIVE IN MARYLAND.  HE ALSO HAS A SON WHO HAS
ATTENDED COLLEGE ON THE EAST COAST AND PLANS TO RETURN TO
COLLEGE IN THE SPRING.  I MENTIONED MRS. WHITE, SHE'S HERE, AND
SHE'S WILLING TO CO-SIGN A BOND IN THE AMOUNT OF $100,000.  HER
OLDEST SISTER IS MY CLIENT'S MOTHER, SO SHE'S THE YOUNGER
SISTER, THE YOUNGER AUNT.  SHE'S A NATURALIZED U.S. CITIZEN.
SHE'S LIVED IN THE UNITED STATES SINCE 1994.  HER HUSBAND
PASSED AWAY ABOUT 10 YEARS AGO, AND SHE RAISED HER SON, WHO IS
NOW 18 YEARS OLD AND RECENTLY GRADUATED FROM HIGH SCHOOL.  SHE
IS A FULL-TIME EMPLOYEE AS A COORDINATOR AT THE UNION MEMORIAL
HOSPITAL IN BALTIMORE, MARYLAND, WHERE SHE'S WORKED FOR THE
LAST EIGHT-PLUS YEARS.

SHE OWNS A HOUSE IN PARKVILLE, MARYLAND, RIGHT OUTSIDE
BALTIMORE, WHICH SHE BOUGHT IN JULY OF 2004.  AS I MENTIONED,
UNFORTUNATELY BECAUSE OF THE FINANCIAL DOWNTURN, SHE HAS NO
EQUITY IN THE HOUSE, BUT SHE'S KEPT THE PAYMENTS CURRENT, AND
SHE WANTS TO KEEP HER HOUSE, AND THE LAST THING SHE WANTS IS A
$100,000 JUDGMENT AGAINST HER THAT WILL WIPE HER OUT
FINANCIALLY.

TURNING TO MY CLIENT, MR. FRANCIS, HE HAS HAD STEADY
EMPLOYMENT, ALBEIT IT'S BEEN IN SINGAPORE, AND HIS PLAN IS TO

WORK REMOTELY IF RELEASED ON BOND.  HE'S THE PRESIDENT OF GLENN
DEFENSE, AND HAS BEEN FOR APPROXIMATELY 30 YEARS.  OVER THAT
TIME HE HAS PROVIDED SERVICES TO THE U.S. NAVY AND OTHER NAVIES
AROUND THE WORLD, AND HANDLED 6 TO 700 PORT VISITS A YEAR,
WHERE SHIPS COME IN AND THEY NEED TO BE REFUELED, RESTOCKED,
THE MEN AND WOMEN NEED TO BE TAKEN ON AND OFF THE SHIP, AND
HE'S PROVIDED THOSE SERVICES OVER A 54 MILLION SQUARE MILE
AREA.

AS I MENTIONED TO JUDGE ADLER, WE UNDERSTAND THE
GOVERNMENT'S ALLEGING THAT HE OVERCHARGED THE U.S. NAVY FOR
SERVICES, BUT THERE'S NO ALLEGATION THAT SERVICES WERE NOT
PERFORMED.  IN FACT, TO THE CONTRARY, ALL THE SERVICES WERE
PERFORMED AND THEY WERE TOP-NOTCH.

HE'S PROVIDED COUNTLESS HOURS OF SERVICE AND GOOD DEEDS
TO THE U.S. NAVY THROUGHOUT HIS ENTIRE ADULT LIFE.  HE'S
PROVIDED SAFE AND SECURE PORTS FOR HUNDREDS OF THOUSANDS OF
SAILORS AND MARINES.  HE'S PROVIDED FORCE PROTECTION TO PROTECT
OUR AIRCRAFT CARRIERS AND OTHER NAVAL SHIPS IN LESS THAN
ACCOMMODATING AND OFTENTIMES HIGH-THREAT PORTS.  HE'S OFTEN THE
FIRST TO ARRIVE AND THE LAST TO LEAVE WHEN HE'S NEEDED TO HELP
THE NAVY CARRY OUT ITS MISSION.

I'M NOT SURE THAT THE COURT SAW THE LETTERS I SUBMITTED
TO JUDGE ADLER THAT WERE WRITTEN BY 11 DIFFERENT AMBASSADORS OR
ATTACHES AT VARIOUS EMBASSIES IN SOUTHEAST ASIA.  WHAT I WOULD
LIKE TO DO, CAN I GIVE A COPY TO THE COURT?

1     THE COURT:  CERTAINLY.  I'VE NOT SEEN THOSE.  I'M SURE

2     MR. HUIE HAS SEEN THEM.

3     MR. SWAN:  YES, HE HAS.

4     MR. HUIE:  THANK YOU.

5     MR. SWAN:  WHAT HE'S THESE -- THEY'RE AN EXAMPLE OF THE

6     TYPE OF LETTERS THAT HE REGULARLY RECEIVED.  THESE LETTERS WERE

7     WRITTEN OVER A 10-YEAR PERIOD FROM NOVEMBER OF 2003 THROUGH

8     NOVEMBER 2012.  THEY'RE BY NO MEANS EXHAUSTIVE, BUT THEY'RE THE

9     TYPES OF COMMENDATIONS HE REGULARLY RECEIVED FOR HIMSELF, FOR

10    HIS COMPANY, AND HIS EMPLOYEES FOR THE FINE SERVICES THEY

11    PROVIDED.

12    I HAVE MANY, MANY MORE LETTERS FROM THE U.S. NAVY

13    ATTESTING TO THE FINE WORK THAT HE'S PROVIDED, BUT I HAVE

14    HESITATED TO PRESENT THOSE TO THE COURT BECAUSE, GIVEN THE

15    ALLEGATIONS, I DON'T WANT ANY GUILT BY ASSOCIATION, BUT I CAN

16    TELL THE COURT, AND THE GOVERNMENT'S WELL AWARE, OF THOSE

17    LETTERS.

18    THE GOVERNMENT'S RIGHT, MR. FRANCIS ISN'T A LONGTIME

19    RESIDENT OF THIS COMMUNITY.  HE WAS LURED HERE BY THE

20    GOVERNMENT SO HE COULD BE ARRESTED.  HE'S HAD A STEADY

21    RESIDENCE IN SINGAPORE, AND HAS LIVED IN THE SAME HOUSE THAT

22    HAS BEEN OWNED FOR 40 YEARS.  HE'S THE KIND OF RESPONSIBLE MAN

23    WHO WHEN HE SAYS HE'S GOING TO DO SOMETHING, DOES IT.  STEADY

24    EMPLOYMENT.  STEADY RESIDENCE.

25    HE HAS NO HISTORY RELATING TO DRUG ABUSE.  HE HAS NO

HISTORY RELATING TO ALCOHOL ABUSE.  HE HAS NO SIGNIFICANT PRIOR

CRIMINAL RECORD.  I KNOW FROM READING THE TRANSCRIPT YOU'RE

AWARE THAT WHEN HE WAS AGE 21 HE WAS ARRESTED IN MALAYSIA WITH

TWO GUNS AND SOME ROUNDS OF AMMUNITION.  IT'S ILLEGAL TO

POSSESS A GUN OR AMMUNITION IN MALAYSIA WITHOUT A LICENSE.  HE

DIDN'T HAVE ONE.  HE WAS RELEASED FROM CUSTODY, AND FOUR YEARS

LATER HE WAS CONVICTED OF POSSESSING THE TWO HANDGUNS.  HE WAS

SENTENCED NOT TO CONSECUTIVE TERMS OF 18 MONTHS, HE WAS

SENTENCED TO 18 MONTHS AND SERVED LESS THAN A YEAR.  HE DIDN'T

FLEE FROM THOSE CHARGES.  HE REMAINED.  HE HAD NO PRIOR RECORD

OF FAILURE TO APPEAR AT COURT PROCEEDINGS.  HE MADE ALL HIS

COURT APPEARANCES 25 YEARS AGO.  HE HAS NO RECORD OF PROBATION,

PAROLE OR SUPERVISED RELEASE VIOLATIONS AND/OR REVOCATIONS.

I CAN ALSO ADVISE THE COURT IF MR. FRANCIS IS

CONVICTED, THE CONVICTION 25 YEARS AGO WILL NOT CHANGE HIS

CRIMINAL HISTORY RECORD.  IT'S TOO OLD.  IN FACT, FOREIGN

CONVICTIONS ARE OFTEN NOT CONSIDERED.  THE COURT CAN CONSIDER

IT.  IT'S PERMISSIVE.  BUT GIVEN THE LENGTH OF TIME, IT'S

UNLIKELY IT WOULD EFFECT HIS CRIMINAL HISTORY, AND I HAVEN'T

HEARD ANY ARGUMENT FROM THE GOVERNMENT THAT HE WOULD HAVE A

CRIMINAL HISTORY OF 1.

THE OTHER ASPECT OF MR. FRANCIS THAT I WOULD LIKE YOU

TO BE AWARE OF IS HIS CHARITABLE NATURE, HIS DONATIONS TO

CHARITIES OVER THE YEARS.  AGAIN, I WOULD LIKE TO SUBMIT SOME

LETTERS THAT MR. HUIE HAS ALREADY SEEN.

```
 1              THE COURT:  CERTAINLY.

 2              MR. SWAN:  BUT I'LL GIVE HIM ANOTHER COPY.  THIS IS

 3      JUST A SMALL SAMPLE OF THE TYPES OF LETTERS HE'S RECEIVED OR

 4      HIS COMPANY'S RECEIVED OR HIS FAMILY'S RECEIVED FOR THEIR

 5      CHARITABLE WORK THROUGHOUT SOUTHEAST ASIA.

 6              AND THE LAST FACTOR UNDER 3142(G) IS THAT HE IS

 7      ACTUALLY LEGALLY HERE IN THE UNITED STATES.  HE WAS INVITED BY

 8      OUR NAVY.  HE WAS ADMITTED BY IMMIGRATION ON A VISA.  THE VISA

 9      IS STILL VALID.

10              I WOULD LIKE TO SHOW ONE LAST EXHIBIT TO THE COURT --

11      AGAIN, I'LL GIVE A COPY TO MR. HUIE -- WHICH IS A COPY OF THE

12      10-YEAR VISA THAT EXPIRES MARCH 5, 2019.  THERE WAS DISCUSSION

13      BEFORE JUDGE ADLER ABOUT THE FACT THAT THE VISA WILL EXPIRE.

14      THAT'S A RED HERRING, FRANKLY.  WE'VE RETAINED IMMIGRATION

15      COUNSEL, BEEN ADVISED THAT HE IS ELIGIBLE FOR AN IMMIGRATION

16      BOND AND THAT THEY WILL EXTEND HIS TIME IN THE UNITED STATES,

17      AS THEY SHOULD, SO HE CAN STAY HERE AND FIGHT THE CHARGES.

18              IN ORDER TO REASONABLY ASSURE MR. FRANCIS'S ATTENDANCE

19      AT FUTURE COURT PROCEEDINGS, WE PROPOSED NINE CONDITIONS OF

20      BOND, AND I KNOW THEY'RE ATTACHED TO JUDGE ADLER'S ORDER, BUT I

21      HAVE A CLEAN COPY FOR THE COURT AS WELL.

22              THE COURT:  OKAY.

23              MR. SWAN:  THANKS.  I HAVE A HARD TIME READING THE

24      SMALL PRINT ON HIS ATTACHMENT.  MR. HUIE HAS COMMENTED ON A FEW

25      OF THESE.  I WOULD LIKE TO DO SO AS WELL.
```

1      HE SAID THAT WE'RE POSTING A CORPORATE SURETY BOND.

 2   ACTUALLY, THE BOND CONDITION WAS CASH OR CORPORATE SURETY.

 3   LOGISTICALLY, WE'RE STILL WORKING ON THAT, IN THE AMOUNT OF

 4   $1 MILLION.

 5      THE SECOND FACTOR IS HIS AUNT, FRANCISCA WHITE, WHO IS

 6   A U.S. CITIZEN, WILL COSIGN A PERSONAL SURETY BOND IN AN

 7   ADDITIONAL AMOUNT OF $100,000.  I'VE EXPLAINED TO HER, AND SHE

 8   UNDERSTANDS, AND SHE WOULD BE SUBJECT TO A HEARING IN FRONT OF

 9   JUDGE ADLER, IF THE GOVERNMENT WANTS, THAT IF HE VIOLATES ANY

10   CONDITION, NOT JUST FAILS TO SHOW BUT HE VIOLATES OTHER

11   CONDITIONS, THAT SHE IS POTENTIALLY LIABLE AND CAN BE LIABLE

12   FOR UP TO $100,000.

13      THIRD, THAT HE'LL WEAR A GPS ANKLE TRANSMITTER AND BE

14   PLACED IN THE HOME CONFINEMENT PROGRAM WITH ACTIVE GPS

15   MONITORING, SUPERVISED BY PRETRIAL SERVICES.  THE COURT CAN

16   IMPOSE THE DAILY COST OF HIS MONITORING.  HE'S WILLING TO PAY

17   FOR THAT.  IT'S NOT A VERY SUBSTANTIAL AMOUNT.

18      FOURTH, BECAUSE HE DIDN'T PLAN TO BE IN SAN DIEGO VERY

19   LONG WHEN HE VISITED, HE NEEDS TO FIND AN APARTMENT OR

20   CONDOMINIUM DOWNTOWN.  WE PROPOSE THAT IT BE IN AN UPPER STORY

21   TO TAKE AWAY THE THOUGHT THAT HE COULD SHIMMY DOWN OR SOMEHOW

22   GET OUT OF THE APARTMENT.  I DOUBT HE'S GOING TO BE DOING ANY

23   SHIMMYING.  WE'LL COMMENT ON THAT IN A FEW MINUTES.  BUT WHAT

24   WE PLAN TO DO IS HE WON'T BE AT GROUND LEVEL.  HE WON'T BE ABLE

25   TO OPEN THE WINDOW UP AND STEP OUTSIDE.  HE'D HAVE TO LEAVE

THROUGH A DOOR.

AS AN EXTRA LAYER OF SECURITY, WE PROPOSED THAT HIS RESIDENCE BE MONITORED BY AN INDEPENDENT SECURITY COMPANY THAT WILL INSTALL SURVEILLANCE CAMERAS ON EXTERNAL DOORS AND INSTALL ALARMS ON ALL WINDOWS AND EXTERNAL DOORS. WE THOUGHT OF DOING THAT SO THERE WOULD BE SOMEONE OFFSITE, SOMEONE THAT MR. FRANCIS COULD NOT, AS THE GOVERNMENT SUGGESTS, CORRUPT OR INFLUENCE. THEY WOULD NEVER SEE HIM. HE WOULD NEVER SEE THEM. THE ONLY WAY THEY WOULD SEE HIM IS THROUGH THE VIDEO CAMERA, AND THEY WOULD, IF THERE WAS AN ALARM ON ANY OF THE DOORS OR WINDOWS OR THEY SEE HIM LEAVING, THEY WOULD CONTACT PRETRIAL SERVICES, PLUS THEY WOULD CONTACT ANY LAW ENFORCEMENT REQUESTED. AGAIN, THIS WOULD BE SUBJECT TO THE SUPERVISION OF PRETRIAL SERVICES.

NOW, I UNDERSTAND -- I'VE TALKED TO PRETRIAL SERVICES. THEY HAVEN'T HAD THIS TYPE OF SECURITY BEFORE. IT IS CLEARLY AN OVERLAY OVER THE GPS MONITORING, WHICH WORKS VERY EFFECTIVELY IN THIS DISTRICT, DESPITE THE FACT THAT TIJUANA IS 17 MILES AWAY. THEY'RE ALERTED INSTANTLY IF THERE'S A VIOLATION. IF SOMEONE CUTS OFF THE RECEIVER OR LEAVES WITHOUT PERMISSION, THEY'RE ALERTED IMMEDIATELY.

AND THEN THE SIXTH CONDITION, THIS WAS NOT A CONDITION WE RECOMMENDED, BUT IT WAS A CONDITION THAT WE ADDED THAT IF THE COURT BELIEVED IT NECESSARY HE'LL PAY FOR A THIRD LEVEL OF SECURITY, A 24-HOUR GUARD SERVICE THAT WILL BE PRESENT AT ALL

TIMES IN HIS APARTMENT.  AGAIN, IT WOULD BE ANOTHER WAY OF
COMMUNICATING THAT HE MIGHT BE LEAVING AND ALSO SERVE AS A
DETERRENT TO HIM DOING SO.  IT WILL BE A VISIBLE BARRIER TO HIM
LEAVING.  NOW, COULD HE PUSH BY THEM?  YES, BUT THEY'LL BE
ALERTING LAW ENFORCEMENT LONG BEFORE HE EVER HITS THE GROUND.

AND THEN THE FINAL THREE CONDITIONS ARE FAIRLY
STANDARD.

MR. HUIE MADE THE ARGUMENT THAT -- I GUESS A TWO-PART
ARGUMENT; FIRST, IT DOESN'T SEEM EQUITABLE OR FAIR THAT BECAUSE
MR. FRANCIS HAS MONEY HE CAN PROVIDE THESE ADDITIONAL
ASSURANCES.  WELL, WHAT OUR GOAL WAS TO PROVIDE THE COURT WITH
REASONABLE ASSURANCES THAT HE WILL MAKE HIS APPEARANCE.  THERE
ARE OTHER PEOPLE WITH RESOURCES WHO ARE ABLE TO POST BONDS IN
THIS DISTRICT, WHERE PEOPLE WITHOUT RESOURCES ARE NOT ABLE TO
POST BONDS.  IT HAPPENS.  HE SHOULD NOT BE PENALIZED BECAUSE HE
HAS RESOURCES, AND HE HAS THE ABILITY TO PROVIDE REASONABLE
CONDITIONS OF RELEASE THAT WILL REASONABLY ASSURE HIS
APPEARANCE IN COURT.

MR. HUIE ALSO ARGUED THAT HE WILL BE USING MONEY THAT
HE DEFRAUDED OUT OF THE UNITED STATES TO PAY FOR THESE
CONDITIONS.  WELL, YES, THE UNITED STATES GOVERNMENT WAS A BIG
CUSTOMER OF GLENN DEFENSE.  IT WAS NOT THE ONLY CUSTOMER.  HE
HAS OTHER CUSTOMERS, OTHER SOURCES OF INCOME, AND ALSO THIS IS
NOT A CASE, WHICH, UNFORTUNATELY, WE SEE FROM TIME TO TIME,
WHERE THE WHOLE BUSINESS WAS A FRAUD, WAS PERMEATED WITH FRAUD,

A BOILER ROOM OPERATION, A DUMP AND PUMP -- OR PUMP AND DUMP, I'VE GOT IT BACKWARDS, PUMP UP THE STOCK AND DUMP IT. WE HAD A LEGITIMATE BUSINESS HERE THAT PROVIDED MILLIONS OF DOLLARS OF SERVICE TO THE UNITED STATES NAVY. THERE ARE ALLEGATIONS THAT THERE WERE OVERCHARGES ON SOME OF THE BILLINGS. THEY'RE NOT -- THE GOVERNMENT'S NOT ARGUING THAT OTHER SERVICES WEREN'T PERFORMED AND RIGHTFULLY PAID FOR. THERE'S ALLEGATIONS THAT SOME BRIBES WERE PAID. SO THERE'S LEGITIMATE SUMS OF MONEY THAT WILL COVER THESE SERVICES WHICH, FRANKLY, ARE NOT OVERWHELMING IN COST.

ONE OF THE OTHER THINGS, AND I REALIZE JUDGE ADLER EXPRESSED SOME CONCERN ABOUT HE DIDN'T HAVE ANYONE LIVING HERE WITH HIM IN SAN DIEGO. JOSEPH, HIS GODSON, IS WILLING TO MOVE FROM MARYLAND AND LIVE WITH HIM WHILE HE'S ON RELEASE. IT WILL BE ANOTHER LAYER IN THE APARTMENT REMINDING MR. FRANCIS THAT SHOULD HE LEAVE HE'S GOING TO LEAVE -- HE'S GOING TO RUIN THE CONFIDENCE THAT HIS GODSON AND HIS AUNT HAVE IN HIM.

MR. HUIE CALLED THIS A HOME JAIL. WHAT WE TRIED TO DO IS PROVIDE CONDITIONS THAT WILL REASONABLY ASSURE HIS APPEARANCE AT FUTURE COURT APPEARANCES. MR. HUIE I THINK MADE THE ARGUMENT IN FRONT OF JUDGE ADLER THAT UNLESS WE WERE TO BUILD A SECOND MCC IT WOULD BE INSUFFICIENT. I DON'T THINK WE NEED TO GO TO THAT EXTENT. WE CAN FASHION CONDITIONS. WE'VE MADE RECOMMENDATIONS FOR CONDITIONS THAT WILL REASONABLY ASSURE HIS APPEARANCE.

1    WE'RE NOT RELYING ON HIS GOODWILL AND VOLUNTARY

2    COMPLIANCE.  ANYTHING BUT.  HE'S GOING TO BE MONITORED 24/7,

3    GPS, SURVEILLANCE CAMERAS, GUARD.

4    YES, THERE ARE SOME CONDITIONS WE STILL NEED TO WORK

5    OUT, THE RESIDENCE, THE GUARD.  I HAVE SPOKEN TO A GUARD

6    COMPANY.  THEY'RE READY TO GO.  WE'VE SPOKEN TO A PRIVATE

7    SECURITY COMPANY.  THEY'RE READY TO COME IN AND INSTALL THE

8    CAMERAS AND THE ALARMS ON THE RESIDENCE ONCE IT'S RETAINED.

9    IT'S GOING TO TAKE A FEW DAYS, MAYBE A WEEK OR SO TO GET ALL

10   THAT IN PLACE, AND IT WILL ALL BE SUBJECT TO PRETRIAL SERVICES

11   OVERVIEW AND REVIEW.  THE PROBLEMS WILL NOT GROW.  THE PROBLEMS

12   CAN BE SOLVED, IF THERE ARE ANY TO BE ADDRESSED.

13   THERE WAS AN ARGUMENT MADE BY MR. HUIE THAT THE BOND

14   AMOUNT OF 1.1 MILLION IS TOO LOW.  THAT WAS NOT AN ARGUMENT

15   MADE BEFORE JUDGE ADLER.  IT'S THE FIRST TIME IT'S BEEN RAISED

16   IN EITHER THE PREVIOUS HEARINGS OR IN THE BRIEFING, AND THE

17   ARGUMENT IS -- I GUESS GOES ALONG THE LINES, WELL, HE SHOULD AT

18   LEAST HAVE TO POST WHAT THE POTENTIAL FINES OR RESTITUTION

19   AMOUNT WOULD BE.  THAT ISN'T HOW YOU SET BONDS IN THIS

20   DISTRICT.  YOU SET A BOND THAT IS GOING TO REASONABLY ASSURE

21   THE DEFENDANT'S APPEARANCE, NOT AS A PENALTY, AS A POSSIBLE

22   FINE OR RESTITUTION.

23   WE BELIEVE THAT THE PROPOSED BOND CONDITIONS CONTAIN

24   THE FOLLOWING CONDITIONS THAT WILL ASSURE HIS APPEARANCE AT

25   FUTURE COURT PROCEEDINGS:  A LARGE CORPORATE SURETY BOND.  A

```
 1    BOND CO-SIGNED BY HIS AUNT, WHO HAS SHOWN HER LOVE AND

 2    DEDICATION BY COMING OUT HERE TWICE WITHIN DAYS.  AND THEN

 3    SIGNIFICANT RESTRICTIONS ON HIS ABILITY TO FLEE, AS THE

 4    GOVERNMENT FEARS HE MIGHT, HOME DETENTION, GPS -- ANKLE

 5    BRACELET AND ACTIVE GPS MONITORING, 24-HOUR GUARD SERVICE,

 6    24-HOUR VIDEO SURVEILLANCE, AND WINDOW AND EXTERNAL DOOR

 7    ALARMS, ALL APPROVED AND SUPERVISED BY PRETRIAL SERVICES.

 8         I ARGUED IN FRONT OF JUDGE ADLER THAT, FRANKLY, MR.

 9    FRANCIS'S ABILITY TO FLEE AND AVOID DETENTION AND ARREST IS

10    VERY LOW.  AS THE COURT CAN SEE HE'S A VERY LARGE MAN.  HE

11    STANDS OUT WHEREVER HE GOES.  THERE'S BEEN TREMENDOUS PUBLICITY

12    ABOUT THIS CASE.  I THINK WE HAD TWICE THE AMOUNT OF REPORTERS

13    IN THE COURTROOM ON THURSDAY.  THEY'RE STILL HERE TODAY

14    FOLLOWING THIS CASE.  HIS PICTURE HAS BEEN PUBLISHED WORLDWIDE.

15    HE'S BECOME A VERY RECOGNIZABLE PUBLIC FIGURE.

16         IF HE WERE TO FLEE, FRANKLY, THERE WOULD BE NO PLACE HE

17    COULD GO TO WHERE HE WOULD NOT BE RECOGNIZED, REPORTED,

18    ARRESTED AND RETURNED TO THE UNITED STATES.  I UNDERSTAND THE

19    GOVERNMENT'S CONCERN THAT SOMEHOW HE COULD TRY TO GET TO A

20    COUNTRY THAT MIGHT NOT EXTRADITE HIM OR MAKE IT DIFFICULT TO

21    EXTRADITE HIM.  HE COULD BE EXTRADITED FROM MALAYSIA, BUT HE'S

22    GOT TO GET THERE FIRST, AND I DOUBT HE'S GOING TO BE ABLE TO

23    TRAVEL ANYWHERE WHERE HE WON'T BE SEEN, RECOGNIZED, REPORTED

24    AND ARRESTED.  BY FLEEING, HE WOULD ONLY INCREASE BY MANY YEARS

25    THE TIME HE WOULD SPEND IN CUSTODY AND BE AWAY FROM HIS THREE
```

1     YOUNG CHILDREN AND THE REST OF HIS FAMILY.

2          WE RESPECTFULLY REQUEST THAT THE COURT DENY THE

3     GOVERNMENT'S MOTION TO REVOKE THE BOND CONDITIONS SET BY JUDGE

4     ADLER AND TO DETAIN HIM WITHOUT BAIL.  WE BELIEVE THAT WE HAVE

5     SATISFIED THE BAIL REFORM ACT, THAT THERE ARE CONDITIONS THAT

6     WILL REASONABLY ASSURE MR. FRANCIS'S APPEARANCE, AND HE SHOULD

7     NOT BE DETAINED WITHOUT BAIL.  THANK YOU VERY MUCH.

8          THE COURT:  THANK YOU, MR. SWAN.

9          AT THIS TIME I WOULD LIKE TO HEAR FROM PRETRIAL

10    SERVICES, IF YOU'RE PREPARED TO ADDRESS THE COURT ON THESE

11    MATTERS.

12         PRETRIAL SERVICES OFFICER KOUHI:  YES, YOUR HONOR, GOOD

13    AFTERNOON.

14         THE COURT:  PULL THE MICROPHONE A LITTLE CLOSER TO YOU,

15    MA'AM.

16         PRETRIAL SERVICES OFFICER KOUHI:  AS NOTED IN THE

17    PRETRIAL SERVICES REPORT, OUR OFFICE IS RECOMMENDING DETENTION

18    IN THIS CASE.  PRETRIAL SERVICES HAS CONCERNS WITH THE

19    CONDITIONS THAT WERE FASHIONED BEFORE JUDGE ADLER -- BY JUDGE

20    ADLER WITH HOW TO CARRY OUT SOME OF THE EXECUTION OF SOME OF

21    THOSE CONDITIONS.  THAT'S OUR MAJOR CONCERN AT THIS POINT FOR

22    THE SAME REASONS OUTLINED BY MR. HUIE, AND WITH THAT WE WOULD

23    SUBMIT TO THE COURT.

24         THE COURT:  SO YOU FIND HIM A FLIGHT RISK AND DON'T

25    FIND THE CONDITIONS AS PROPOSED CAPABLE OF BEING SUCCESSFULLY

IMPLEMENTED.

PRETRIAL SERVICES OFFICER KOUHI: THAT IS CORRECT, YOUR HONOR.

THE COURT: VERY WELL.

MR. SWAN: YOUR HONOR, THE ONLY -- I RESPECT PRETRIAL SERVICES AND THEIR MISSION, AND I'VE WORKED VERY CLOSELY WITH THEM OVER THE YEARS. I'VE HAD A NUMBER OF CLIENTS WHO THE GOVERNMENT HAS MOVED TO DETAIN, WHO WERE RELEASED, WHO SATISFIED ALL THE CONDITIONS, WHO WERE CONVICTED, WHO APPEARED FOR SENTENCING AND WENT INTO CUSTODY. SO OFTENTIMES THERE IS THIS INITIAL CONCERN THAT THE PERSON IS A FLIGHT RISK AND WON'T MAKE THEIR APPEARANCE.

THE COURT: MR. SWAN, I DON'T MEAN TO STOP YOU, BUT ADMITTEDLY THOSE ARE DIFFERENT CASES AND DIFFERENT CIRCUMSTANCES, NOT OFTEN IN THIS DISTRICT DO WE HAVE SOMEBODY WHO HAS THE LIMITED TIES THAT YOUR CLIENT DOES, IF ANY, TO THIS JURISDICTION. HE'S A FOREIGN NATIONAL WHO WAS -- YOU COULD SAY HE WAS INVITED HERE. YOU COULD SAY HE WAS LURED HERE. IN ANY EVENT, SOME OTHER MEANS GOT HIM HERE.

MR. SWAN: I AGREE.

THE COURT: AND HE WAS ARRESTED, SO HERE WE ARE.

MR. SWAN: THE ONLY THING I WAS GOING TO MENTION, I REALIZE EVERY CASE IS DIFFERENT, BUT I'VE ACTUALLY HAD TWO FOREIGN NATIONALS, WHO WERE NOT U.S. CITIZENS, WHO WERE RELEASED TO HOME DETENTION, GPS MONITORING, AND MADE ALL THEIR

1    COURT APPEARANCES.  SO IT IS NOT AN EXCEPTIONAL CASE IN THAT

2    EXTENT.

3          THE COURT:  I WOULD SUBMIT TO YOU THAT MAY BE THE CASE,

4    AND I DON'T DENY THAT, MR. SWAN, BUT WE HAVE TO FOCUS ON MR.

5    FRANCIS'S CASE TODAY AND THE CIRCUMSTANCES THAT HE BRINGS

6    BEFORE US, WITHOUT DELVING INTO THE CIRCUMSTANCES OF THOSE

7    OTHER CLIENTS.  I'M SURE IT CAN HAPPEN, SIR.

8          MR. SWAN:  OKAY.  THANK YOU.

9          THE COURT:  YOU'RE WELCOME.

10          MR. HUIE, THE GOVERNMENT HAS THE BURDEN IN THIS MATTER.

11    IS THERE ANYTHING ELSE YOU WOULD LIKE TO SAY?  AND THEN I WOULD

12    LIKE TO TAKE A BRIEF BREAK BECAUSE WE'VE BEEN IN SESSION FOR

13    AWHILE.  GO AHEAD, SIR.

14          MR. HUIE:  YES, YOUR HONOR.

15          THE COURT:  YOU CAN RESPOND TO ANYTHING THAT YOU WOULD

16    LIKE TO RESPOND TO.

17          MR. HUIE:  THANK YOU.  YOUR HONOR'S BEEN VERY GENEROUS

18    WITH THE COURT'S TIME, AND THIS HAS BEEN EXTENSIVELY BRIEFED

19    AND ARGUED AND I'M NOT GOING TO RESPOND POINT BY POINT.

20          ONE POINT I WOULD LIKE TO MAKE THOUGH, YOUR HONOR, IS

21    THAT MR. SWAN HAS MENTIONED THAT MR. FRANCIS CAME HERE KNOWING

22    OF THE INVESTIGATION, AND I WOULD JUST LIKE TO BE CLEAR THAT

23    THAT IS NOT SOMETHING THAT WEIGHS IN FAVOR OF BAIL, IN FACT,

24    IT'S THE EXACT OPPOSITE BECAUSE MR. FRANCIS CARED ENOUGH ABOUT

25    WHAT NCIS WAS DOING THAT HE PAID AN NCIS SUPERVISOR TO GIVE HIM

1    INFORMATION AND TO GIVE HIM STATUS REPORTS ABOUT THAT ONGOING

2    INVESTIGATION.

3        NOW, AS MR. SWAN MENTIONED, ONCE THE GOVERNMENT FOUND

4    OUT ABOUT THIS THEY PLANTED FAKE REPORTS IN THERE.  THAT

5    INFORMATION WAS COMMUNICATED BY SPECIAL AGENT BELIVEAU TO MR.

6    FRANCIS.  MR. SWAN HAS SAID THERE'S NO EVIDENCE OF THAT.

7    THAT'S EVIDENCE THAT WE'RE PROFFERING TO THE COURT, AND IN FACT

8    WE DO, TO THE EXTENT IT'S NECESSARY, HAVE THOSE TEXT MESSAGES

9    AT OUR DESK, BUT WE'VE BEEN PROCEEDING BY WAY OF PROFFER IN

10   THAT REGARD.

11       THE FACT IS, THE DEFENDANT WAS VERY CONCERNED ABOUT THE

12   ONGOING INVESTIGATIONS, AND IT WAS A VERY INTRICATE,

13   LONG-RUNNING, CAREFUL ORCHESTRATION ON THE PART OF LAW

14   ENFORCEMENT TO GET HIM HERE.  TO THE EXTENT THERE'S A

15   SUGGESTION THAT MR. FRANCIS CAME HERE TO FACE CHARGES OR TO

16   ACCEPT RESPONSIBILITY, I DON'T KNOW THAT THAT IS THE

17   SUGGESTION, BUT THAT WOULD BE THE OPPOSITE OF THE TRUTH.

18       IN OUR VIEW, YOUR HONOR, EVERY FACTOR IN THIS CASE

19   FAVORS DETENTION.  NO FACTOR FAVORS BAIL.  AND UNLESS THE COURT

20   HAS ANY QUESTIONS, WE WOULD SUBMIT ON OUR PRESENTATION.

21       THE COURT:  NO, I DON'T HAVE ANY QUESTIONS AT THIS

22   TIME.  WHAT I WOULD LIKE TO DO WOULD BE TO TAKE A BRIEF BREAK

23   AND COME BACK IN ABOUT 10, 15 MINUTES.

24       MR. HUIE:  THANK YOU, YOUR HONOR.

25       MR. SWAN:  THANK YOU.

```
 1     (COURT WAS AT RECESS.)

 2          THE COURT:  THE COURT THIS AFTERNOON HAS BEEN ASKED TO

 3     CONSIDER WHAT ARE UNPRECEDENTED CONDITIONS IN THIS DISTRICT.  I

 4     BELIEVE THAT THE GOVERNMENT, IN THE COURT'S VIEW, HAS MET ITS

 5     BURDEN AND I FIND THAT MR. FRANCIS IS A FLIGHT RISK.

 6          NOW, I FIND THAT FOR THE FOLLOWING REASONS:  THE FIRST

 7     IS THE NATURE AND CIRCUMSTANCES OF THE OFFENSE.  ALTHOUGH, AS

 8     EVERYBODY KNOWS, WE DON'T HAVE VIOLENCE OR DISTRIBUTION OF

 9     DRUGS AS PART OF THE CHARGES HERE.  THIS IS NOT WHAT THIS IS.

10     IT'S A FINANCIAL SITUATION.  THE ACCUSATIONS ARE OF A

11     SOPHISTICATED CRIMINAL CONDUCT.  THE SUCCESSFUL COMPLETION OF

12     THIS CONDUCT REQUIRED THE ABILITY TO TRAVEL INTERNATIONALLY, TO

13     ADAPT EASILY TO FOREIGN COUNTRIES AND TO GET THERE EASILY, TO

14     MOVE ASSETS, TO MOVE INDIVIDUALS QUICKLY FROM ONE COUNTRY TO

15     ANOTHER.  NUMEROUS COUNTRIES COULD PROVIDE A SAFE HAVEN FOR MR.

16     FRANCIS, IN THE COURT'S VIEW, AND SO I THINK IN LIGHT OF THAT

17     HE MUST BE CONSIDERED A FLIGHT RISK.

18          THE WEIGHT OF THE EVIDENCE MUST BE CONSIDERED, AND, AS

19     CORRECTLY POINTED OUT, THIS IS THE LEAST SIGNIFICANT FACTOR,

20     THE LEAST WEIGHT, BUT I'VE READ THE FOUR COMPLAINTS AND THE

21     AFFIDAVITS THAT ARE ATTACHED.  I UNDERSTAND WELL THAT MR.

22     FRANCIS HAS NOT HAD HIS DAY IN COURT, BUT THE VIEW OF THE

23     EVIDENCE AT THIS TIME IS THAT THERE IS SOME SIGNIFICANT

24     EVIDENCE, AND SOME OF IT IS DEFENDANT'S OWN WORDS OR EMAILS AND

25     TRANSMITTALS, IF YOU WERE.
```

1    PART AND PARCEL WITH THIS YOU HAVE TO CONSIDER THE

2   PENALTIES.  UNDER ANY VIEW OF WHAT'S BEING DISCUSSED HERE THIS

3   AFTERNOON, THE PENALTIES ARE SIGNIFICANT, WHETHER IT'S

4   20 YEARS, 15 YEARS, I DON'T KNOW WHAT IT WOULD BE.  I THINK WE

5   CAN'T FORETELL WHAT IT WILL BE.  WE CAN'T FORETELL THE FINAL

6   VIEW OF THIS CASE, HOWEVER IT GOES FORWARD, BUT I THINK IT'S

7   SIGNIFICANT.

8    THE THIRD AREA I HAVE TO CONSIDER IS THE HISTORY AND

9   CHARACTERISTICS OF MR. FRANCIS.  IT'S VERY CLEAR HE DOES NOT

10  HAVE TIES TO THE SOUTHERN DISTRICT OF CALIFORNIA.  HE HAS SOME

11  TIES TO THE UNITED STATES, BUT I MUST SAY THE COURT'S VIEW OF

12  THOSE TIES IS THAT THEY'RE SOMEWHAT ATTENUATED.  HE HAS AN AUNT

13  AND NEPHEW IN THE SUBURBS OF BALTIMORE, WHO HAVE BEEN KIND

14  ENOUGH TO COME HERE AND BE SUPPORTIVE, AND THAT'S APPRECIATED,

15  I KNOW, BUT I DON'T VIEW THAT AS SIGNIFICANT.

16    HE DOESN'T OWN ANYTHING HERE.  HE DOESN'T HAVE A

17  BUSINESS HERE.  HE HAS NO ASSETS HERE.  HE DOESN'T OWN REAL

18  ESTATE IN THIS COUNTRY.

19    IN A FOREIGN JURISDICTION, HE HAS HIS FAMILY.  HE HAS

20  HIS BUSINESS.  HE HAS HIS HOME.  HE HAS ALL HIS ASSETS.  HIS

21  CHILDREN, HIS MOTHER ALL ARE ELSEWHERE, AND THOSE ARE THE

22  PRIMARY REASONS THAT THE COURT FEELS HE'S A FLIGHT RISK.

23    NOW, I WOULD LIKE TO COMMENT ON THE CONDITIONS THAT

24  HAVE BEEN PROPOSED.  I DON'T BELIEVE THE CONDITIONS THAT HAVE

25  BEEN PROPOSED PROVIDE ANY REAL ACCOUNTABILITY.  I APPRECIATE

```
 1     THE GPS.  I APPRECIATE THE DISCUSSION OF VIDEO CAMERAS AND

 2     SECURITY SYSTEMS, AND WHATNOT, BUT THE COMBINATION OF WHAT'S

 3     BEING OFFERED PROVIDES NO ASSURANCE AGAINST FLIGHT OCCURRING

 4     BEFORE MEASURES COULD BE TAKEN TO PREVENT A DETECTED DEPARTURE

 5     FROM THE JURISDICTION.  I BELIEVE FOR THESE REASONS THE

 6     GOVERNMENT'S MOTION MUST BE GRANTED, AND MR. FRANCIS WILL BE

 7     DETAINED AS A FLIGHT RISK.

 8          MR. HUIE, I WOULD ASK YOU TO PROPOSE A DETENTION ORDER

 9     TO THE COURT ON THIS MATTER, AND I WILL TAKE CARE OF IT AS SOON

10     AS IT COMES TO CHAMBERS.

11          MR. HUIE:  THANK YOU, YOUR HONOR, WE'LL SUBMIT IT THIS

12     AFTERNOON.

13          MR. SWAN:  YOUR HONOR, WOULD I HAVE AN OPPORTUNITY TO

14     FILE OBJECTIONS TO THE PROPOSED ORDER?

15          THE COURT:  OF COURSE.  CERTAINLY.

16          MR. SWAN:  THANK YOU.

17          THE COURT:  WE'LL TAKE THE TIME TO DO THAT.  THANK YOU,

18     WE'LL BE AT RECESS.

19          MR. HUIE:  THANK YOU, YOUR HONOR.

20     (COURT WAS AT RECESS.)

21

22

23

24

25
```

```
1                        C E R T I F I C A T E

2


3            I, GAYLE WAKEFIELD, CERTIFY THAT I AM A DULY
     QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED
4    STATES DISTRICT COURT, THAT THE FOREGOING IS A TRUE AND
     ACCURATE TRANSCRIPT OF THE PROCEEDINGS AS TAKEN BY ME IN THE
5    ABOVE-ENTITLED MATTER ON NOVEMBER 25, 2013; AND THAT THE FORMAT
     USED COMPLIES WITH THE RULES AND REQUIREMENTS OF THE UNITED
6    STATES JUDICIAL CONFERENCE.

7


8    DATED:  DECEMBER 4, 2013       /S/ GAYLE WAKEFIELD
                                    GAYLE WAKEFIELD, RPR, CRR
9                                   OFFICIAL COURT REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```