```
 1                  THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 2

 3                    HONORABLE JANIS L. SAMMARTINO
                 UNITED STATES DISTRICT JUDGE PRESIDING
 4

 5        ------------------------------------------------------

 6     UNITED STATES OF AMERICA,      )
                                      )  NO. 13-CR-3781-JLS
 7                    PLAINTIFF,      )
                                      )
 8     VS.                            )  OCTOBER 14, 2016
                                      )
 9     JOHN BELIVEAU, JR.,            )
                                      )  SENTENCING HEARING
10                    DEFENDANT.      )

11        ------------------------------------------------------

12
       APPEARANCES:
13

14     FOR THE PLAINTIFF:      MARK W. PLETCHER
                               BRIAN R. YOUNG
15                             PATRICK HOVAKIMIAN
                               U.S. ATTORNEY'S OFFICE
16                             SOUTHERN DIST. OF CALIFORNIA
                               CRIMINAL DIVISION
17                             880 FRONT STREET, SUITE 6293
                               SAN DIEGO, CA  92101
18

19     FOR THE DEFENDANT:      JESSICA N. CARMICHAEL
                               PHOENIX AYOTTE HARRIS
20                             HARRIS & CARMICHAEL, PLLC
                               1800 DIAGONAL ROAD, SUITE 600
21                             ALEXANDRIA, VA  22314

22                             JASON T. CONFORTI
                               LAW OFFICES OF JASON T. CONFORTI
23                             550 WEST "C" STREET, SUITE 790
                               SAN DIEGO, CA 92101
24

25     THE COURT REPORTER:     GAYLE WAKEFIELD, RPR, CRR
```

```
 1     OCTOBER 14, 2016

 2                         AFTERNOON SESSION

 3          THE CLERK:  CALLING MATTER NUMBER 7 ON THE CALENDAR,

 4     13-CR-3781, UNITED STATES OF AMERICA VS. JOHN BERTRAND

 5     BELIVEAU.

 6          THE COURT:  APPEARANCES, PLEASE.

 7          MS. CARMICHAEL:  GOOD AFTERNOON, YOUR HONOR, JESSICA

 8     CARMICHAEL AND PHOENIX HARRIS FOR MR. BELIVEAU, WHO IS PRESENT.

 9          THE COURT:  THANK YOU.

10          I BELIEVE WE HAVE AN APPEARANCE TELEPHONICALLY ALSO ON

11     BEHALF OF MR. BELIVEAU.  MR. CONFORTI?

12          MR. CONFORTI:  THAT'S CORRECT, YOUR HONOR.  GOOD

13     AFTERNOON.  THIS IS JASON CONFORTI ON BEHALF OF MR. BELIVEAU AS

14     LOCAL COUNSEL.

15          THE COURT:  THANK YOU VERY MUCH.

16          ON BEHALF OF THE GOVERNMENT.

17          MR. PLETCHER:  THANK YOU, YOUR HONOR.  GOOD AFTERNOON.

18     MARK PLETCHER, PATRICK HOVAKIMIAN AND BRIAN YOUNG ON BEHALF OF

19     THE UNITED STATES.

20          THE COURT:  THANK YOU VERY MUCH.

21          WELL, AS IS MY CUSTOM AND PRACTICE ON CRIMINAL

22     SENTENCING MATTERS, I WILL, OF COURSE, HEAR FROM BOTH SIDES.  I

23     WILL HEAR FROM MR. BELIVEAU, IF HE WISHES TO ADDRESS THE COURT.

24     I'LL BEGIN BY INDICATING WHAT I HAVE READ AND CONSIDERED IN

25     THIS MATTER, WHICH IS, AS BOTH SIDES KNOW, VERY EXTENSIVE.
```

1          THE COURT HAS READ AND CONSIDERED THE FOLLOWING

2     DOCUMENTS FOR SENTENCING THIS AFTERNOON:  THE PRESENTENCE

3     REPORT.  THE ADDENDUM TO THE PRESENTENCE REPORT.  DEFENDANT'S

4     CORRECTIONS TO THE PRESENTENCE REPORT.  DEFENDANT'S SENTENCING

5     SUMMARY CHART.  DEFENDANT'S POSITION ON SENTENCING.

6     DEFENDANT'S EXHIBITS, WHICH ARE EXTENSIVE.  IT INCLUDES THE

7     DEFENDANT'S LETTERS, LETTERS FROM FAMILY, SISTER,

8     BROTHER-IN-LAW, BROTHER, PARENTS, AND MANY OTHERS.  I HAVE TWO

9     DOCUMENTS FROM MEDICAL EXPERTS, DR. RONALD BOGGIO AND DR.

10    RICHARD FONTE.  I HAVE THE DEFENDANT'S REPLY TO THE

11    GOVERNMENT'S MOTION.

12          FROM THE GOVERNMENT THE COURT HAS READ AND CONSIDERED

13    THE FOLLOWING DOCUMENTS:  THE SENTENCING SUMMARY CHART FROM THE

14    GOVERNMENT.  THE MEMORANDUM OF THE UNITED STATES IN SUPPORT OF

15    THEIR SENTENCING POSITION, WHICH HAS NUMEROUS EXHIBITS

16    ATTACHED, ALL OF WHICH THE COURT HAS GONE THROUGH.

17          I HAVE THE DEFENDANT'S MOTION, AND I HAVE THE

18    UNDERLYING PLEA AGREEMENT.

19          I WOULD LIKE THE PARTIES TO KNOW THAT THE COURT HAS

20    READ MANY OF THESE DOCUMENTS MORE THAN ONE TIME AND I AM

21    PREPARED TO PROCEED AT THIS JUNCTURE.  I DO HAVE THIS QUESTION

22    FOR BOTH SIDES TO COMMENT ON AND THIS RELATES -- THIS IS A

23    TECHNICAL MATTER ON THE CALCULATION.  WITH REGARD TO THE AMOUNT

24    OF LOSS, PROBATION INDICATED THAT IT WAS A PLUS 18, AND THE

25    GOVERNMENT HAS INDICATED IT'S A PLUS 20, AND I BELIEVE THE

1    SENTENCING GUIDELINES THAT ARE APPLICABLE TODAY WOULD MAKE IT A

2    PLUS-18.  I THINK -- BECAUSE IT IS INURES TO MR. BELIVEAU'S

3    ADVANTAGE, I THINK I MUST CALCULATE AS A PLUS 18 AND NOT A PLUS

4    20, BUT I WOULD LIKE TO HEAR FROM BOTH SIDES ON THAT ISSUE,

5    ESPECIALLY THE GOVERNMENT, SINCE THEY'RE CALCULATING IT UPWARD

6    BY 2 POINTS.

7         I THINK WITH THAT, WE'RE PREPARED -- I'M PREPARED TO

8    PROCEED, AND I WILL BEGIN BY ASKING THE DEFENSE IF -- YOU CAN

9    TELL ME ANYTHING YOU WOULD LIKE TO TELL ME.  PLEASE REMEMBER,

10   COUNSEL, I HAVE READ EVERYTHING MULTIPLE TIMES, SO PLEASE GO

11   AHEAD, MA'AM.

12        MS. CARMICHAEL:  THANK YOU, YOUR HONOR.  WOULD YOUR

13   HONOR LIKE ME TO ADDRESS THE GUIDELINES ISSUE AT THIS JUNCTURE

14   OR SIMPLY --

15        THE COURT:  WHATEVER YOU WOULD LIKE TO DO.  IF YOU WISH

16   TO DISCUSS IT, IF YOU DON'T WANT TO DISCUSS IT, I JUST WANTED

17   TO CALL THAT TO PEOPLE'S ATTENTION BECAUSE IT JUMPED OUT AT ME

18   WHEN I COMPARED THE GUIDELINES.  THAT'S WHERE THAT DISCREPANCY

19   CAME FROM.

20        MS. CARMICHAEL:  ABSOLUTELY, YOUR HONOR, AND WE WOULD

21   AGREE WITH THE COURT THAT THE DISCREPANCY SHOULD BE RESOLVED IN

22   FAVOR OF THE DEFENDANT IN THIS CASE.  ADDITIONALLY I WOULD NOTE

23   FOR THE COURT --

24        THE COURT:  PULL BOTH MICROPHONES UP TOGETHER AND SPEAK

25   INTO BOTH OF THEM.  I THINK THAT WOULD HELP FOR EVERYBODY WHO

1    IS LISTENING.

2            MS. CARMICHAEL:  THANK YOU, YOUR HONOR.  SO I WOULD

3    CERTAINLY SUBMIT THAT THE DISCREPANCY BE RESOLVED IN FAVOR OF

4    THE DEFENDANT.  ADDITIONALLY, I WOULD TELL THE COURT THAT WHEN

5    MR. BELIVEAU PLED GUILTY IN THIS CASE THAT THE CONVERSATIONS

6    THAT WE HAD WITH THE GOVERNMENT WERE TO DISCONTINUE CALCULATING

7    THE LOSS AMOUNT WITH RESPECT TO HIM IN PARTICULAR, AND TO LEAVE

8    IT AT THAT $7 MILLION-PLUS LOSS AMOUNT.

9            THE COURT:  CORRECT, WHICH IS DIFFERENT THAN WHAT'S

10   GOING TO BE -- WHAT I BELIEVE TO BE AN AGREED-UPON RESTITUTION

11   AMOUNT.

12           MS. CARMICHAEL:  THAT'S CORRECT, YOUR HONOR.

13           THE COURT:  FAIR ENOUGH.  THE CALCULATION STOPS AT THAT

14   FIGURE YOU'VE GIVEN ME, AND YOU BELIEVE IT SHOULD BE AN 18.

15           MS. CARMICHAEL:  THAT'S CORRECT, YOUR HONOR.

16           AT THIS TIME I WOULD LIKE TO CALL DR. FONTE TO TESTIFY.

17           THE COURT:  HE'S GOING TO MAKE A STATEMENT TO THE

18   COURT?  HE MAY STAND AT THE PODIUM, AND HE MAY ADDRESS THE

19   COURT FOR A BRIEF PERIOD OF TIME.  WE DON'T NORMALLY DO THIS.

20   WHEN YOU SAY "TESTIFY," IT'S NOT A QUESTION AND ANSWER WITH A

21   CROSS-EXAMINATION.  I'VE READ HIS REPORTS.  HE MAY COME FORWARD

22   AND TELL THE COURT WHATEVER HE WOULD LIKE TO TELL ME.

23           MS. CARMICHAEL:  YES, YOUR HONOR.  MAY I CONFER WITH

24   HIM FOR JUST ONE MOMENT?

25           THE COURT:  CERTAINLY.

1        (DISCUSSION HELD OFF THE RECORD.)

2            DR. FONTE:  GOOD AFTERNOON

3            THE COURT:  GOOD AFTERNOON, SIR.  PLEASE STATE YOUR

4        NAME FOR THE RECORD.

5            DR. FONTE:  I'M DR. RICHARD FONTE.

6            THE COURT:  SIR, I HAVE READ AND CONSIDERED YOUR MARCH,

7        9, 2016, LETTER.  I ALSO HAVE YOUR OCTOBER 1ST, 2016, LETTER,

8        SO PLEASE TAKE THAT INTO ACCOUNT IN ADDRESSING THE COURT, SIR.

9        YOU MIGHT PULL UP THE MICROPHONES A LITTLE BIT.

10           DR. FONTE:  YES, YOUR HONOR.

11           THE COURT:  THANK YOU.

12           DR. FONTE:  I WILL BE BRIEF.  I BASICALLY WANT TO SAY

13       THAT WE WANTED TO INTRODUCE MENTAL HEALTH HISTORY NOT AS A

14       REASON TO JUSTIFY THE CRIME, I THINK THAT'S VERY IMPORTANT.

15       THE MENTAL HISTORY -- HEALTH HISTORY IS NOT INTRODUCED TO

16       JUSTIFY THE CRIMINAL ACTIVITY.  THAT'S NOT WHAT WE'RE SAYING.

17           AS A MATTER OF FACT, I WOULD GO ONE STEP FURTHER AND

18       SAY THE MENTAL HEALTH HISTORY DID NOT CAUSE HIM TO -- THIS

19       CRIMINAL ACTIVITY.  I JUST WANTED TO MAKE THAT CLEAR BECAUSE I

20       THINK THERE'S BEEN SOME CONFUSION ABOUT THAT.

21           I DO WANT TO EMPHASIZE THOUGH THAT THE COURT NEEDS TO

22       KNOW THAT HIS MENTAL STATUS DURING THE TIME THAT HE COMMITTED

23       THESE CRIMES HE WAS SIGNIFICANTLY IMPAIRED.  MY UNDERSTANDING

24       IS THAT THAT CAN BE INTRODUCED POSSIBLY AS A MITIGATING

25       CIRCUMSTANCE IN THE SENTENCING PROCESS, AND THAT'S BASICALLY

1    WHY I'M HERE TODAY.

2            THE COURT:  THANK YOU VERY MUCH, SIR, I APPRECIATE

3    THAT.

4            MS. CARMICHAEL:  YOUR HONOR --

5            THE COURT:  AND IT'S A FACTOR IN MITIGATION, BUT IT

6    WASN'T IMPAIRED TO THE POINT WHERE HE WASN'T ABLE TO ENTER THE

7    PLEA AND PROCEED TODAY, AND THAT'S A QUESTION FOR COUNSEL, I

8    JUST WANT TO BE CLEAR ON THAT.

9            MS. CARMICHAEL:  THAT'S CORRECT, YOUR HONOR.

10           THE COURT:  YOU'RE OFFERING IT IN MITIGATION, AND

11   THAT'S THE WAY I TOOK IT, DOCTOR.

12           DR. FONTE:  YES, I JUST WANTED TO EMPHASIZE THAT, YOUR

13   HONOR.

14           THE COURT:  THANK YOU.

15   (DISCUSSION HELD OFF THE RECORD.)

16           DR. FONTE:  AM I ABLE TO RESPOND TO THE BRIEF OR DO YOU

17   NOT REALLY WANT TO HEAR ANYMORE FROM ME?

18           THE COURT:  WHAT DO YOU WANT TO RESPOND TO, SIR?

19           DR. FONTE:  JUST SOME OF THE -- ONE OF THE QUESTIONS

20   THAT CAME UP IS THAT --

21           THE COURT:  GO AHEAD, I WOULD LIKE TO HEAR WHAT YOU

22   HAVE TO SAY.

23           DR. FONTE:  THANK YOU VERY MUCH.

24           THE COURT:  CERTAINLY.

25           DR. FONTE:  THAT HE'S TO BLAME FOR STOPPING HIS

```
1    MEDICATION, THAT IS NOT TRUE.  THAT HE FOLLOWED THE GUIDELINES,

2    HE WAS ON HIS MEDICATION FOR 15 MONTHS, AND THE GUIDELINES SAY

3    TO STAY ON YOUR MEDICINE FROM 12 TO 24 MONTHS, SO THAT IS JUST

4    INACCURATE THAT THAT IS NOT HIS FAULT.  PEOPLE WITH OCD ARE

5    TOLD TO GO OFF THEIR MEDICINES AFTER A YEAR OR SO, AND WE

6    REALIZE THAT MANY OF THEM WILL RELAPSE, WE JUST DON'T KNOW WHO

7    WILL RELAPSE, SO THAT IS STANDARD OF CARE.  IT IS NOT HIS FAULT

8    THAT HIS OCD RELAPSED, THAT IS A FUNCTION OF THE ILLNESS.

9         THE COURT:  BUT ONE SHOULD BE MONITORED TO KNOW IF

10   YOU'RE GOING TO BE A RELAPSING PERSON AND YOU NEED TO GO BACK

11   ON IT; IS THAT A FAIR STATEMENT?

12        DR. FONTE:  I DID FOLLOW HIM FOR ONE YEAR AFTER HE WENT

13   OFF HIS MEDICATION, AND THEN HE MOVED TO PHILADELPHIA SO I LOST

14   TRACK OF HIM, SO YOU ARE CORRECT.  BUT AGAIN RELAPSE CAN OCCUR

15   WHEN YOU --

16        THE COURT:  UNDERSTOOD.  THANK YOU, SIR.

17        ANYTHING ELSE?

18        MS. CARMICHAEL:  I'M SORRY, YOUR HONOR.  DR. FONTE HAS

19   NEVER TESTIFIED IN COURT BEFORE SO THIS IS A LITTLE BIT

20   AWKWARD.

21        THE COURT:  WHATEVER HE WANTS TO SAY, MS. CARMICHAEL,

22   GO AHEAD.

23        MS. CARMICHAEL:  THANK YOU.

24   (DISCUSSION HELD OFF THE RECORD.)

25        DR. FONTE:  AGAIN, THIS MIGHT BE A MINOR POINT, BUT ONE
```

1    OF THE POINTS IN THE BRIEF WAS THAT THEY DOWNPLAYED THE

2    SIGNIFICANCE OF HIS MENTAL ILLNESS BECAUSE HE WAS ABLE TO

3    FUNCTION AT A VERY HIGH LEVEL.  I'M HERE TO TELL YOU THAT

4    PEOPLE WITH MENTAL ILLNESS CAN FUNCTION AT A VERY HIGH LEVEL.

5    IT DOESN'T NECESSARILY CORRELATE.  THAT DURING HIS COLLEGE

6    YEARS HIS OCD WAS VERY SEVERE, AND IT WAS NOT TREATED, AND HE

7    FUNCTIONED AT A VERY HIGH LEVEL, HONORS IN COLLEGE, AND HE

8    EXCELLED IN THE ROTC PROGRAM.  I JUST WANTED TO BRING UP I

9    THINK THERE ARE TWO INACCURACIES IN THE REPORT.

10           THE COURT:  THANK YOU.

11   (DISCUSSION HELD OFF THE RECORD.)

12           DR. FONTE:  DOES YOUR HONOR WANT TO HEAR ANY MORE WHY I

13   THINK HIS MENTAL ILLNESS CONTRIBUTED TO THE CRIME?  I MEAN,

14   IT'S IN MY REPORT.

15           THE COURT:  I'LL HEAR WHATEVER YOU WANT TO TELL ME,

16   SIR.  I MEAN, I CONSIDER WHAT'S BROUGHT BEFORE ME.  I'VE READ

17   EVERYTHING.

18           DR. FONTE:  OKAY.  I THINK THAT WITH -- THE PTSD I

19   THINK THAT HAS ALSO BEEN DOWNPLAYED IN THE PRESENTENCING

20   REPORT.  I THINK THAT IS REALLY THE GAME CHANGER IN HIS MENTAL

21   STATUS.  I THINK THAT AGAIN HAS BEEN DOWNPLAYED, AND I'M HERE

22   TO EMPHASIZE THAT THAT'S VERY IMPORTANT, THAT HE WAS

23   FUNCTIONING AT A VERY MARGINAL LEVEL DURING THIS TIME, AND THAT

24   HE WAS USING ALCOHOL AND SEXUAL COMPULSIONS AS A NUMBING AGENT,

25   AND I THINK HIS RELATIONSHIP WITH LEONARD FRANCIS ALLOWED HIM

1    TO CONTINUE THAT NUMBING, SO TO SPEAK.  I THINK THAT WAS IN A

2    SENSE THE ORIGINAL BASIS OF THE RELATIONSHIP, THAT IT WAS A WAY

3    FOR HIM TO TREAT -- REALLY THE ONLY WAY HE HAD TO TREAT HIS

4    MENTAL PROBLEMS DURING HIS TIME IN EAST ASIA.  I JUST WANTED TO

5    EMPHASIZE THAT POINT.

6         THE COURT:  THANK YOU, SIR.

7         MS. CARMICHAEL:  YOUR HONOR, THERE'S ONLY ONE MORE

8    PRACTICAL ISSUE, THAT IS, DR. FONTE HAS INCREASED ONE OF MR.

9    BELIVEAU'S MEDICATIONS, THE SEROQUEL, TO 200 MILLIGRAMS.  THIS

10   IS SO OBVIOUSLY IMPORTANT FOR THE PRESENTENCE REPORT.  WE WOULD

11   ASK THAT DR. FONTE ACKNOWLEDGE THAT HERE IN COURT TODAY, AND

12   THAT THE COURT ORDER AN ADDENDUM TO THE PRESENTENCE REPORT TO

13   REFLECT THE CURRENT DOSAGE OF HIS MEDICATION.

14        DR. FONTE:  SO I NEED TO SAY THAT I INCREASED THE

15   SEROQUEL TO 200 MILLIGRAMS AT BEDTIME, YOUR HONOR.

16        THE COURT:  THANK YOU.

17        DR. FONTE:  THANK YOU, YOUR HONOR.

18        THE COURT:  YOU MAY CONTINUE, MS. CARMICHAEL, IF YOU

19   WISH TO ADDRESS THE COURT.  I'LL HEAR EVERYTHING FROM YOU.

20   I'LL ASK FOR YOUR CLIENT'S COMMENTS, IF ANY, AND THEN I'LL GO

21   TO THE GOVERNMENT.  I'LL GO TO PROBATION.

22        MS. CARMICHAEL:  YOUR HONOR, I WROTE MY SENTENCING

23   BRIEF IN THIS CASE ABOUT TWO YEARS AGO, AND WHEN I WROTE THAT

24   POSITION I ORIGINALLY STARTED ASKING FOR A SHORT PERIOD OF

25   INCARCERATION, BUT OVER THE COURSE OF THE LAST TWO YEARS I HAVE

1    SPOKEN SEVERAL TIMES TO DR. FONTE.  I HAVE GOTTEN TO KNOW MR.

2    BELIVEAU, AND UNDERSTAND THE CIRCUMSTANCES UNDER WHICH THIS

3    OFFENSE OCCURRED AND ALSO THE SEVERE MENTAL HEALTH ISSUES THAT

4    AFFECTED HIM AT THAT TIME.

5         I'VE ALSO COME TO LEARN MORE ABOUT EVERYONE'S

6    INVOLVEMENT IN THIS OFFENSE AND WHERE MR. BELIVEAU'S CONDUCT

7    ACTUALLY FALLS, AND FOR THOSE REASONS, YOUR HONOR, I WENT BACK

8    AND I CHANGED EVERYTHING THAT I HAD WRITTEN IN THAT MEMO WITH

9    RESPECT TO A FAIR SENTENCE, AND I SUBMIT TO YOU THAT A SENTENCE

10   OF HOME CONFINEMENT WITH A SUPERVISED RELEASE IS THE

11   APPROPRIATE SENTENCE IN THIS CASE.

12        YOUR HONOR, THE GOVERNMENT HAS INDICATED THAT SUCH A

13   REQUEST IS INSULTING, BUT, YOUR HONOR, IT WAS A 72-PAGE, WELL

14   REASONED SUPPORTED DOCUMENT THAT LED TO THAT RECOMMENDATION AND

15   WAS BEFORE YOU IN THIS CASE.

16        NOW, YOUR HONOR, THE DEPUTY ATTORNEY GENERAL OF THE

17   UNITED STATES, DEPUTY ATTORNEY GENERAL SALLY YATES, RECENTLY

18   GAVE REMARKS AT A CONFERENCE DEDICATED TO THE INTERSECTION OF

19   MENTAL HEALTH AND THE CRIMINAL JUSTICE SYSTEM, AND SHE

20   RECOGNIZED THAT THERE WAS THIS INTERSECTION OF MENTAL HEALTH

21   AND THE CRIMINAL JUSTICE SYSTEM.  SHE SAID THAT REQUIRING OUR

22   STRAINED CRIMINAL JUSTICE SYSTEM TO DO DOUBLE DUTY AS FRONTLINE

23   MENTAL HEALTH FACILITIES IS NOT ONLY INEFFICIENT, IT IS TOTALLY

24   INCONSISTENT WITH OUR VALUES AND WHO WE ARE AS A COUNTRY.  THIS

25   IS NOT THE TREATMENT THAT OUR FELLOW CITIZENS DESERVE.

1    SHE NOTED THAT OUR CURRENT SYSTEM IS UNFAIR BOTH TO

2    THOSE STRUGGLING WITH MENTAL ILLNESS AND UNFAIR TO THE

3    CORRECTIONAL OFFICERS WHO LACK THE RESOURCES AND THE KNOWLEDGE

4    TO HANDLE SUCH SITUATIONS.  SHE SAID THAT THE LACK OF TREATMENT

5    IN THESE FACILITIES LEADS TO A VICIOUS CYCLE AND "WE, AT DOJ,

6    NEED TO BE DOING FAR MORE TO ADDRESS THIS CRITICAL ISSUE."

7    THEN SHE OUTLINED VARIOUS SOLUTIONS, WHICH INCLUDED DIVERSION

8    PROGRAMS, KEEPING INDIVIDUALS OUT OF PRISON AND IN TREATMENT.

9    YOUR HONOR, THIS WAS A DIRECTIVE FROM THESE

10   INDIVIDUALS' BOSS'S BOSS'S BOSS, AND YET THEY HAVE NOT

11   ACCOUNTED FOR IT IN THIS CASE.

12   THE GOVERNMENT IN ITS POSITION ALL BUT IGNORED MR.

13   BELIVEAU'S SEVERE MENTAL ILLNESS ONLY TO SAY THAT THE DEFENSE

14   MAKES NO EFFORT TO IDENTIFY HOW THEY JUSTIFY HIS DECISION TO

15   TAKE BRIBES FROM LEONARD FRANCIS.

16   YOUR HONOR, WE SPENT AT LEAST 20 PAGES DOCUMENTING THE

17   STRUGGLES THAT MR. BELIVEAU WENT THROUGH, BOTH BEFORE HE

18   ENCOUNTERED THAT HORRIFIC INCIDENT IN EAST TIMOR, THAT LED TO

19   HIS PTSD, AND AFTER.  YOU HEARD FROM DR. FONTE THAT SAID HIS

20   JUDGMENT WAS ABSOLUTELY IMPAIRED.  HE NEEDED A FRIEND, AND

21   LEONARD FRANCIS EXPLOITED THAT.  HE NEEDED NUMBING AGENTS, AND

22   LEONARD FRANCIS PROVIDED THOSE.  HIS STRUGGLE WITH MENTAL

23   ILLNESS HAS BEEN LIFE-LONG, AND IT'S ONLY MORE SEVERE SINCE HE

24   WAS SERVING OUR COUNTRY OVERSEAS AND WITNESSED A HORRIFIC

25   INCIDENT, ONE THAT DR. FONTE DESCRIBED THAT NO HUMAN SHOULD

1    HAVE TO ENDURE.  THIS CAUSED IRREPARABLE HARM TO MR. BELIVEAU

2    AND CAUSED HIM FURTHER VULNERABILITIES WHICH LED TO THIS

3    OFFENSE.

4         YOUR HONOR, I WROTE THIS IN MY MEMO, BUT I THINK THAT

5    IT'S IMPORTANT FOR ME TO REITERATE IT AGAIN HERE TODAY.

6    PERHAPS WHAT IS MOST PROFOUND IN MR. BELIVEAU'S SENTENCING

7    POSITION IS WHAT IS ABSENT FROM IT, AND THAT IS HE HAS NO

8    LETTER FROM ANYONE WHO CONSIDERS HIMSELF MR. BELIVEAU'S FRIEND.

9    MR. BELIVEAU DOES NOT HAVE A FRIEND.  HE DOES NOT -- HE'S NEVER

10   HAD A ROMANTIC RELATIONSHIP.  HE CERTAINLY HAS A COURTROOM FULL

11   OF PEOPLE ROOTING AGAINST HIM, YOUR HONOR, BUT IMAGINE LIVING

12   FOR 47 YEARS AND NOT HAVING A SINGLE FRIEND, AND THIS WAS THE

13   EFFECT OF HIS MENTAL ILLNESS.

14        NOW, AT THE TIME OF THE OFFENSE HE WAS WEAK.  HE WAS

15   LONELY.  HE WAS SUFFERING FROM PHYSICAL AILMENTS.  HE WAS

16   SUFFERING FROM MENTAL TORTURE, YOUR HONOR, AND FRANCIS KNEW IT,

17   AND HE EXPLOITED IT.

18        I WOULD LIKE TO READ TO YOU ONE TEXT MESSAGE, AND I

19   DIDN'T INCLUDE THIS IN MY MEMO, YOUR HONOR, BUT I THINK IT IS

20   VERY IMPORTANT TO ADDRESS IT HERE TODAY, ONE TEXT MESSAGE IN

21   WHICH FRANCIS IS COMMUNICATING WITH ANOTHER INDIVIDUAL AND HE

22   SAYS, "THAT IS WHY HE," MR. BELIVEAU, "IS LONELY, WITH NO

23   FRIENDS, AS HE HAS A SPLIT PERSONALITY.  IT IRRITATES ME," HE

24   SAYS.  THEN HE GOES ON TO SAY, "NO, HE WILL NOT CHANGE.  IT IS

25   A MENTAL CONDITION.  HE IS 40 AND NO GIRL OR FRIEND HANGS OUT

1    WITH HIM EXCEPT FOR ME FOR A REASON."

2         YOUR HONOR, FRANCIS KNEW ABOUT MR. BELIVEAU'S STRUGGLES

3    AND HIS MENTAL ILLNESS, AND HE PROVIDED FRIENDSHIP.  HE

4    PROVIDED THE ALCOHOL.  HE PROVIDED THE SEXUAL EXPLOITS THAT

5    ALLOWED MR. BELIVEAU TO NUMB THE TURMOIL THAT HE WAS FEELING IN

6    HIS MIND DAY AFTER DAY AFTER DAY.  YOU SAW IN THAT DOCUMENT AND

7    YOU'LL NOTE, YOUR HONOR, THAT MR. FRANCIS SAID TIME AND TIME

8    AGAIN TO MR. BELIVEAU, "I AM YOUR FRIEND FOR LIFE."

9         NOW, YOUR HONOR, THE GOVERNMENT'S MEMO WOULD LIKE YOU

10   TO FOCUS ONLY ON ONE ASPECT IN THIS CASE AND THAT IS THE

11   CONDUCT IN WHICH MR. BELIVEAU ENGAGED, AND IT WAS TERRIBLE,

12   YOUR HONOR, MR. BELIVEAU KNOWS THAT.  WE ALL KNOW THAT.  BUT

13   THAT IS NOT THE ONLY FACTOR THAT THE COURT MUST CONSIDER IN

14   THIS CASE.  THE COURT MUST CONSIDER MR. BELIVEAU'S SEVERE

15   MENTAL ILLNESS, THE EFFECT THAT IT HAD AT THE TIME OF THE

16   OFFENSE, AND THE HARM THAT IT WILL CAUSE HIM IN A PRISON.

17        THE JUSTICE DEPARTMENT ITSELF HAS ASKED THE COMMUNITY

18   FOR HELP IN THIS REGARD.  THE GOVERNMENT WANTS YOU TO FOCUS ON

19   MR. BELIVEAU'S KNOWLEDGE, BUT THAT IS ONLY ONE HALF OF MR.

20   BELIVEAU'S BRAIN.  THE OTHER HALF OF MR. BELIVEAU'S BRAIN WAS

21   AFFLICTED BY SEVERE MENTAL ILLNESS, SO SEVERE THAT HE COULD NOT

22   INTERACT WITH PEOPLE IN A NORMAL WAY, AND SOMETIMES COULD NOT

23   EVEN PERFORM DAILY FUNCTIONS.

24        YOUR HONOR, THIS IS NOT SIMPLY ABOUT SIGNIFICANT

25   MITIGATING CIRCUMSTANCES.  THIS SENTENCING REQUEST IS ALSO

1          OBJECTIVELY WHERE MR. BELIVEAU'S CONDUCT FALLS WITHIN THIS

2     SCHEME.  IT IS IMMUTABLE, EMPIRICAL FACT THAT LEAKING

3     CLASSIFIED INFORMATION, WHICH MR. BELIVEAU DID NOT DO, IS MORE

4     SEVERE THAN LEAKING INTERNAL NCIS REPORTS.  CONGRESS HAS

5     ACTUALLY DEFINED CLASSIFIED INFORMATION AS THAT INFORMATION

6     WHICH, IF LEAKED, COULD REASONABLY BE EXPECTED TO CAUSE SERIOUS

7     DAMAGE TO THE NATIONAL SECURITY OF THE UNITED STATES.  AN

8     EXAMPLE OF THIS WOULD BE SHIP MOVEMENTS, WHICH WERE LEAKED IN

9     THIS CASE, SHIP MOVEMENTS WHICH ACTUALLY ENDANGER HUMAN BEINGS'

10     LIVES.  IN FACT, YOUR HONOR, JUST DAYS AGO ONE OF OUR SHIPS WAS

11     FIRED UPON.

12          NOW, THESE PARTICULAR PROSECUTORS MAY NOT TREAT

13     INTERNAL NCIS REPORTS AS LESS SEVERE THAN CLASSIFIED

14     INFORMATION, BUT THE UNITED STATES GOVERNMENT AS A WHOLE TREATS

15     LEAKING CLASSIFIED INFORMATION AS MORE SEVERE CONDUCT THAN

16     INTERNAL REPORTS.

17          BUT, YOUR HONOR, WE CAN'T LOOK TO THE GOVERNMENT ON

18     WHERE MR. BELIVEAU'S CONDUCT FALLS IN THIS CASE BECAUSE THE

19     GOVERNMENT IS ALL OVER THE MAP WITH RESPECT TO INDIVIDUALS'

20     CULPABILITY IN THIS SCHEME, AND I WOULD LIKE TO GIVE THE COURT

21     ONE SPECIFIC EXAMPLE OF THIS.

22          THE GOVERNMENT IN TWO DIFFERENT DOCUMENTS STATED THAT

23     TWO DIFFERENT PEOPLE WHO HAVE ALREADY BEEN SENTENCED IN THIS

24     CASE ARE THE SECOND MOST CULPABLE PERSON IN THE CONSPIRACY.

25     FIRST, MISIEWICZ, THE GOVERNMENT SAID, "IN THIS WIDE-RANGING

1    CONSPIRACY EVERYONE PLAYED THEIR ROLE, BUT OVERALL, IN ITS

2    FINAL ITERATION, NO ONE WAS MORE IMPORTANT TO FRANCIS THAN

3    MISIEWICZ."  MISIEWICZ RECEIVED 78 MONTHS.

4         THEN IN AN ALMOST IDENTICAL SENTENCE IN DUSEK'S

5    MEMORANDUM SAID, "IN THIS WIDE-RANGING CONSPIRACY, EVERYONE

6    PLAYED THEIR ROLE, BUT OVER THIS PERIOD OF TIME NO ONE WAS MORE

7    IMPORTANT TO FRANCIS THAN THE COVETED GOLDEN GOOSE DEFENDANT

8    DUSEK."  AND THAT GOLDEN GOOSE TERM, THAT GOLDEN ASSET, THAT

9    WAS SOMETHING THAT FRANCIS HIMSELF IDENTIFIED DUSEK AS, HIS

10   GOLDEN ASSET, AND DUSEK RECEIVED A SENTENCE OF 46 MONTHS.

11        SO SURELY, YOUR HONOR, MR. BELIVEAU SHOULD NOT RECEIVE

12   A SENTENCE THAT IS HIGHER THAN THE TWO INDIVIDUALS THAT THE

13   GOVERNMENT HAS ALREADY IDENTIFIED AS SECOND MOST CULPABLE IN

14   THIS CASE.

15        BUT MR. BELIVEAU'S CONDUCT WAS EVEN LESS SEVERE THAN

16   ALL OF THE OTHER PEOPLE WHO HAVE BEEN SENTENCED IN THIS CASE

17   AND HERE IS WHY, MR. BELIVEAU ENGAGED IN THIS CONDUCT OVER THE

18   COURSE OF 21 MONTHS -- THE LAST 21 MONTHS OF THIS CONSPIRACY.

19   HE LEAKED UNCLASSIFIED INFORMATION AND WAS NOT MOTIVATED BY

20   GREED BUT INSTEAD BY SEVERE MENTAL ILLNESS.

21        OTHER INDIVIDUALS IN THIS CASE ENGAGED IN CONDUCT VERY

22   SIMILAR TO MR. BELIVEAU'S LEAKING NCIS REPORTS, COUNSELING

23   FRANCIS ON HOW TO MANEUVER INVESTIGATIONS, AND THEY DID IT FOR

24   SEVEN YEARS.  OTHER INDIVIDUALS LEAKED SUBMARINE SCHEDULES,

25   LURED SHIPS TO PORTS, AIRCRAFT CARRIERS, STILL OTHERS RECEIVED

1    HUNDREDS OF THOUSANDS OF DOLLARS IN THIS CASE.  AND, YOUR

2    HONOR, ED ARUFFO, WHO THE GOVERNMENT HAS NOT EVEN ADDRESSED IN

3    THEIR MEMO, HELPED DEVISE THIS SCHEME AND CARRY IT OUT, WORKING

4    AS LEONARD FRANCIS'S RIGHT-HAND MAN, AND HE RECEIVED A PLEA

5    AGREEMENT WITH A FIVE-YEAR STATUTORY MAXIMUM.

6            THE COURT:  HE'S NOT BEEN SENTENCED YET --

7            MS. CARMICHAEL:  THAT'S CORRECT, YOUR HONOR.

8            THE COURT:  SO WE DON'T KNOW WHAT HE'S GOING TO GET, DO

9    WE?

10           MS. CARMICHAEL:  THAT'S CORRECT, YOUR HONOR.  HOWEVER,

11   HIS C1B GUIDELINES ARE LOWER, AND HE HAS A FIVE-YEAR STATUTORY

12   MAXIMUM IN HIS PLEA AGREEMENT.

13           AND, YOUR HONOR, AS I MENTIONED IN MY UNDER SEAL

14   MOTION, WHAT ABOUT MR. FRANCIS HIMSELF?  MR. FRANCIS HAS

15   GUIDELINES THAT ARE ONLY SLIGHTLY ABOVE MR. BELIVEAU'S, THE MAN

16   WHO ORCHESTRATED AND CARRIED OUT THIS ENTIRE SCHEME,

17   MANIPULATING INDIVIDUAL AFTER INDIVIDUAL, RECRUITING INDIVIDUAL

18   AFTER INDIVIDUAL, HIS GUIDELINES ARE ONLY BARELY ABOVE MR.

19   BELIVEAU'S?

20           YOUR HONOR, THE GOVERNMENT HAS PEGGED MR. BELIVEAU IN

21   THIS UNIQUELY CULPABLE POSITION BECAUSE THE GOVERNMENT ALLEGES

22   THAT MR. BELIVEAU IS THE ONLY PERSON WHO HAD THE KNOWLEDGE OF

23   BOTH THE BRIBERY AND THE FRAUD, AND THAT IS SIMPLY NOT

24   ACCURATE.  I OUTLINED NUMEROUS INDIVIDUALS ON MY SENTENCING

25   POSITION WHO LIKEWISE HAD THE KNOWLEDGE OF THE BRIBERY AND THE

1    FRAUD, AND CERTAINLY ED ARUFFO HAD THE KNOWLEDGE OF THE BRIBERY

2    AND THE FRAUD.

3         YOUR HONOR, THE PERSON WHO PLED GUILTY IN THIS

4    COURTROOM YESTERDAY, LIEUTENANT COMMANDER DEBORD, IT SIMPLY IS

5    MISPLACED TO --

6         THE COURT:  I DIDN'T TAKE THAT PLEA, MA'AM.  HE PLED IN

7    FRONT OF ONE OF OUR MAGISTRATE JUDGES.

8         MS. CARMICHAEL:  I UNDERSTAND, YOUR HONOR.

9         THE COURT:  THAT'S WHAT THE GOVERNMENT WAS TRYING TO

10    LET YOU KNOW.

11         MS. CARMICHAEL:  YOUR HONOR, WHY THE CHARGE BARGAINING

12    IN THIS CASE?  WHY?  IS IT SIMPLY BECAUSE THEY JUST DON'T LIKE

13    MR. BELIVEAU?  THERE'S CERTAINLY A ROOM FULL OF PEOPLE HERE TO

14    ROOT AGAINST MR. BELIVEAU, BUT NOT LIKING MR. BELIVEAU IS

15    CERTAINLY NOT A REASON TO INFLATE HIS POSITION WITHIN A

16    CONSPIRACY.  CERTAINLY HIS CONDUCT FALLS BELOW THE TWO

17    INDIVIDUALS THAT THE GOVERNMENT HAS IDENTIFIED AS THE MOST --

18    THE SECOND MOST CULPABLE IN THIS CASE.

19         NOW, YOUR HONOR, THE GOVERNMENT SPENT QUITE SOME TIME

20    IN THEIR SENTENCING POSITION DISCUSSING HOW MR. BELIVEAU'S

21    CONDUCT HELPED THWART AND STALL THE INVESTIGATION IN THIS CASE,

22    AND IN THAT RESPECT, YOU KNOW, I WOULD SAY THAT MR. BELIVEAU

23    WAS PERHAPS THE LEAST HELPFUL CO-CONSPIRATOR TO FRANCIS IN THAT

24    REGARD.  AFTER ALL, YOUR HONOR, THE FINAL 21 MONTHS WHEN THIS

25    WAS GOING ON WAS WHEN MR. FRANCIS GOT CAUGHT.  CERTAINLY THE

1          PEOPLE WHO WERE ENGAGED IN THIS AND HELPING FRANCIS FOR THE

2          SEVEN YEARS PRIOR WERE MUCH MORE INVOLVED IN THWARTING AND

3          STALLING AN INVESTIGATION THAN MR. BELIVEAU.

4               THE GOVERNMENT ALSO SAYS THAT MR. BELIVEAU IS MORE

5          CULPABLE BECAUSE HE -- HIS OFFENSE, EXCUSE ME, "RAN SO

6          PERFECTLY CONTRARY TO THE RESPONSIBILITIES FOR WHICH THE

7          TAXPAYERS PAID HIM."  THAT'S TRUE, YOUR HONOR, BUT THAT IS

8          EVERY SINGLE INDIVIDUAL THAT HAS BEEN INVOLVED IN THIS CASE.

9          THE FLEET INDUSTRIAL SUPPORT CENTER, THE OFFICER IN CHARGE,

10         THOSE INDIVIDUALS, THE NAVY SUPPLY OFFICERS, THE INDIVIDUALS

11         WHOSE VERY JOB IT IS TO ENGAGE IN THAT OVERSIGHT AND TO ENSURE

12         THE INTEGRITY OF THOSE CONTRACTS, THEY TOOK BRIBES TO THWART

13         THAT OVERSIGHT AND IN SOME CASES SUSPENDED CONTRACTS OF

14         COMPETITORS, UNINSTALLED DEVICES THAT WERE INTENDED TO MONITOR

15         GDMA'S CONDUCT, AND THOSE INDIVIDUALS ARE NOT BEING HELD IN

16         THIS UNIQUELY UNFAVORABLE POSITION.  EVERY SINGLE PERSON IN

17         THIS CONSPIRACY ENGAGED IN CONDUCT THAT RAN PERFECTLY CONTRARY

18         TO THEIR RESPONSIBILITIES.

19              NOW, EVENTUALLY THE GOVERNMENT SUCCINCTLY PUTS EXACTLY

20         WHAT MR. BELIVEAU DID IN THEIR POSITION.  THEY WROTE, "SIMPLY

21         PUT, BELIVEAU HELPED FRANCIS STEAL MONEY FROM THE UNITED

22         STATES."  AND THAT IS WHAT HE DID, YOUR HONOR, AND THAT IS IT.

23         HE DID NOT HURT ANYONE.  HE DID NOT KILL ANYONE.  HE DID NOT

24         ASSAULT ANYONE.

25              YOUR HONOR HAS BEEN ON THE BENCH FOR QUITE SOME TIME

1    AND KNOWS THAT VIOLENT CRIMINALS COME BEFORE YOU WITH

2    SENTENCING REQUESTS THAT ARE LESS THAN 15 YEARS.  YOUR HONOR,

3    THIS WAS NOT AGGRAVATED CONDUCT.  THIS SIMPLY WAS THE CRIME

4    THAT HE COMMITTED.  ALL PUBLIC OFFICIALS WHO ENGAGE IN BRIBERY

5    ABUSE THE TRUST THAT THE PUBLIC HAS GIVEN THEM, EVERYONE OF

6    THEM, AND IT IS AWFUL, AND MR. BELIVEAU HAS LIVED WITH IT DAY

7    IN AND DAY OUT FOR THE LAST THREE YEARS.

8        HE IS DEVASTATED BY WHAT HE HAS DONE.  HE IS

9    IMMEASURABLY SORRY, AND IF ANYTHING GOOD HAS COME FROM THE

10   CRIME THAT WAS COMMITTED HERE, IF ANYTHING GOOD HAS COME OF IT,

11   IT IS THAT MR. BELIVEAU HAS FINALLY RECEIVED THE CRITICAL

12   TREATMENT THAT HE NEEDED, THE TREATMENT FOR HIS PTSD, THE

13   TREATMENT FOR HIS OBSESSIVE COMPULSIVE DISORDER, HIS ANXIETY

14   AND DEPRESSION.

15       IN A WAY, YOUR HONOR, IT MAKES IT ACTUALLY MORE

16   DIFFICULT FOR MR. BELIVEAU TO LIVE WITH HIMSELF AT THIS POINT

17   BECAUSE HE NO LONGER OPERATES IN THAT CLOUDY HAZE OF HIS

18   OBSESSIVE COMPULSIVE MIND, HIS PTSD-INDUCED ANXIETY.  HE HAS A

19   CLEAR MIND NOW, YOUR HONOR, AND HE SEES THE FULL PICTURE OF

20   WHAT HE DID AND IT DEVASTATES HIM, AND HE WILL ADDRESS THE

21   COURT IN A FEW MINUTES.

22       YOUR HONOR, INSTEAD OF GOING HOME TO PENNSYLVANIA AND

23   SITTING IN A CORNER AND FEELING BAD FOR HIMSELF, AND SAD FOR

24   HIS SITUATION, HE DID EXACTLY THE OPPOSITE.  HE CAME INTO THIS

25   COURTHOUSE.  HE WAS THE FIRST INDIVIDUAL TO STEP UP IN FRONT OF

1    THE VICIOUS EYES OF THE MEDIA AND THE WATCHFUL GLARE OF THE

2    NATION AND SAID, "I DID THIS, AND IT WAS WRONG, AND IT WAS

3    CERTAINLY A SUBSTANTIAL STEP IN THE GOVERNMENT'S CASE."  HE

4    THEN PROCEEDED TO HELP THE GOVERNMENT FOR THE NEXT THREE YEARS,

5    YOUR HONOR.

6         HE HAS ALSO BEEN VOLUNTEERING EXTENSIVELY.  YOU SAW A

7    LETTER FROM HIS CHURCH, HE VOLUNTEERS HUNDREDS OF HOURS.  AND

8    HE'S HELPED LAUNCH A RECOVERY ORGANIZATION THAT HELPS OTHER

9    INDIVIDUALS, VETERANS, WHO ALSO SUFFER FROM SUBSTANCE ABUSE.

10   THERE IS NOT A SINGLE DAY IN THE LAST THREE YEARS THAT MR.

11   BELIVEAU HAS NOT BEEN ENGAGED IN EITHER HIS OWN TREATMENT OR IN

12   HELPING HIS COMMUNITY.

13        YOUR HONOR, THE GOVERNMENT WAS CORRECT ABOUT ONE THING

14   IN THEIR SENTENCING POSITION AND THAT IS THIS IS HOW THE PUBLIC

15   WILL JUDGE THE FAIRNESS OF THE JUDICIAL SYSTEM.  THE PUBLIC

16   WILL JUDGE FAIRNESS BASED ON SOMEONE WHO HAS A MENTAL ILLNESS,

17   WHO MAY NOT RECEIVE ADEQUATE TREATMENT -- OR WHO PROBABLY WILL

18   NOT RECEIVE ADEQUATE TREATMENT IN THE BUREAU OF PRISONS SYSTEM,

19   SOMEONE'S WHOSE CONDUCT FELL BELOW THE SEVERITY LEVEL OF THE

20   OTHER INDIVIDUALS IN THE CASE, THE PERSON WHO WAS FIRST TO

21   PLEAD AND COOPERATED FOR THREE YEARS.  FAIRNESS WILL BE

22   ACCOUNTING FOR ALL OF THAT.

23        A SENTENCE OF HOME CONFINEMENT WITH SUPERVISED RELEASE

24   IS PROPORTIONABLE AND REASONABLE IN THIS CASE BECAUSE OF MR.

25   BELIVEAU'S MENTAL ILLNESS AND THE EFFECT THAT IT HAD ON HIM AT

1    THE TIME AND HIS CURRENT STATE, HOW HE WOULD SUFFER IN PRISON,

2    BUT ALSO BECAUSE OBJECTIVELY WHERE HIS CONDUCT FALLS IN THIS

3    SCHEME.

4         THE GOVERNMENT WANTS THE COURT TO MEASURE MR. BELIVEAU

5    BY ONE THING AND ONE THING ONLY AND THAT IS HIS CONDUCT, THE

6    WORST THING, AND I WOULD SUBMIT, YOUR HONOR, THAT IF WE ARE TO

7    GO ABOUT JUDGING INDIVIDUALS -- EACH INDIVIDUAL THAT WE

8    ENCOUNTER EVERY DAY BY THE WORST THING THAT THEY HAVE EVER DONE

9    IN THEIR LIFE, THE WORLD WOULD BE A VERY DARK PLACE.

10        AS I WROTE IN MY MEMO, AND AS THE COURT SAID IN

11   *ADELSON*, "BUT, SURELY, IF EVER A MAN IS TO RECEIVE CREDIT FOR

12   THE GOOD HE HAS DONE, AND HIS IMMEDIATE CONDUCT ASSESSED IN THE

13   CONTEXT OF HIS OVERALL LIFE HITHERTO, IT SHOULD BE AT THE

14   MOMENT OF HIS SENTENCING, THE MOMENT WHEN HIS VERY FUTURE HANGS

15   IN THE BALANCE."

16        WE WOULD ASK THAT YOU IMPOSE THE SENTENCE THAT IS FAIR

17   IN THIS CASE, THAT IS FAIR FOR THIS MAN, AND THAT IS HOME

18   CONFINEMENT WITH SUPERVISED RELEASE.

19        THE COURT:  THANK YOU VERY MUCH, MS. CARMICHAEL.  I

20   APPRECIATE THOSE COMMENTS, MA'AM.

21        IF YOUR CLIENT WOULD LIKE TO ADDRESS THE COURT --

22        MR. BELIVEAU, IF YOU WOULD LIKE TO ADDRESS THE COURT,

23   YOU HAVE THAT OPPORTUNITY NOW, SIR.  YOU DO NOT HAVE TO, BUT

24   YOU HAVE THAT OPPORTUNITY.  YOU CAN COME TO THE PODIUM BECAUSE

25   I COULD HEAR YOU BETTER, SIR, WITH BOTH MICROPHONES THERE THAN

1    AT THE TABLE.

2         THE DEFENDANT:  I WANT TO THANK YOUR HONOR, THIS COURT,

3    THE PUBLIC, AND MY FORMER GOVERNMENT COLLEAGUES FOR THIS TIME.

4    YOUR HONOR, I PRAY THAT IN SOME WAY WHAT I STATED IN MY

5    PREVIOUS LETTER TO YOU, AND WHAT I'M ABOUT TO SAY, IS TAKEN NOT

6    AS AN EXCUSE FOR MY CRIMINAL ACTS BUT AS A STORY OF WHAT

7    HAPPENED AND WHY SO THAT OTHERS MAY LEARN FROM IT.  I BELIEVE

8    THAT GOOD CAN COME FROM ANY BAD CIRCUMSTANCE, AND IT IS IN THIS

9    CONTEXT THAT I WISH TO ADDRESS THE COURT.

10        WHAT WILL YOU DO WITH THE TIME THAT HAS BEEN GIVEN TO

11   YOU, A PHRASE I HAVE RECENTLY COME TO ADOPT IN MY STRUGGLE TO

12   REDEEM OR REHABILITATE MYSELF OVER THE PAST THREE YEARS SINCE

13   MY ARREST.  IT HAS SEEMED LIKE AN ETERNITY.  WHAT CAN I SAY TO

14   YOUR HONOR, THIS COURT, ABOUT MY PAST CRIMES, MY CRIMINAL ACTS,

15   AND HOW I CAME TO MAKE SUCH CATASTROPHIC DECISIONS AND

16   MISTAKES?  I HAVE SUFFERED IN SILENCE IN MY OWN MIND AND THE

17   LONELY NIGHTS OF ISOLATION AND FEELINGS OF TORTUROUS PAIN WHICH

18   IS DIFFICULT TO CONTROL.  OFTEN I DIDN'T UNDERSTAND WHAT WAS

19   HAPPENING TO ME.  THE PAIN WOULD BE SO GREAT THAT IT BROUGHT ME

20   TO MY KNEES, AND SOMETIMES STILL DOES, WHERE I LAY ON THE FLOOR

21   FOR HOURS, AWAKE, AND OFTEN CHANGING PLACES TO SLEEP SEVERAL

22   TIMES A NIGHT FOR A FEELING OF SAFETY, BUT THEN THE PAIN

23   PERSISTED.

24        THE THOUGHTS OF BLOOD ON ME STILL PERSIST, AND I STILL

25   CANNOT SEEM TO GET IT OFF NO MATTER HOW HARD I TRY.  TO LIVE IN

1      A CULTURE THAT SAYS, "GET UP, DUST YOURSELF OFF, AND MOVE ON,"

2      TO ALWAYS BE OKAY, MY OWN STRONG DESIRE TO SERVE GAVE ME IN

3      SOME WAY THE ABILITY TO CONTINUE AND SUCCEED AT WORK, AND SO I

4      DID.  I PUSHED DOWN THE PAIN AS FAR AS I COULD GO TO THE

5      DEEPEST REACHES WITHIN ME.  I HAD TO SURVIVE, AND I WAS, BUT IN

6      MY MIND ALONE.

7           THROUGHOUT MY LIFE I ONLY WANTED TO SERVE MY COUNTRY.

8      WHAT MAKES IT DIFFICULT FOR ME, WHAT HAPPENED WHEN I COMMITTED

9      THE CRIMINAL ACTS NOW OVER THREE YEARS AGO, THREE YEARS THAT I

10     HAVE LIVED IN THE PAST ON A DAILY BASIS, A CONTINUAL MENTAL

11     REMINDER OF WHAT I DID.  I STAND BEFORE YOU WITH MY HEAD HELD

12     LOW IN HUMILITY, AND MY HEAD HELD HIGH BUT NOT BECAUSE I AM

13     PROUD, BUT THE KNOWLEDGE THAT I HAVE BEEN WORKING DILIGENTLY

14     OVER THE LAST THREE YEARS TO TRY AND REDEEM THE WRONGS I HAVE

15     COMMITTED AND TRY TO DO THE RIGHT THING.

16          TO CONTINUE MY TREATMENT AND RECOVERY PLAN, TO HEAL

17     FROM A LIFE OF SUFFERING AND INTERNAL TORTURE, I'M HESITANT AND

18     EMBARRASSED TO DISCUSS IN GRAPHIC DETAIL THE PAIN I'VE SUFFERED

19     AND CONTINUE TO SUFFER.  TO BE HERE TODAY IS TO RELIVE THE

20     PAST, BRINGS PAIN, BUT I MUST.  IT HAS TAKEN ME YEARS OF

21     THERAPY, MEDICATION AND ACTION TO BE ABLE TO STAND BEFORE YOU

22     TODAY.

23          WHEN I MET LEONARD FRANCIS I WAS EXPERIENCING GREAT

24     PAIN FROM FLASHBACKS OF THINGS I SAW, FROM THE INTRUSIVE

25     THOUGHTS, AND THE NEED TO DRINK AND CONSORT WITH WOMEN TO

1    ESCAPE MY PAIN.  IT IS HUMILIATING FOR ME TO DISCUSS THIS.  HE

2    PROVIDED ME WITH THIS RELIEF IN THE FORM OF ALCOHOL AND WOMEN,

3    AND RELIEF WITH GESTURES AND WORDS OF FRIENDSHIP AND

4    UNDERSTANDING, ALWAYS SUGGESTING WE WOULD BE FRIENDS FOR LIFE.

5    HE PROVIDED OFFERS OF CASH TO CONTINUE MY WAY OF DRINKING AND

6    CONSORT WITH WOMEN.  I WOULD BE DISTRAUGHT AND ALMOST CRAZED IF

7    I THOUGHT I WOULD LOSE THIS WAY OF LIVING OR HIM.  I THOUGHT

8    AND TRIED TO CONVINCE MYSELF, WRONGLY I KNOW NOW, THAT I HAD

9    BEATEN DOWN THESE FEELINGS AND THOUGHTS, BUT THEY PERSISTED.

10         I NEEDED TO DRINK, AND HEAVILY, TO SUPPRESS THE PAINFUL

11   THOUGHTS AND DEPRESSION.  I WOULD DO ANYTHING TO STOP THE PAIN.

12   THAT WAS MY PRIORITY AT THE TIME.  I THOUGHT MAYBE IT WOULD ALL

13   JUST GO AWAY.  I RELIED ON THE SECRET AND PRIVATE WAY OF

14   DEALING WITH TREMENDOUS PAIN THAT I SUFFERED FROM MY MENTAL

15   ILLNESS, AND THE OVERPOWERING FEELING THAT I POSSESSED FROM

16   WHAT HAPPENED IN TIMOR.  I SUFFERED TRAUMATIC FLASHBACKS THAT

17   COULD BE TRIGGERED BY A RANDOM SMELL, THE SIGHT OF BLOOD, AND

18   SURROUNDINGS SIMILAR TO THE PLACE I WAS.  THE THOUGHTS ARE AS

19   ALIVE TODAY AS THEY WERE MANY YEARS AGO.

20         UP UNTIL NOW I HAVE BEEN LIVING IN MY MIND AWAITING THE

21   SENTENCE AND INTERNALLY PUNISHING MYSELF AS A WAY TO DEAL WITH

22   THE GUILT.  HE ALLOWED ME TO MASK MY ILLNESS WITHOUT KNOWLEDGE

23   OF EVERYONE ELSE, INCLUDING PEOPLE AT WORK, AND I WOULD HAVE

24   DONE ANYTHING TO KEEP THIS FRIENDSHIP.  HE OFFERED THIS WITHOUT

25   THE NEED TO WORRY ABOUT STIGMAS OR JUDGMENT.  MY FEELINGS AND

1    PERCEPTIONS I KNOW NOW WERE SORELY MISPLACED.  IT IS UPSETTING

2    TO THIS DAY TO THINK ABOUT WHAT I DID, TO READ THE THINGS I

3    WROTE.

4         I WISH, IF GIVEN THE PRIVILEGE TO DO SO, TO CONTINUE MY

5    RECOVERY PLAN, MY MENTAL HEALTH TREATMENT THROUGH MEDICATION

6    AND THERAPY, TO CONTINUE MY SUBSTANCE ABUSE RECOVERY THROUGH A

7    PROGRAM THAT HAS KEPT ME SOBER DURING THIS WAITING PERIOD.

8         I'VE BEEN BUSY THE LAST THREE YEARS AND HAVE MADE

9    PROGRESS WITH THE SUPPORT OF MY FAMILY AND OTHERS, WHICH HELPED

10   ME GAIN THE STRENGTH TO CHANGE.  WITHOUT IT, WHO KNOWS WHAT

11   CONDITION I WOULD BE IN TODAY.  IT'S THROUGH THIS VENUE I WISH

12   NOW TO THANK THEM FOR THEIR LOVE AND SUPPORT AND APOLOGIZE TO

13   THEM FOR PUTTING THEM THROUGH THIS VERY PUBLIC PROCESS OF MY

14   OWN DOING.

15        I HAVE RECEIVED AND COMPLETED TRAINING COURSES TO

16   BECOME A CERTIFIED RECOVERY SPECIALIST, A WAY TO HELP THOSE WHO

17   ARE SUFFERING FROM SUBSTANCE ABUSE.  I BELIEVE I HAVE FOUND A

18   WAY IN WHICH I CAN SERVE AND REDEEM WHAT I'VE LOST.  AS I

19   STATED PREVIOUSLY, IT IS ONLY THROUGH YOUR ACTIONS I BELIEVE

20   THAT ONE CAN PROVE THEIR SINCERITY AND REMORSE.  THE WORDS "I'M

21   SORRY" TODAY I BELIEVE CARRIES LITTLE TO NO MEANING.  I HOPE I

22   HAVE BEEN ABLE TO SHOW THE COURT THE SINCERITY.

23        THE PTSD BROUGHT AND STILL BRINGS EPISODES OF HORRIBLE

24   MEMORIES THAT LEADS TO DISSOCIATIVE EPISODES, EPISODES WHICH

25   CAUSE ME TO LOSE TIME, TO GET LOST IN THE PAST.  A SMELL, A

1       THOUGHT, A NEWS REPORT GLANCED, AN IMAGE, IT IS AS FRIGHTENING

2       AS IT IS PAINFUL, I JUST WANTED TO ADD.  AND IT IS ALSO PAINFUL

3       TO TALK ABOUT, EVEN TO READ THE LETTERS.

4               TO THOSE WITH WHOM I ONCE SERVED, NCIS, THE DEPARTMENT

5       OF NAVY, I ASK THEIR FORGIVENESS, AND I HOPE GOOD WILL COME OF

6       THIS EVEN IF IT SEEMS NOTHING CAN.  WHETHER BELIEVED OR NOT,

7       ACCEPTED OR NOT, I KNOW WHAT THE TRUTH IS FOR ME, AND I WILL

8       CONTINUE ALONG THE PATH THAT IS HONORABLE, TO CONTINUE

9       RECOVERY, AND TO THE BEST I CAN SERVE IN WAYS THAT I HAVE LOST.

10              I LOST EVERYTHING, CAREER, REPUTATION, LIVING WITH THE

11      FACT THAT I BETRAYED MY BADGE.  I DON'T SAY THIS FOR PITY'S

12      SAKE, FOR I DESERVE NONE, BUT AS A REMINDER OF WHAT WOULD BE

13      LOST IF YOU STRAY FROM AN HONORABLE PATH.  I HOLD MY OATH NEAR

14      ME EVERY DAY AND I HANG IT ON MY WALL TO REMIND ME WHAT I

15      BETRAYED.  I HOPE THAT THE OATHS WE TOOK ARE ALWAYS REMEMBERED

16      AND REENFORCED TO PREVENT ONE FROM STRAYING.  I FOR ONE WILL

17      NOT STRAY AGAIN, FOR IT IS THE END GAME IN LIFE THAT TRULY

18      MATTERS, AND I WILL WORK TO END IT HONORABLY, DESPITE WHAT IS

19      THOUGHT OF ME.

20              YOUR HONOR, I THANK YOU AND THE COURT FOR THIS TIME,

21      AND IF I COULD ONLY ASK FOR ONE THING, AND I KNOW IN MY

22      POSITION TO DO SO, IF I COULD, I WOULD ONLY ASK FOR FAIRNESS,

23      FAIRNESS IN THE APPLICATION OF JUSTICE AND SENTENCE.  THANK YOU

24      FOR YOUR TIME.

25              THE COURT:  THANK YOU VERY MUCH, MR. BELIVEAU.  I

```
 1        APPRECIATE YOUR COMMENTS, SIR.  THANK YOU.
 2             MS. CARMICHAEL.  THAT'S EVERYTHING FROM THE DEFENSE.
 3             THE GOVERNMENT MAY PROCEED.  MR. PLETCHER.
 4             MR. PLETCHER:  THANK YOU, YOUR HONOR.  YOUR HONOR, MR.
 5        YOUNG IS GOING TO BE GIVING THE LION'S SHARE OF OUR REMARKS,
 6        BUT IT'S MY PLEASURE TO RECOGNIZE AND HAVE STAND A SMALL NUMBER
 7        OF THE LAW ENFORCEMENT AGENTS AND THE AUDITORS WHO HAVE
 8        COMMITTED A SUBSTANTIAL PORTION OF THEIR TIME AND ENERGY IN THE
 9        INVESTIGATION OF THIS CASE AND THAT ARE HERE TODAY.
10             THE COURT:  THANK YOU.
11             MR. PLETCHER:  YOUR HONOR, THESE INDIVIDUALS, BY
12        RISING, STAND UNIFIED FOR INTEGRITY AND HONOR IN LAW
13        ENFORCEMENT.
14             ANDREW TRAVER, DIRECTOR OF THE NAVAL CRIMINAL
15        INVESTIGATIVE SERVICE, I'M GOING TO HAVE COME UP AND STAND TO
16        OFFER VICTIM IMPACT COMMENTS IN THIS REGARD.
17             THE COURT:  OKAY.  CERTAINLY.
18             SIR, IF YOU WOULD STATE YOUR NAME FOR THE RECORD.  I
19        DID READ THE LETTER WHICH YOU SUBMITTED TO THE COURT, BUT YOU
20        CERTAINLY MAY GO AHEAD AND TELL THE COURT ANYTHING YOU WOULD
21        LIKE TO TELL ME, BUT START BY GIVING YOUR NAME.
22             MR. TRAVER:  YES, YOUR HONOR.  THANK YOU.  MY NAME IS
23        ANDREW TRAVER.
24             THE COURT:  GO AHEAD.
25             MR. TRAVER:  I THINK I HAVE A UNIQUE PERSPECTIVE TO
```

1     LEND TO THESE PROCEEDINGS.  I ACTUALLY WAS SWORN IN AS THE

2     DIRECTOR OF NCIS THREE YEARS AGO A WEEK AGO TODAY, ABOUT THREE

3     WEEKS AFTER JOHN BELIVEAU WAS ARRESTED.  SO I CAME IN, AND I'VE

4     NEVER SEEN JOHN BELIVEAU UNTIL TODAY.

5          I'VE HAD THE OPPORTUNITY TO COME IN FROM THE OUTSIDE

6     AND TO SEE, VERY CANDIDLY, THE KIND OF IMPACT THAT HIS BEHAVIOR

7     HAS HAD ON THE ORGANIZATION, ON OUR RELATIONSHIPS WITH THE

8     NAVY, WITH OTHER LAW ENFORCEMENT, AND EVEN, MORE IMPORTANTLY,

9     THE IMPACT IT'S HAD ON OUR WORK FORCE.  I REPORT DIRECTLY TO

10    THE SECRETARY OF THE NAVY.

11          THE GLENN DEFENSE MARINE ASIA CASE IS PROBABLY THE

12    LARGEST -- ARGUABLY THE LARGEST FRAUD CASE THAT OUR AGENCY HAS

13    EVER BEEN INVOLVED IN.  THE MOST SIGNIFICANT CASE THAT'S EVER

14    IMPACTED THE NAVY, AT LEAST IN RECENT TIME, AND BY HAVING TO

15    ARREST ONE OF OUR OWN AGENTS AS A PART OF THAT INVESTIGATION

16    HAD A DEFINITE CHILLING AFFECT WITH THE NAVY.  I BELIEVE THAT

17    THE SECRETARY OF THE NAVY AND OTHER HIGH-RANKING MEMBERS OF THE

18    NAVY LOOK AT US WITH SUSPICION, NOT KNOWING WHO AMONG US THEY

19    COULD TRUST AND COULD NOT TRUST.  SO WHILE WE HAD TREMENDOUS

20    RESOURCES IN WORKING THIS INVESTIGATION FOR MANY YEARS WITH OUR

21    PARTNERS FROM DCIS, AND DCA, AND OTHER AGENCIES, WE HAD TO NOT

22    ONLY PULL SOME OF OUR MOST SKILLED HIGH-LEVEL INVESTIGATORS OFF

23    OF THEIR PRIMARY MISSIONS TO INVESTIGATE MR. BELIVEAU, BUT WE

24    ALSO HAD TO CONDUCT AN INTERNAL SCRUB TO DETERMINE IF, IN FACT,

25    MR. BELIVEAU WAS THE ONLY AGENT THAT HAD GONE ROGUE.  SO AT A

1      TIME WHEN WORKING ONE OF THE LARGEST FRAUD CASES IN OUR HISTORY

2      AND THE NAVY'S HISTORY, WE HAD TO DIVERT RESOURCES FROM DOING

3      OTHER THINGS THAT ARE EQUALLY IMPORTANT TO THE NAVY AND WITH US

4      TO INVESTIGATE MR. BELIVEAU, AND ALSO TO CONDUCT AN INTERNAL

5      INVESTIGATION OF OURSELVES AND ANYONE THAT WORKED IN THAT AREA

6      OR WORKED WITH MR. BELIVEAU PREVIOUSLY.  I CONTINUE TODAY, WHEN

7      I SPEAK TO THE SECRETARY OF THE NAVY OR ANY OF HIS

8      SUBORDINATES, I OFTEN DETECT THAT THEY LOOK AT WHATEVER WE

9      PRESENT THEM WITH A CERTAIN AIR OF SCEPTICISM AS IF THE TRUST

10     THAT WE ONCE HAD HAS BEEN DAMAGED IN IN SOME SIGNIFICANT WAY.

11     IT MAKES IT INCREASINGLY DIFFICULT FOR US TO DO OUR JOBS AND

12     FOR MYSELF TO NEGOTIATE FOR THE RESOURCES THAT WE NEED, AS WE

13     TEND TO CHRONICALLY NEED, UNDER-RESOURCE TO DEVELOP THE

14     IMPORTANT WORK THAT WE DO IN THE DEFENSE OF OUR NATION.

15          ANOTHER ISSUE THAT'S EVEN OF GREATER IMPORTANCE IS WE

16     HAVE AGENTS DEPLOYED ALL AROUND THE WORLD, SOME OF THEM IN VERY

17     DANGEROUS AREAS, WITH LIMITED ABILITY TO PROTECT THEMSELVES AS

18     A LAW ENFORCEMENT OFFICER IN THE SAME WAY YOU CAN PROTECT

19     YOURSELF HERE IN THE UNITED STATES.  IN MANY CASES THEY'RE

20     UNARMED AND THEY'RE WORKING PRIMARILY WITHOUT ANYONE TO SUPPORT

21     THEM.  A LOT OF THESE AGENTS NOW HAVE THE PERCEPTION THAT

22     PERHAPS THEIR IDENTITIES HAVE BEEN COMPROMISED AND IT PUTS THEM

23     AND THEIR FAMILIES AT INCREASED RISK.

24          THE OTHER THING THAT'S VERY IMPORTANT TO US IS TO BE

25     ABLE TO RECRUIT SOURCES OF INFORMATION, CONFIDENTIAL INFORMANTS

1    IS WHAT I PREFER TO ADDRESS THEM.  WELL, WITH THIS HAVING TAKEN

2    PLACE, NOW POTENTIAL SOURCES FOR US MAY COME TO THE REALIZATION

3    THAT PERHAPS WE ARE NOT AS ADEPT AT PROTECTING THEIR

4    CONFIDENTIALITY AS WE ASSERT TO BE.  SO AGAIN, THAT RUNS THE

5    RISK OF US BEING LESS CAPABLE OF ACTUALLY CONDUCTING OUR

6    IMPORTANT MISSIONS AROUND THE WORLD.

7            ONE OTHER THING I'D LIKE TO SAY, I'VE BEEN A FEDERAL

8    AGENT FOR 30 YEARS NOW, AND MY OLD AGENCY, ATF, WAS CAUGHT UP

9    IN A THING CALLED FAST AND FURIOUS, WHICH I'M SURE YOUR HONOR

10   HAS HEARD OF.  SO IT WAS ONE INVESTIGATION AND ONE OFFICE OUT

11   OF AN ORGANIZATION THAT'S ROUGHLY TWO AND-A-HALF TIMES THE SIZE

12   OF NCIS.  AFTER THAT CASE BROKE, EVERY SINGLE ATF AGENT,

13   INCLUDING MYSELF, WAS MET WITH SCEPTICISM AND SUSPICION ABOUT

14   OUR ACTIVITIES BECAUSE EVERYONE, ESPECIALLY THE PUBLIC, AND A

15   LOT OF LOCAL AND STATE AND FEDERAL LAW ENFORCEMENT FELT THAT IN

16   SOME WAY WE MIGHT ALL BE COMPLICIT.  I THINK IN A LOT OF WAYS

17   OUR WORK FORCE WILL FEEL THAT SAME KIND OF IMPACT.

18           TO PARAPHRASE, WE'VE TAKEN AN OATH TO UPHOLD AND DEFEND

19   THE CONSTITUTION OF THE UNITED STATES AGAINST ALL ENEMIES,

20   FOREIGN AND DOMESTIC.  WE ACCEPT THIS OBLIGATION FREELY,

21   WITHOUT MENTAL RESERVATION OR PURPOSE OF EVASION.  I TOOK THAT

22   OATH OCTOBER 7TH OF 2013 TO BECOME THE DIRECTOR HERE.  I'VE

23   TAKEN THAT OATH MANY TIMES IN MY LIFE AS A LAW ENFORCEMENT

24   OFFICER AND PREVIOUSLY AS AN ACTIVE DUTY NAVY OFFICER.

25           I THINK THE GREATEST INSULT IS THE VIOLATION OF THAT

1    OATH AND THE BETRAYAL OF EVERY OTHER AGENT THAT'S TAKEN THAT

2    OATH WITH NCIS AND WITH MANY OTHER FEDERAL AGENCIES.  THAT IS

3    AN IRREPARABLE HARM THAT I THINK IS REALLY IMPOSSIBLE AT THIS

4    TIME TO GAUGE AND ONLY OVER TIME WILL TELL WHAT KIND OF LASTING

5    REPERCUSSIONS THAT HAS FOR US, AND THAT'S ALL I HAVE, YOUR

6    HONOR.

7         THE COURT:  THANK YOU VERY MUCH, MR. TRAVER, I

8    APPRECIATE THOSE COMMENTS.

9         MR. YOUNG:  GOOD AFTERNOON, YOUR HONOR.

10        THE COURT:  GOOD AFTERNOON.

11        MR. YOUNG:  YOUR HONOR, THIS DEFENDANT SOLD OUT HIS

12   SERVICE AND HE SOLD OUT HIS COUNTRY.  WHAT HE DID WAS

13   ABSOLUTELY UNCONSCIONABLE.  HE ACTED AS THE CONSIGLIERI AND

14   RIGHT-HAND MAN TO LEONARD FRANCIS, WHO HATCHED ONE OF THE

15   LARGEST PUBLIC CORRUPTION AND FRAUD SCHEMES IN THE HISTORY OF

16   THE U.S. NAVY.  HE DISCLOSED THE IDENTITIES OF COOPERATING

17   WITNESSES TO TARGETS OF A CRIMINAL INVESTIGATION.  HE BELITTLED

18   AND INSULTED HIS COLLEAGUES.  HE COUNSELED A CRIMINAL, WHO IS

19   UNDER INVESTIGATION, TO DESTROY EVIDENCE.  AND FINALLY, HE

20   ENGINEERED THE MOST SERIOUS SECURITY BREACH IN THE HISTORY OF

21   THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

22        HAVING DONE SO MUCH DAMAGE TO HIS COUNTRY AND TO HIS

23   SERVICE, WHAT DOES HE NOW HAVE TO SAY FOR HIMSELF?  HE MADE

24   SOME OF THE RIGHT NOISES IN HIS ALLOCUTION, BUT I THINK HIS

25   SENTENCING RECOMMENDATION SPEAKS LOUDER THAN HIS WORDS.  WHAT

1    HE'S ESSENTIALLY TRYING TO TELL THE COURT IS, "I SHOULDN'T BE

2    HELD ACCOUNTABLE FOR MY ACTIONS.  I SHOULD RECEIVE A SENTENCE

3    OF NON-CUSTODY."  HE'S OFFERED AN INSULTING LITANY OF EXCUSES

4    ABOUT PTSD AND OBSESSIVE COMPULSIVE DISORDER, OCD, A VERITABLE

5    ALPHABET OF NONSENSE CONDITIONS THAT THE FACTS SHOW AREN'T AS

6    ACUTE AS HE WOULD SUGGEST.

7         HIS COUNSEL HAS TOLD TALES OF WHAT A GOOD PERSON HE WAS

8    BEFORE HE STARTED TO COMMIT THESE CRIMES.  ESSENTIALLY, HE

9    STANDS UNREPENTANT AND ONLY A STIFF SENTENCE IS GOING TO

10   PROMOTE RESPECT FOR THE LAW IN THIS CASE.

11        LEONARD FRANCIS PULLED OFF WHAT IS EASILY ONE OF THE

12   BIGGEST FRAUD AND CORRUPTION SCHEMES IN THE HISTORY OF THE

13   NAVY.  LEONARD FRANCIS HAS A KEEN CRIMINAL MIND, BUT HE DIDN'T

14   PULL SOMETHING OF THIS MAGNITUDE ON HIS OWN, HE NEEDED HELP,

15   AND FOR HELP HE TURNED TO THIS DEFENDANT, JOHN BELIVEAU.

16        JOHN BELIVEAU WENT INTO THE NCIS SYSTEM, CALLED THE

17   K-NET SYSTEM, AND DOWNLOADED AND PROVIDED SCORES OF NCIS

18   REPORTS TELLING LEONARD FRANCIS ALMOST EVERY DETAIL ABOUT THE

19   INVESTIGATION ON AT LEAST 15 DIFFERENT OCCASIONS.  IN THE MONTH

20   OF APRIL 2013 ALONE, BELIVEAU PROVIDED LEONARD FRANCIS WITH 80

21   DIFFERENT K-NET REPORTS.  HE REVEALED THAT NCIS HAD COVERT

22   SOURCES WITHIN GDMA WHO WERE MAKING SECRET TELEPHONE -- SECRET

23   RECORDED CONVERSATIONS.  HE REVEALED THE FACT THAT NCIS HAD

24   SOURCES IN THE TARGET COMPANY.

25        ONE OF THE DOCUMENTS WE SHOULD LOOK AT, WHICH IS

1       PROBATIVE OF THIS, IF YOU LOOK AT WHAT WE HAVE ATTACHED AS

2       EXHIBIT A, AT PAGE 13, THE HIGHLIGHTED PART, THIS IS A TEXT

3       MESSAGE EXCHANGE FROM THE PHONE OF LEONARD FRANCIS WHERE HE'S

4       HAVING A CONVERSATION WITH JOHN BELIVEAU.  BELIVEAU SAYS, "I

5       HAVE 30 REPORTS FOR YOU, NOT GOOD.  YOUR GIRL IN THAILAND F'ED

6       UP AND GOT CAUGHT ON TAPE."  THIS IS BELIVEAU TELLING

7       SOMEONE -- TELLING THE TARGET THAT HE'S BEING RECORDED.  THAT

8       WAS HORRENDOUSLY DAMAGING TO THIS INVESTIGATION BECAUSE

9       OBVIOUSLY THE TARGET IS NOT GOING TO SAY THINGS HE OTHERWISE

10      WOULD HAVE SAID HAD HE NOT HAVE KNOWN OF THE INFILTRATION OF

11      HIS COMPANY.

12          JOHN BELIVEAU ALSO COACHED LEONARD FRANCIS ON HOW TO

13      RESPOND TO INVESTIGATIONS, BEING HIS RIGHT-HAND MAN.  WE SEE AN

14      EXAMPLE OF THIS AT EXHIBIT D.  THIS IS AN EMAIL IN WHICH

15      LEONARD FRANCIS AND JOHN BELIVEAU ARE TALKING ABOUT THE FACTS

16      THAT NCIS NEEDS TO INTERVIEW LEONARD PURSUANT TO ONE OF THEIR

17      INVESTIGATIONS.  BELIVEAU GIVES HIM ADVICE AND COUNSEL ON HOW

18      TO TRY TO SWEEP IT UNDER THE RUG.  "HE NEEDS TO ATTEMPT TO

19      INTERVIEW GDMA AS PART OF YOUR INVESTIGATION.  REMEMBER WHAT WE

20      DISCUSSED REGARDING HOW NEIL CAN HANDLE THIS.  LET'S TALK."

21      ADVICE FROM COUNSEL ABOUT HOW TO EVADE AND ESCAPE

22      RESPONSIBILITY AND PROLONG THE SCHEME.

23          MOREOVER, JOHN BELIVEAU, ON SEVERAL DIFFERENT

24      OCCASIONS, COUNSELLED FRANCIS, THE TARGET OF THEIR

25      INVESTIGATION, TO DESTROY EVIDENCE.  AND SO WHAT HE UNDERSTOOD

1      AS AN NCIS OFFICER IS SOME OF THE MOST IMPORTANT EVIDENCE YOU

2      COULD HAVE IN A CASE LIKE THIS IS EMAILS AND DOCUMENTARY

3      EVIDENCE, AND BECAUSE HE WANTED FRANCIS TO KEEP GETTING AWAY

4      WITH THIS SCHEME, HE COUNSELED HIM TO DELETE THIS STUFF.

5              LET'S RETURN TO EXHIBIT A, AT PAGE 16.  THE HIGHLIGHTED

6      PART, BELIVEAU WARNS FRANCIS, "INDICTMENTS ARE COMING.  DID YOU

7      DUMP YOUR GMAIL?  I CLEANED IT.  MAYBE NOT BEST TO SEND ME

8      ANYTHING FROM YOUR GMAIL ACCOUNTS.  DELETE ALL CONTACTS AND

9      BOXES AND DELETE YOUR TRASH BIN."  THIS IS EVIDENCE OF A CRIME

10     THAT HE IS TRYING TO DESTROY.

11             SIMILARLY, WE COULD GO TO EXHIBIT C, AT PAGE 6.  THIS

12     IS A SKYPE CONVERSATION -- A TEXT OF A SKYPE CONVERSATION

13     BETWEEN FRANCIS AND BELIVEAU, AND IN THIS PART, BELIVEAU IS

14     TALKING ABOUT MICHAEL MISIEWICZ, AND WHAT HE'S SAYING IS

15     "MICHAEL MISIEWICZ IS A LIABILITY FOR YOU.  MICHAEL MISIEWICZ

16     MAY TURN ON YOU," AND BELIVEAU IS ADVISING FRANCIS, "DON'T

17     TRUST HIM.  NEVER EMAIL OR TEXT HIM.  NEVER SPEAK ON THE PHONE

18     WITH HIM.  SOPRANOS.  TRUST ME.  ONLY IN PERSON WITH NOISE, AND

19     PROTECT YOURSELF THROUGH BUGS."  SO WHAT BELIVEAU IS COUNSELING

20     IS WHEN YOU MEET WITH THIS GUY HAVE NOISE ON IN THE BACKGROUND,

21     DON'T MEET WITH HIM IN PERSON.  THAT IS EXTRAORDINARILY

22     DAMAGING.  THAT CRIPPLES AN INVESTIGATION.

23             THIS DEFENDANT OUTED IDENTITIES OF COOPERATING

24     WITNESSES.  HE GAVE FRANCIS INFORMATION THAT ALLOWED HIM TO

25     DETERMINE THAT EMPLOYEES AND PEOPLE THAT FRANCIS ASSOCIATED

1     WITH WERE COOPERATING WITH THE GOVERNMENT'S INVESTIGATION.

2     THIS PUT THESE PEOPLE AT RISK IN A DANGEROUS PART OF THE WORLD.

3     NOW, FORTUNATELY, NOBODY GOT HURT, BUT IT WAS BY I WOULD SUBMIT

4     LUCK THAT THAT NEVER HAPPENED.  AS IT TURNED OUT, LEONARD IS

5     NOT A VIOLENT PERSON, BUT WE DIDN'T KNOW THAT FOR SURE.  AND

6     EVEN -- THE BIGGEST HARM THE DIRECTOR JUST DISCUSSED WAS IT

7     MAKES IT VERY DIFFICULT TO RECRUIT OTHER WITNESSES IN THE

8     FUTURE BECAUSE THEY'RE SCARED IF THEY COME FORWARD NCIS CAN'T

9     PROTECT THEIR IDENTITY AND IT WILL GET OUT.  IT IMPAIRS FUTURE

10    CASES.

11         JUST THE CONDUCT OF THIS, THESE TEXTS, THESE CHATS,

12    THEY READ LIKE A PLOT LINE FOR AN EPISODE OF THE T.V. SHOW

13    NCIS.  YOU CAN'T MAKE THIS STUFF UP.  THIS IS LIKE SOMETHING

14    FROM A MOVIE.  THIS DOESN'T HAPPEN REGULARLY.  THIS CRIME IS

15    EXTRAORDINARILY RARE.  IT'S EXTRAORDINARILY RARE.  WE TRIED TO

16    COME UP WITH AN EXAMPLE OF WHEN'S THE LAST TIME THAT SOMETHING

17    LIKE THIS HAPPENED, AND THE BEST WE COULD THINK OF IS TO FIND

18    ANOTHER INSTANCE IN WHICH A CRIMINAL ENTERPRISE SO THOROUGHLY

19    PENETRATED A FEDERAL LAW ENFORCEMENT AGENCY, YOU WOULD HAVE TO

20    LOOK BACK TO THE 1980'S WHEN WHITEY BULGER'S WINTER HILL GANG

21    PENETRATED THE BOSTON FBI.  NOW, THERE ARE, OF COURSE,

22    IMPORTANT DISTINCTIONS BETWEEN LEONARD FRANCIS AND WHITEY

23    BULGER, BUT I OFFER THIS EXAMPLE TO SHOW THAT THIS WHOLESALE

24    PRODUCTION OF NCIS REPORTS AND INSIDE INVESTIGATIVE INFORMATION

25    DOESN'T HAPPEN ALL THAT OFTEN.  IT'S A TRULY EXTRAORDINARY

```
 1    CRIME.
 2         MS. CARMICHAEL, IN HER COMMENTS, SUGGESTED, AND IN FACT
 3    ARGUED, THAT JOHN BELIVEAU IS LESS CULPABLE THAN OTHER
 4    DEFENDANTS IN THIS CASE, THAT HIS CONDUCT WAS RELATIVELY
 5    HARMLESS COMPARED TO OTHERS WHOM THE COURT HAS SENTENCED.
 6    WELL, I WOULD SUGGEST, AND THE EVIDENCE SHOWS, THAT THIS IS THE
 7    MOST CULPABLE PERSON WHO HAS BEEN BEFORE THE COURT FOR
 8    SENTENCING IN THIS CASE.
 9         I'LL GIVE YOU THREE REASONS FOR THAT; THE FIRST IS JOHN
10    BELIVEAU'S PROXIMITY AND THE CLOSENESS OF HIS RELATIONSHIP WITH
11    LEONARD FRANCIS, THE EPICENTER OF THE SCHEME.  EVEN SO, WE CAN
12    SHOW YOU THOUSANDS OF TEXT MESSAGES BETWEEN FRANCIS AND
13    BELIVEAU, WHERE FRANCIS HAD A VERY CLOSE RELATIONSHIP WITH JOHN
14    BELIVEAU, PUTTING THIS GUY AT THE CENTER OF THE SCHEME AS
15    OPPOSED TO, LET'S SAY, A DAN LAYUG WHO DEFINITELY PLAYED A ROLE
16    BUT WAS MUCH MORE ON THE PERIPHERY.
17         SECOND, BY VIRTUE OF HIS ACCESS TO THE NCIS SYSTEM AND
18    TO THE CASE FILE, MR. BELIVEAU HAD A MORE COMPLETE PICTURE THAN
19    ANYBODY ELSE, EXCEPT FOR LEONARD FRANCIS, ON EXACTLY WHAT WAS
20    GOING ON HERE.  MR. BELIVEAU ACCESSED SCORES OF NCIS REPORTS,
21    AND YOU CAN CONTRAST THIS AGAIN TO SOMEBODY LIKE DAN LAYUG.  HE
22    KNEW WHAT HE WAS DOING, HIS PART OF THE SCHEME, BUT HE DIDN'T
23    HAVE ACCESS TO THE WHOLE INVESTIGATIVE FILE TO SEE WHAT OTHERS
24    WERE DOING.
25         I WOULD EVEN CONTRAST TO MICHAEL MISIEWICZ.  THE COURT
```

1    RECALLS THAT WAS SOMEBODY, A NAVY OFFICER, WHO WAS GIVING OVER

2    CLASSIFIED SHIP SCHEDULES.  WELL, MISIEWICZ KNEW WHAT HE WAS

3    DOING.  HE HAD A BILATERAL RELATIONSHIP WITH LEONARD FRANCIS,

4    AND HE WAS ALSO HELPING TO ROUTE SHIPS TO OTHER PLACES, BUT HE

5    DIDN'T UNDERSTAND THE FULL MAGNITUDE OF THE SCHEME AS WELL AS

6    JOHN BELIVEAU DID.

7         I WOULD SUGGEST TO VISUALIZE THE RELATIVE POSITIONS OF

8    BELIVEAU AND FRANCIS, I WOULD PICTURE BELIVEAU AND FRANCIS WITH

9    SOMEWHAT OF A GOD VIEW OF THE WHOLE CONSPIRACY, SITTING ON

10   HIGH, LOOKING DOWN OVER THEIR CREATION, OVER THE CONSPIRACY,

11   AND WATCHING OTHER PEOPLE FUNCTION.  NOW, IT'S CERTAINLY TRUE

12   THAT BELIVEAU DIDN'T KNOW EVERY DETAIL OF THE SCHEME, BUT

13   THERE'S NO QUESTION THAT HE KNEW HE HAD ACCESSED REPORTS, ONE

14   OF WHICH IS ATTACHED, SHOWING THAT THE NCIS KNEW THAT MISIEWICZ

15   WAS DOWNLOADING SHIP SCHEDULES, AND HE ALSO KNEW THAT THE

16   SCHEME WAS COSTING TENS OF MILLIONS OF DOLLARS.  SO IN SOME

17   SENSE, JOHN BELIVEAU'S CULPABILITY, BY VIRTUE OF HIS KNOWLEDGE

18   OF THE ENTIRETY OF THE SCHEME, IS THE SUM OF THE CULPABILITY OF

19   THE OTHERS WHO HAVE COME BEFORE HIM TODAY.

20        THIRD AND FINALLY, OUT OF EVERY SINGLE PARTICIPANT IN

21   THIS SCHEME, NO ONE WAS IN A BETTER POSITION TO STOP THE FRAUD

22   THAN JOHN BELIVEAU.  WHY IS THIS?  IT'S BECAUSE HE'S A LAW

23   ENFORCEMENT OFFICER.  THAT'S HIS JOB.  THE GUY'S A COP.  PEOPLE

24   LIKE MISIEWICZ, DUSEK, LAYUG.  THEY'RE NAVY PEOPLE.  THEY

25   CERTAINLY HAVE A DUTY TO REVEAL A CRIME WHEN THEY SEE IT.  IT

1    IS NOT THEIR ACTUAL JOB.  HE COULD GET WIRETAPS.  HE COULD GET

2    SEARCH WARRANTS.  HE HAS HANDCUFFS.  THIS GUY COULD HAVE

3    STOPPED HIM.

4          BUT ALSO, WHEREAS THESE OTHER FOLKS HAD A MORE LIMITED

5    VIEW, THIS GUY COULD HAVE ROLLED UP THE ENTIRE SCHEME.  IN

6    FACT, JOHN BELIVEAU HAD AT HIS FINGERPRINTS ONE OF THE LARGEST

7    CASES IN THE HISTORY OF THE NCIS.  IF HE HAD JUST ACTED, HE

8    WOULD HAVE HAD A CAREER CASE.  HE WOULD HAVE BEEN ONE OF THE

9    MOST FAMOUS AND DECORATED NCIS AGENTS IN HISTORY, BUT WHAT DID

10   HE DO INSTEAD?  DID HE ACT?  NO, HE DIDN'T ACT.  DID HE STAY

11   SILENT?  HE DIDN'T EVEN STAY SILENT.  HE HELPED LEONARD TO

12   PERPETRATE THE SCHEME.  HE HELPED HIM TO COMPLETE IT, AND IN SO

13   DOING IT, HE ALLOWED TENS OF MILLIONS OF DOLLARS TO EVAPORATE

14   INTO THIN AIR.  HE ALLOWED FOR THE CORRUPTION OF DOZENS OF NAVY

15   OFFICERS WHO WERE CORRUPTED AT THE HANDS OF LEONARD FRANCIS.

16         THE COURT HAS SENTENCED AND SEEN A NUMBER OF DIFFERENT

17   NAVY OFFICERS.  WELL, THIS DIDN'T HAVE TO HAPPEN THIS WAY.  IT

18   DIDN'T HAVE TO HAPPEN BECAUSE IF JOHN BELIVEAU HAD THE

19   OPPORTUNITY TO SHUT DOWN THE SCHEME, AND HE DID, WE WOULD HAVE

20   FEWER SHIP SCHEDULES GOING OUT AND MUCH LESS CORRUPTION.

21         IT'S IMPORTANT TO REMEMBER THAT JOHN BELIVEAU -- MR.

22   BELIVEAU WAS A REFERENT, THAT WAS ONE OF HIS ROLES IN THE NCIS.

23   A REFERENT IS SOMEBODY WHO IS IN CHARGE OF PROTECTING THE

24   SHIPS, THINKING ABOUT SECURITY FOR SHIPS WHEN THEY'RE IN

25   ANOTHER COUNTRY.  SO OF ALL THE PEOPLE IN THE ENTIRE NAVY,

1       NOBODY BETTER UNDERSTOOD THAN JOHN BELIVEAU THE IMPORTANCE AND

2       THE DAMAGE THAT COULD COME ABOUT WHEN CLASSIFIED NAVY SHIP

3       SCHEDULES FALL INTO THE WRONG HANDS.  NOW, IT'S TRUE HE DID NOT

4       DISSEMINATE THE SHIPS SCHEDULES INDIVIDUALLY HIMSELF; HOWEVER,

5       HE PROVIDED COVER FOR PEOPLE LIKE MICHAEL MISIEWICZ WHO DID.

6           JUDGE, THIS SCHEME IS INTERDICTED.  IT'S STOPPED NOW.

7       PEOPLE HAVE BEEN ARRESTED NOW, AND THAT'S A GOOD THING, BUT IT

8       DIDN'T HAVE TO GO THIS WAY.  WE PUT A LOT OF HARD WORK INTO THE

9       CASE, AND A LOT OF GOOD WORK, BUT I'LL BE HONEST WITH YOU, A

10      LOT OF THE FACT THAT WE'RE HERE IS BY LUCK, AND ONE OF THE

11      THINGS WE GOT LUCKY ON WAS THE FACT THAT WE GOT AHOLD OF

12      LEONARD FRANCIS'S GMAIL ACCOUNT.  THIS IS THE SAME ACCOUNT MR.

13      BELIVEAU RECOMMENDED MR. FRANCIS DELETE.  MR. FRANCIS DID TRY

14      TO DELETE IT, BUT WE HAD A PRESERVATION HOLD THAT WENT TO

15      GOOGLE VERY SHORTLY BEFORE THE DELETION OCCURRED, AND THAT BLEW

16      THE CASE WIDE OPEN.

17          IF WE WERE A COUPLE OF DAYS LATE, IF THE FAX MACHINE AT

18      GOOGLE DIDN'T WORK, WE'RE NOT HERE TODAY.  THIS CASE ISN'T HERE

19      TODAY.  HE'S BACK AT NCIS.  LEONARD IS STILL UNDER CONTRACT

20      WITH THE NAVY, AND TENS OF MILLIONS OF DOLLARS ARE CONTINUING

21      TO EVAPORATE INTO THIN AIR.

22          WE HEARD A LOT ABOUT PTSD, AND OCD, AND MR. BELIVEAU'S

23      CONDITIONS, AND HAVING BEEN INJURED IN THE NAVY SO GRIEVOUSLY.

24      THE DEFENDANT NOW ADDS INSULT WITH THESE CLAIMS ABOUT PTSD, AND

25      OCD, AND THINGS LIKE THIS.  AND I HAVE HEARD THAT THIS PTSD

1        SEEMS TO HAVE FLARED UP AROUND THE TIME OF JOHN BELIVEAU'S

2        ARREST.  WHY DO I THINK THAT?  WHY DO I SAY THAT?  WE SHOULD

3        LOOK AT THE FACTS OF THE CASE TO DETERMINE THIS.

4            HIS DOCTOR TESTIFIED AND HAS WRITTEN THAT IN 2009 MR.

5        BELIVEAU WITNESSED A TRAUMATIC INCIDENT IN EAST TIMOR WHERE

6        SOMEBODY WAS BEHEADED.  THEY GOT THEIR HEAD CUT OFF.  MY

7        INITIAL REACTION TO THAT IS THAT IT SEEMS THAT THAT WASN'T

8        DOCUMENTED ANYWHERE IN NCIS'S FILES.  WE SAW IT DIDN'T GET

9        DOCUMENTED, SEEMS LIKE A CRIME TO ME, DIDN'T GET DOCUMENTED.  I

10       THINK WHAT'S IMPORTANT HERE IS THAT AFTER THIS BEHEADING, WHICH

11       WAS THE CATALYST FOR ALL THE CONDITIONS WE'VE HEARD OR AT LEAST

12       AN EXACERBATING FACTOR, BELIVEAU CONTINUED TO LEAD A HIGHLY

13       FUNCTIONAL AND BY ALL ACCOUNTS SUCCESSFUL LIFE.

14           LET'S TAKE A LOOK AT EXHIBIT I.  HERE WE HAVE JOHN

15       BELIVEAU BEING AWARDED IN 2010 NCIS SPECIAL AGENT OF THE YEAR,

16       APPROXIMATELY A YEAR AFTER THIS SUPPOSED INCIDENT IN EAST

17       TIMOR.  OUT THE THOUSANDS OF PEOPLE IN NCIS, OVER A THOUSAND

18       AGENTS, HE WAS AWARDED THE VERY BEST.  WHAT DOES THAT SAY ABOUT

19       HIS FUNCTIONING?  WHAT DOES THAT SAY ABOUT HIS SELF-AWARENESS?

20           IN 2012, FOLLOWING THIS, MR. BELIVEAU WAS PROMOTED TO

21       BE THE SPECIAL AGENT IN CHARGE, SUPERVISOR OF THE QUANTICO,

22       VIRGINIA, NCIS OFFICE, WHICH IS CONSIDERED ONE OF THE CHERRY

23       POSITIONS, ONE OF THE PLUM POSITIONS IN THE ENTIRE AGENCY, A

24       POSITION THAT PEOPLE WOULD GIVE THEIR FRONT TEETH FOR.  IT

25       DIDN'T HAPPEN BY ACCIDENT.  HE HAD TO COMPETE WITH OVER 40

1    APPLICANTS, AND HE WAS PICKED.

2           WHERE WERE THESE DEBILITATING CONDITIONS AT THAT POINT?

3    IF THE CONDITIONS WERE AS BAD AS THE DOCTOR HAS SUGGESTED, HE

4    WOULD NOT HAVE BEEN ABLE TO FUNCTION AT THE HIGH LEVEL THAT HE

5    DID.

6           AND IN 2012 HE TOOK A VACATION TO THAILAND, SINGAPORE,

7    AND THE PHILIPPINES, PAID FOR BY LEONARD FRANCIS.  SEEMS SORT

8    OF ODD THAT MR. BELIVEAU WOULD RETURN TO THE SAME PART OF THE

9    WORLD, THAT WAS THE SOURCE OF ALL OF THESE BAD MEMORIES, ON

10   VACATION.  GRANTED EAST TIMOR IS NOT A NEIGHBORING COUNTRY, BUT

11   I THINK IT'S FAIR TO SAY IT'S IN THE SAME NEIGHBORHOOD.

12          THE CRIME ITSELF, JUDGE, DEMONSTRATES THAT THIS WAS A

13   CLEAR THINKING AND INTELLIGENT PERSON WHO OPERATED WITH THE

14   FORETHOUGHT AND KNEW EXACTLY WHAT HE WAS DOING.  IF WE RETURN

15   TO THE TEXT MESSAGES, EXHIBIT A, AT PAGE 19, BELIVEAU OBSERVES

16   TO FRANCIS, "THEY GOT A WARRANT FOR YOUR GMAIL ACCOUNT.  I'M

17   WORRIED I MIGHT BE IN THERE.  DID YOU DELETE ALL MY EMAILS?

18   SHUT IT DOWN.  YOU MUST DELETE ALL THE EMAILS."

19          LET'S GO TO PAGE 16 OF THAT EXHIBIT.  BELIVEAU SAYS,

20   "INDICTMENTS ARE COMING.  IT WOULD BE BEST NOT TO SEND ME

21   ANYTHING FROM YOUR GMAIL ACCOUNT.  DELETE CONTACTS AND BOXES IN

22   YOUR OLD GMAIL AND THEN DEACTIVATE."  THIS IS SOMEONE WHO HAS A

23   HIGH LEVEL OF SELF-AWARENESS, A HIGH LEVEL OF PROFESSIONAL

24   COMPETENCY.  IT SIMPLY CONTRASTS WITH THE PICTURE THAT'S BEING

25   PAINTED FOR JOHN BELIVEAU IN THE DEFENDANT'S SENTENCING PAPERS.

```
 1              FINALLY ON THIS ISSUE, I WOULD LIKE TO ADDRESS THE

 2     NOTION THAT MR. BELIVEAU WAS SOMEHOW ON HYPER -- HAD AN

 3     UNHEALTHY ATTACHMENT TO LEONARD FRANCIS.  HIS WILL WAS OVERCOME

 4     BY FRANCIS'S CHARMS.  AND THE SECOND SET OF EXHIBITS WOULD

 5     DEFEAT THAT PROPOSITION.  WHAT THEY SHOW IS THAT THESE PEOPLE

 6     DIDN'T HAVE A DYSFUNCTIONAL RELATIONSHIP, THEY HAD A

 7     TRANSACTIONAL RELATIONSHIP, A BUSINESS RELATIONSHIP, WHERE TWO

 8     CONTRACTED BODIES DECIDE WHAT THEY WANTED, WHAT THEY COULD

 9     OFFER, AND HAD AN ASSIGNED VALUE.

10              TAKE A LOOK AT EXHIBIT F.  THIS IS AN EMAIL BETWEEN

11     FRANCIS AND BELIVEAU WHERE BELIVEAU SAYS, "YOU WILL GET NOTHING

12     ELSE UNTIL I GET WHAT YOU PROMISED.  YOU GIVE WHORES MORE MONEY

13     THAN ME."  ARE THESE THE WORDS OF A BROKEN-DOWN PERSON, WHO IS

14     SO WEAK THAT HE'S OVERCOME BY FRANCIS'S CHARMS?  ABSOLUTELY

15     NOT.

16              EXHIBIT A, AT PAGE 21, SIMILARLY, THERE'S A

17     NEGOTIATION, BELIVEAU SAYS, "BEFORE I SEND," HE'S TALKING ABOUT

18     REPORTS, "LET'S NEGOTIATE."  THEY HAD AN ARM'S LENGTH

19     RELATIONSHIP.  IT SIMPLY WAS NOT THE CASE THAT HE WAS OVERCOME.

20              THE DOCTOR SAID THAT JOHN BELIVEAU HAD BAD JUDGMENT.  I

21     WOULD SUBMIT THAT THAT DOESN'T DISTINGUISH HIM FROM ALMOST ANY

22     CRIMINAL DEFENDANT THAT APPEARS BEFORE THE COURT.  MANY

23     DEFENDANTS ALMOST BY DEFINITION HAVE BAD JUDGMENT.  THEY'VE

24     MADE DECISIONS.  I WOULD BE SURPRISED IF THE DOCTOR HAS

25     EXAMINED A CRIMINAL DEFENDANT AT ANY POINT AND THOUGHT TO
```

1      HIMSELF, "THIS IS SOMEBODY WHO EXERCISES REALLY GOOD JUDGMENT.

2      THIS IS A REALLY GOOD DECISION-MAKING PERSON."  DID HE HAVE BAD

3      JUDGMENT?  OF COURSE.  HE GOT WRAPPED UP IN A BRIBERY SCHEME.

4      DOES THAT DISTINGUISH HIM FROM THE HEARTLAND OF DEFENDANTS THAT

5      THIS COURT TYPICALLY SEES?  ABSOLUTELY NOT.

6           JUDGE, THE CHARACTERISTICS OF THE DEFENDANT IN THIS

7      CASE MS. CARMICHAEL ADDRESSED, AND THAT CUTS BOTH WAYS.  IT

8      CUTS BOTH WAYS BECAUSE THERE ARE SOME THINGS THAT ARE IN HIS

9      CORNER, TO BE CLEAR.  JOHN BELIVEAU WAS A REALLY GOOD STUDENT.

10     HE GRADUATED FROM A GOOD UNIVERSITY, AND I'M SURE HE COULD HAVE

11     GOTTEN A JOB IN BANKING OR SOMETHING ELSE, AND HE ELECTED TO GO

12     INTO PUBLIC SERVICE, FIRST THE NAVY, THEN LAW ENFORCEMENT.

13     THAT'S IMPORTANT.

14          IT'S TRUE, HE ALSO ACCEPTED -- WHEN HE WAS CAUGHT,

15     CONFRONTED WITH OVERWHELMING EVIDENCE, HE ACCEPTED

16     RESPONSIBILITY BY COMING IN AND PLEADING GUILTY.  HE DID THAT

17     QUICKLY AND BEFORE ANYBODY ELSE.  HE WAS THE FIRST PERSON TO

18     PLEAD GUILTY.  COUNTS IN HIS FAVOR, NO DOUBT ABOUT IT.  THERE'S

19     AN UNDER-SEAL MOTION WE FILED, AND THAT'S SOMETHING THE COURT

20     SHOULD CONSIDER AS WELL.

21          AND LASTLY I WOULD ADD ON THIS SCORE THAT HE HAS A

22     LOVING FAMILY, SOME OF WHOM ARE HERE TODAY, AND I'M SURE THAT

23     THIS CASE HAS BEEN VERY TAXING ON THEM, AND I THINK THEIR

24     PRESENCE IS SOMETHING THAT THE COURT SHOULD THINK ABOUT.

25          BUT, JUDGE, IT CUTS BOTH WAYS, IT CUTS BOTH WAYS

1     BECAUSE JOHN BELIVEAU HAD EVERYTHING YOU COULD ASK FOR IN HIS

2     CAREER.  HE WAS A GUY WHO WAS NCIS SPECIAL AGENT OF THE YEAR.

3     HOW MANY PEOPLE DO YOU KNOW THAT WORK FOR AN ORGANIZATION OF

4     OVER A THOUSAND PEOPLE THAT ARE SINGLED OUT TO BE THE VERY

5     BEST?  MOST PEOPLE WORK AN ENTIRE CAREER AND NEVER HAVE THAT

6     KIND OF RECOGNITION.  AND THEN HE GETS PROMOTED, PROMOTED TO

7     ONE OF THE MOST PRESTIGIOUS AND SOUGHT-AFTER POSITIONS AT NCIS,

8     DIRECTOR OF THE QUANTICO OFFICE.  HE HAD THAT RESPECT AND HE

9     HAD ADULATION AND HE HAD ADVANCEMENT, BUT IT JUST WASN'T GOOD

10    ENOUGH FOR HIM.  THAT JUST WASN'T GOOD ENOUGH.  HE THREW ALL OF

11    THAT AWAY.  ALL OF THOSE GOOD THINGS HE HAD, HE THREW AWAY.

12          MS. CARMICHAEL MADE A COMMENT AND WHAT SHE SAID WAS

13    THAT "THERE ARE PEOPLE -- TWICE -- IN THIS AUDIENCE THAT ARE

14    ROOTING AGAINST JOHN BELIVEAU."  JUDGE, THESE PEOPLE AREN'T

15    ROOTING AGAINST JOHN BELIVEAU.  THEY WERE DOING THEIR JOBS,

16    WHICH IS MORE THAN I CAN SAY FOR THE DEFENDANT IN THIS CASE.

17          NOW, I THINK WHAT'S ALSO IMPORTANT IS THAT JOHN

18    BELIVEAU, WHEN HE HAD CONVERSATIONS WITH LEONARD FRANCIS,

19    IDENTIFIED THE NAMES OF NCIS AGENTS IN THE CASE, THAT COULD

20    HAVE PUT THEM AT RISK, OKAY?  SO ARE PEOPLE INTERESTED IN THE

21    CASE?  YEAH, THEY'RE INTERESTED IN THE CASE, AND THEY HAVE GOOD

22    REASON TO BE BECAUSE HE PUT THEM AT RISK, AND THEN TO SAY THAT

23    THEY'RE ROOTING AGAINST HIM IS AN INSULT, FRANKLY, JUDGE, AND I

24    DON'T THINK THAT HELPS THE DEFENDANT'S CASE.

25          NOW, I THINK ONE OTHER THING THAT COUNTS AGAINST --

1          THAT MAKES THESE PERSONAL CHARACTERISTICS A DOUBLE-EDGED SWORD

2     IS THE FACT THAT JOHN BELIVEAU USED THE SPECIAL TRAINING THAT

3     THE TAXPAYERS INVESTED IN HIM TO HELP PERPETRATE THE CRIME.

4     WHAT WE WOULD SAY IS THAT HE USED HIS TRADE CRAFT.  HE USED HIS

5     TRADE CRAFT TO PERPETRATE THE CRIME.

6          LET'S LOOK AT EXHIBIT A, AT PAGE 14.  WHAT WE SEE HERE

7     IS BELIVEAU AND FRANCIS DISCUSSING A DROPBOX EMAIL ACCOUNT.  IT

8     MAY NOT MAKE SENSE WHEN YOU'RE LOOKING AT IT, BUT WHAT THESE

9     GUYS ARE DOING IS INSTEAD OF SENDING EMAILS BACK AND FORTH --

10    EMAILS WHEN THEY GO BACK AND FORTH CAN BE TRACKED INTO ONE

11    ACCOUNT OR ANOTHER.  THEY WOULD OPEN UP A MUTUAL EMAIL ACCOUNT,

12    WHICH THEY BOTH HAD ACCESS TO, AND TO COMMUNICATE THEY WOULD

13    SAVE A DRAFT IN THAT EMAIL ACCOUNT RATHER THAN SENDING IT,

14    OKAY?  THAT'S A SPY TECHNIQUE, AND HE'S SHARING IT WITH LEONARD

15    FRANCIS.  SO IT'S TRUE THAT HE DEVOTED HIS LIFE TO LAW

16    ENFORCEMENT, BUT IT'S ALSO TRUE THAT HE TOOK THE LESSONS HE

17    LEARNED IN LAW ENFORCEMENT AND HE USED THEM TO HELP AID THE

18    SCHEME.

19         WE WOULD SUBMIT, JUDGE, THAT THESE OUTLANDISH

20    SENTENCING POSITIONS OF NO CUSTODIAL SENTENCE ARE PROBATIVE OF

21    HIS CHARACTERISTICS BECAUSE THEY SHOW A LACK OF CONTRITION.

22    YOU KNOW, I THINK IT SUGGESTS HE DOESN'T GET IT.  TO SAY --

23    AFTER ALL HE'S DONE, TO COME IN HERE AND SAY, "I SHOULDN'T HAVE

24    TO GO TO JAIL AT ALL," SHOWS HE DOESN'T GET IT.  CANDIDLY, I

25    WONDER WHETHER HE POSES A RISK OF RECIDIVISM.

1          SO WHAT DID HE GET OUT OF IT?  WELL, I THINK WHAT HE

2     GOT OUT OF IT IS IMPORTANT FOR HIS CHARACTERISTICS BECAUSE HE

3     GOT SO LITTLE.  HE GOT $30,000 IN PROSTITUTES AND CASH AND

4     ENTERTAINMENT.  I THINK TO SAY THAT HE WOULD TAKE SO MUCH RISK

5     AND RISK SO MUCH DAMAGE FOR SO LITTLE SHOWS AN EXTRAORDINARILY

6     SELF-CENTERED WORLD VIEW.  HE JEOPARDIZED CASES.  HE PUT PEOPLE

7     AT RISK.  HE SULLIED THE FINE REPUTATION OF THE NCIS, THE

8     AGENCY THAT HAD GIVEN HIM SO MUCH, ALL THE ACCOLADES, ALL THE

9     ACCOMMODATIONS, THE PROMOTIONS THAT HE THREW OUT THE WINDOW.

10    HE THREW IT ALL AWAY FOR $30,000.

11          MOST IMPORTANTLY THOUGH ON HIS CHARACTER, I THINK

12    THROUGHOUT THE TEXT AND COMMUNICATIONS THAT YOU SEE, IT SHOWS

13    THAT JOHN BELIVEAU HAS A MINDSET WHERE PEOPLE TO HIM ARE

14    OBJECTS, THEY'RE OBJECTS TO BE USED, OBJECTS THAT ARE THERE TO

15    GRATIFY HIM OR GIVE HIM THINGS.  WE SEE THAT PART OF THE CRIME

16    WAS TAKING PROSTITUTES, I THINK THAT'S A PART OF THE EQUATION.

17          I WOULD LIKE TO POINT TO EXHIBIT A, AT PAGE 8, THIS IS

18    MR. FRANCIS AND MR. BELIVEAU DISCUSSING AN NCIS AGENT, AND MR.

19    BELIVEAU HAS IDENTIFIED THE IDENTITY OF ONE OF THE AGENTS ON

20    THE CASE INVESTIGATING GDMA, AND HE COMMENTS, "SHE'S

21    INCOMPETENT.  I'VE KNOWN HER FOR YEARS."  FRANCIS ASKS A

22    QUESTION AND BELIVEAU RESPONDS, "THE AGENT IS A STUPID C-U-N-T.

23    I KNOW HER.  IF SHE SAID BILLIONS, HA-HA, SHE BETTER BE ABLE TO

24    PROVE IT, AND SHE CAN'T, SO SHE'S GOING TO LOOK STUPID."

25          HOW CAN YOU SAY THAT ABOUT ANYBODY?  HOW COULD THAT

1        THOUGHT ENTER YOUR MIND ABOUT ANYBODY, AND HOW COULD THAT

2        THOUGHT ENTER YOUR MIND ABOUT YOUR COLLEAGUE, SOMEBODY YOU WORK

3        WITH?  MAYBE YOU DON'T LIKE THEM, MAYBE YOU DON'T HANG OUT WITH

4        THEM, BUT THEY'RE AT THE SAME PLACE, THEY HAVE THE SAME MISSION

5        FOR YOU.  EVEN IF YOU DID THINK THAT ABOUT SOMEBODY ELSE, HOW

6        COULD YOU SAY IT TO A TARGET OF A CRIMINAL INVESTIGATION IN

7        WRITING?  IT BOGGLES THE MIND, JUDGE.  IT ABSOLUTELY -- I DON'T

8        UNDERSTAND IT, BUT WHAT I CAN SAY IS YOU SHOULD CONSIDER THIS

9        WHEN ASSESSING THIS TYPE OF PERSONALITY THAT YOU'RE GOING TO

10       SENTENCE TODAY.

11            THE SENTENCE THAT WE SEEK IS NECESSARY TO REFLECT THE

12       SERIOUSNESS OF THE CRIME, AND ONE OF THE MOST IMPORTANT PARTS

13       OF OUR DEMOCRACY IS HAVING A COURT SYSTEM THAT PEOPLE TRUST.

14       FOR PEOPLE TO TRUST THE COURTS, THEY HAVE TO HAVE FAITH IN

15       THOSE WHO ARE CHARGED WITH ADMINISTERING JUSTICE, AND WHEN

16       PEOPLE LOSE FAITH WITH THOSE CHARGED WITH ADMINISTERING

17       JUSTICE, THERE'S A DANGER THAT THEY LOSE FAITH IN THE

18       LEGITIMACY OF THE COURTS.  SO WHEN THE PUBLIC HEARS ABOUT THESE

19       TYPES OF OFFENSES, IT CAUSES US TO THINK LESS OF THE WAY WE

20       ADMINISTER JUSTICE.  AND THAT, OF ALL THE HARMS THAT I'VE

21       IDENTIFIED, JUDGE, I THINK IS PROBABLY THE WORST.

22            AND SO I WOULD LIKE TO CLOSE ON SOME COMMENTARY I HEARD

23       THE OTHER DAY THAT MADE ME THINK ABOUT THE CASE AND THAT HELPED

24       ME THINK ABOUT THE CASE.  EVERY OCTOBER, AT THE CHURCH WHERE I

25       GOT MARRIED, THEY HAVE WHAT'S CALLED A RED MASS, AND THE RED

1    MASS IS FOR MEMBERS OF THE SUPREME COURT.  IT'S ON THE SUNDAY

2    BEFORE THE FIRST TERM.  I FINALLY RETURNED TO THE CHURCH --

3    EVEN THOUGH I DON'T REALLY GO, I WILL SAY THAT I DID ATTEND

4    THIS EVENT, AND AT THE RED MASS THE HOMILIST THERE OBSERVED

5    THAT PEOPLE HAVE OFTEN HYPOCRITICAL VIEWS OF HOW JUSTICE SHOULD

6    BE ADMINISTERED, AND WHAT HE SAID WAS "PEOPLE WANT JUSTICE FOR

7    OTHERS BUT MERCY FOR THEMSELVES."  ISN'T THAT TRUE OF JOHN

8    BELIVEAU, A MAN WHO SPENT HIS LIFE ENFORCING THE LAW AND

9    HOLDING OTHER PEOPLE TO ACCOUNT NOW STANDS BEFORE YOU SEEKING A

10   FREE PASS.  HE DOESN'T DESERVE A FREE PASS, AND HE SHOULDN'T

11   GET ONE.

12        SO UNLESS THE COURT HAS ANY OTHER QUESTIONS ABOUT OUR

13   SUBMISSION, THE GUIDELINES.

14        THE COURT:  I DO HAVE A QUESTION ABOUT THE GUIDELINES.

15   DO YOU WANT TO TAKE IT OR DO YOU WANT MR. PLETCHER.  I JUST

16   WANT TO KNOW YOUR THOUGHTS ON THE 20 BECAUSE I THINK IT'S TRULY

17   AN 18 BASED ON THE CURRENT GUIDELINES BECAUSE THEY DO WORK TO

18   MR. BELIVEAU'S ADVANTAGE.

19        MR. PLETCHER:  YOUR HONOR, WE FACED THIS CIRCUMSTANCE

20   IN ONE OF THE PREVIOUS SENTENCINGS.  THE ORIGINAL GUIDELINE

21   RANGE WAS 7 TO $20 MILLION, SO AS REFLECTED IN THE PLEA

22   AGREEMENT, THE VERBIAGE THAT WAS ADOPTED IN THE PLEA AGREEMENT

23   SAYS OVER $7 MILLION, OVER $7 MILLION, AND THEN THE RESTITUTION

24   AMOUNT IS THE $20 MILLION FIGURE.  THAT WAS MEANT TO INVOKE

25   THAT GUIDELINE RANGE OF 7 TO $20 MILLION.  BECAUSE THE LOSS IN

1    THIS CASE IS MUCH HIGHER, THE OPERATIVE FIGURE IS STILL 7 TO

2    $20 MILLION.  NOW THE GUIDELINE RANGE HAS SHIFTED FROM TO 9

3    AND-A-HALF TO $25 MILLION AT THE 20, SO BECAUSE THE LOSS THAT

4    WAS ORIGINALLY ENVISIONED NOW FALLS WITHIN THE HIGHER

5    GUIDELINE, IT'S STILL A 20.  THE LOSS NEVER WAS 7.  IT WAS

6    ALWAYS OVER 7 UP TO THE CAP.

7        THE COURT:  DIDN'T HE ADMIT IN THE PLEA AGREEMENT TO

8    THE $7 MILLION FIGURE?  ISN'T THAT THE FACTUAL BASIS FOR WHAT

9    WE'RE DOING HERE?

10       MR. PLETCHER:  I THINK IT SAID AT LEAST AS MUCH OR OVER

11    $7 MILLION.

12       THE COURT:  LET ME DOUBLE-CHECK BECAUSE I THINK WE HAVE

13    TO LIVE WITH WHATEVER THAT WAS.  LET ME JUST QUICKLY CHECK

14    THAT.  YOU MAY BE ABLE TO FIND IT FASTER.

15       MR. PLETCHER:  IT'S ON PAGE 12, PARAGRAPH 11 AT THE

16    VERY BOTTOM, THE LOSS TO THE GOVERNMENT FROM THESE --

17       THE COURT:  PAGE 12?

18       MR. YOUNG:  PAGE 12 AT THE VERY TOP OF THE PAGE.

19       THE COURT:  SO 7 MILLION OR MORE.

20       MR. PLETCHER:  IT WAS MORE THAN 7 MILLION, AND SO THAT

21    WAS JUST MEANT TO INVOKE THE GUIDELINE RANGE OF 7 TO

22    $20 MILLION THAT'S THEN FOUND IN THE GUIDELINE CALCULATION.

23       THE COURT:  YOU'RE SAYING IT'S STILL 20.

24       MR. PLETCHER:  IT HAS ALWAYS BEEN MORE THAN 9.5, WHICH

25    IS THE 20.  IT'S ALWAYS BEEN 20 MILLION OR MORE.

```
 1                THE COURT:  OKAY.

 2                MR. PLETCHER:  SO BECAUSE THAT HAS NOW SIMPLY SHIFTED

 3      TO 9 AND-A-HALF TO 25 MILLION, THE APPROPRIATE GUIDELINE RANGE,

 4      EVEN UNDER TODAY'S GUIDELINES, IS STILL THE $20 MILLION.

 5                THE COURT:  FAIR ENOUGH.  SO YOU'RE COMFORTABLE WITH

 6      THE 20.  LET ME JUST ASK THIS, SO THE GOVERNMENT'S POSITION IS

 7      180 MONTHS?

 8                MR. PLETCHER:  YES, THE GUIDELINE RANGE IS --

 9                THE COURT:  THAT'S A MID-RANGE FIGURE.

10                MR. PLETCHER:  -- 168 TO 210, AFTER TAKING INTO ACCOUNT

11      ACCEPTANCE OF RESPONSIBILITY AND THE SEALED FILING, THE

12      RESULTING GUIDELINE RANGE IS 168 TO 210, AND THE GOVERNMENT'S

13      RECOMMENDATION IS 180 MONTHS.

14                THE COURT:  VERY WELL.  THANK YOU.

15                MS. CARMICHAEL:  YOUR HONOR, MAY I HAVE A FEW MINUTES

16      TO RESPOND?

17                THE COURT:  YOU MAY BUT AFTER PROBATION.  I'LL COME

18      BACK TO YOU AND YOU CAN HAVE A FEW MOMENTS AT THE END, MA'AM.

19                MS. CARMICHAEL:  THANK YOU, YOUR HONOR.

20                THE COURT:  LET ME HEAR FROM PROBATION, IF THERE'S

21      ANYTHING TO ADD, SIR.

22                THE PROBATION OFFICER:  JUST TWO THINGS, YOUR HONOR.

23      KEVIN PAGAY WITH U.S. PROBATION.

24                AT THE BEGINNING MS. CARMICHAEL MADE THE REPRESENTATION

25      THAT HER CLIENT UPPED HIS DOSAGE IN SEROQUEL TO 200 MILLIGRAMS,
```

1      AND REQUESTED THAT THE PRESENTENCE REPORT BE AMENDED; IS THAT

2      THE COURT'S WISHES?

3              THE COURT:  THAT'S FINE.  IT CAN BE AMENDED TO REFLECT

4      THAT.

5              THE PROBATION OFFICER:  PERFECT.  IF THE COURT HAS NO

6      OTHER QUESTIONS.

7              THE COURT:  NO.  YOUR RECOMMENDATION, YOU'VE BEEN MORE

8      PRECISE THAN OTHERS IN THIS, AND WE DO HAVE TWO COUNTS, AND

9      YOU'RE RECOMMENDING 60 MONTHS, WHICH IS THE STAT MAX ON THE

10     FIRST COUNT AND 84 ON THE SECOND COUNT FOR A TOTAL OF

11     144 MONTHS.

12             THE PROBATION OFFICER:  THAT'S CORRECT, YOUR HONOR.

13             THE COURT:  VERY GOOD.  THANK YOU.

14             CERTAINLY.  GO AHEAD, MS. CARMICHAEL.

15             MS. CARMICHAEL:  THANK YOU, YOUR HONOR.  THE GOVERNMENT

16     AGAIN FRAMES THIS CASE IN TERMS OF MR. BELIVEAU'S KNOWLEDGE,

17     BUT FAILS TO DISCUSS THE INDIVIDUALS WHICH HAD -- WHO HAD THE

18     SAME LEVEL OF KNOWLEDGE AND MORE, SUCH AS ED ARUFFO AND

19     MISIEWICZ ALSO HAD THE KNOWLEDGE.  WHAT ABOUT SIMPKINS, WHO

20     WORKED FOR FISC, WHO OVERSAW THESE CONTRACTS AND HE ACCEPTED

21     OVER $300,000 IN BRIBES.  THESE INDIVIDUALS, DEBORD AS WELL,

22     HAD THIS SAME LEVEL OF KNOWLEDGE IF NOT MORE.  ED ARUFFO

23     DEVISED AND IMPLEMENTED THAT SCHEME, AND HE HAS A 5-YEAR

24     MAXIMUM.  MR. BELIVEAU'S LEVEL OF KNOWLEDGE IS NO GREATER THAN

25     MANY, MANY OTHER INDIVIDUALS IN THIS CONSPIRACY.

1        SECONDLY, YOUR HONOR, THE GOVERNMENT SAYS THAT MR.

2    BELIVEAU WAS FRANCIS'S RIGHT-HAND MAN, BUT, YOUR HONOR, THEY'VE

3    COME BEFORE THIS COURT AND SAID THAT AT LEAST TWO OTHER

4    INDIVIDUALS WERE FRANCIS'S RIGHT-HAND MAN.  THERE WAS A LITTLE

5    BRO, AND A BIG BRO, AND THEN THERE WAS THE GOLDEN ASSET, AND,

6    YOUR HONOR, EVERYONE CANNOT BE LEONARD GLENN FRANCIS'S

7    RIGHT-HAND MAN.  THERE'S NO EVIDENCE TO SUPPORT HE WAS WORKING

8    RIGHT ALONGSIDE FRANCIS FOR A SEVEN-YEAR DURATION AS OTHER

9    DEFENDANTS IN THIS CASE.  THERE ARE ALSO NO NICKNAMES

10    ASSOCIATED WITH HIM TO INSINUATE THAT HE WOULD HAVE BEEN THE

11    RIGHT-HAND MAN, LIKE LITTLE BRO AND BIG BRO AND GOLDEN GOOSE OR

12    GOLDEN ASSET.

13        NOW, I WOULD LIKE TO JUST TOUCH A LITTLE BIT ON THE

14    EXHIBITS THAT THE GOVERNMENT POINTED TO, THE MESSAGES.  YOUR

15    HONOR, THOSE ARE INSULTING MESSAGES.  THEY ARE NOT GOOD

16    MESSAGES.  THEY ARE NOT PLEASANT TO READ, BUT I WOULD POINT OUT

17    THAT THE GOVERNMENT HAS HUNDREDS IF NOT THOUSANDS OF MESSAGES

18    IN THIS CASE, ESPECIALLY TO AND FROM MR. BELIVEAU, WHO WAS IN

19    AN OBSESSIVE COMPULSIVE STATE SENDING MESSAGE AFTER MESSAGE,

20    EMAIL, TEXT, SKYPE.  HE WAS CLINICALLY OBSESSED WITH THIS MAN.

21    THEY HAVE PICKED THE FEW WORST INDIVIDUAL MESSAGES TO SHOW THE

22    COURT HERE TODAY.  AND, YES, HE INSULTED A COLLEAGUE, AND IT

23    WAS TERRIBLE, BUT IT IS NOT WORTH 15 YEARS IN PRISON, A TEXT

24    MESSAGE INSULTING A COLLEAGUE.  WHAT THESE TEXT MESSAGES ARE

25    ARE RAMBLINGS OF AN ILL MAN, AND IT SHOULD NOT BE USED TO SAY

1    THAT MR. BELIVEAU NEEDS 15 YEARS IN PRISON.

2         YOUR HONOR, I WOULD LIKE TO ALSO DISCUSS THE WITNESS

3    OUT -- THAT THE GOVERNMENT MENTIONED BECAUSE I DO THINK THAT

4    THIS IS AN IMPORTANT ISSUE, THE COOPERATING WITNESS.  NOW, YOUR

5    HONOR, AFTER MR. BELIVEAU PLED GUILTY THREE YEARS AGO, HE

6    BECAME A COOPERATING WITNESS, AND IN THAT TIME, ACTUALLY

7    SHORTLY -- RIGHT BEFORE HIS GUILTY PLEA, TWO NCIS AGENTS,

8    SPEAKING ON CONDITION OF ANONYMITY, SO I HAVE NO IDEA WHO THESE

9    AGENTS WERE, SPOKE TO THE WASHINGTON POST AND SAID THAT MR.

10   BELIVEAU WAS COOPERATING, HE WAS A WITNESS FOR THE GOVERNMENT,

11   AND SAID HE WAS COOPERATING, AND IT ENDANGERED HIS LIFE.  SO,

12   YOUR HONOR, IT'S NOT RIGHT ON EITHER END, BUT IT'S ALSO NOT

13   RIGHT TO USE CONDUCT THAT THEY THEMSELVES ENGAGED IN TO INFLATE

14   MR. BELIVEAU'S PLACE WITHIN THIS CONSPIRACY.

15        AS FOR THE NCIS'S STATEMENT HERE TODAY, MR. BELIVEAU

16   HAS APOLOGIZED AND ASKED FOR FORGIVENESS FOR THE HARM THAT HE

17   CAUSED HIS NCIS COLLEAGUES, AND HE RECOGNIZES THAT THERE WAS

18   HARM CAUSED.  THE GENTLEMAN DISCUSSED DIVERTING RESOURCES IN

19   THIS CASE, AND THAT IS INCONVENIENT, YOUR HONOR, BUT IT'S NOT

20   WORTH 15 YEARS IN PRISON.  AND HE DISCUSSED SCEPTICISM THAT HE

21   IS MET WITH IN MEETINGS, AND THAT'S TROUBLING, YOUR HONOR, BUT

22   IT'S NOT WORTH 15 YEARS IN PRISON.

23        FINALLY, YOUR HONOR, AND I HAVE TO MAKE THIS VERY, VERY

24   IMPORTANT POINT, THAT IS THAT THE GOVERNMENT HAS DISCUSSED MR.

25   BELIVEAU'S MENTAL HEALTH CONDITIONS WITH SUCH HEARTLESSNESS AND

1      SUCH INSULT THAT THAT IS PART OF THE REASON WHY OUR VETERANS

2      AND OUR CIVILIANS SERVING OUR COUNTRY HAVE A STIGMA ASSOCIATED

3      WITH POST-TRAUMATIC STRESS DISORDER.  THEY MENTION THAT THIS

4      INCIDENT WAS NOT DOCUMENTED.  THAT MAY BE TRUE, YOUR HONOR, BUT

5      WE ADDRESSED THAT SQUARELY IN OUR POSITION.  MR. BELIVEAU DID

6      NOT WANT TO TALK ABOUT IT.  HE WANTED IT TO GO AWAY.  LIKE MANY

7      OTHER SERVICE MEMBERS AND CIVILIANS WHO PATROL OUR FRONT LINES

8      AND SEE TERRIBLE, TERRIBLE THINGS, TO CALL THEIR CONDITIONS

9      NONSENSE AND AN ALPHABET SOUP IS INSULTING, AND IT SHOULD NOT

10     BE THAT WAY IN THIS COURT TODAY.

11          DR. FONTE CAME ALL THE WAY HERE FROM PENNSYLVANIA.

12     HE'S NEVER SPOKEN IN A COURTROOM BEFORE.  HE'S NOT A FORENSIC

13     PSYCHIATRIST.  HE'S HERE BECAUSE MR. BELIVEAU'S CONDITIONS ARE

14     SEVERE, AND THEY WILL TROUBLE HIM FOR THE REST OF HIS LIFE, AND

15     PART OF THAT CONDITION WAS INCURRED -- PART OF THAT IRREPARABLE

16     HARM WAS INCURRED IN SERVICE TO HIS COUNTRY.

17          MR. YOUNG:  MAY I HAVE JUST ONE POINT, JUDGE?

18          THE COURT:  YES, YOU MAY.

19          MR. YOUNG:  I DIDN'T INTEND TO SAY THAT OCD AND PTSD

20     DON'T EXIST.  I INTENDED TO SAY IT DOESN'T EXCUSE HIS BEHAVIOR,

21     AND HE WAS HIDING BEHIND IT.  I RECOGNIZE THOSE ARE CONDITIONS.

22     I'M SUGGESTING THAT THEY DIDN'T IMPACT HIS SENTENCE -- OR THE

23     WAY HE WENT ABOUT THE CRIMES.

24          THE ONLY THING I WOULD LIKE TO ADDRESS, UNLESS THE

25     COURT WANTS TO HEAR, IS THE SUGGESTION THAT TWO NCIS AGENTS

1    LEAKED THE FACT OF MR. BELIVEAU'S COOPERATION, AND IT'S JUST

2    NOT ACCURATE.  THERE WAS A WASHINGTON POST ARTICLE IN DECEMBER

3    OF 2013, SHORTLY BEFORE MR. BELIVEAU ENTERED HIS GUILTY PLEA --

4    YOU CAN GOOGLE IT AND FIND IT -- AND IT QUOTES TWO ANONYMOUS

5    SOURCES SAYING THAT BELIVEAU WAS COOPERATING.  THE ARTICLE

6    SIMPLY DOES NOT SAY THAT THEY WERE NCIS SOURCES.

7         I DON'T KNOW WHO THE SOURCES ARE.  I CAN'T EXCLUDE THAT

8    THEY WERE FROM NCIS, BUT I HAVE NO REASON TO BELIEVE THAT THEY

9    WERE.  IF I FIND OUT THAT THEY WERE, YOU KNOW, SOMEBODY IN THE

10   NAVY, WELL, THAT WOULD MERIT THE ATTENTION OF THE GRAND JURY,

11   BUT I THINK IT'S A FAR CRY -- I WANT TO BE CLEAR THAT THE STORY

12   DOES NOT ATTRIBUTE THE STATEMENTS TO ANYBODY IN NCIS.  IT'S NOT

13   ACCURATE, AND SO I WANT TO MAKE THAT CLEAR BECAUSE WE HAVE

14   PEOPLE IN THE ROOM THAT CARE ABOUT THIS ISSUE.

15        MS. CARMICHAEL:  YOUR HONOR, I DISPUTE THAT, AND I'VE

16   SEEN THE ARTICLE.

17        THE COURT:  WE'RE NOT GOING TO RESOLVE THAT TODAY.

18   SUFFICE IT TO SAY, SOME NEWSPAPER ARTICLE RECOUNTED THAT MR.

19   BELIVEAU MIGHT BE COOPERATING.  I DON'T THINK THAT'S A MAJOR

20   FACTOR IN ANY OF THIS, TO BE QUITE HONEST.

21        SO THAT'S EVERYTHING FROM THE GOVERNMENT, EVERYTHING

22   FROM THE DEFENSE.  PROBATION HAS WEIGHED IN.  I WOULD LIKE TO

23   TAKE A SHORT, FIVE -- LET'S SAY 10-MINUTE BREAK AND COME BACK,

24   AND THEN IT'S THE COURT'S OPPORTUNITY TO SPEAK ABOUT THIS.

25   THANK YOU.

```
 1              MS. CARMICHAEL:  THANK YOU, YOUR HONOR.
 2         (COURT WAS AT RECESS.)
 3              MS. CARMICHAEL:  YOUR HONOR, I APOLOGIZE, I FORGOT TO
 4         ACKNOWLEDGE MR. BELIVEAU'S FAMILY IN THE COURT HERE TODAY AND I
 5         JUST WANTED TO DO THAT.
 6              THE COURT:  CERTAINLY.  THEY'RE SITTING IN THE FRONT
 7         ROW RIGHT BEHIND HIM, CORRECT?
 8              MS. CARMICHAEL:  YES, YOUR HONOR.
 9              THE COURT:  THANK YOU FOR COMING.
10              THE COURT HAS ADEQUATE INFORMATION TO EXERCISE
11         SENTENCING DISCRETION THIS AFTERNOON.  I KNOW THIS CASE PRETTY
12         WELL BY NOW, AND EACH TIME SOMEBODY HAS COME BEFORE THE COURT
13         THEIR POSITION IN THE TOTAL SCHEME OF THINGS HAS BEEN A LITTLE
14         DIFFERENT, AND TODAY THE SCHEME AND THE POSITION OF MR.
15         BELIVEAU IS VERY DIFFERENT THAN THE OTHERS I HAVE SEEN THUS
16         FAR.
17              FOR THE SAKE OF FAMILY THAT ARE HERE, I'M LOOKING FOR A
18         SENTENCE THAT'S SUFFICIENT BUT NOT GREATER THAN WHAT IS
19         NECESSARY, LOOKING AT THE TOTALITY OF THE CIRCUMSTANCES THAT
20         ARE BROUGHT BEFORE ME TODAY, THAT'S THE NATURE AND
21         CIRCUMSTANCES OF THE OFFENSE, THE HISTORY AND CHARACTERISTICS
22         OF MR. BELIVEAU, THE SERIOUSNESS OF THE OFFENSE, AND THE NEED
23         TO PROMOTE RESPECT FOR THE LAW AND PROVIDE A JUST PUNISHMENT.
24         I'M SUPPOSED TO CONSIDER DETERRENCE.  I'M TO PROTECT THE
25         PUBLIC, AVOID SENTENCING DISPARITIES, AND PROVIDE RESTITUTION.
```

1        WHEN WE THINK OF LAW ENFORCEMENT IN THIS COUNTRY, WE

2    THINK OF TRUST AND HONESTY AND ETHICAL BEHAVIOR AS BEING

3    ESSENTIAL TO LAW ENFORCEMENT AGENCIES ACCOMPLISHING THEIR

4    MISSIONS, AND WE'VE HEARD, AND I HAD IT IN WRITING FROM THE

5    DIRECTOR'S LETTER TO THE COURT, THAT MR. BELIVEAU'S CONDUCT

6    CAST A SHADOW ON NCIS, AND THAT'S BEING KIND.  I THINK IT CAST

7    MORE THAN A SHADOW, AND IT CAST A SHADOW ON THE ABILITY OF THE

8    AGENCY TO ACCOMPLISH ITS MISSION.  IT'S REALLY VERY DIFFICULT

9    TO QUANTIFY THE EXTENT OF THE DAMAGE AND THE DURATION OF THE

10   HARM ON THE AGENCY.

11        MANY PEOPLE WERE PLACED AT RISK, AND IN THE MIDDLE OF

12   WHAT WAS PROBABLY THE LARGEST FRAUD INVESTIGATION THAT THE

13   AGENCY FACED, AND CERTAINLY THE LARGEST INVESTIGATION INTO

14   FRAUD WITH THE UNITED STATES NAVY, THERE WAS A DIVERSION, AND

15   MR. BELIVEAU, YOU WERE THE DIVERSION WHILE YOU BECAME

16   INVESTIGATED AND THERE WAS A NEED TO DETERMINE WHETHER ANYBODY

17   ELSE WAS COMPROMISING THE INVESTIGATION.  SO NUMEROUS, NUMEROUS

18   PEOPLE WERE I CAN THINK OF NO OTHER WORD THAN TO SAY THEY WERE

19   BETRAYED BY YOUR CONDUCT.

20        NOW, HAVING SAID THAT, I APPRECIATE THAT THERE ARE

21   FACTORS IN MITIGATION THAT HAVE BEEN PRESENTED.  I HAVE READ AT

22   LENGTH, AND APPRECIATE THE DOCTOR'S APPEARANCE THIS AFTERNOON,

23   THAT YOU HAVE A VARIETY OF THINGS, BUT -- I'M NOT SURE I CAN

24   FIND IT, BUT I DON'T THINK ANYBODY WOULD DISAGREE, AND IT'S

25   ACTUALLY IN ONE OF THE MEDICAL LETTERS, THAT THERE WAS NOTHING

1      ABOUT WHAT YOU WERE EXPERIENCING, WHILE IT DID IMPACT YOUR

2      JUDGMENT, AND ALL DEFENDANTS HAVE POOR JUDGMENT, I HAVE TO

3      AGREE WITH THAT COMMENT THAT WAS MADE BY THE GOVERNMENT, BUT

4      THERE WAS NOTHING ABOUT IT THAT IMPACTED YOUR ABILITY TO KNOW

5      RIGHT FROM WRONG.  YOU KNEW WHAT YOU WERE DOING, ALTHOUGH YOUR

6      JUDGMENT MAY HAVE BEEN INFLUENCED BY YOUR CONDITIONS, AND I

7      APPRECIATE THAT, SIR, AND I UNDERSTAND THAT.

8           WHILE WE WERE ON BREAK, I TOOK A LOOK, AND THE

9      GOVERNMENT IS CORRECT THAT IT SHOULD BE A PLUS 20 ON THE AMOUNT

10     OF LOSS.  I DOUBLE-CHECKED ON THAT.  I'M GOING TO PROCEED BY

11     MAKING THE NECESSARY GUIDELINE CALCULATION THAT NEEDS TO BE

12     MADE HERE, AND I WILL ATTEMPT TO EXPLAIN AS I GO THROUGH THIS.

13          THE BASE OFFENSE LEVEL IS A 14.  BECAUSE OF MORE THAN

14     ONE BRIBE BEING INVOLVED, THERE'S A PLUS 2 ADDED.  BECAUSE

15     THERE WAS $7 MILLION MINIMUM INVOLVED, THERE'S A PLUS 20 ADDED.

16     BECAUSE OF THE SENSITIVE NATURE, MR. BELIVEAU, OF YOUR POSITION

17     A PLUS 4 IS ADDED.  AND BECAUSE OF ALL THE THINGS THAT WERE

18     DONE IN THIS CASE, THERE'S A PLUS 2 FOR OBSTRUCTION OF JUSTICE,

19     AND THAT ADDS UP TO --

20          YES, SIR.

21          MR. PLETCHER:  SORRY, YOUR HONOR.  USING TODAY'S

22     GUIDELINES, I THINK THE COURT IS FINDING A LOSS OF MORE THAN 9

23     AND-A-HALF MILLION TO REACH THE PLUS 20 AS OF TODAY.

24          THE COURT:  OKAY.  I MISSPOKE.  IS THAT WHAT YOU'RE

25     SAYING, MR. PLETCHER, I MISSPOKE?

1          MR. PLETCHER:  YES.

2          THE COURT:  THANK YOU.  LET ME DOUBLE-CHECK MY MATH,

3     AND, PLEASE, COUNSEL, GO ALONG WITH ME.  IT'S A 42 ADJUSTED

4     OFFENSE LEVEL.

5          YOU'VE ACCEPTED, MR. BELIVEAU, RESPONSIBILITY FOR WHAT

6     OCCURRED HERE, AND THAT'S A 3-POINT REDUCTION, TAKING ME DOWN

7     TO A TOTAL OFFENSE LEVEL OF 39.  YOU HAVE NO CRIMINAL HISTORY

8     POINTS.  YOU'RE IN CRIMINAL HISTORY CATEGORY 1, AND THAT RANGE

9     OF IMPRISONMENT IS 262 TO 327 MONTHS.  NOW, THE GOVERNMENT'S

10    MOVING FOR A 4-POINT REDUCTION FOR THE REASONS SET FORTH IN

11    THEIR MOTION, AND I WILL ACCEPT THAT AND GO FORWARD.

12         SO WHAT OCCURS AT THIS POINT IS THE COURT'S

13    DETERMINATION AS TO WHETHER TO EXERCISE ANY DISCRETION, EITHER

14    BY WAY OF A VARIANCE OR A DEPARTURE, MR. BELIVEAU --

15         AND I GUESS I SHOULD HAVE ASKED, MS. CARMICHAEL, FOR

16    YOU AND YOUR CLIENT TO COME TO THE PODIUM.  IF YOU WOULD STAND

17    OVER HERE AT THE PODIUM, SIR.

18         I HAVE A LOT OF FACTORS TO CONSIDER, MR. BELIVEAU, IN

19    GOING FORWARD AS TO WHETHER OR NOT TO EXERCISE THE COURT'S

20    DISCRETION.  A GREAT DEAL OF HARM OCCURRED AS A RESULT OF YOUR

21    CONDUCT, SIR, AND I THINK YOU DO APPRECIATE THAT.  YOU HAVE

22    PRESENTED SOME FACTORS FOR THE COURT'S CONSIDERATION, AND I DO

23    TAKE THEM SERIOUSLY, AND I DO CONSIDER THEM CAREFULLY.

24         WHAT I'M GOING TO DO IS TAKE A SMALL REDUCTION BY WAY

25    OF A COMBINATION THAT WILL CONSIDER THE -- ALL THE FACTORS

1    RAISED BY YOUR COUNSEL, AND THAT'S GOING TO BE THE MINUS 4 FOR

2    THE GOVERNMENT'S MOTION AND A MINUS 2 FOR COMBINATION, WHICH

3    WOULD TAKE ME DOWN TO A TOTAL OFFENSE LEVEL OF 33, AND A RANGE

4    OF IMPRISONMENT OF 135 TO 168 MONTHS.

5          NOW, I'M GOING TO TELL YOU I THINK YOUR CASE DOES

6    WARRANT CUSTODIAL TIME, MR. BELIVEAU.  I THINK THE NATURE OF

7    THIS OFFENSE IS AN EXTRAORDINARILY SERIOUS ONE.  I THINK THE

8    CONCERN THAT THE COURT HAS IS FOR GENERAL DETERRENCE TO OTHER

9    LAW ENFORCEMENT AGENCIES.  I THINK -- SPECIFIC DETERRENCE, I

10   THINK YOU'LL NEVER BE BACK HERE BEFORE ME, AND I'M GOING TO DO

11   THE FOLLOWING:  I'M GOING TO IMPOSE 144 MONTHS ON COUNT 2, AND

12   I'M GOING TO IMPOSE 60 MONTHS ON COUNT 1 TO RUN CONCURRENTLY,

13   WHICH MEANS IT'S A TOTAL OF 144 MONTHS.

14         WHILE YOU'RE IN CUSTODY, MR. BELIVEAU, I WANT YOU TO

15   GET ALL THE HELP THAT YOU NEED, SIR.  THE FIRST THING I'M GOING

16   TO DO IS ORDER THAT HE BE IN THE RDAP PROGRAM BECAUSE IT'S VERY

17   CLEAR TO THE COURT THAT YOUR SELF-MEDICATION, SIR, WITH ALCOHOL

18   WAS A FACTOR IN ALL OF THIS, AND YOU COULD GET HELP FOR THAT,

19   AND IT'S A GOOD PROGRAM.  I THINK YOU WILL BENEFIT, AND AS MS.

20   CARMICHAEL WILL TELL YOU, IT DOES CARRY WITH IT SOME CUSTODIAL

21   CREDIT.  THERE ARE OTHER PRODUCTIVE THINGS YOU CAN DO WHILE

22   YOU'RE IN CUSTODY, SIR.

23         THIS IS GOING TO BE FOLLOWED BY A 3-YEAR PERIOD OF

24   SUPERVISION, AND DURING THOSE 3 YEARS, YOU'RE NOT TO VIOLATE

25   ANY LAWS.  YOU CAN THINK OF IT AS A TIME WHEN IF YOU VIOLATE A

1    LAW, YOU COULD BE BROUGHT BACK BEFORE THE COURT AND YOU COULD

2    SERVE ADDITIONAL TIME IN CUSTODY, AND I DON'T THINK THAT'S

3    GOING TO BE AN ISSUE IN YOUR CASE.

4         ALL THE STANDARD CONDITIONS OF SUPERVISION APPLY, BUT

5    IN ADDITION THERE ARE GOING TO BE A NUMBER OF SPECIAL

6    CONDITIONS THAT APPLY.

7         THE FIRST IS A SEARCH CONDITION, THAT YOU SUBMIT YOUR

8    PERSON, YOUR PROPERTY, YOUR RESIDENCE, YOUR OFFICE, YOUR

9    VEHICLE TO A SEARCH CONDUCTED BY PROBATION, PROVIDED THE SEARCH

10   IS DONE AT A REASONABLE TIME, IN A REASONABLE MANNER, BASED ON

11   A REASONABLE SUSPICION OF CONTRABAND OR EVIDENCE OF A VIOLATION

12   OF A CONDITION OF RELEASE.  IF YOU FAIL TO SUBMIT TO A SEARCH,

13   THAT CAN BE GROUNDS FOR REVOKING YOUR SUPERVISION.  YOU MUST

14   LET WHOEVER LIVES WITH YOU KNOW THAT THE HOME COULD BE SUBJECT

15   TO SEARCH.

16        NUMBER TWO IS THAT YOU PARTICIPATE IN A MENTAL HEALTH

17   PROGRAM AS DIRECTED BY PROBATION, AND TAKE ALL MEDICATIONS AS

18   PRESCRIBED.

19        I SHOULD HAVE INDICATED THAT WHILE IN CUSTODY I WANT

20   YOU TO BE IN A MENTAL HEALTH PROGRAM.  ALSO, I WANT YOU TO

21   RECEIVE ALL MEDICATIONS AS PRESCRIBED CURRENTLY BY YOUR

22   PHYSICIANS.  I KNOW THERE'S A CONCERN ABOUT THAT, BUT THAT CAN

23   BE ACCOMPLISHED.  I'M GLAD THAT PROBATION IS CHANGING THE

24   DOSAGE ON YOUR MEDICATION SO THAT WILL BE ACCURATELY REFLECTED.

25   YOU'RE GOING TO CONTINUE THAT KIND OF TREATMENT WHEN YOU GET

1    OUT OF CUSTODY BECAUSE YOU KNOW, MR. BELIVEAU, THAT THIS IS A

2    LIFETIME ISSUE FOR YOU.  IT'S BEEN YOUR ISSUE SINCE YOU WERE A

3    YOUNG PERSON.  IT CONTINUES TO BE YOUR ISSUE, AND YOU'LL NEED

4    TO CONTINUE TO TREAT, SO THAT'S CONDITION NUMBER 2.

5         CONDITION NUMBER 3 IS REPORT ALL THE VEHICLES THAT YOU

6    OWN OR OPERATE OR IN WHICH YOU HAVE AN INTEREST.

7         CONDITION NUMBER 4 IS PROVIDE DISCLOSURE OF YOUR

8    PERSONAL AND BUSINESS FINANCIAL RECORDS TO PROBATION.

9         CONDITION NUMBER 5 IS TO NOTIFY THE COLLECTIONS UNIT OF

10   THE U.S. ATTORNEY'S OFFICE OF ANY INTEREST IN PROPERTY OBTAINED

11   DIRECTLY OR INDIRECTLY, INCLUDING ANY INTEREST OBTAINED UNDER

12   ANY OTHER NAME OR ENTITY, INCLUDING A TRUST, PARTNERSHIP OR

13   CORPORATION, UNTIL THE FINE OR RESTITUTION IS PAID IN FULL.

14        THE FINAL CONDITION IS NOTIFY THE COLLECTIONS UNIT OF

15   THE UNITED STATES ATTORNEY'S OFFICE BEFORE TRANSFERRING ANY

16   INTEREST IN PROPERTY OWNED DIRECTLY OR INDIRECTLY, INCLUDING

17   ANY INTEREST HELD OR OWNED UNDER ANY OTHER NAME, ENTITY,

18   INCLUDING A TRUST, PARTNERSHIP OR CORPORATION.

19        I AM NOT GOING TO IMPOSE A FINE.  THE $200 SPECIAL

20   ASSESSMENT CAN BE WORKED OFF WHILE YOU'RE IN CUSTODY, MR.

21   BELIVEAU.

22        WITH REGARD TO RESTITUTION -- I'M NOT FINDING A

23   PROVISION FOR RESTITUTION IN THE PROBATION REPORT, BUT THERE

24   NEEDS TO BE ONE, DOESN'T THERE, MR. PLETCHER OR MR. YOUNG?

25        MR. YOUNG:  YES.  JUDGE, THE PARTIES HAVE AGREED TO A

1      RESTITUTION AMOUNT OF $20 MILLION.

2              THE COURT:  JOINTLY AND SEVERALLY WITH?

3              MR. YOUNG:  JOINTLY AND SEVERALLY WITH LEONARD FRANCIS.

4              THE COURT:  IS THERE INTEREST THAT'S GOING TO RUN ON

5      THAT?

6              MR. YOUNG:  I THINK JOINTLY AND SEVERALLY WITH ALL OF

7      THE OTHER CO-DEFENDANTS IN THE CASE.  I THINK WE'RE NOT GOING

8      TO SEEK INTEREST PAYMENTS.

9              THE COURT:  THERE'S BEEN NO INTEREST SOUGHT ON ANYBODY

10     ELSE, CORRECT?

11             MR. YOUNG:  YES.

12     (DISCUSSION HELD OFF THE RECORD.)

13             MR. YOUNG:  JUDGE, I THINK THERE WERE SOME PEOPLE WITH

14     ADDITIONAL ABILITY TO PAY THAT HAD MORE OF A LIKELIHOOD OF

15     PAYING FOR WHOM WE SOUGHT INTEREST, BUT I THINK IN THIS CASE --

16             THE COURT:  THAT RESTITUTION IS PAYABLE TO?  WE'RE

17     GOING TO NEED ALL THAT INFORMATION FOR THE JUDGMENT, AND I

18     DON'T HAVE IT, THAT'S WHY I'M ASKING.

19             MR. YOUNG:  SURE.  THE RESTITUTION IS PAYABLE TO THE

20     CLERK OF COURT -- GOES TO THE CLERK OF COURT AND THEN IT'S

21     PAYABLE TO THE UNITED STATES NAVY.

22             THE COURT:  VERY WELL.

23             MR. BELIVEAU, IN YOUR PLEA AGREEMENT, ON PAGE 23, SIR,

24     YOU GAVE UP YOUR RIGHT TO APPEAL THE JUDGMENT IN THIS CRIMINAL

25     CASE AND THE SENTENCE THAT I JUST IMPOSE, SIR; DO YOU

1    UNDERSTAND THAT?

2         THE DEFENDANT:  YES, YOUR HONOR.

3         THE COURT:  MS. CARMICHAEL, WHAT IS YOUR REQUEST FOR A

4    HOUSING DESIGNATION FOR YOUR CLIENT SO HE CAN BE NEAR FAMILY?

5    I WOULD LIKE HIM TO HAVE THE APPROPRIATE PROGRAMS, BOTH FOR

6    RDAP AND MENTAL HEALTH TREATMENT THAT WILL BE REQUIRED.

7         MS. CARMICHAEL:  ABSOLUTELY, YOUR HONOR, WE WOULD ASK

8    THAT HE BE IN A FACILITY AS CLOSE TO YORK, PENNSYLVANIA, AS

9    POSSIBLE, WHERE HIS FAMILY RESIDES.

10        MAY I CONFER WITH MY CLIENT ON ONE POINT?

11        THE COURT:  OF COURSE.  I WAS JUST GOING TO ASK YOU,

12   WHILE WE'RE TALKING ABOUT THIS, IF HE'S ASKING FOR A

13   SELF-SURRENDER, IF THERE WAS A REQUEST FOR IMMEDIATE CUSTODY OR

14   NOT?

15   (DISCUSSION HELD OFF THE RECORD.)

16        MR. PLETCHER:  BEFORE WE GET THERE, YOUR HONOR, I THINK

17   THE RESTITUTION --

18        THE COURT:  WAIT UNTIL SHE'S FINISHED SO SHE CAN HEAR

19   THIS.

20   (DISCUSSION HELD OFF THE RECORD.)

21        MS. CARMICHAEL:  YOUR HONOR, MR. BELIVEAU WOULD LIKE TO

22   BE REMANDED TODAY.

23        THE COURT:  OKAY.  THAT'S PREDESIGNATION, SO I DON'T

24   KNOW, BUT WE CAN CERTAINLY DO THAT.  WE'RE GOING TO HAVE TO

25   MAKE A CALL TO GET THE U.S. MARSHALS HERE.

1          WHAT WERE YOU GOING TO SAY ABOUT RESTITUTION?

2          MR. PLETCHER:  RESTITUTION, YOUR HONOR, NEEDS TO BE

3     ORDERED PAYABLE FORTHWITH AND THEN WITH WHATEVER SCHEDULE.

4     IT'S $20 MILLION.  I DON'T THINK MR. BELIVEAU HAS THE ABILITY

5     TO PAY $20 MILLION TODAY, BUT JUST TO ALLOW THE COLLECTIONS

6     UNIT TO PROCEED.

7          THE OTHER THING IS THERE'S A PRELIMINARY ORDER OF

8     FORFEITURE THAT'S BEEN ENTERED IN THIS CASE, THAT'S

9     DOCUMENT 70, AND SO MY UNDERSTANDING IS THAT MR. BELIVEAU HAS

10    FORFEITED THAT MONEY, SO THAT IF THE JUDGE COULD INCLUDE THE

11    FORFEITURE ORDER AS PART OF THE JUDGMENT.

12         THE COURT:  I HAVE AN AMENDED ORDER OF FORFEITURE FOR

13    6,200?  IS THAT THE MONEY YOU WERE TALKING ABOUT?

14         MR. PLETCHER:  THE ONE I'M TALKING ABOUT IS

15    DOCUMENT 70, WHICH INCLUDES $30,000 IN U.S. CURRENCY, THE

16    AMOUNT OF WHICH IS GROSS PROCEEDS 6,200 --

17         THE COURT:  WE'RE TALKING ABOUT THE SAME ORDER.

18         MR. PLETCHER:  -- WAS SEIZED.  I BELIEVE MR. BELIVEAU

19    HAS MADE PAYMENTS ON THE REMAINDER.

20         THE COURT:  VERY WELL.  SO YOU WANT THAT FORFEITURE

21    REFLECTED IN THE JUDGMENT.

22         MR. PLETCHER:  YES, YOUR HONOR, SO THAT FINAL ORDER

23    MAYBE IT'S COUCHED AS AN AMENDED ORDER OF FORFEITURE REFLECTED

24    ON THE JUDGMENT.

25         THE COURT:  VERY WELL.

1              MR. YOUNG:  I'M SORRY.  I DON'T WANT TO COMPLICATE

2      THINGS FURTHER, BUT WE'VE AGREED WITH THE DEFENDANTS THAT ANY

3      PAYMENTS MADE TOWARDS FORFEITURE SHALL BE OFFSET AGAINST THIS

4      RESTITUTION OBLIGATION.

5              THE COURT:  VERY WELL.  THAT'S APPROPRIATE AND FAIR.

6      SO HE DOESN'T WISH A SELF-SURRENDER DATE IN THE FUTURE?

7              MS. CARMICHAEL:  THAT'S CORRECT, YOUR HONOR.

8              THE COURT:  THIS IS PREDESIGNATION.

9              LET ME ASK YOU, MS. CARMICHAEL, LET ME ASK PROBATION,

10     LET ME ASK THE GOVERNMENT, IS THERE ANYTHING I HAVE NOT COVERED

11     THIS AFTERNOON?

12             MS. CARMICHAEL:  YOUR HONOR, I WOULD JUST LIKE TO -- I

13     HAVE MR. BELIVEAU'S MEDICATION, AND HIS MOTHER HAS THE BOTTLES

14     OF HIS MEDICATION.  I WOULD LIKE TO ENSURE THAT DURING THIS

15     TRANSFER PERIOD MR. BELIVEAU'S MEDICATIONS ARE ADMINISTERED

16     APPROPRIATELY.

17             THE COURT:  WELL, I WANT TO ENSURE THAT ALSO, SO LET ME

18     INDICATE THAT ALL THE APPROPRIATE MEDICATIONS AND DOSAGES THAT

19     MR. BELIVEAU IS TAKING AT THIS TIME SHOULD CONTINUE TO BE

20     ADMINISTERED AND NOT BE CHANGED WITHOUT APPROPRIATE MEDICAL

21     DIRECTION, AND THAT THE MEDICATIONS THAT YOU PROVIDE FOR HIM

22     TODAY WILL GO WITH HIM THROUGH THIS TRANSFER PROCESS.  IT'S

23     CERTAINLY BEYOND THE COURT'S CONTROL, BUT I'M ENTERING THAT TO

24     HELP.  IF YOU HEAR ANYTHING, COUNSEL, YOU KNOW YOU CAN CONTACT

25     THE COURT.

1          MS. CARMICHAEL:  YOUR HONOR, MAY I ASK WHO THOSE

2     MEDICATIONS SHOULD BE PROVIDED TO?

3          THE COURT:  WE'RE GOING TO ASK THE U.S. MARSHALS, ONCE

4     THEY COME UP HERE, AS TO HOW TO ACCOMPLISH THAT, COUNSEL,

5     BECAUSE I AM NOT CERTAIN.  IT NORMALLY DOESN'T HAPPEN EXACTLY

6     THIS WAY.

7          BERNADETTE, DID YOU CALL FOR SOMEBODY TO COME UP?

8          THE CLERK:  THEY ARE ON THEIR WAY.

9          THE COURT:  THEY'RE ON THEIR WAY.  SO LET ME ASK, CAN

10    YOU HELP US WITH THAT?

11         THE PROBATION OFFICER:  AS FAR AS?

12         THE COURT:  THE MEDICATIONS.

13         THE PROBATION OFFICER:  I THINK THE MARSHAL SERVICE

14    WOULD PROBABLY BE THE BEST PARTY TO ADDRESS THAT.

15         JUST TO CLARIFY THE RECORD, YOUR HONOR, I THINK YOU

16    PRONOUNCED 3 YEARS OF SUPERVISED RELEASE.  I WANTED TO CLARIFY

17    THAT IT'S 3 YEARS AS TO EACH COUNT CONCURRENT?

18         THE COURT:  THAT IS CORRECT, AS TO EACH COUNT

19    CONCURRENT, CORRECT.  60 ON COUNT 1.  144 ON COUNT 2.  THE 60

20    ON COUNT 1 RUNS CONCURRENTLY WITH COUNT 2.  $200 IN SPECIAL

21    ASSESSMENTS.  NO FINE AS THE RESTITUTION ORDER IS MORE THAN

22    SUFFICIENT.

23         ANYTHING ELSE?

24         MR. PLETCHER:  NOT SPECIFICALLY.  THE PROCESS RIGHT NOW

25    IS GOING TO RUN INEFFICIENTLY, RIGHT?  THE BUREAU OF PRISONS IS

1    NOT EXPECTING MR. BELIVEAU TODAY, SO HE'S GOING TO BE TAKEN

2    INTO CUSTODY BY THE MARSHALS, THEN HE'LL NEED TO BE BOOKED.

3    THE BUREAU OF PRISONS WILL ULTIMATELY TAKE POSSESSION OF THE

4    MEDICATION AND ADMINISTER IT.  HE'S NOT GOING TO BE ALLOWED TO

5    HOLD IT WITH HIM, SO THERE'S GOING TO BE SOME AMOUNT OF

6    INEFFICIENCY IN THE PROCESS BECAUSE THEY HAVE OTHER THINGS TO

7    DO.

8            SO MY GUESS IS THAT THE MEDICAL STAFF AT EITHER MCC OR

9    GEO WILL SEE MR. BELIVEAU AND I THINK, IN CONSULTATION WITH HIS

10   LAWYER, AND PERHAPS HIS DOCTOR, DEVELOP AN ONGOING TREATMENT

11   PLAN.  I JUST DON'T KNOW THE TIME LAG IN THAT OR HOW THAT'S

12   GOING TO GO.  I SAY THAT INTO THE ETHER SO FOLKS ARE AWARE TO

13   NOT PERHAPS NECESSARILY EXPECT THINGS TO HAVE RUN AS

14   EFFICIENTLY AS IF PEOPLE HAD BEEN TOLD AND KNEW THAT THIS WAS

15   COMING.

16           THE COURT:  THIS IS TRUE.  I'M REQUESTING A DESIGNATION

17   AS CLOSE TO YORK, PENNSYLVANIA, AS POSSIBLE.

18           SO YOU UNDERSTAND WHAT HE'S SAYING, MA'AM, IT MAY BE

19   BEYOND ANY OF OUR CONTROL WITH MR. BELIVEAU SELF-SURRENDERING

20   RIGHT NOW WHEN HE WASN'T ANTICIPATED.

21           MS. CARMICHAEL:  I UNDERSTAND, YOUR HONOR.  MAY I

22   CONFER WITH MY CLIENT?

23           THE COURT:  CERTAINLY.  WOULD THERE BE OBJECTION TO A

24   FUTURE DATE, IF THAT'S WHAT HE WANTED TO DO?

25           MR. PLETCHER:  NO, YOUR HONOR.

1          THE COURT:  I WAS EXPECTING A FUTURE DATE TO BE

2     REQUESTED, SO THERE WOULD BE NO GOVERNMENT OBJECTION TO THAT,

3     AND THEN MAYBE IF HE GETS A DESIGNATION THERE, HE WOULD JUST GO

4     BACK WITH HIS FAMILY, AND THEN HAVE MEDICATION AND THINGS A

5     LITTLE MORE SETTLED, BUT I'M HAPPY TO DO WHATEVER PEOPLE WANT

6     TO DO.

7          MR. PLETCHER:  CERTAINLY.  THE DEFENDANT HAS HIS

8     REASONS, NO DOUBT.  WE HAVE NO OBJECTION TO THIS, AND WE WILL

9     WORK WITH THE BUREAU OF PRISONS AND THE MARSHALS AS WE ARE ABLE

10    TO SORT OF STEP OUT, SO WHATEVER IS --

11         MS. CARMICHAEL:  YOUR HONOR, MAY I CONFER WITH MR.

12    BELIVEAU'S DOCTOR?

13         THE COURT:  CERTAINLY.  TAKE YOUR TIME, COUNSEL.  THIS

14    IS A SIGNIFICANT ISSUE.

15    (DISCUSSION HELD OFF THE RECORD.)

16         MS. CARMICHAEL:  YOUR HONOR, MR. BELIVEAU WILL

17    SELF-SURRENDER IF THE COURT WILL ALLOW IT AT A LATER DATE.

18         THE COURT:  YOU WANT A FUTURE DATE?

19         MS. CARMICHAEL:  FUTURE DATE, I'M SORRY.

20         THE COURT:  NO, I THINK THAT'S FAIR.  HOW MUCH TIME --

21    IT'S USUALLY GOING TO TAKE SIX WEEKS TO EIGHT WEEKS TO GET THE

22    DESIGNATION.  DOES ANYBODY WANT TO GIVE ME A BETTER ESTIMATE?

23    LET ME ASK PROBATION, SIX TO EIGHT WEEKS?

24         THE PROBATION OFFICER:  I'M NOT SURE, YOUR HONOR.

25         MR. PLETCHER:  YOUR HONOR, CAN I INTERJECT ONE MORE

1    TIME?

2            THE COURT:  OF COURSE.

3            MR. PLETCHER:  CAN WE JOIN YOU AT SIDEBAR?

4            THE COURT:  CERTAINLY.

5    (THE FOLLOWING OCCURRED AT SIDEBAR.)

6            MR. PLETCHER:  JUDGE, I WAS TRYING TO BE HELPFUL

7    EARLIER IN MY COMMENTS ABOUT WHAT WOULD HAPPEN WITH THE

8    MEDICATION AND VARIOUS THINGS TO FACILITATE THIS PROCESS AS

9    WE'RE ABLE, AND, IN HAVING A BRIEF CONVERSATION WITH MS.

10   CARMICHAEL, I THINK THE CONCERN MAY BE THAT MR. BELIVEAU MAY

11   PRESENT AT THIS POINT A DANGER TO HIMSELF AND THAT HIS REQUEST

12   MAY BE MOTIVATED BY HIS SELF-UNDERSTANDING AND PERCEPTION ABOUT

13   THAT CONCERN, AND SO I WANTED TO GIVE VOICE TO THAT BECAUSE I

14   DON'T WANT TO BE THE ONE IN THE POSSESSION OF THAT KNOWLEDGE

15   NOW AS WE'RE CONTEMPLATING A FUTURE DATE OF SELF-SURRENDER.

16           MS. CARMICHAEL:  YOUR HONOR, MAY I SPEAK?

17           MR. PLETCHER:  I WOULD LIKE COUNSEL TO ADDRESS THAT.

18           THE COURT:  WE WANT EVERYBODY TO BE SAFE, AND I KNOW

19   WHAT'S JUST HAPPENED IS VERY DIFFICULT FOR YOUR CLIENT, MA'AM,

20   SO WITH THAT, GO AHEAD.

21           MS. CARMICHAEL:  YOUR HONOR, THAT WAS A CONCERN IN THIS

22   SITUATION.  THAT'S WHY I ASKED TO CONFER WITH MR. BELIVEAU'S

23   DOCTOR BECAUSE I WANTED TO BE ABLE TO ASSESS THE RISK OF HARM

24   FOR MR. BELIVEAU IF HE WERE TO TURN HIMSELF IN AT A LATER DATE

25   COMPARED TO THE RISK OF HIM NOT BEING ABLE TO GET HIS

1    MEDICATION FOR THE NEXT SEVERAL DAYS, PERHAPS WEEKS.  MR.

2    BELIVEAU'S DOCTOR MADE A REPRESENTATION THAT THE LATER DATE MAY

3    BE THE LEAST RISKY OPTION IN THIS CASE, AND THAT WAS MY BASIS

4    FOR AMENDING MY ORIGINAL REQUEST.

5          MS. HARRIS:  WE'VE ALSO ALREADY TALKED TO DR. FONTE

6    ABOUT PUTTING HIM IN A THERAPEUTIC COMMUNITY AND IF HE'S IN

7    ACUTE NEED.

8          THE COURT:  SO THE REQUEST CONTINUES TO BE FOR HIM TO

9    SELF-SURRENDER AT SOME POINT IN THE FUTURE?

10          MS. CARMICHAEL:  THAT'S CORRECT, YOUR HONOR.

11          THE COURT:  DOES HE HAVE A DATE THAT HE WOULD LIKE?

12    IT'S AT LEAST SIX OR EIGHT WEEKS BEFORE DESIGNATION.

13          MS. CARMICHAEL:  THAT WOULD BE FINE, YOUR HONOR.

14          THE COURT:  HE'LL BE DESIGNATED, GO BACK HOME WITH HIS

15    FAMILY, AND HE WILL BE MUCH CLOSER TO WHERE HE'S GOING TO

16    SELF-SURRENDER.

17          MR. PLETCHER:  I HAVE AT THIS POINT, YOU KNOW, GIVEN

18    THE EVOLUTION OF THIS CASE, GRAVE CONCERN ABOUT THAT.  IF THE

19    BALANCE -- IF THE DECISION IS BEING MADE BASED ON HE'S NOT

20    GOING TO GET HIS MEDICATION FOR WEEKS OR DAYS, I DON'T THINK

21    THAT'S THE CASE.  I DON'T KNOW THAT HE WILL BE SEEN BY A BUREAU

22    OF PRISONS DOCTOR TONIGHT, BUT GIVEN THIS CONCERN THAT'S OUT

23    THERE, AND GIVEN NOW THE ABILITY TO TELL THE BUREAU OF PRISONS

24    THAT THIS IS A PRIORITY MATTER, I THINK THAT THEY WILL

25    ASSIDUOUSLY ADDRESS THE QUESTION.  COUNSEL CAN MAKE THEIR OWN

1    CONDITION DETERMINATION ON THIS, BUT THE ABSOLUTE THING THAT

2    ANYBODY HERE SHOULD BE ENVISIONING IS MAKING A DECISION THAT

3    WOULD RESULT IN HIM HARMING HIMSELF.

4        MS. CARMICHAEL:  THIS WAS HIS DOCTOR'S ASSESSMENT OF

5    THE RISK FACTORS IN THIS CASE.  I SPECIFICALLY ASKED TO SPEAK

6    WITH HIS DOCTOR AND THIS WAS HIS RECOMMENDATION, THAT IT WOULD

7    BE BETTER FOR MR. BELIVEAU TO BE IN AN ENVIRONMENT WHERE HE CAN

8    BE ADMINISTERED HIS MEDICATIONS, HAVE HIS THERAPY, WHICH HE HAS

9    BEEN RESPONDING TO, AND, IF POSSIBLE, GO INTO AN INPATIENT

10   SITUATION.

11       MR. PLETCHER:  I VOICED MY CONCERN.

12       THE COURT:  I DID NOT EXPECT THE SELF-SURRENDER REQUEST

13   OR I WOULD HAVE HAD U.S. MARSHALS HERE THROUGH THE WHOLE THING.

14   I NEVER EXPECTED THAT.

15       MS. CARMICHAEL:  I WAS NOT SURE WHAT THE DECISION WOULD

16   BE EITHER OR I WOULD HAVE ALERTED THE COURT.

17       MR. PLETCHER:  WOULD THE DOCTOR MAYBE NEED TO TALK TO

18   THEM, IF THE BUREAU OF PRISONS COULD REPRESENT HE WOULD GET HIS

19   MEDICATION ON A DAILY BASIS STARTING TODAY?  WOULD THAT CHANGE

20   THE RECOMMENDATION?  BECAUSE IF IT DOES, THEN I'M INCLINED TO

21   FIGURE OUT AN ANSWER TO THAT QUESTION.

22       AGAIN, I'VE BEEN IN THIS SITUATION BEFORE WHERE

23   DEFENDANTS IN THE SAME POSITION, WHO LOOK AN AWFUL LOT LIKE MR.

24   BELIVEAU, HAVE TAKEN THEIR OWN LIVES IN THE WAKE OF THINGS LIKE

25   THIS.  I DON'T WANT TO BE A PART OF IT AGAIN.

1    MS. HARRIS:  YOUR HONOR, I CAN GO ASK DR. FONTE, IF YOU

2 LIKE, TO SEE IF HIS RECOMMENDATION WOULD CHANGE IN THE FACE OF

3 THAT RECOMMENDATION, IF THAT'S SOMETHING THAT WOULD MATTER TO

4 THE COURT.

5    THE COURT:  I THINK IT DOES MATTER.

6    MS. CARMICHAEL:  YOUR HONOR, WOULD YOU LIKE TO QUESTION

7 DR. FONTE PERHAPS?

8    THE CLERK:  WE HAVE THE MARSHAL HERE NOW.

9    THE COURT:  SURE, BRING THE DOCTOR OVER HERE.

10    DOCTOR, WE'RE SORRY TO BRING YOU OVER AT SIDEBAR.  THE

11 CONCERN IS MR. BELIVEAU'S SAFETY.

12    DR. FONTE:  YES, THAT'S MY CONCERN.

13    THE COURT:  IF HE SELF-SURRENDERS NOW, IF THE ASSURANCE

14 CAN BE MADE THAT HE WILL GET HIS MEDICATION, DO YOU HAVE ANY

15 CONCERNS?

16    DR. FONTE:  THAT'S MY BIGGEST CONCERN, BUT THE REMARKS

17 THAT GO "INTO THE ETHER" AND "WE CAN'T TELL," WE CANNOT STOP

18 HIS MEDICINES FOR TWO OR THREE DAYS, THAT WOULD BE HORRIBLE.  I

19 KNOW YOU CAN'T GUARANTEE THAT.  I THINK SELF-HARM IS A DEFINITE

20 ISSUE.

21    THE COURT:  THERE'S ALSO A CONCERN IF HE DOESN'T

22 SELF-SURRENDER OF HARM.

23    MR. PLETCHER:  THAT'S MY CONCERN.

24    DR. FONTE:  TRUST ME, IT'S -- EITHER WAY SELF-HARM CAN

25 HAPPEN.  WHY CAN'T WE GUARANTEE THAT SOMEBODY GIVES HIM HIS

1     MEDICINE?  THAT'S ALL I'M SAYING.

2             MR. PLETCHER:  WE WILL HAVE TO GET SOMEONE HERE.

3             DR. FONTE:  IT'S NOT THAT HARD.  IT'S BEEN PRESCRIBED.

4             MR. PLETCHER:  SO I THINK WE WOULD HAVE TO HAVE SOMEONE

5     FROM THE BUREAU OF PRISONS COME OVER, IT'S JUST A QUESTION OF

6     EFFICIENCY FOR THEM, AND MY CONCERNS WERE NOT TAKING INTO

7     ACCOUNT THE RISK OF HARM, AND BASED ON THAT ISSUE AT LEAST MY

8     CONCERN RIGHT NOW IS THE RISK OF HARM IF HE'S OUT UNFETTERED AS

9     COMPARED TO SELF-SURRENDERING TODAY.

10            DR. FONTE:  PROTECTIVE CUSTODY, AT LEAST WE CAN PROVIDE

11    ONE ON ONE.  WHERE WOULD HE GO AS OF TODAY?  DOES HE GO TO --

12            MR. PLETCHER:  MCC.

13            THE COURT:  WHICH IS THE METROPOLITAN CORRECTIONAL

14    FACILITY, ABOUT A BLOCK AWAY.  I DON'T KNOW IF HE WOULD STAY

15    THERE THE WHOLE TIME.  WE COULD REQUEST THAT HE DOES, AND MAKE

16    THE REQUEST ON MEDICATIONS, BUT AGAIN THAT'S BEYOND THE COURT'S

17    CONTROL AND THE GOVERNMENT'S CONTROL.  ALL WE CAN DO IS MAKE

18    THAT REQUEST.

19            MS. CARMICHAEL:  MY EXPERIENCE HAS BEEN THAT IT DOES

20    TAKE TIME TO GET THESE MEDICATIONS ADMINISTERED TO MY CLIENTS

21    BECAUSE THEY HAVE TO DO A FULL ASSESSMENT, READ THE PRESENTENCE

22    REPORT.  THEY CAN'T JUST TAKE SOMEONE'S WORD, WHEN THEY WALK IN

23    WITH A BOTTLE, AND GIVE THEM THE MEDICATION.  THAT'S BEEN MY

24    EXPERIENCE.

25            DR. FONTE:  JOHN PREFERS TO LEAVE RIGHT NOW.  I'VE

1    TALKED TO HIM ABOUT THIS.  THE LONGER --

2            THE COURT:  YOU MEAN GO INTO CUSTODY?

3            DR. FONTE:  YES.  THE LONGER THE SENTENCE, THE MORE HE

4    WANTED TO GO RIGHT NOW.  I MEAN, THAT WAS HIS DESIRE.  MY ONLY

5    CONCERN IS THE ADMINISTRATION OF THE MEDICATION.

6            MR. YOUNG:  JUDGE, THERE'S A POSSIBILITY THAT IF HE

7    GOES IN NOW, AND WE HEAR FROM THE DOCTOR THAT THINGS ARE

8    WORKING OUT, WE COULD GIVE HIM 30 DAYS AFTER THAT, I DON'T

9    KNOW.

10           MR. PLETCHER:  I THINK THE EASIER ROUTE IS TO INFORM

11   THE BUREAU OF PRISONS OF THE PRIORITY AND URGENT MATTER.

12           THE COURT:  YOU DO THAT.  I DON'T KNOW HOW TO DO THAT.

13           MR. PLETCHER:  WE WILL CALL DOWN THERE RIGHT NOW.

14           THE COURT:  CALL NELLIE.  SHE'S COUNSEL TO THE WARDEN

15   LOCALLY.  MAYBE -- IT WOULD BE NICE IF EVERYBODY WHO IS HERE

16   OBSERVING THIS WOULD TAKE OFF AND WE COULD HAVE A SMALLER

17   PROCEEDING AND GET NELLIE OVER HERE.

18           MS. CARMICHAEL:  WE COULD CLOSE THE COURTROOM.

19           DR. FONTE:  I COULD WAIT, IF THAT'S HELPFUL.

20           THE COURT:  DID YOU HAVE A FLIGHT HOME THIS EVENING?

21           DR. FONTE:  TOMORROW MORNING.  I'M STILL ON EASTERN

22   TIME.

23           THE COURT:  I'M SURE YOU ARE, SIR.

24           MS. CARMICHAEL:  YOUR HONOR, WE ARE OBVIOUSLY --

25           DR. FONTE:  ARE YOU OKAY WITH THIS DECISION?

1          MS. CARMICHAEL:  IT'S NOT MY DECISION.

2          DR. FONTE:  I DID SPEAK TO JOHN THIS MORNING, AND THAT

3     IS HIS WISH.

4          THE COURT:  AND THAT CONTINUES TO BE HIS WISH?

5          DR. FONTE:  YES.

6          MR. PLETCHER:  CAN WE DO THIS AS AN INTERIM MATTER SO

7     WE CAN GET PEOPLE WHERE THEY NEED TO BE?  CAN THE MARSHALS TAKE

8     HIM INTO CUSTODY NOW, TAKE HIM DOWNSTAIRS?

9          THE COURT:  ASK THEM TO HOLD --

10         MR. PLETCHER:  THE MARSHALS ARE JUST HOLDING HIM,

11    ADJOURN THE PROCEEDINGS, SEE IF WE CAN GET THE BUREAU OF

12    PRISONS ON THE PHONE.

13         THE COURT:  I'LL WORK WITH THIS AS LONG AS WE HAVE TO

14    SO WE CAN GET SOMETHING RESOLVED THAT GIVES US ALL A LEVEL OF

15    COMFORT.  WE HAVE APPREHENSIONS AND CONCERNS ABOUT HIS SAFETY

16    AND WELL-BEING, WHICHEVER WAY WE GO, DOCTOR, EXACTLY, AND I'M

17    STILL RESPONSIBLE FOR HIS WELL-BEING.

18         DR. FONTE:  I UNDERSTAND.  THAT'S PARTLY WHY I'M HERE.

19         THE COURT:  SO MAYBE WE'LL RECESS THIS AND WE'LL LET

20    THEM TAKE HIM INTO CUSTODY.  I THINK THE COURTROOM SHOULD BE

21    CLEARED OUT, AND HE SHOULD HAVE SOME PRIVACY TO DO THAT.

22         MR. PLETCHER:  YES.

23         MS. HARRIS:  THANK YOU, JUDGE.

24         DR. FONTE:  THANK YOU.

25    (SIDEBAR CONCLUDED.)

```
 1          THE COURT:  UNLESS THERE'S SOMETHING ELSE, I KNOW THAT

 2     THE UNITED STATES MARSHAL HAS COME.  MR. BELIVEAU, I UNDERSTAND

 3     YOUR REQUEST IS TO SURRENDER IMMEDIATELY, SIR, AND WE'RE

 4     WILLING TO DO THAT.

 5          I'M GOING TO THANK EVERYBODY AND CLOSE THESE

 6     PROCEEDINGS WHILE THAT OCCURS.  THANK YOU.

 7          MR. PLETCHER:  THANK YOU, YOUR HONOR.

 8          THE COURT:  THANK YOU.

 9     (COURT WAS AT RECESS.)

10          THE COURT:  THANK YOU FOR COMING OVER.  WHY DON'T YOU

11     COME FORWARD.  I DON'T KNOW WHAT THEY TOLD YOU ABOUT THE

12     COURT'S CONCERNS.  WHY DON'T YOU STATE YOUR NAME FOR THE

13     RECORD.

14          MS. KLEIN:  MY NAME IS NELLIE KLEIN, AND I'M THE STAFF

15     ATTORNEY FOR MCC SAN DIEGO.

16          MARK PLETCHER HAD CONTACTED ME A FEW MINUTES AGO AND

17     ASKED ME TO COME OVER.  HE EXPRESSED CONCERNS REGARDING THE

18     INMATE'S POTENTIAL STATUS IF HE IS REMANDED INTO OUR CUSTODY

19     THIS AFTERNOON.  FROM HIS PRESENTENCE REPORT, WE HAD A LITTLE

20     BIT OF INFORMATION ON HIS MEDICAL CONDITION, AND PARTICULARLY

21     THE DRUGS THIS HE'S CURRENTLY TAKING.  I HAVE DR. NOLTE, WHO IS

22     THE STAFF PHYSICIAN AT MCC SAN DIEGO, HERE WITH ME BECAUSE I

23     DID NOT FEEL COMFORTABLE ANSWERING ANY MEDICAL QUESTIONS, AND

24     WE DO HAVE A VERY SPECIFIC PROTOCOL AS TO HOW WE WOULD HANDLE A

25     DEFENDANT WITH THE MEDICATION HE'S TAKING IF HE WERE TO COME
```

1    INTO OUR CUSTODY THIS EVENING.

2         THE COURT:  WELL, WE HAVE A DOCTOR HERE ALSO WHO HAS

3    BEEN WORKING WITH MR. JOHN BELIVEAU, WHO I JUST SENTENCED, AND

4    HE REQUESTED TO GO INTO CUSTODY FORTHWITH AS OPPOSED TO A

5    FUTURE SELF-SURRENDER, BUT THE CONCERN WAS EXPRESSED ABOUT HIS

6    MEDICATIONS, AND WE CERTAINLY WANT TO ASSURE -- INSURE HIS

7    SAFETY, AND WE WANTED TO MAKE SURE HE COULD GET HIS

8    MEDICATIONS.

9         HE WAS REQUESTING, AND I HAVE REQUESTED ON HIS BEHALF,

10   A DESIGNATION QUITE SOME DISTANCE FROM HERE, AS CLOSE TO YORK,

11   PENNSYLVANIA, AS POSSIBLE, AND THAT'S WHY WE ASKED YOU TO STEP

12   OVER BECAUSE WE WERE NOT CERTAIN HOW TO ACCOMPLISH -- SHOULD I

13   ORDER THAT HE STAY AT MCC -- HIS RECEIVING THESE MEDICATIONS

14   UNTIL HE GETS DESIGNATED HOPEFULLY TO SOMEPLACE CLOSE TO YORK,

15   PENNSYLVANIA, AND HE WILL RECEIVE THOSE MEDICATIONS IN

16   TRANSPORT, SHOULD WE HAVE TO INSURE THE MEDICATION BE PROPERLY

17   ADMINISTERED.  NOT TO SELF-SURRENDER TODAY, BUT CONCERNS HAVE

18   BEEN EXPRESSED ABOUT HIS SAFETY AND WELL-BEING, MS. KLEIN,

19   WHETHER HE SELF-SURRENDERS TODAY OR GETS DESIGNATED AND

20   SELF-SURRENDERS THEN, ITS JUST A VERY CONCERNING SITUATION TO

21   EVERYBODY.

22        MS. KLEIN:  RIGHT.  SO IT'S MY UNDERSTANDING, FROM

23   SPEAKING TO THE DOCTOR, THAT IF HE DOES SELF-SURRENDER TODAY,

24   AND WE DID HAVE SOME QUESTIONS REGARDING SOME OF THE

25   MEDICATION, IF HE TAKES IT DAILY, REGULARLY, BECAUSE IF HE DOES

1     -- IT DOESN'T MATTER IF HE SELF-SURRENDERS TO US HERE IN SAN

2     DIEGO OR IF HE'S DESIGNATED AND SELF-SURRENDERS ELSEWHERE,

3     THEY'RE GOING TO HAVE TO ADDRESS HIS MEDICATION ISSUE, AND IT'S

4     ALMOST BEST IF WE JUST GO AHEAD AND HE STARTS THE PROCESS.

5          THE COURT:  YOU MEAN IF HE STARTS THE PROCESS --

6          MS. KLEIN:  IT DOESN'T MATTER WHETHER HE COMES INTO

7     PRISON TODAY OR IN TWO MONTHS, THE SAME PROTOCOL IS LIKELY

8     GOING TO BE FOLLOWED.

9          THE COURT:  MR. BELIVEAU, YOU JUST JOINED US, SIR, AND

10    THIS IS NELLIE KLEIN.  SHE'S LEGAL COUNSEL AT THE MCC, AND

11    WE'RE DISCUSSING MEDICATIONS AND HOW TO BEST MAKE CERTAIN, SIR,

12    THAT YOU OBTAIN EVERYTHING YOU NEED ON A REGULAR BASIS.

13         SO GO AHEAD.

14         MS. KLEIN:  THAT WAS MY POINT IS THAT WHETHER HE COMES

15    INTO CUSTODY AT THE MCC OR IF HE SELF-SURRENDERS AT ANOTHER

16    FACILITY IN PENNSYLVANIA, OR WHEREVER HE'S DESIGNATED, IT'S

17    PROBABLY GOING TO BE THE EXACT SAME PROTOCOL.

18         THE COURT:  APPARENTLY PEOPLE CAME TODAY WITH

19    MEDICATIONS SO IT'S AVAILABLE, AND I DON'T KNOW HOW MANY -- THE

20    DOCTOR HERE HAS ALL THE MEDICATIONS TO HELP EXPEDITE THINGS

21    BECAUSE APPARENTLY HIS MEDICATIONS RIGHT NOW ARE BEING

22    EFFECTIVE FOR HIM AND HELPFUL, AND WE WANTED THAT TO CONTINUE.

23         MS. KLEIN:  THE CURRENT MEDICATION LIST THAT I REVIEWED

24    FROM HIS PRESENTENCE REPORT WOULD NOT BE FOLLOWED BY THE BUREAU

25    OF PRISONS.  OTHER MEDICATIONS WOULD BE SUBSTITUTED, AND IN ONE

1     PARTICULAR MEDICATION HE'S TAKING, HE WOULD HAVE TO BE DETOXED

2     FROM IT IF HE'S TAKING IT ON A REGULAR BASIS.  SO I CAN HAVE

3     THE DOCTOR COME UP AND EXPLAIN EXACTLY WHICH ONE OR IF YOU WANT

4     TO HAVE THE DOCTORS TALK, WE CAN COME UP WITH A PLAN.

5            THE COURT:  ONE MEDICATION TODAY WAS MODIFIED BY HIS

6     COUNSEL INDICATING THAT, AND WE ASKED THAT THE PRESENTENCE

7     REPORT BE MODIFIED INDICATING THAT HIS DOSAGE ON A PARTICULAR

8     MEDICATION HAD GONE UP, SEROQUEL.

9            MS. KLEIN:  CORRECT.  WE DON'T ISSUE SEROQUEL PER SE AT

10    THE MCC, BUT WE WOULD GIVE HIM A MEDICATION THAT'S COMPARABLE

11    TO IT.

12           THE COURT:  WE HAVE NOW -- IN TALKING ABOUT OTHER

13    MEDICATIONS THAT COULD BE SUBSTITUTED, WE ARE NOW OUT OF MY

14    REALM, AND MAYBE THE DOCTOR WHO CAME WITH YOU WOULD LIKE TO

15    SPEAK WITH THE DOCTOR HERE.

16           DR. FONTE:  I WOULD LIKE IT, DOCTOR, IF WE COULD

17    CONVERSE.

18           THE COURT:  MAYBE WE CAN DO THAT OFF THE RECORD AND

19    THEN WE COULD COME BACK AND WE COULD SEE IF WE'VE ACCOMPLISHED

20    SOMETHING.

21           WOULD THAT BE BENEFICIAL, DOCTORS?

22           DR. FONTE:  THAT WOULD BE HELPFUL.

23           THE COURT:  VERY GOOD.  LET US KNOW WHEN YOU'RE READY.

24    TAKE FIVE, 10 MINUTES.  SHOULDN'T TAKE TOO LONG.

25           MR. YOUNG:  WE'LL JUST NOTIFY YOU ONCE THEY'RE DONE

```
 1      CONFERRING.

 2              THE COURT:  YES.

 3              MR. BELIVEAU, WE NEGLECTED TO GIVE YOU AT THE TIME OF

 4      SENTENCING COPIES OF THE CONDITIONS THAT I IMPOSED, SIR, AND

 5      THAT PAPERWORK IS IMPORTANT FOR YOU TO KEEP.

 6              THE DEFENDANT:  THANK YOU, YOUR HONOR.

 7              THE COURT:  YOU'RE WELCOME.

 8      (COURT WAS AT RECESS.)

 9              THE COURT:  GO AHEAD, MS. CARMICHAEL.

10              MS. CARMICHAEL:  YOUR HONOR, THE DOCTORS HAVE CONFERRED

11      IN THIS MATTER AND IT APPEARS THAT FOUR OF THE FIVE MEDICATIONS

12      THAT MR. BELIVEAU TAKES WILL BE DISCONTINUED; HOWEVER, HE WILL

13      BE HOSPITALIZED TO -- DURING THAT PERIOD WHERE HE IS OFF OF HIS

14      MEDICATION FOR OBSERVATION, BUT THEY SIMPLY DO NOT -- ARE NOT

15      ON THE FORMULARY AND NOT PRESCRIBED IN THE WAY THAT MR.

16      BELIVEAU NEEDS.

17              THE COURT:  AND THAT WOULD BE THE CASE TODAY OR

18      SIX WEEKS FROM TODAY?

19              MS. CARMICHAEL:  THAT'S CORRECT.

20              MR. PLETCHER:  I THINK THE RECOMMENDATION BY EVERYBODY

21      NOW IS TO TAKE HIM INTO CUSTODY TO API, THE PSYCHIATRIC

22      FACILITY, RUN OR CONTRACTED BY THE BUREAU OF PRISONS, AND THERE

23      THEY CAN WEAN HIM FROM CERTAIN OF THE MEDICATIONS.  THEY CAN DO

24      AN ASSESSMENT.  AND THEY ALSO HAVE PERSONNEL WHO ARE TRAINED.

25      IT'S A HOSPITAL SPECIFICALLY FOR THESE PURPOSES.
```

```
1              THE COURT:  WHERE IS THAT?

2              MR. PLETCHER:  IT'S IN LA MESA.  THIS IS THE BUREAU OF

3    PRISONS' CONTRACTED FACILITY FOR WHICH THEY DO ANY NUMBER OF

4    THIS TYPE OF WORK.

5              THE COURT:  WOULD HE STAY THERE PENDING DESIGNATION TO

6    THE FACILITY NEAR YORK, PENNSYLVANIA?

7              MR. PLETCHER:  I THINK HE WOULD STAY THERE UNTIL THEY

8    HAVE COMPLETED THE DETOXIFICATION AND ASSESSMENT, AND IF THEY

9    CLEAR HIM FROM ANY RISK OF HARM TO HIMSELF, THEN HE WOULD BE

10   SENT BACK TO MCC PENDING DESIGNATION.  THE AMOUNT OF TIME THAT

11   HE SPENDS AT API IS UNCERTAIN.  IT DEPENDS ON THE DOCTOR'S

12   EVALUATION.

13             THE COURT:  LET ME JUST ASK THE DOCTOR WHO IS HERE WITH

14   MR. BELIVEAU.  SIR, ARE YOU SATISFIED WITH THE SITUATION IN

15   PLACING HIM AT THE API FACILITY?

16             DR. FONTE:  I WOULDN'T USE THE WORD "SATISFIED."  AS

17   WAS MENTIONED, THE BUREAU OF PRISONS HAS THIS FORMULARY AND

18   THEY WOULD WITHDRAW SEVERAL OF THE MEDICATIONS.  I FEEL

19   SATISFIED HE'LL BE IN A PSYCHIATRIC FACILITY THAT WILL ENSURE

20   HIS SAFETY, WHICH IS MY PRIME CONCERN.

21             THE COURT:  AND THAT WAS PART OF THE REASON WE NEEDED

22   SO MUCH TO SEE YOU, MS. KLEIN, AND THE PHYSICIAN FROM YOUR

23   FACILITY.

24             DR. FONTE:  CAN I ASK A QUESTION OF THE DOCTOR?

25             THE COURT:  OF COURSE.
```

1          DR. FONTE:  DR. NOLTE, DOES HE HAVE TO COME TO YOUR

2     FACILITY FIRST TO BE ADMITTED TO THE HOSPITAL?  I BELIEVE

3     THAT'S THE PROTOCOL.

4          DR. NOLTE:  YES.

5          DR. FONTE:  SO WE'LL SEND HIM TO YOUR FACILITY AND YOU

6     CAN EVALUATE HIM, AND THEN DO YOU THINK HE CAN BE ADMITTED THIS

7     EVENING IF THERE'S A BED AVAILABLE?

8          DR. NOLTE:  THAT IS WHAT WE WOULD RECOMMEND, AND --

9          THE COURT:  WAIT, WAIT, WAIT.  IF THIS IS SUPPOSED TO

10     BE ON THE RECORD, COME FORWARD, DOCTOR, AND STATE YOUR NAME FOR

11     THE RECORD BECAUSE I DON'T THINK YOU'VE ENTERED AN APPEARANCE.

12          DR. NOLTE:  I'M MICHELLE NOLTE.  I'M ONE OF THE STAFF

13     PHYSICIANS AT MCC.

14          OUR STANDARD PROTOCOL FOR PATIENTS WHO ARE TAKING

15     MEDICATIONS THAT ARE ADDICTIVE, THAT WILL REQUIRE A

16     DETOXIFICATION AND OBSERVATION PERIOD FOR DETOX, AND FOR ANY

17     SUICIDE RISK ASSESSMENT, IS TO HAVE THEM ADMITTED TO ALVARADO

18     PARKWAY INSTITUTE, WHICH IS THE PSYCHIATRIC HOSPITAL WE HAVE A

19     CONTRACT WITH.

20          PEOPLE PROCEED TO MCC.  THEY ARE ALL EVALUATED BY A

21     LICENSED MEDICAL PROFESSIONAL, WHETHER IT IS A REGISTERED NURSE

22     OR A NURSE PRACTITIONER OR A PHYSICIAN ASSISTANT OR A

23     PHYSICIAN, PRIOR TO BEING REFERRED OUT.

24          THE COURT:  OKAY.

25          DR. NOLTE:  AND WE WOULD RECOMMEND THAT ADMISSION IS

```
 1        THE SAME DAY.
 2                THE COURT:  OKAY.  YES, DOCTOR.
 3                DR. FONTE:  IN OUR NECK OF THE WOODS --
 4                THE COURT:  I CAN'T HEAR YOU.
 5                DR. FONTE:  IN OUR AREA, ADMITTING SOMEBODY TO A
 6        PSYCHIATRIC HOSPITAL IS DIFFICULT BECAUSE OF A LACK OF BEDS.
 7        MY QUESTION IS, IF THEY DON'T HAVE BEDS AT THAT FACILITY, IS
 8        THERE A BACKUP FACILITY THAT YOU USE OR WHAT WOULD HAPPEN IF
 9        THEY SAID, "WE DON'T HAVE ANY BEDS"?
10                MS. KLEIN:  IT'S MY IMPRESSION THAT -- I'M NOT AWARE OF
11        ANY BED SHORTAGE AT API RIGHT NOW.  I KNOW WE JUST TODAY HAD
12        TWO INMATES RELEASED FROM API TO BE ADMITTED INTO THE PRISON,
13        SO I REALLY DON'T BELIEVE THAT THAT WILL BE AN ISSUE.
14                DR. FONTE:  OKAY.
15                THE COURT:  THANK YOU.
16                SO WITH THAT INFORMATION, YOUR CLIENT, MS. CARMICHAEL,
17        WANTS TO CONTINUE WITH HIS REQUEST TO SELF-SURRENDER FORTHWITH?
18                MS. CARMICHAEL:  YES, YOUR HONOR.
19                THE COURT:  SO I THINK THAT CONCLUDES OUR INQUIRY.
20                I REALLY WANT TO THANK THE DOCTOR AND MS. KLEIN FOR
21        COMING, AND THANK YOU, DOCTOR, FOR BEING HERE ON BEHALF OF MR.
22        BELIVEAU BECAUSE I THINK WE'VE TAKEN CARE OF THAT ISSUE AS BEST
23        WE CAN.
24                THANK YOU.  WE'LL BE IN RECESS.
25                MR. PLETCHER:  THANK YOU, YOUR HONOR.
```

1          MR. HOVAKIMIAN:  THANK YOU, YOUR HONOR.

2          THE COURT:  THANK YOU.

3      (THE SENTENCING CONCLUDED.)

4

5

6

7

8

9

10

11                  C E R T I F I C A T E

12

13          I, GAYLE WAKEFIELD, CERTIFY THAT I AM A DULY
      QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED
14    STATES DISTRICT COURT, THAT THE FOREGOING IS A TRUE AND
      ACCURATE TRANSCRIPT OF THE PROCEEDINGS AS TAKEN BY ME IN THE
15    ABOVE-ENTITLED MATTER ON OCTOBER 14, 2016; AND THAT THE FORMAT
      USED COMPLIES WITH THE RULES AND REQUIREMENTS OF THE UNITED
16    STATES JUDICIAL CONFERENCE.

17

18    DATED:  NOVEMBER 1, 2016      /S/ GAYLE WAKEFIELD
                                    GAYLE WAKEFIELD, RPR, CRR
19                                  OFFICIAL COURT REPORTER

20

21

22

23

24

25